## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "**Agreement**") is made and entered into as of _____, 2013 (the "**Execution Date**"), by and between NATURAL PORK PRODUCTION II, LLP, an Iowa limited liability partnership, its designees and assigns (collectively the "**Seller**"), and AMVC CRAWFORDSVILLE, LLC, an Iowa limited liability company, its designees and assigns (the "**Purchaser**").

## RECITALS

A.      Seller is engaged in the business of owning a tract of land located in Clinton County, Indiana, and conducting pork production operations thereon (the "**Business**");

B.      Purchaser, through its affiliate AMVC Management Services, LLC ("**Management**"), is currently operating the Business and the Owned Real Estate pursuant to the certain Swine Production Management Agreement dated as of October 2, 2009, between Seller and Management; and

C.      Purchaser desires to purchase the Acquired Assets and assume the Assumed Obligations from Seller, and Seller desires to sell, convey, assign and transfer to Purchaser the Acquired Assets together with the Assumed Obligations, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with sections 105, 363, 365, 1123 and 1146 and/or other applicable provisions of Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101-1330 (the "**Bankruptcy Code**"); and

D.      The Acquired Assets and Assumed Obligations shall be purchased and assumed by Purchaser pursuant to a bankruptcy Sale Order, approving such sale, free and clear of all Liens, Claims and Liabilities (as defined herein), except the Assumed Obligations (as defined herein), pursuant to sections 105, 363, 365 and 1146 of the Bankruptcy Code, which order will include the authorization for the assumption by Seller and assignment to Purchaser of the Assumed Contracts thereunder in accordance with section 365 of the Bankruptcy Code, all as and if applicable, and in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

## ARTICLE I.  DEFINITIONS AND RULES OF CONSTRUCTION

**Definitions**.  Unless otherwise defined herein, terms used herein shall have the meanings set forth below:

"Acquired Assets" means all of the direct and indirect right, title and interest of Seller in and to the following assets:

(a)  all of Seller's rights and obligations under the Assumed Contracts,

(b)  all of the Intellectual Property used exclusively in connection with the Business;

(c)  all Equipment;

(d)  all prepaid expenses incurred or paid by Seller prior to the Closing other than any prepaid expenses related to Seller's insurance policies and prepaid Taxes;

(e)  all Inventory as of the Closing;

(f)  the Owned Real Estate;

(g)  all books and records of the Business, including customer and supplier lists and related customer and supplier information;

(h)  all Permits to the extent transferable, used exclusively in connection with the Business and necessary for Purchaser to operate the Business or to perform its obligations under the Assumed Contracts after the date of this Agreement;

(i)  all goodwill and general intangibles associated with the assets, properties and rights of Seller to the extent they relate primarily to the Business, and all of Seller's rights (both legal and equitable) to protect its rights and interests with respect to the Business to the extent they relate primarily to the Acquired Assets and the Assumed Obligations; and

(j)  all rights, recoveries, refunds, counterclaims, rights to offset, choses in actions, rights under all warranties, representations and guarantees made by suppliers of products, materials or equipment or components thereof, other rights and claims (whether known or unknown, matured or unmatured, contingent or accrued) against third parties resulting from, arising out of or otherwise with respect to any of the Acquired Assets or Assumed Obligations.

"Affiliate" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities or otherwise.

"Agreement" means this Asset Purchase Agreement, including all the Exhibits and the Schedules hereto, as the same may be amended from time to time in accordance with its terms.

"Allocation" shall have the meaning set forth in Section 10.01(b) hereof.

"Assignment and Assumption Agreement" shall have the meaning set forth in Section 3.02(b) hereof.

"Assumed Contracts" means, collectively, any Contracts of Seller that Purchaser designates in writing to Seller as "Assumed Contracts" in accordance with the process set forth in Section 2.02 hereof.

"Assumed Obligations" means only the Claims, Liens or Liabilities arising under the Assumed Contracts, in each case to the extent such Claims, Liens or Liabilities arise during and relate only to the periods on or after the Closing Date and the Permitted Exceptions.

"Auction" means any auction conducted by Seller pursuant to the Bidding Procedures Order and Section 6.05 hereof.

"Bankruptcy Code" shall have the meaning set forth in the Recitals.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Iowa.

"Bidding Procedures" means the procedures outlined in the Bidding Procedures Order.

"Bidding Procedures Order" means an Order entered by the Bankruptcy Court in a form satisfactory to Seller and Purchaser.

"Bill of Sale" shall have the meaning set forth in Section 3.02 hereof.

"Business" shall have the meaning set forth in the Recitals.

"Business Day" means a day other than Saturday, Sunday or other day that banks located in Iowa or Indiana are authorized or required by Law to close.

"Chapter 11 Case" means Case No. 12-02872-11 now pending before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code.

"Claim" has the meaning contained in Bankruptcy Code §101(5), including, without limitation, all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, rights of first refusal, obligations, and liabilities of any kind or nature under contract, at Law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"Closing" shall have the meaning set forth in Section 3.01 hereof.

"Closing Date" shall have the meaning set forth in Section 3.01 hereof.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Contract" means any agreement, contract, commitment or other binding arrangement or understanding, whether written or oral.

"Cost and Expense Reimbursement" shall have the meaning set forth in Section 9.02.

"Cure Payments" means any cure payment (pursuant to section 365 of the Bankruptcy Code) due by Seller, and required by the Bankruptcy Court to be paid by Seller at Closing, in order to cure any default with respect to any Acquired Assets or Assumed Obligations.

"Deed" shall have the meaning set forth in Section 3.02 hereof.

"Deposit" shall have the meaning set forth in Section 2.04 hereof.

"Disapproved Items" shall have the meaning set forth in Section 6.10(a) hereof.

"Dollars" or "$" means dollars of the United States of America.

"Equipment" means, collectively, all machinery, fixtures, furniture, supplies, accessories, materials, equipment, parts, automobiles, trucks, vehicles, office equipment, computers, servers, telephones, and all other items of tangible personal property items that are owned, leased or otherwise used by Seller or otherwise used in the Business and located at Seller's facility in Colfax, Indiana or at other sites in Clinton County, Indiana.

"Escrow Holder" means First American Title Insurance Company.

"Execution Date" shall have the meaning set forth in the Preamble to the Recitals hereto.

"Exhibits" means the exhibits attached hereto.

"Governmental Authority" means any United States federal, state or local or any foreign government, governmental regulatory or administrative authority, agency or commission or any court, tribunal or judicial or arbitral body.

"Intellectual Property" means all (i) patents, patent applications, registrations, patent disclosures and all related continuations, continuations-in-part, divisions, reissues, and reexaminations, utility models, certificates of invention and design patents, and all improvements thereon and extensions thereof, (ii) trademarks, service marks, trade dress, logos, slogans, corporate names, trade names, domain names, and other designations of source, origin, sponsorship, endorsement or certification, together with the goodwill associated with any of the foregoing, and all applications and registrations therefore, (iii) copyrights and registrations and applications therefore, together with all translations, adaptations, derivations and combinations therefore, works of authorship, publications, website content, and moral rights, (iv) confidential and proprietary information, including, without limitation, trade secrets, concepts, ideas, recipes, research and development, financial, marketing and business data, pricing and cost information, business and marketing plans, algorithms, know-how, formulae, inventions (whether or not patentable), processes, techniques, technical data, designs, drawings, specifications, databases, and customer and supplier lists and information, (v) computer programs, software, including any and all software implementations of algorithms, hardware, models and methodologies, whether in source code or object code, operating systems, design documents, website code, operating systems and specifications, flow-charts, user manuals and training materials relating thereto and any translations thereof, (vi) other proprietary or contract rights or rights of publicity relating to any of the foregoing (including remedies against infringements thereof and rights of protection of interest therein under the laws of all jurisdictions), and (vii) copies and tangible embodiments of any and all of the foregoing.

"IP Assignments" shall have the meaning set forth in Section 3.02(e).

"Inventory" means all finished goods inventory, goods-in-transit, raw materials and work-in-process and packaging materials including, without limitation, the items described on Schedule 4.03(b).

"Knowledge of Seller" shall mean the actual knowledge of Seller and its principal officers, together with such knowledge that such persons would reasonably be expected to discover after due investigation concerning the matter in question.

"Law" means any law, statute, regulation, ruling, or Order of, administered or enforced by or on behalf of, any Governmental Authority.

"Legal Proceeding" means any action, suit, proceeding, claim, opposition, challenge, charge or arbitration by or before any Governmental Authority.

"Liability" means any liability or obligation (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, and due or to become due and regardless of when asserted), including, without limitation, any liability for Taxes.

"Lien" or "Liens" means any charge, claim, lien, option, encumbrance, mortgage, pledge, security interest, conditional sale agreement or other title retention agreement, finance lease, security agreement, right of first refusal, option, restriction, tenancy, license, covenant, right of way or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or Law of any jurisdiction) on property.

"Material Adverse Effect" means any change or event that has had or would reasonably be likely to have a material adverse effect on the assets, liabilities, operations or condition (financial or otherwise) of Seller, the Acquired Assets or the Business, other than the Chapter 11 Case.

"Order" means any decree, order, injunction, rule, judgment, consent of or by any Governmental Authority.

"Owned Real Estate" means those certain parcels of land legally described on the attached Schedule 4.06(a), together with all rights interests appurtenant thereto and the buildings and improvements thereon.

"Permits" means all certificates of occupancy or other certificates, permits, authorizations, filings, approvals and licenses possessed by Seller, or through which Seller has rights, that are used, useable or useful in the operation of the Business or the use or enjoyment or benefit of the Acquired Assets.

"Permitted Exceptions" means title exceptions (a) that have arisen from or in connection with any act or omission of Purchaser or its Affiliates, (b) that have arisen from or in connection with any Assumed Obligation or (c) as otherwise expressly provided in this Agreement or that Purchaser has otherwise expressly approved in writing.

"<u>Person</u>" means any corporation, partnership, joint venture, limited liability company, organization, entity, authority or natural person.

"<u>Petition Date</u>" means December 7, 2012.

"<u>Purchase Price</u>" shall have the meaning set forth in Section 2.03 hereof.

"<u>Purchaser</u>" shall have the meaning set forth in the Preamble to the Recitals.

"<u>Purchaser Default Termination</u>" shall have the meaning set forth in <u>Section 9.01(b)</u> hereof.

"<u>Real Property Leases</u>" shall have the meaning set forth in Section 4.06 hereof.

"<u>Rule</u>" or "<u>Rules</u>" means the Bankruptcy Rules (defined above).

"<u>Sale Order</u>" means an order entered by the Bankruptcy Court in form and substance satisfactory to Purchaser in the exercise of its sole discretion, authorizing Seller to sell the Acquired Assets to Purchaser pursuant to this Agreement and sections 105, 363 and 365 of the Bankruptcy Code, free and clear of all Liens, Claims, Liabilities and interests other than the Assumed Obligations.

"<u>Schedules</u>" means the schedules attached hereto.

"<u>Seller</u>" shall have the meaning set forth in the Preamble to the Recitals hereto.

"<u>Tax</u>" and, with correlative meaning, "<u>Taxes</u>" mean with respect to any Person all federal, state, local, county, foreign and other taxes, charges, fees, duties, customs, levies and other assessments, including, without limitation, any income, alternative or add-on minimum tax, estimated gross income, gross receipts, sales, use, value added, transfer, capital stock franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real and personal), abandoned property, escheat, environmental or windfall profit tax, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority responsible for the imposition of any such tax (domestic or foreign).

"<u>Tax Return</u>" means any report, return, declaration, claim for refund or other information or statement supplied or required to be supplied by Seller relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"<u>Title Policy</u>" shall have the meaning set forth in Section 6.10 hereof.

"<u>Transaction Documents</u>" means this Agreement, the Assignment and Assumption Agreement, the Bill of Sale, the Deed and all other agreements, instruments, certificates and other documents to be entered into or delivered by any party in connection with the transactions contemplated to be consummated pursuant to this Agreement.

"<u>WARN Act</u>" means the Worker Adjustment and Retraining Notification Act and any rules or regulations as have been issued in connection therewith.

**Rules of Construction**.   Unless the context otherwise clearly indicates, in this Agreement, (a) the singular includes the plural, (b) "includes" and "including" are not limiting, (c) "may not" is prohibitive and not permissive; and (d) "or" is not exclusive.

## ARTICLE II.    PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES

**Section 2.01   Purchase and Sale of Acquired Assets**.   On the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell, convey, assign, transfer and deliver to Purchaser, and Purchaser shall purchase, acquire and take assignment and delivery of, for the consideration specified in <u>Section 2.03</u>, all of the Acquired Assets, free and clear of all Liens, except Assumed Obligations.

**Section 2.02   Assignment and Assumption of Assumed Obligations**.   Subject to the terms and conditions set forth in this Agreement, at the Closing, Purchaser shall assume from Seller, and thereafter be solely responsible for the payment, performance or discharge, of only the Assumed Obligations.   Prior to or promptly following the Execution Date, Seller has made or shall make available to Purchaser unredacted, complete and accurate copies of all Contracts related to the Business and the Acquired Assets.   Prior to the later of (i) five Business Days of the Execution Date or (ii) five (5) Business Days of Purchaser's actual receipt of an unredacted, complete and accurate copy of any Contract, Purchaser shall either reject such Contract or designate such Contract as an Assumed Contract and by written notice to Seller ("**Purchaser Contract Notice**").   Purchaser's final assumption of any Assumed Contract identified in a Purchaser Contract Notice is expressly conditioned on the satisfactory correction, at or prior to Closing, of any identified defects, as provided in of Section 7.02.   No Contract shall be an Assumed Contract unless and until Purchaser sets forth such Contract in a Purchaser Contract Notice.   Purchaser will not assume or have any responsibility with respect to any other Claim, Lien or Liability not included within the definition of Assumed Obligations, including without limitation any Claims, Liens or Liabilities related to (a) Taxes, (b) the employment (or the termination of employment) of any employees of Seller including WARN Act obligations or any unpaid wages or other compensation to such employees, (c) claims of any vendor of Seller, (d) any Claim, Lien or Liability related to Seller's employee benefit plans, (e) the operation of the Business or the Acquired Assets prior to the Closing, or (f) any brokerage fees or commissions. It is expressly understood and agreed that the Parties intend that Purchaser shall not be considered a successor to Seller by reason of any theory of law or equity, and that neither Purchaser nor its Affiliates shall assume any Claim, Lien or Liability of Seller or any of its Affiliates, except for the Assumed Obligations.

**Section 2.03   Purchase Price**. The aggregate purchase price for the Acquired Assets payable at the Closing (the "**Purchase Price**") shall be (i) **$1,700,000.00**, less (ii) the Deposit, plus (iii) the assumption of the Assumed Obligations.

**Section 2.04   Deposit.** On or before the end of the three (3) Business Days following the Execution Date, Purchaser shall deliver to Escrow Holder $**50,000.00** (the "**Deposit**").   The Deposit shall become payable to Seller upon the earlier of (a) the Closing, or (b) a Purchaser Default Termination.   The Deposit shall become payable to Purchaser upon the termination of this Agreement other than pursuant to a Purchaser Default Termination.   If the Deposit becomes payable to Seller by reason of a Purchaser Default Termination, the Seller shall, subject to such notice and cure procedures as are set forth in <u>Section 9.01(b)</u>, have the right to retain the Deposit. If the Deposit becomes payable to Purchaser, Escrow Holder shall, within five (5) Business Days

after receiving demand therefor from Purchaser, release and disburse the Deposit to an account designated by Purchaser. Upon request from Escrow Holder, Seller and Purchaser shall enter into Escrow Holder's standard form of escrow agreement. Each of Seller and Purchaser shall be liable for one half of all fees owed to the Escrow Holder.

**Section 2.05**   **Post-Closing Use and Assignment of Contracts**.  With respect to any Contract that is not an Assumed Contract as of the Closing Date, and provided that such Contract is still in effect and has not been rejected by Seller pursuant to section 365 of the Bankruptcy Code, Seller shall be authorized to, and shall, reject any such Contract without further notice to Purchaser.  In the event Purchaser provides notice to Seller that it does not intend to assume any Contract prior to the Closing Date, Seller shall be authorized to reject such Contract upon receipt to of such notice.

# ARTICLE III.   CLOSING

**Section 3.01**   **Closing**.   Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, the closing of the transaction contemplated by this Agreement (the "**Closing**") will take place through an escrow closing arrangement with Escrow Agent (or in such other manner and at such location as agreed to by the parties in writing), prevailing local time, no later than the fifth (5th) Business Day after entry of the Sale Order, provided that the conditions set forth in ARTICLE 7 and ARTICLE 8 of this Agreement have been satisfied or waived; or on such other date or place as Purchaser and Seller may mutually agree upon in writing (the "**Closing Date**").   If agreed by the parties, Closing shall be conducted by the delivery and exchange of all Transaction Documents by UPS, FedEx or other recognized overnight courier and/or by facsimile or electronic transmission in "PDF" or a comparable electronic format with hard copies to follow.  This transaction shall be considered closed upon the delivery of all Transaction Documents and receipt by Seller of all funds then due from Purchaser.  All actions to be taken at the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously on the Closing Date, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such acts, documents and transactions have been taken, delivered or effected.

**Section 3.02**   **Deliveries by Seller**.  At the Closing, Seller shall deliver or cause to be delivered to Purchaser:

(a)   a bill of sale with respect to the Acquired Assets, substantially in the form attached hereto as Exhibit A (the "**Bill of Sale**"), duly executed by Seller;

(b)   one or more assignments and assumptions of the Assumed Obligations, substantially in the form attached hereto as Exhibit B (collectively, the "**Assignment and Assumption Agreement**"), duly executed by Seller;

(c)   a recordable general warranty deed (the "**Deed**"), duly executed by Seller and conveying title to the Owned Real Estate in conformity with this Agreement, free and clear of all exceptions, except Permitted Exceptions;

(d)   the Title Policy;

(e)        Intellectual Property assignments, in form and substance satisfactory to Purchaser (the "**IP Assignments**"), duly executed by Seller;

(f)        evidence in form and substance satisfactory to Purchaser and via Order of the Bankruptcy Court of the release of all Claims, Liens and Liabilities, except Assumed Obligations, with respect to the Acquired Assets;

(g)        a copy of the Bidding Procedures Order and the Sale Order;

(h)        duly executed statutory and regulatory consents and approvals which are required by Law, and all other necessary consents and approvals of third parties or Affiliates of Seller to the transactions contemplated hereby;

(i)        all other agreements, records and other documents required by this Agreement; and

(i)        all such other instruments of conveyance and related affidavits as shall, in the reasonable opinion of Purchaser, be necessary to vest in Purchaser good, valid and marketable title to the Acquired Assets, including time-stamped instruments and releases, in form and substance satisfactory to Purchaser, evidencing release and removal of any Claims, Liens and Liabilities, except Assumed Obligations, on the Acquired Assets.

**Section 3.03    Deliveries by Purchaser**.  At the Closing, Purchaser shall deliver or cause to be delivered to Seller (a) the Purchase Price, less the Deposit, (b) the Assignment and Assumption Agreement, duly executed by Purchaser, and (c) all other agreements, records and other documents required by this Agreement.

ARTICLE IV.        <u>REPRESENTATIONS AND WARRANTIES OF SELLER</u>

Seller represents and warrants to Purchaser as of the Execution Date and as of the Closing Date as follows:

**Section 4.01    Organization and Standing**.    Seller is a limited liability partnership duly organized, validly existing and in good standing under the Laws of the State of Iowa.

**Section 4.02    Authorization and Power**.    Subject to any necessary authorization from the Bankruptcy Court, Seller has all requisite power and authority to own, lease and operate the Owned Real Estate, to carry on the Business as now being conducted and to execute and deliver the Transaction Documents to which it is a party and to perform its obligations thereunder.  The execution and delivery by Seller of this Agreement has been, and the other Transaction Documents to which Seller is a party will be, duly and validly authorized by all partnership action on the part of Seller.  This Agreement has been duly executed and delivered by Seller, all other Transaction Documents will be duly executed and delivered by Seller at or prior to the Closing, and, subject to any necessary authorization from the Bankruptcy Court, all Transaction Documents to which Seller is a party constitute, or will constitute, as the case may be, the valid and binding agreements of Seller, enforceable against Seller in accordance with their terms.

**Section 4.03    Title to Assets**.  Seller has good, valid, marketable and undivided title to, or a valid leasehold interest in, as applicable, the Acquired Assets.  Subject to Bankruptcy Court

approval and except as otherwise provided herein, Seller has the power and the right to sell, convey, assign and transfer, and Seller will sell, convey, assign, transfer and deliver to Purchaser, and Purchaser will be vested with good, valid, marketable and undivided title to, the Acquired Assets, free and clear of all Claims, Liens and Liabilities, except the Assumed Obligations. Schedule 4.03(a) attached hereto is a true, complete and correct list of all the Equipment.

**Section 4.04    Contracts**.

(a) Schedule 4.04(a) attached hereto sets forth a list of all Contracts to which Seller is a party or which otherwise relate to the Business or bind the Acquired Assets.  Seller has delivered, or will deliver pursuant to Section 2.02, true, complete and correct copies of each Contract required to be listed on Schedule 4.04(a).

(b) Except as set forth on Schedule 4.04(b), each Contract is in full force and effect and is valid, binding and enforceable in all material respects in accordance with its terms, (ii) Seller has complied with and is in compliance with, and to the Knowledge of Seller, all other parties thereto have complied with and are in compliance with, the provisions of each Contract in all material respects, (iii) Seller is not, and to Knowledge of Seller, no other party thereto is, in default in the performance, observance or fulfillment of any obligation, covenant, condition or other term contained in any Contract, and Seller has not given or received notice to or from any Person relating to any such alleged or potential default that has not been cured and (iv) no event has occurred which with or without the giving of notice or lapse of time, or both, has resulted in or is reasonably likely to result in a violation or breach of, or give any Person the right to exercise any remedy under or accelerate the maturity or performance of, or cancel, terminate or modify, any Contract.

(c) Except for defaults that can be cured through the Cure Payments or defaults arising solely as a consequence of the commencement of the Chapter 11 Case, neither Seller nor, to the Knowledge of Seller, any other party thereto is in default or breach in any material respect under the terms of any Contract.  To the Knowledge of Seller, Schedule 4.04(c) sets forth a true, complete and correct list of all Cure Payments as of the Execution Date.

(d) Subject to the necessary authorization of the Bankruptcy Court, each Assumed Contract is assignable by Seller to Buyer without the consent or approval of any Person and will continue to be legal, valid, binding and enforceable immediately following the Closing, in accordance with the terms thereof as in effect immediately prior to the Closing.  To the Knowledge of Seller, Schedule 4.04(d) sets forth a true, complete and correct list of all consent or approval requirements existing under any Contract as of the Execution Date.

**Section 4.05    Intellectual Property**.  Schedule 4.05 attached hereto sets forth all registered and unregistered Intellectual Property (including registration applications) that Seller owns and uses exclusively in the operation of the Business as presently conducted.  All Intellectual Property disclosed on Schedule 4.05 is valid, subsisting and enforceable, and Seller owns or otherwise holds valid rights to use such Intellectual Property. In the conduct of the Business, Seller is not infringing, violating or misappropriating any Intellectual Property of any Person in any material respect. No suit, action, reissue, reexamination, interference, arbitration, mediation, opposition, cancellation or other proceeding to which Seller is a party is pending concerning any claim or position that Seller has violated, in the conduct of the Business, any Intellectual Property of

10

another Person, nor, to the Knowledge of Seller, has any such suit or other Legal Proceeding been threatened in writing. To the Knowledge of Seller, no Person is infringing, violating or misappropriating any Intellectual Property disclosed on Schedule 4.05 in any material respect.

**Section 4.06    Real Property**.  The only Owned Real Estate held by Seller is listed on Schedule 4.06(a) attached hereto.  The only leasehold interests in real property held by Seller are listed on Schedule 4.06(b) attached hereto (the "**Real Property Leases**").  A true, complete and correct copy of the Real Property Leases have been delivered or made available to Purchaser.  Except for the Real Property Leases and the Owned Real Estate, Seller does not occupy or have any interest in any other real property.

**Section 4.07    Affiliate Transactions**.  Except as set forth in Schedule 4.07 attached hereto, (a) there are no Contracts, understandings or transactions, between Seller on the one hand and Seller or any other of its Affiliates on the other hand that relate to the Business or the Acquired Assets and (b) there are no services provided to the Business by Seller's Affiliates that will be necessary in order to continue operation of the Business after the Closing as it is presently conducted.

**Section 4.08    Noncontravention**. As of Closing, upon entry of the Bidding Procedures Order and the Sale Order, neither the execution and delivery by Seller of this Agreement or any of the Transaction Documents to which Seller will be a party nor the consummation by Seller of the transactions contemplated hereby or thereby will (a) conflict with or violate any provision of the charter, by-laws or governing documents of Seller, (b) require on the part of Seller or any of its Affiliates any material notice to or filing with, or any material permit, authorization, consent or approval of, any Governmental Authority, (c) conflict with, result in a breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any Person the right to terminate, modify or cancel, or require any notice, consent or waiver under, any Assumed Contract, (d) result in the imposition of any Lien upon any of the Acquired Assets or (e) violate any material order, writ, injunction, judgment, decree or Law applicable to Seller or any of its Affiliates or any of their properties or assets.

**Section 4.09    Litigation**.  Except for the Chapter 11 Case, any adversary proceeding filed in the Chapter 11 Case and any motion, application, pleading or order filed in the Chapter 11 Case that relates to this Agreement or the Transaction Documents, the Bidding Procedures Order and/or the Sales Order, there is no Legal Proceeding or, to the Knowledge of Seller any investigation, that is pending or has been threatened in writing that relates in any material respect to the Acquired Assets or in any manner challenges or seeks to prevent, enjoin, alter or delay the transactions contemplated by this Agreement. Except to the extent that it would not subject Purchaser or any of its Affiliates to any liability or restrict the ownership or impair Purchaser's use of the Acquired Assets in any material respect, there is no judgment, order, injunction or decree outstanding against Seller that is related to the Acquired Assets.

**Section 4.10    Brokers.**  Except to the extent authorized by the Bankruptcy Court, Seller has not, directly or indirectly, retained or engaged any Person to act as a broker or finder, or in any similar capacity in connection with the transactions contemplated by this Agreement.

## ARTICLE V. REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as of the Execution Date and as of the Closing Date as follows:

**Section 5.01    Organization, Standing and Power**.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Iowa.

**Section 5.02    Authorization**.  Purchaser has all requisite power and authority to own, lease and operate its properties, and to execute and deliver the Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder.  All Transaction Documents to which Purchaser is a party have been duly executed and delivered by Purchaser, except such Transaction Documents that are required by the terms hereof to be executed and delivered by Purchaser after the date hereof, in which case such Transaction Documents will be duly executed and delivered by Purchaser at or prior to the Closing, and all Transaction Documents to which Purchaser is a party constitute, or will constitute, as the case may be, the valid and binding agreements of Purchaser, enforceable against Purchaser in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general equitable principles.

**Section 5.03    No Conflict or Violation**.  Except to the extent any of the foregoing is not enforceable due to operation of applicable bankruptcy Law or the Sale Order, the execution, delivery and performance of the Transaction Documents and the consummation of the transactions contemplated thereby by Purchaser do not and shall not violate any Law or any provision of the charter or organizational documents of Purchaser.

**Section 5.04    Availability of Funds**.  Simultaneous with the signing of this Agreement, Purchaser shall provide written evidence of its financial capability to consummate the transactions contemplated by this Agreement, which is acceptable to Seller in its sole discretion.  At the Closing, Purchaser shall have cash available which is sufficient to enable it to consummate the transactions contemplated by this Agreement.

**Section 5.05    Brokers.**  Purchaser has not, directly or indirectly, retained or engaged any Person to act as a broker or finder, or in any similar capacity in connection with the transactions contemplated by this Agreement.

**Section 5.06    Management by Purchaser.**  For as long as Seller has owned the Acquired Assets, Purchaser or an Affiliate of Purchaser has been the exclusive manager of the Business.  Subject to Seller's oversight, Purchaser's or its Affiliate's activities and responsibilities as manager have included direct control over the day-to-day business and affairs of the Business, including use and operation of the Acquired Assets.  Purchaser has not taken or failed to take, and has no actual knowledge of, any action, omission or circumstance that would cause any of Seller's representations and warranties in Article IV to be inaccurate or untrue in any material respect.

## ARTICLE VI.        COVENANTS OF PURCHASER AND SELLER; OTHER AGREEMENTS

**Section 6.01**   **Consents and Approvals**.   Seller shall use commercially reasonable efforts to take all actions and to do all things necessary, proper or advisable to consummate the transactions contemplated by this Agreement, including without limitation: (a) to ensure that the deliverables to be provided by it at the Closing are delivered on a timely basis, including entering into and causing its Affiliates to enter into good faith negotiations to reach agreement on the terms of the Transaction Documents to be provided at the Closing, (b) to obtain all necessary consents and approvals to consummate the purchase and sale of the Acquired Assets and the assignment of the Assumed Obligations, together with any other necessary consents and approvals to consummate the transactions contemplated hereby, including, without limitation, obtaining the Bidding Procedures Order and Sale Order, (c) to make all filings, applications, statements and reports to all authorities that are required to be made prior to the Closing Date by or on behalf of Seller or any of their Affiliates pursuant to any applicable Law in connection with this Agreement and the transactions contemplated hereby, and to permit Purchaser to own the Acquired Assets following the Closing and (d) to obtain all required consents and approvals (if any) necessary to assign and transfer Seller's Permits included in the Acquired Assets to Purchaser at Closing.   In the event that certain of Seller's Permits included in the Acquired Assets are not transferable or replacements therefor are not obtainable on or before the Closing, but such Permits are transferable or replacements therefor are obtainable after the Closing, Seller and Purchaser shall continue to cooperate and use such commercially reasonable efforts after the Closing as may be required to obtain all required consents and approvals to transfer, or obtain replacements for, such Permits after Closing and shall do all things necessary to give Purchaser the benefits that would be obtained under such Permits.   Each of the parties shall give any other notices to, make any other filings with, and use reasonable best efforts to obtain, any other authorizations, consents and approvals of any other Governmental Authority in connection with the matters contemplated by this Agreement. This Section 6.01 shall survive the Closing to the extent required to give it its proper and intended effect.

**Section 6.02**   **Access**.   Seller shall, prior to the Closing Date, (a) provide Purchaser and its representatives and agents, upon reasonable written notice and at reasonable times, access to the facilities, offices, personnel, professionals, customers and suppliers of Seller and to all books, records and lists of Seller relating to the Acquired Assets, including, without limitation, (i) all records relating to customers, suppliers or personnel of Seller (including, without limitation, customer and mailing lists) and (ii) all books, ledgers, files, reports, plans, drawings and operating and Tax records of Seller; (b) furnish Purchaser with such financial and operating data and other information with respect to the Business, the Acquired Assets and the Assumed Obligations as Purchaser shall reasonably request; (c) permit Purchaser to make such reasonable inspections and copies thereof as Purchaser may require; and (d) facilitate discussions between Purchaser and Seller's customers, suppliers and other parties with whom Seller conducts business. In the event the transactions contemplated by this Agreement are not consummated, for any reason, Purchaser promptly will return to Seller or destroy all records and information provided to Purchaser from Seller, including, without limitation, all notes and analysis Purchaser may have prepared based thereon, and Purchaser will treat all such records and information as confidential.

**Section 6.03**    **Further Assurances**.

(a)  Seller will use commercially reasonable efforts (i) to obtain the entry of the Bidding Procedures Order on the Bankruptcy Court's docket for the Chapter 11 Case as soon as practicable after the Execution Date; (ii) to hold the Auction no later than thirty (30) days after the date of entry of the Bidding Procedures Order; and (iii) to obtain the entry of the Sale Order on the Bankruptcy Court's docket as soon as practicable thereafter and as permitted by the Bankruptcy Court.

(b)  With respect to each Assumed Contract, to the extent required by the Bankruptcy Court, Purchaser shall provide adequate assurance of the future performance of such Assumed Contract by Purchaser.  Purchaser and Seller shall cooperate and take all commercially reasonable efforts to cause entry of the Bidding Procedures Order and the Sales Order.

(c)  From time to time after the Closing and without further consideration, Seller, (i) upon the reasonable request of Purchaser, shall execute and deliver such documents and instruments of conveyance and transfer as Purchaser may reasonably request in order to consummate more effectively the purchase and sale of the Acquired Assets as contemplated hereby and to vest in Purchaser title to the Acquired Assets transferred hereunder, or to otherwise more fully consummate the transactions contemplated by this Agreement, and (ii) subject to the Sale Order, Purchaser, upon the reasonable request of Seller, shall execute and deliver such documents and instruments of contract or lease assumption as Seller may reasonably request in order to confirm Purchaser's Liability for the Assumed Obligations or otherwise to more fully consummate the transactions contemplated by this Agreement.  This Section 6.03(c) shall survive the Closing to the extent required to give it its proper and intended effect.

(d)  From and after the date hereof, Seller shall not, and shall ensure that none of its Affiliates, take any action or fail to take any action, which action or failure to act would reasonably be expected to prevent or impede the consummation of the transactions contemplated by this Agreement in accordance with the terms of this Agreement. Seller covenants and agrees that the terms of any plan of reorganization or liquidation or proposed order of the Bankruptcy Court that may be filed, proposed or submitted or supported by Seller after entry of the Sales Order or consummation of the transactions contemplated hereby shall not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement, the Bidding Procedures Order or the Sales Order or the rights of Purchaser hereunder or thereunder.  Seller's obligations in the previous sentence shall survive the Closing to the extent required to give them their proper and intended effect.

(e)  Seller shall promptly notify Purchaser of any litigation, arbitration or administrative proceeding pending, or to Knowledge of Seller, threatened against Seller which challenges the transactions contemplated by this Agreement.

**Section 6.04**    **Bankruptcy Actions**.

(a)  As promptly as practicable after the Execution Date, Seller shall file in the Chapter 11 Case a motion, in form and substance reasonably acceptable to Purchaser, seeking the entry of (a) the Bidding Procedures Order and (b) the Sale Order.

(b)  Seller shall not, and shall not file or cause to be filed a motion seeking to, assume or reject any Contract under 11 U.S.C. § 365 without the prior written consent of Purchaser. Within two (2) Business Days of the Execution Date, Seller shall deliver to Purchaser fully-executed copies of each Contract not already in Purchaser's possession.  Within five (5) days of Purchaser's receipt of such Contracts, Purchaser shall deliver to Seller written notice of the Contracts that Purchaser conditionally intends to designate as Assumed Contracts.  Seller shall, as soon as reasonably practicable following entry of the Bidding Procedures Order notify all parties to such Contracts that (i) Seller intends to assume and assign such Contracts to Purchaser, (ii) that it understands that all Cure Payments payable in connection with such assumption and assignment are as set forth in such notice, and (iii) that such parties must file any objection to such assumption and assignment or such Cure Payments by the deadline set forth in the Bidding Procedures Order or else waive and be estopped from any objection to such assumption and assignment or such Cure Payments.   If a counterparty to an Contract indicates orally or in writing that there is a material breach, default or basis for a breach or default under such Contract, Seller shall as soon as it is reasonably practicable inform Purchaser, and Seller shall, and shall cause their Affiliates to, and Purchaser shall cooperate with Seller, to cure such breach or default and resolve such basis for a breach or default prior to the Closing to Purchaser's satisfaction. Seller shall keep Purchaser reasonably informed, including providing copies of correspondence and other material information, on a timely basis, as to the status of Seller's efforts to cure such breach or default or resolve such basis for a breach or default.

(c)  Subject to its obligations as a debtor-in-possession, Seller shall promptly make any filings, take all actions and use all commercially reasonable efforts to obtain any and all relief from the Bankruptcy Court that is necessary or appropriate to consummate the transactions contemplated by this Agreement and the Transaction Documents.

(d)  Seller shall conduct any Auction process in accordance with the Bidding Procedures. Except as permitted by the Bidding Procedures Order or with Purchaser's consent, Seller shall comply with, and shall not amend, waive, modify or supplement, the Bidding Procedures.

(e)  Seller shall promptly notify Purchaser if any party appeals, requests a stay of, or seeks reconsideration of the Bidding Procedures Order or Sale Order and provide Purchaser a copy of any related notices, applications or motions within one (1) Business Day after receipt by Seller.

(f)  Seller and Purchaser shall cooperate, and shall take all steps as may be reasonable and appropriate, in resolving or contesting any objections (including testimony or argument in Bankruptcy Court) to this Agreement, the Bidding Procedures Order or the Sale Order, and Purchaser and Seller shall bear their own costs relating thereto.

(g)  Seller shall not, other than in the ordinary course of business, pay any obligation or liability, in each case related to the Acquired Assets or Assumed Obligations.

(h)  Seller shall not amend its charter, by-laws or other governing documents in a manner that would have a material adverse effect on the transactions contemplated by this Agreement.

(i)    Seller shall not institute or settle any Legal Proceeding related solely to the Acquired Assets or that would reasonably be expected to adversely affect the use of the Acquired Assets after the Closing.

**Section 6.05    Auction Procedures**

**(a)**    Notwithstanding anything to the contrary in this Agreement, the Bidding Procedures as approved by the Bankruptcy Court in the Bidding Procedures Order shall govern the process by which the Seller shall conduct the Auction and ultimate sale of the Acquired Assets.    Subject to approval of the Bankruptcy Court and the final Bidding Procedures Order, the procedures set forth on Exhibit C include the process by which Seller shall conduct, and Purchaser shall participate, in the Auction.    Seller shall commence the Auction on a date that is mutually agreeable to Seller and Purchaser (or, in the absence of such agreement, on a date selected by Seller after consultation with Purchaser).

**(b)**    Purchaser acknowledges that pursuant to the Bidding Procedures Order, Seller will solicit bids from other prospective purchasers for the sale of the Acquired Assets, on terms and conditions substantially the same in all respects to this Agreement and in accordance with the procedures set forth in the Bidding Procedures Order. The sale of the Acquired Assets to Purchaser at the Auction shall be subject to higher or better bids, as determined by Seller in its sole discretion.    Purchaser shall have the right, in its sole discretion, to raise the price for the Acquired Assets (or to otherwise improve its offer contained in this Agreement) at any time until the conclusion of the Auction.    Each such improvement by Purchaser in its bid at the Auction shall constitute an irrevocable and binding amendment to this Agreement.

**Section 6.06    Disclosure Schedules and Supplements**.    Seller shall notify Purchaser in writing of, and shall supplement the Schedules to this Agreement with respect to, any matter that (a) arises after the Execution Date and that, if existing or occurring at or prior to the Execution Date, would have been required to be set forth or described in the Schedules to this Agreement or (b) makes it necessary to correct any information in the Schedules to this Agreement or in any representation and warranty of Seller that has been rendered inaccurate thereby.    Each such notification and supplementation, to the extent known, shall be made no later than three (3) Business Days after discovery thereof.    None of such supplements to the Schedules shall be deemed to cure any inaccuracy of any representation or warranty made in this Agreement with respect to satisfaction of the conditions set forth in ARTICLE 7 or otherwise affect any other term or condition contained in this Agreement.

**Section 6.07    Conduct of Business Prior to Closing**.    Except as expressly contemplated by this Agreement or with Purchaser's prior written consent, the Bankruptcy Code, other applicable Law or any ruling or order of the Bankruptcy Court, during the period from the Execution Date through the Closing:

(a)    Seller shall not directly or indirectly sell or otherwise transfer, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer, any of the Acquired Assets other than as required in the ordinary course of business, but the parties acknowledge that Seller will continue to market the Acquired Assets in an effort to generate qualified bids for the Auction;

(b)  Seller shall not enter into any transaction or take any other action that could be reasonably expected to cause or constitute a material breach of any representation or warranty made by Seller in this Agreement;

(c)  Seller shall notify Purchaser promptly in writing of any Material Adverse Effect;

(d)  Seller shall comply in all material respects with all Laws applicable to it or having jurisdiction over the Business or any Acquired Asset;

(e)  Seller shall not enter into any Contract material to Seller (taken as a whole) to which Seller is a party or by which it is bound and that are used in or related to the Business or the Acquired Assets or assume, amend, modify or terminate any Contract to which Seller is a party or by which it is bound and that are used in or related to the Business or the Acquired Assets (including any Assumed Contract);

(f)  Seller shall use commercially reasonable efforts to (1) conduct the Business in substantially the same manner as conducted as of the date of this Agreement and only in the ordinary course as a debtor in possession, (2) to the best of its ability preserve the existing business organization and management of the Business intact, (3) keep available the services of the current officers and employees of the Business, to the extent reasonably feasible, (4) to the best of its ability maintain the existing relations with customers, distributors, suppliers, creditors, business partners, employees and others having business dealings with the Business, to the extent reasonably feasible, (5) refrain from changing in any material respect any of their product prices or pricing policies (e.g., discount policies) for any of their products except as shall be necessary to meet competition or customer requirements and as commercially reasonable as a debtor in possession, and (6) preserve and protect the Acquired Assets, pay all post-petition Taxes as they become due and payable, and maintain insurance on the Acquired Assets (in amounts and types in the ordinary course of business);

(g)  Seller shall not take, or agree, commit or offer (in writing or otherwise) to take, any actions in violation of the foregoing; and

(h)  Purchaser or its Affiliate shall continue to manage the Business and maintain the Acquired Assets solely in the ordinary course consistent with past practice. Neither Purchaser nor any of its Affiliates shall take or fail to take any action as manager of the Business that would, after Execution Date, create any fact or condition that would, as of the time of such occurrence, constitute a failure on the part of Seller to comply with its representations, warranties and covenants under this Agreement.

**Section 6.08    Casualty**.  If, between the Execution Date and the Closing, any of the Acquired Assets shall be destroyed or damaged in whole or in part by fire, earthquake, flood, other casualty or any other cause ("**Casualty**"), then Purchaser shall have the option to: (a) acquire such Acquired Assets on an "as is" basis and take an assignment from Seller of all insurance proceeds payable to Seller in respect of the Casualty, or (b) in the event that the Casualty would have a Material Adverse Effect, terminate this Agreement and the transactions contemplated hereby and receive a full return of the Deposit.

**Section 6.09    <u>Refunds and Remittances</u>**.  If Seller or any of its Affiliates, on the one hand, or Purchaser or any of its Affiliates, on the other hand, after the Closing Date receives any funds properly belonging to the other party in accordance with the terms of this Agreement, the receiving party will promptly so advise such other party and will promptly deliver such funds to an account or accounts designated in writing by such other party.  This Section 6.09 shall survive the Closing to the extent required to give it its proper and intended effect.

**Section 6.10    <u>Commitment and Title</u>**.

(a)    Seller shall, at its expense, promptly after the Execution Date, obtain a commitment for an owner's policy of title insurance issued by Escrow Holder for the Owned Real Estate (the "**<u>Commitment</u>**").   The Commitment shall show merchantable title in Seller in conformity with this Agreement.  Within twenty (20) Business Days after the later of (i) the Execution Date or (ii) receipt by Purchaser's counsel of the Commitment, a copy of the deed under which Seller obtained title to the Owned Real Property and copies of all documents affecting title to the Owned Real Property (including all documents referenced on Schedule B of the Commitment) (the "**<u>Title Contingency Date</u>**"), Purchaser shall deliver written notice to Seller ("**<u>Purchaser's Commitment Opinion</u>**") of all matters of title to the Owned Real Estate disapproved by Purchaser (the "**<u>Disapproved Items</u>**").  Purchaser's failure to deliver Purchaser's Commitment Opinion by the Title Contingency Date shall be deemed to be Purchaser's approval of title to the Owned Real Estate.  Purchaser will have no right, under any circumstances, to identify any of the Permitted Exceptions as Disapproved Items.  If Purchaser timely notifies Seller of Disapproved Items, and any of the Disapproved Items are not cured within thirty (30) days of such notification (the "**<u>Cure Deadline</u>**"), Purchaser may terminate this Agreement and promptly receive a full return of the Deposit by written notice to Seller within not later than ten (10) Business Days of the Cure Deadline. If Purchaser does not timely terminate this Agreement, any uncured Disapproved Items shall be deemed to be Permitted Exceptions and Purchaser shall be deemed to have waived its right to terminate this Agreement pursuant to this Section.  Any encumbrances that are not Disapproved Items shall become Permitted Exceptions.   At Closing, Seller shall cause Escrow Holder to deliver to Purchaser an owner's policy of title insurance in an amount equal to the Purchase Price (the "**<u>Title Policy</u>**") for the Owned Real Estate, which shall be subject only to the Permitted Exceptions. Seller shall pay the premium for Title Policy and Purchaser shall pay for the costs for any endorsements to the Title Policy.

(b)    At the Closing, Seller shall deliver to Escrow Holder the returns, questionnaires, certificates, sales disclosure forms, affidavits and other documents required in connection with the payment (or non-payment) of any real property transfer taxes and other similar taxes and fees imposed by the state, county or municipality in which the Owned Real Estate is located in connection with the transactions contemplated hereby (collectively, the "**<u>RE Tax Returns</u>**").  If the procedures required by the state, county, or municipality require that any RE Tax Returns be filed, reviewed or approved prior to the Closing Date, Purchaser and Seller shall complete, sign and swear to the RE Tax Returns and deliver the same to Escrow Holder for delivery to the appropriate authority sufficiently in advance of the Closing Date so as to permit the sale contemplated hereby to be consummated by the Closing Date.

(c)    Seller and Purchaser shall enter into a closing statement at Closing setting forth all

closing credits and prorations (if any) and Seller and Purchaser shall enter into any and all customary conveyance and closing documents as are reasonable and appropriate for the closing transactions.

**Section 6.11    Prorations and Other Payment Obligations**.

(a)    Property Taxes, Operating Expenses and Rent Prorations.

(i)    Taxes. All actual real estate and personal property taxes, and all assessments in each case payable by Seller with respect to the Acquired Assets, for the calendar year in which the Closing Date occurs shall be prorated between Seller and Purchaser as of the Closing Date (with Seller being responsible for such taxes through and including the Closing Date and Purchaser being responsible for such taxes from and after the Closing Date). If the actual amount of taxes or assessments payable by Seller is not known on the Closing Date, the parties shall prorate same on the basis of the amount of taxes assessed against Seller for the preceding tax year applicable to the Acquired Assets, and such amount shall be adjusted between the parties when the actual amount of taxes and assessments is known to Purchaser and Seller.

(ii)    Utility Charges, Etc. Utility charges, rents and fees, if any, shall be prorated as of the Closing Date. Purchaser and Seller will cooperate to attempt to transfer all utility services for the Acquired Assets to Purchaser, and charges for any services so transferred shall be prorated as of the Closing Date, but if any such services cannot be transferred to Purchaser such that Purchaser must open a new account, Seller may close its account and shall be responsible for payment through the Closing Date.

(iii)    Income and Expenses. All receipts from the Acquired Assets, and all expenses relating to the Acquired Assets, shall be prorated on a daily basis between Seller and Purchaser as of the Closing Date (with Seller being entitled to receipts, and responsible for expenses, through and including the Closing Date, and Purchaser being entitled to receipts, and responsible for expenses, from and after the Closing Date). If the actual amount of any expense is not known on the Closing Date, it shall be prorated on the basis of the most recently available bill and then the parties shall make the appropriate adjustments promptly when accurate information becomes available and either party shall be entitled to an adjustment to correct the same, provided that it makes written demand on the one from whom it is entitled to such adjustment within one  (1) year after the Closing Date. Any corrected adjustment or proration shall be paid in cash to the party entitled thereto.

(b)    Closing Costs. Seller shall before or simultaneously with Closing pay the following costs: (a) the cost of obtaining and/or updating the Commitment and the premium for the Title Policy (but not the fees for any endorsements to the Title Policy) (b) Seller's attorneys' fees and all of the costs of recording all documents and instruments required to clear title in Seller and any other ordinary and reasonable closing costs and expenses which are the responsibility of Seller under this Agreement, (c) all sales, excise, documentary, real estate conveyance and transfer taxes applicable to the sale which are

imposed by any Governmental Authority, and (d) all Cure Payments attributable to Assumed Contracts.  Purchaser shall pay the costs of recording the Deed and all documents or instruments required by Purchaser's lender and Purchaser's attorneys' fees associated with the sale.  It is agreed that at time of settlement, funds of the Purchase Price may be used to pay Liens as may be necessary to comply with the requirements of this Agreement.

(c)   <u>State and Local Transfer Taxes</u>.  In addition to the foregoing, and in accordance with Section 1146(c) of the Bankruptcy Code, the making or delivery of any instrument to evidence, effectuate, or perfect the rights, transfers, and conveyances contemplated by this Agreement shall be in contemplation of and necessary to a plan or plans of reorganization to be confirmed in the Chapter 11 Case and, as such, shall be free and clear of any and all Taxes and any such instrument shall contain an endorsement to that effect.  In the event that, notwithstanding the foregoing, any state or local transfer taxes are assessed on the transfer of the Acquired Assets to Purchaser, such Taxes shall be paid by Seller, and Seller shall complete and file all returns associated therewith.

(d)   This <u>Section 6.11</u> shall survive the Closing to the extent required to give it its proper and intended effect.

### ARTICLE VII.        CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser under this Agreement are subject to satisfaction, or waiver at the option of Purchaser, of the following conditions precedent on or before the Closing Date.

**Section 7.01    Representations and Warranties; Covenants**.

(a)   All of Seller's representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), shall have been accurate in all material respects as of the Execution Date, and shall be accurate in all material respects as of the time of the Closing as if then made, without giving effect to any update to the Schedules.

(b)   Each of the representations and warranties of Seller in this Agreement that contains an express materiality qualification, shall have been accurate in all respects as of the Execution Date of this Agreement, and shall be accurate in all respects as of the time of the Closing as if then made, without giving effect to any update to the Schedules.

(c)   All of the covenants and obligations that Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), shall have been duly performed and complied with in all material respects.

**Section 7.02    Correction of Defects in Assumed Contracts and Title to Acquired Assets**.

(a)   Seller shall have corrected any and all defects in the Assumed Contracts and any and all defects in title to the Acquired Assets (other than Owned Real Estate, which shall be covered by Section 6.10) identified by Purchaser, to the sole satisfaction of Purchaser.

(b) There shall be no material impairment of any rights of Seller under any of the Assumed Contracts as of the Closing Date.

**Section 7.03   Bankruptcy Court Approval**.  The Sale Order, in form and substance reasonably satisfactory to Seller and Purchaser, shall have been entered by the Bankruptcy Court and shall not have been stayed.  The Sale Order shall: (i) approve the sale, transfer and assignment of the Acquired Assets to Purchaser upon the terms and conditions set forth herein, free and clear of any and all Liens, Claims and Liabilities of any kind or nature whatsoever except as specifically described herein and except, in the case of the Owned Real Estate, the Permitted Exceptions, (ii) contain findings based on evidence presented that (A) the Purchaser is a good faith purchaser pursuant to section 363 of the Bankruptcy Code and is entitled to the protections afforded thereunder; (B) due and adequate notice and an opportunity to be heard in accordance with all applicable law were given to all creditors and interested parties in the Chapter 11 Case, and any and all other affected or interested parties, including, but not limited to, all federal, state and local taxing authorities and (C) nothing related to or arising out of this Agreement or the Sale Order shall cause Purchaser to be deemed to be in control of Seller, or to be acting as a "responsible person" with respect to the operation and management of Seller, either prior to or after the Closing; (iii) authorize the assumption by and assignment to Purchaser pursuant to Section 365 of the Code of the Assumed Contracts; and (iv) reject all other Contracts that are not Assumed Contracts.  To the extent that, as of the Execution Date, Seller is not a party to any Contracts which relate to the Business or bind the Acquired Assets, Seller shall have caused such Contracts to be assigned to Seller and to shall have received from the assignor representations and warranties substantially similar to those set forth in Section 4.04, which shall expressly be for the benefit of Purchaser.  Notwithstanding anything herein to the contrary, there shall be no default under this Agreement if the failure to obtain authorization of such assignment is due to the Purchaser not providing adequate assurance of future performance.  Seller shall not amend in any material respect the Contracts, without the consent of the Purchaser, which shall not be unreasonably withheld.

**Section 7.04   No Proceedings**.  No Legal Proceeding shall have been commenced by any Person to enjoin, restrict or prohibit the Closing, which has not, by the Closing Date, been dismissed, quashed or permanently stayed without any further right of appeal.

**Section 7.05   Closing Deliveries**.  Seller shall have delivered to Purchaser all of the closing deliveries set forth in Section 3.02.

**Section 7.06   Real Property Leases**.  Purchaser shall have received an estoppel certificate from each owner of the real property subject to the Real Property Leases, each in form and content reasonably satisfactory to the Purchaser.

## ARTICLE VIII.        CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

**Section 8.01**   The obligations of Seller under this Agreement are subject to satisfaction, or waiver at the option of Seller, of the following conditions precedent on or before the Closing Date.

**Section 8.02    Representations and Warranties; Covenants**.

(a)   All of Purchaser's representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), shall have been accurate in all material respects as of the Execution Date, and shall be accurate in all material respects as of the time of the Closing as if then made, without giving effect to any update to the Schedules.

(b)   Each of the representations and warranties of Purchaser in this Agreement that contains an express materiality qualification, shall have been accurate in all respects as of the Execution Date of this Agreement, and shall be accurate in all respects as of the time of the Closing as if then made, without giving effect to any update to the Schedules.

(c)   All of the covenants and obligations that Purchaser is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), shall have been duly performed and complied with in all material respects.

**Section 8.03    Bankruptcy Court Approval**.  The Sale Order in form and substance reasonably satisfactory to Seller and Purchaser shall have been entered by the Bankruptcy Court and shall not have been stayed.

**Section 8.04    No Proceedings**.   No Legal Proceeding shall have been commenced by any Person to enjoin, restrict or prohibit the Closing, which has not, by the Closing Date, been dismissed, quashed or permanently stayed without any further right of appeal.

**Section 8.05    Closing Deliveries**.   Purchaser shall have delivered to Seller the other closing deliveries set forth in Section 3.03.

## ARTICLE IX.        TERMINATION; TERMINATION PAYMENT

**Section 9.01    Termination**.   This Agreement may be terminated prior to the Closing as follows:

(a)   by mutual written agreement of Purchaser and Seller;

(b)   by either Purchaser or Seller (provided that the terminating party is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if there shall have been a material breach or misrepresentation of any of the representations or warranties or a material breach of any of the covenants set forth in this Agreement on the part of the other party, which breach would give rise to the failure of the condition set forth in ARTICLE VII or ARTICLE VIII, as applicable, and such breach is not cured within ten (10) days following written notice to the party committing such breach or which breach, by its nature, cannot be cured prior to the Closing (with respect to Seller's right to terminate, a "**Purchaser Default Termination**");

22

(c)   by Purchaser, if the Auction shall not have commenced by the date that is forty-five (45) days after the date of entry of the Bidding Procedures Order;

(d)   by Purchaser or Seller if the Bankruptcy Court, acting pursuant to the Bidding Procedures Order, enters an order approving any proposal (other than by Purchaser or its Affiliates) relating to any merger, consolidation, business combination, transfer, sale or other disposition of a substantial or material portion of the Acquired Assets pursuant to one or more transactions (including, without limitation, by way of a foreclosure or plan of reorganization or liquidation);

(e)   by Purchaser on any day on or after the sixtieth (60th) day following the Execution Date if the Closing shall not have been consummated by such date (or by such later date as shall be mutually agreed to by Purchaser and Seller in writing), provided that as of the date of such termination by Purchaser the conditions set forth in Section 8.02 are satisfied;

(f)   by Purchaser, if (i) prior to the Closing, the Chapter 11 Case shall have been converted to a case under chapter 7 of the Bankruptcy Code or dismissed;

(g)   by Purchaser, if there shall be excluded from the Acquired Assets any Assumed Contract that is not assignable or transferable under the Bankruptcy Code or otherwise without the consent of any person other than Seller, to the extent such consent shall not have been given prior to the Closing and such Assumed Contract shall, in the opinion of Purchaser in its sole discretion, prevent it from effectively operating the Business utilizing any Acquired Asset; and

(h)   by Purchaser (provided that Purchaser is not then in material breach of any representation, warranty, covenant or other agreement contained herein) if it shall have reasonably determined that one or more conditions set forth in ARTICLE 7 has not been or cannot be reasonably fulfilled or satisfied prior to the date specified in such condition or within a commercially reasonable time thereafter (if such condition specifies a date other than the Closing Date by which such condition must be satisfied).

**Section 9.02   Cost and Expense Reimbursement**.  If the transactions contemplated hereby are not consummated for any reason other than a Purchaser Default Termination, (i) Seller shall, after the conclusion of the Auction, pay (in cash) to Purchaser a fixed fee of  **$50,000.00**, intended to cover opportunity costs incurred by Purchaser in pursuing and negotiating this Agreement, as wells as the expenses incurred by Purchaser in connection with this Agreement and the transactions contemplated herein ("**Cost and Expense Reimbursement**") and (ii) the Escrow Holder shall disburse the Deposit to Purchaser in accordance with Section 2.04.  The Cost and Expense Reimbursement will be paid out of proceeds of a sale to a higher successful bidder that is approved by the Court, provided that, as of the date specified for the return of the Deposits in the Bidding Procedures, the conditions set forth in Section 8.02 are satisfied.  Seller's obligation to pay the Cost and Expense Reimbursement pursuant to this Section 9.02 shall constitute an administrative expense (which shall be a super-priority administrative expense claim senior to all other administrative expense claims) of Seller under section 364(c) of the Bankruptcy Code.  The Cost and Expense Reimbursement is intended solely to benefit AMVC Crawfordsville, LLC, as Purchaser, and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any other Person, including without limitation

any Person asserting a right of first refusal to purchase the Acquired Assets pursuant to any Contract.

**Section 9.03**    **Effect of Termination or Breach**.  If the transactions contemplated hereby are not consummated:  (a) this Agreement shall become null and void and of no further force and effect, except (i) for this Section 9.03, (ii) for the provisions of Sections 2.04, 9.02 and Article XI (except Sections 11.13, 11.14 and 11.15), hereof, and (iii) that the termination of this Agreement for any cause shall not relieve any party hereto from any Liability for intentional breach which at the time of termination had already accrued to any other party hereto or which thereafter may accrue in respect of any act or omission of such party prior to such termination; and (b) the return of the Deposit, as well as the payment of the Cost and Expense Reimbursement, if required under Section 9.02, shall be the sole and exclusive remedy (as liquidated damages) of Purchaser, except with respect to claims arising out of or in connection with an intentional breach by Seller of any agreement or covenant in this Agreement.  Except for a claim of Purchaser for the Cost and Expense Reimbursement, any claims arising out of or in connection with any Seller intentional breach shall be treated as follows: (i) if the breach occurs prior to entry of the Sale Order or other order entered by the Bankruptcy Court approving this Agreement (as it may be otherwise amended or modified), then such claims shall be treated as unsecured claims in the Chapter 11 Case, and (ii) if the breach occurs at any time after entry of the Sale Order or other order entered by the Bankruptcy Court approving this Agreement (as it may otherwise be amended or modified), then such claims shall be treated as expenses of administration under 11 U.S.C. § 503(b)(1) of Seller's bankruptcy estate.

## ARTICLE X.   POST-CLOSING TAX MATTERS

**Section 10.01 Tax Matters**.

(a)   Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges which may be payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Obligations under this Agreement or the transactions contemplated herein shall be borne and timely paid by Seller and Seller shall indemnify, defend (with counsel reasonably satisfactory to Purchaser), protect, and save and hold Purchaser harmless from and against any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such Taxes.

(b)   Purchaser shall, within the later of (i) 120 days after the Closing Date or (ii) 30 days prior to the date by which Seller's federal income Tax Returns must be filed, prepare and deliver to Seller a schedule allocating the Purchase Price among the Acquired Assets (such schedule, the "**Allocation**").  Purchaser and Seller shall report and file all Tax Returns consistent with the Allocation, and shall take no position contrary thereto or inconsistent therewith (including, without limitation, in any audits or examinations by any Governmental Authority or any other proceeding).  Purchaser and Seller shall cooperate in the filing of any forms (including Form 8594 under section 1060 of the Code) with respect to such Allocation, including any amendments to such forms required pursuant to this Agreement with respect to any adjustment to the Purchase Price.

(c)   Notwithstanding any other provision of this Agreement, the terms and provisions of Section 10.01(b) shall survive the Closing without limitation.

## ARTICLE XI.          MISCELLANEOUS

**Section 11.01 Expenses**.  Except otherwise set forth herein and as may be covered by the Cost and Expense Reimbursement, each party hereto shall bear its own costs and expenses, including attorneys' fees, with respect to the transactions contemplated hereby.

**Section 11.02 Amendment**.  This Agreement may not be amended, modified or supplemented except by a written instrument signed by Seller and Purchaser.

**Section 11.03 Notices**.  Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given, (a) when received if given in person, (b) on the date of transmission if sent by facsimile or e-mail, (c) upon delivery, if delivered by a nationally known commercial courier service providing next day delivery service, or (d) upon delivery, or refusal of delivery, if deposited in the U.S. mail, certified or registered mail, return receipt requested, postage prepaid.  Unless another address is specified in writing, any notice, request, instruction or other documents given to the parties to this Agreement shall be sent to the addresses indicated below:

*To Purchaser:*

AMVC Crawfordsville, LLC
Attn: Steve Schmitz, DVM
508 Market Street
Audubon, IA 50025
Tel: (712 563-2080
Email: sschmitz@amvcms.com

*With a copy to:*

Baird Holm LLP
Attn: Sylvester J. Orsi, Esq.
1700 Farnam Street
Suite 1500
Omaha, NE 68102-2068
Tel: (402) 344-0500
Email: sorsi@bairdholm.com

*To Seller:*

Natural Pork Production II, LLP
Attn: Lawrence Handlos, Managing Partner
PO Box 468
Harlan, Iowa  51537

*With copy to:*

Davis, Brown, Koehn, Shors & Roberts, P.C.
Attn: John Pietila, Esq.
215 10th Street, Suite 1300

Des Moines, IA 50309
Email: johnpietila@davisbrownlaw.com

*With additional copy to:*

Bradshaw, Fowler, Proctor & Fairgrave, P.C.
Attn: Jeffrey Goetz, Esq.
801 Grand Avenue, Suite 3700
Des Moines, IA  50309
goetz.jeffrey@bradshawlaw.com

*With additional copy to:*

Bose McKinney & Evans, LLP
Attn:  Gary Chapman
111 Monument Circle, Suite 2700
Indianapolis, IN  46204
gchapman@boselaw.com

**Section 11.04 <u>Waivers</u>**.    The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same.  No waiver by a party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing by Seller or Purchaser, as applicable, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach of other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

**Section 11.05 <u>Counterparts and Execution</u>**.  This Agreement may be executed simultaneously in counterparts, each of which shall be deemed an original, all of which together shall constitute one and the same instrument.  Any such counterpart, to the extent delivered by means of a.pdf, .tif, .gif, .jpeg or similar attachment to an electronic mail message, shall be treated in all manner and respects as an original executed counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

**Section 11.06 <u>Headings</u>**.  The headings preceding the text of the Articles and Sections of this Agreement and the Schedules are for convenience only and shall not be deemed part of this Agreement.

**Section 11.07 <u>SUBMISSION TO JURISDICTION</u>**.    THE PARTIES HEREBY AGREE THAT ANY AND ALL CLAIMS, ACTIONS, CAUSES OF ACTION, SUITS, AND PROCEEDINGS RELATING TO THIS AGREEMENT OR THE OTHER AGREEMENTS CONTEMPLATED HEREIN SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND THE PARTIES HEREBY CONSENT TO THE JURISDICTION OF SUCH COURT.

**Section 11.08 <u>Governing Law; Jurisdiction</u>**.  This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Indiana (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code or other applicable federal Law.  For so long

as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.

**Section 11.09  Binding Nature; Assignment**.   Upon the approval of this Agreement by the Bankruptcy Court, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other parties (which shall not be unreasonably withheld or delayed), except:  (a) the rights and interests of Seller hereunder may be assigned to a trustee appointed under Chapter 7 of the Bankruptcy Code; (b) this Agreement may be assigned to any entity appointed as a successor to Seller pursuant to a confirmed Chapter 11 plan; (c) Purchaser may transfer and assign this Agreement and the rights, interest and obligations hereunder to one or more of its Affiliates; and (d) as otherwise provided in this Agreement.  Seller hereby agrees that the terms of this Agreement shall be binding upon any subsequent trustee appointed under Chapter 7 of the Bankruptcy Code.

**Section 11.10  No Third Party Beneficiaries**.  This Agreement is solely for the benefit of the parties hereto and nothing contained herein, express or implied, is intended to confer on any Person other than the parties hereto or their successors and permitted assigns, any rights, remedies, obligations, claims, or causes of action under or by reason of this Agreement.

**Section 11.11  Construction**.  The language used in this Agreement will be deemed to be the language chosen by the parties to this Agreement to express their mutual intent, and no rule of strict construction shall be applied against any party.  Any reference to any federal, state, local or foreign Law shall be deemed also to refer to all rules and Laws promulgated thereunder, unless the context requires otherwise.

**Section 11.12  Entire Understanding**.  This Agreement, the Exhibits and the Schedules set forth the entire agreement and understanding of the parties hereto in respect to the transactions contemplated hereby and the Agreement, the Exhibits and the Schedules supersede all prior agreements, arrangements and understandings relating to the subject matter hereof and are not intended to confer upon any other Person any rights or remedies hereunder.

**Section 11.13  Closing Actions**.  All deliveries, payments and other transactions and documents relating to the Closing shall be interdependent, and none shall be effective unless and until all are effective (except to the extent that the party entitled to the benefit thereof has waived in writing satisfaction or performance thereof as a condition precedent to the Closing).

**Section 11.14  Conflict Between Transaction Documents**.   The parties hereto agree and acknowledge that to the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of any other Transaction Document referred to herein, this Agreement shall govern and control.

**Section 11.15  Waiver of Warranties; Indemnity Regarding Environmental Matters**.

(a)     PURCHASER ACKNOWLEDGES THAT IS HAS INSPECTED THE ACQUIRED ASSETS AND THAT IT HAS HAD AN OPPORTUNITY TO CONDUCT SUCH DUE DILIGENCE AS IT CONSIDERS NECESSARY AND APPROPRIATE WHEN

EVALUATING A TRANSACTION OF THE TYPE DESCRIBED HEREIN. PURCHASER ACKNOWLEDGES AND AGREES IT IS A SOPHISTICATED PURCHASER OF AGRICULTURAL REAL ESTATE, AGRI-BUSINESSES, AND LIVESTOCK AND THAT IT IS RELYING ON ITS SKILL AND EXPERTISE IN EVALUATING THIS TRANSACTION AND NOT THE SKILL AND EXPERTISE OF SELLER. IT IS UNDERSTOOD AND AGREED THAT SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER (EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT), EXPRESSED OR IMPLIED, WITH RESPECT TO THE BUSINESS OR THE ACQUIRED ASSETS, INCLUDING BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE (OTHER THAN AS SET FORTH IN THE DEED), TAX CONSEQUENCES, OR ANY OTHER MATTER OR THING REGARDING THE ACQUIRED ASSETS.  PURCHASER ACKNOWLEDGES AND AGREES THAT UPON CLOSING, SELLER SHALL SELL AND CONVEY TO PURCHASER, AND PURCHASER SHALL ACCEPT, EXCEPT AS SET FORTH IN THIS AGREEMENT, THE ACQUIRED ASSETS "AS IS, WHERE IS, WITH ALL FAULTS". PURCHASER HAS NOT RELIED AND WILL NOT RELY ON, AND SELLER IS NOT LIABLE FOR OR BOUND BY, ANY EXPRESSED OR IMPLIED WARRANTIES, GUARANTEES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE ACQUIRED ASSETS OR RELATING THERETO MADE OR FURNISHED BY SELLER, EXCEPT AS SET FORTH IN THIS AGREEMENT.

(b)     PURCHASER SHALL INDEMNIFY AND HOLD HARMLESS SELLER AND SELLER'S AGENTS, EMPLOYEES, PARTNERS AND REPRESENTATIVES FROM ANY AND ALL CLAIMS ARISING OUT OF COMPLIANCE WITH APPLICABLE FEDERAL, STATE AND LOCAL REQUIREMENTS FOR CONFINED FEEDING OPERATIONS (CFOS) AND CONCENTRATED ANIMAL FEEDING OPERATIONS (CAFOS), INCLUDING, BUT NOT LIMITED TO, SUCH LIABILITIES ARISING PURSUANT TO ENVIRONMENTAL LAWS OR THE USE OR PRESENCE OF HAZARDOUS MATERIALS IN, AT, ABOUT OR UNDER THE OWNED REAL ESTATE. THE FOREGOING INDEMNITY SHALL BE IN ADDITION TO ANY OTHER INDEMNITY UNDER THIS AGREEMENT AND INCLUDES, WITHOUT LIMITATION, ANY DAMAGES ARISING FROM ACTS AND OMISSIONS OCCURRING BEFORE CLOSING, INCLUDING ANY FAILURE OF COMPLIANCE WITH ANY FEDERAL, STATE, OR LOCAL LAW PRIOR TO CLOSING. PURCHASER ACKNOWLEDGES AND AGREES THAT IT HAS HAD SUFFICIENT TIME AND OPPORTUNITY TO EVALUATE THE RISKS DESCRIBED IN THIS SECTION AND EXPLICITLY AGREES TO THE ALLOCATION OF RISK SET FORTH IN THIS SECTION.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed and delivered on the date first above written.

**SELLER:**

NATURAL PORK PRODUCTION II, LLP,
an Iowa limited liability partnership

By:    _____
Name:  _____
Title: _____

**PURCHASER:**

AMVC CRAWFORDSVILLE, LLC
an Iowa limited liability company

By:    _____
Name:  _____
Title: _____

Schedules:

Schedule 4.03(a) – Equipment
Schedule 4.03(b) – Inventory
Schedule 4.04(a) – Contracts
Schedule 4.04(b) – Contract Exceptions
Schedule 4.04(c) – Known Cure Payments
Schedule 4.04(d) – Known Consent Requirements
Schedule 4.05 – Intellectual Property
Schedule 4.06(a) – Owned Real Property
Schedule 4.06(b) – Real Property Leases
Schedule 4.07 – Affiliate Contracts

Exhibits:

Exhibit A – Form of Bill of Sale
Exhibit B – Form of Assignment and Assumption Agreement
Exhibit C – Auction and Bidding Procedures

Schedule 4.03(a)
(Equipment)

[See attached]

<u>Schedule 4.03(b)</u>
(Inventory)

None

<u>Schedule 4.04(a)</u>
(Contracts)

1. That certain Grower Agreement dated September 21, 2009, but executed on October 7, 2009, between Seller and Indiana Packers Corporation, as amended by a document dated June 23, 2009, but executed on October 7, 2009.

2. That certain Manure Lease Agreement dated July 24, 2006, between Seller and Infinity Pork, LLC.

3. Swine Production Management Agreement dated October 2, 2009, between Seller and AMVC Management Services, LLC.

4. Land Application Agreement dated December 5, 2008, between NPPII and Denny and Joanie Keiser.

5. Land Application Agreement dated December 15, 2008, between NPPII and James O. Emmert.

6. Land Application Agreement dated December 15, 2008, between NPPII and Stephen G. Emmert.

7. Land Application Agreement dated December 15, 2008, between NPPII and Michael J. Emmert.

8. Land Application Agreement dated December 15, 2008, between NPPII and Michael J. Emmert and Stephen Emmert.

Schedule 4.04(b)
(Contract Exceptions)

None

<u>Schedule 4.04(c)</u>
(Known Cure Payments)

None

<u>Schedule 4.04(d)</u>
(Known Consent Requirements)

1.  That certain Grower Agreement dated September 21, 2009, but executed on October 7, 2009, between Seller and Indiana Packers Corporation, as amended by a document dated June 23, 2009, but executed on October 7, 2009.
    - Assignment of this Contact requires consent of the counterparty

Schedule 4.05
(Intellectual Property)

<u>Schedule 4.06(a)</u>
(Legal Description of Owned Real Estate)

## TRACT 1

A part of the fractional Northwest quarter, also a part of the fractional Southwest quarter, all in Section 6, Township 20 North, Range 2 West of the Second Principal Meridian, more particularly described as follows:

Begin at the southwest corner of Lot Number 3 of the Original Government Survey, marked by a wooden headpost; proceed thence (1) North 0 degrees 12 minutes 14 seconds East (assumed bearings) a distance of 642.27 feet along the west line of said Lot Number 3 to the westerly prolongation of the approximate centerline of a County Road, marked by a railroad spike; thence (2) North 0 degrees 10 minutes 29 seconds East a distance of 33.35 feet along said west line to a railroad spike; thence (3) South 89 degrees 00 minutes 29 seconds West a distance of 351.10 feet to an iron bar; thence (4) North 0 degrees 10 minutes 29 seconds East a distance of 167.72 feet to an iron bar; thence (5) South 89 degrees 00 minutes 29 seconds West a distance of 236.91 feet to an iron bar; thence (6) South 0 degrees 12 minutes 14 seconds West a distance of 838.62 feet to the Old Thorntown Indian Reserve Line marked by an iron bar; thence (7) North 89 degrees 28 minutes 03 seconds East a distance of 588.03 feet along said Reserve Line to the point of beginning, containing 10.00 acres, and being the tract shown on the survey by Ronald E. Wharry, recorded October 13, 1992 as Instrument No. 92- 5525 in the Office of the Recorder of Clinton County, Indiana.

## TRACT 2

A part of the SW 1/4, Sec. 6, T2ON, R2W,2nd P.M., Perry Township, Clinton County, Indiana, more particularly described as follows:

From the SW corner of Lot Number 3 in the Original Government Survey, marked by the SE corner of a wooden headpost, proceed thence S 89 degrees 28 minutes 03" W (assumed bearings) a distance of 588.03 feet along the Old Thorntown Indian Reserve Line to the point of beginning, marked by an iron bar; thence (1) continue on said line a distance of 139.55 feet to the NW corner of said Reserve, marked by the NE corner of a wooden headpost; thence (2) S 00 degrees 02 minutes 52" E a distance of 900.00 feet along the west line of said Reserve to an iron bar; thence (3) S 89 degrees 28 minutes 03" W a distance of 500.00 feet to an iron bar; thence (4) N 00 degrees 02 minutes 52" W a distance of 950.00 feet to an iron bar; thence (5) N 89 degrees 28 minutes 03" E a distance of 639.77 feet to an iron bar; thence (6) S 00 degrees 12 minutes 14" W a distance of 50.00 feet to the point of beginning, containing 11.064 acres.

## TRACT 3

A part of the SW 1/4, Sec. 6, T2ON, R2W, 2nd P.M., Perry Township, Clinton County, Indiana, more particularly described as follows: From the SW corner of Lot Number 3 in the Original

Government Survey, marked by the SE corner of a wooden headpost, proceed thence S 89 degrees 28' 03" W (assumed bearings) a distance of 727.58 feet along the Old Thorntown Indian Reserve Line to the NW comer of said Reserve, marked by the NE corner of a wooden headpost; thence S 00 degrees 02' 52" E a distance of 900.00 feet along the west line of said Reserve to the point of beginning, marked by an iron bar; thence (1) continue on said line a distance of 50.00 feet; thence (2) S 89 degrees 28' 03" W a distance of 735.00 feet to an iron bar; thence (3) N 00 degrees 02' 52" W a distance of 1000.00 feet to an iron bar; thence (4) N 89 degrees 28' 03" E a distance of 235.00 feet; thence (5) S 00 degrees 2' 52" E a distance of 950.00 feet; thence (6) N 89 degrees 28' 03" E a distance of 500.00 feet to the point of beginning, containing 5.9686 acres.

## TRACT 4

A part of the Fractional Southwest Quarter and Northwest Quarter, Section 6, Township 20 North, Range 2 West of the Second Principal Meridian, more particularly described as follows:

Begin at the Northwest corner of said fractional Southwest Quarter, marked by the Southwest corner of a wooden headpost, proceed thence (1) South 0 degrees 19 minutes 49 seconds East (assumed bearings) a distance of 1562.89 feet along the West line of said fractional Southwest Quarter to an iron bar; thence (2) North 89 degrees 28 minutes 03 seconds East a distance of 171.38 feet; thence (3) North 0 degrees 02 minutes 52 seconds West a distance of 1,000.00 feet to an iron bar; thence (4) North 89 degrees 28 minutes 03 seconds East a distance of 874.77 feet to an iron bar; thence (5) North 0 degrees 12 minutes 14 seconds East a distance of 788.59 feet to an iron bar; thence (6) South 89 degrees 00 minutes 19 seconds West a distance of 1059.03 feet to the West line of said Northwest Quarter, marked by an iron bar; thence (7) South 0 degrees 28 minutes 15 seconds East a distance of 217.07 feet along the West line of said Northwest Quarter to the point of beginning, containing 22.982 acres.

## TRACT 5

To the extent not described above, that certain tract of land identified as Tax Parcel No. 121306100003000013 in the records of the Office of the County Assessor, Clinton County, Indiana.  To the extent such tract is not legally described above, a separate legal description shall be confirmed in connection with the title process under Section 6.10.

<u>Schedule 4.06(b)</u>
(Real Property Leases)

1.  That certain Manure Lease Agreement dated July 24, 2006, between Seller and Infinity
    Pork, LLC.
    -   This lease is for the sole purpose of waste management and the spreading and
        disposal of animal waste on the leased premises

(Schedule 4.07)
(Affiliate Transactions)

None

**<u>EXHIBIT A</u>**
**(Form of Bill of Sale)**


BILL OF SALE

NATURAL PORK PRODUCTION II, LLP, an Iowa limited liability partnership, hereinafter referred to as "Grantor," for and in consideration of the sum of $1,700,000 and other good and valuable consideration to it in hand paid by AMVC CRAWFORDSVILLE, LLC, an Iowa limited liability company, hereinafter referred to as "Grantee," the receipt and sufficiency of which is hereby acknowledged, does hereby BARGAIN, SELL, GRANT, CONVEY AND TRANSFER and by these presents has BARGAINED, SOLD, GRANTED, CONVEYED AND TRANSFERRED unto the said Grantee, its successors and assigns , all of the direct and indirect right, title, and interest of Grantor in and to the Acquired Assets. For purposes of this Bill of Sale, the "Acquired Assets" include the assets which Seller has agreed to sell, and which Grantee has agreed to purchase, pursuant to that Asset Purchase Agreement entered into by and between the parties on March __, 2013 (the "APA"), including without limitation all property and assets of Grantor that integrally belongs or is part of the Owned Real Estate (as defined in the APA), whether attached or detached, and which is necessary for operation of the Business (as defined in the APA).

**TO HAVE AND TO HOLD the same, unto the said Grantee, its successors and assigns forever. Grantor does hereby warrant title to the Acquired Assets (if at all) only to the extent of the terms in the APA, and covenants and agrees to and with Grantee, its successors and assigns to defend the Acquired Assets hereby sold unto Grantee, its successors and assigns, against all claims by persons who lawfully claim any interest in the Acquired Assets by, through or under Grantor, but not otherwise, all to the extent (if any) of the terms in the APA.**

Grantor covenants and agrees to take all steps reasonably necessary to establish the record of Grantee's title to the Acquired Assets and, at the request of Grantee, to execute and deliver further instruments of transfer and assignment and take such other action as Grantee may reasonably request to more effectively transfer and assign to and vest in Grantee each of the Acquired Assets, all at the sole cost and expense of Grantee. Without limiting the generality of the foregoing, Grantor hereby constitutes and appoints Grantee the true and lawful agent and attorney in fact of Grantor, with full power of substitution and re-substitution, in whole or in part, in the name and stead of Grantor but on behalf and for the benefit of Grantee and its successors and assigns, from time to time:

(a)     to demand, receive and collect any and all of the Acquired Assets and to give receipts and releases for and with respect to the same, or any part thereof;

(b)     to institute and prosecute, in the name of Grantor or otherwise, any and all proceedings at law, in equity or otherwise, that Grantee or its successors and assigns may deem proper in order to collect or reduce to possession any of the Acquired Assets and in order to collect or enforce any claim or right of any kind hereby assigned or transferred, or intended so to be; and

(c)     to do all things legally permissible, required or reasonably deemed by Grantee to

be required to recover and collect the Acquired Assets and to use Grantor's name in such manner as Grantee may reasonably deem necessary for the collection and recovery of same,

Seller hereby declaring that the foregoing powers are coupled with an interest and are and shall be irrevocable by Grantor.


EXECUTED THIS _____ day of _____, 2013.

                                NATURAL PORK PRODUCTION II, LLP
                                an Iowa limited liability partnership


                                By:_____


                                Title:_____

## EXHIBIT B
**(Form of Assignment and Assumption Agreement)**

## ASSIGNMENT & ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (the "**Agreement**) is entered into and made effective this _____ day of _____, 2013, by and between NATURAL PORK PRODUCTION II, LLP an Iowa limited liability partnership (hereinafter referred to as "**Assignor**") and AMVC CRAWFORDSVILLE, LLC, an Iowa limited liability company (hereinafter referred to as "**Assignee**").  **Assignor** and **Assignee** may be referred to herein as "**Party**" or "**Parties**" as the context so requires.

WHEREAS, **Assignor** and **Assignee** have entered into an Asset Purchase Agreement dated _____, 2013 (the "**Purchase Agreement**") whereby **Assignor** has agreed to sell to **Assignee**, and **Assignee** has agreed to purchase from **Assignor**  the Acquired Assets (as defined in the Purchase Agreement); and

WHEREAS, among the Acquired Assets is all of Assignor's direct and indirect right, title, and interest in and to certain manure leases, easements, permits, purchase agreements, contracts, commitments or other binding arrangements or understandings, whether written or oral, and other rights related to the Owned Real Estate and Business (as those terms are defined in the Purchase Agreement), each as may be further described and identified on Schedule 1 to this Agreement (collectively, the "Assumed Contracts"); and

WHEREAS, Assignor desires to assign the Assumed Contracts to Assignee, and Assignee desires to assume the Assumed Contracts, each as provided herein.

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth and other good and valuable consideration and intending to be legally bound hereby, the **Parties** agree as follows:

1. Assignment to Assignee.  In exchange for the purchase price provided in the **Purchase Agreement**, **Assignor** hereby GRANTS, CONVEYS, ASSIGNS, TRANSFERS, SELLS, and DELIVERS unto **Assignee**, as of the date hereof, contractual rights, benefits, and privileges under the Assumed Contracts. Except as specifically set forth herein and in the Purchase Agreement, the Assumed Contracts are being assigned subject to the sale order entered on _____, 2013 in the case of In re: Natural Pork Production II, LLP, Case No.: 12-02872-11, now pending before the United States Bankruptcy Court for the Southern District of Iowa. Nothing in this Assignment shall assign or limit Assignor's rights under the Purchase Agreement.

2. Assumption by Assignee.   As of the date hereof, **Assignee** hereby accepts the assignments referenced at Section 1 herein and assumes any and all duties, liabilities, and obligations related to said assignments.

3.  <u>General Provisions.</u>   The terms and conditions of this **Agreement** shall be binding upon and inure to the benefit of the **Parties** hereto and their respective successors and assigns. This **Agreement** constitutes the entire agreement between the **Parties** pertaining to the subject matter contained in it and supersedes all prior contemporaneous agreements, representations and understanding of the **Parties**.   This **Agreement** shall be construed and governed by the laws of the State of Indiana regardless of the application of any conflicts of law principles. For so long as Seller is subject to the jurisdiction of the Bankruptcy Court (as defined in the Purchase Agreement), the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.   In the event Seller is no longer subject to the jurisdiction of the Bankruptcy Court, any disputes arising from this **Agreement** shall be adjudicated only by the Federal District Court in the Southern District of Iowa or the State Courts sitting in Audobon County, Iowa.   This **Agreement** may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.   Any such counterpart, to the extent delivered by means of a.pdf, .tif, .gif, .jpeg or similar attachment to an electronic mail message, shall be treated in all manner and respects as an original executed counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

   IN WITNESS WHEREOF, the **Parties** have executed this **Agreement** as of the date first referenced herein.

NATURAL PORK PRODUCTION II, LLP
an Iowa limited liability partnership

By:_____

Name:_____

Title:_____


AMVC CRAWFORDSVILLE, LLC,
an Iowa limited liability company

By:_____

Name:_____

Title:_____

## **EXHIBIT C**
**(Auction and Bidding Procedures)**

[See attached]