# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In Re: | ) | Case No.:  12-02872-als11 |
| | ) | |
| **NATURAL PORK PRODUCTION II, LLP,** | ) | Chapter 11 |
| | ) | |
| | ) | Hon. Anita L. Shodeen |
| Debtor and Debtor in Possession. | ) | |
| | ) | **DEBTOR'S MOTION FOR ORDER** |
| PO Box 468 | ) | **AUTHORIZING DEBTOR TO** |
| Harlan, IA 51537 | ) | **PROCEED WITH LIQUIDATION OF** |
| | ) | **ROMANIAN INVESTMENT** |
| EIN: 03-0480873 | ) | [Bankruptcy Code Section 363] |
| | ) | |
| _____ | ) | No Hearing Set |

Natural Pork Production II, LLP, the Debtor and Debtor in Possession herein, by and through its duly-employed General Reorganization Counsel, Jeffrey D. Goetz, Esq., of the law firm of Bradshaw, Fowler, Proctor & Fairgrave, P.C., respectfully files its Motion for Order Authorizing the Debtor to Proceed with Liquidation of its Romanian Investment in Natural Porc Production Olt, S.R.L., and would show this Honorable Court as follows:

1.      On September 11, 2012 ("Petition Date") Natural Pork Production II, LLP ("NPPII" or "Debtor"), filed its voluntary petition under Chapter 11 of the Bankruptcy Code, which case is now pending before this Court, and in which the Debtor is duly operating as a Debtor in Possession, pursuant to Bankruptcy Code Sections 1107 and 1108.  There is no motion or application pending for the appointment of a Trustee or Examiner.

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for relief sought herein include Code §§ 105(a), 363, and Rules 2002, 6004, 6006 and 9006 of the Federal Rules of

Bankruptcy Procedures (the "Bankruptcy Rules").

## Background On Natural Porc Production Olt, SRL

3.      The Debtor's Schedule B(13) discloses the Debtor holds all the outstanding and issued shares and/or other equity interests in a Romanian business entity legally described as S.C. Natural Porc Production Olt, S.R.L. and commonly referred to as Natural Porc Production Olt (hereinafter referred to as "NPPOS").  For purposes of clarity, the initials "S.R.L." refer to the Romanian version of what we would describe as a Limited Liability Company.

4.      NPPOS was created and organized under Romanian law as a foreign-owned, single purpose business entity, formed to purchase, take title to, reconstruct and operate a swine production facility in Southern Romania.  NPPOS is not a Debtor before this Court, or any domestic or foreign court, in any liquidation, reorganization or insolvency proceeding, and the NPPOS asset in this Bankruptcy Case is simply NPPII's investment represented by shares/units in NPPOS. The Debtor is informed and believes and thereupon alleges that NPPOS is in good standing and in substantial compliance with all applicable Romanian laws.

5.      In or about May/June 2006, the Debtor, as organizer of, sole investor in and sole equity interest holder of NPPOS, caused NPPOS to purchase a non-operating, Communist-era hog farm, in and around Ipotesti Commune, in Olt Judat (County)(hereinafter referred to as the "Ipotesti Farm") for approximately $650,000.00.  The Ipotesti Farm encompasses approximately 36 acres, with 13 hog barns, almost a dozen other buildings, including waste management facilities, grain storage and a lagoon.  The Debtor is informed and believes and thereupon alleges that after the fall of Communism in Romania in December 1989, the Ipotesti Farm operated until approximately 1993, but has not operated since then.

6.      The Debtor is informed and believes and thereupon alleges that the original business

plan for the Ipotesti Farm was to invest a limited amount of money for demolition and

reconstruction of the facilities, in order to update them to a "modern" swine production facility, and

borrow additional funds to complete the project and operate same. To that end, between June and

December, 2006, NPPII invested approximately $2,105,000.00 in NPPOS for such purposes.

7.      The Debtor is informed and believes and thereupon alleges that after the

approximately $2,105,000.00 additional investment, and after significant progress had been made in

demolition and reconstruction, NPPOS was poised to secure an approximate $7,500,000.00 loan

from a lender in Europe. Unfortunately, beginning in 2007, dynamic and negative changes in the

global hog markets caused the loan transaction to be cancelled, leaving the project in limbo.

8.      With NPPOS having no effective means to generate revenue or income, between

2007 and the Petition Date, it fell upon NPPII to provide "short-term loans" to NPPOS totalling

approximately $314,852.62 for taxes, utilities, security, and professional services in order to

preserve and protect its investment in NPPOS.

## NPPOS – Post Petition

9.      Since the Petition Date, the Debtor has continued to provide short-term loans to

NPPOS in order to preserve and protect its investment in NPPOS in the approximate amount of

$89,731.00.

10.     In light of NPPII's decision to liquidate substantially all of its assets in an orderly

manner, in December, 2012,  NPPII caused NPPOS to begin the process of seeking professional

legal, tax/audit, and M&A/Investment Banking advice and counsel in Romania. To that end,

NPPOS engaged Deloitte Audit, S.R.L., Deloitte Tax, S.R.L., Deloitte Consultata, S.R.L. and Reff

& Associates, S.C.A, (the in-house, correspondent law firm at Delotitte in Romania) (collectively,

these several different units in Deloitte's Bucharest Office shall be referred to as "Deloitte").

11.    Deloitte has reviewed and investigated NPPOS's financial, legal and corporate affairs, and advised NPPOS of several tax, legal and corporate issues that need to be addressed. Among the more pressing of these issues are building tax and environmental concerns. To that end, Deloitte has assisted NPPOS in engaging appraisers and environmental engineers to advise and counsel it.

### NPPOS Pre-Contract

12.    In addition to conducting legal, financial and other due diligence for NPPOS, Deloitte has also marketed the Ipotesti Farm to potential interested parties. Deloitte marketed the Ipotesti Farm from approximately March 22nd to April 23rd of 2013. Deloitte approached approximately ten (10) local and international companies from the same business sector and same general geographic region.

13.    Deloitte's efforts have borne success, in that a major European agro/food company, S.C. Agrikilti S.R.L, dba Carmistin ("Carmistin"), has expressed interest in purchasing the Ipotesti Farm from NPPOS. To that end, NPPOS and Carmistin have executed a Promissory Sale Purchase Agreement ("Pre-Contract"), whereby Carmistin proposes to purchase the Ipotesti Farm for approximately €500,000.00 (Euros), plus VAT (Value Added Tax), plus assumption of several of NPPOS's liabilities, including resolution of several tax, financial, legal and environmental obligations that have an approximate value of €58,000.00. At the foreign exchange rate on May 6, 2013, €500,000.00 equates to $655,700.00. A true and exact copy of the complete Pre-Contract is attached hereto as Exhibit "A" and is incorporated by reference herein.

14.    To facilitate initiation of the sale process, on April 16, 2013 NPPII, by and through Lawrence Handlos, its Sole Managing Partner, in its capacity as the Sole Shareholder of NPPOS, formally resolved in writing to sell the Ipotesti Farm to Carmistin and empower Ms. Cristiana-

Luminita Popa, to act on behalf of NPPOS in execution of the Pre-Contract and take those other

actions in furtherance of the sale of the Ipotesti Farm.  A true and exact copy of the Resolution is

attached hereto as Exhibit "B" and is incorporated by reference herein.

15.     There is no secured debt held against the Ipotesti Farm, and substantially all the

unsecured debt owed by NPPOS is to its parent, NPPII.  NPPOS has no executory contracts or

unexpired leases, other than a month-to-month rental agreement for an electric power

transformer.

16.     In addition to being a condition of the Pre-Contract, the Deloitte professionals have

informed NPPOS and NPPII that pursuant to applicable Romanian law, NPPII, in its capacity as

sole equity interest holder of NPPOS, must formally resolve and authorize NPPOS in writing

regarding any transaction that results in the sale or transfer of substantially all of NPPOS's assets.

To that end, NPPII is inclined to so resolve and authorize NPPOS to do so although such action may

not be required under U.S. Law.  However, since NPPII is a Debtor and Debtor in Possession in

what Romanian law considers a foreign "insolvency proceeding," in order for NPPII's authorization

to NPPOS to be valid under Romanian law, NPPII must provide an Order of this Bankruptcy Court,

confirming that NPPII has authority, as the sole equity interest holder of NPPOS, to authorize

NPPOS to sell substantially all of its assets.

## Relief Requested

17.     The Debtor is seeking a Court order that NPPII is authorized to liquidate its

investment in NPPOS, by instructing NPPOS to sell its sole asset, the Ipotesti Farm, and to

execute all necessary documents and instruments and take all the requisite actions under

applicable Romanian law, to consummate a final Sale Purchase Agreement.

18.     Debtor is informed and believes and thereupon alleges that NPPOS's proposed

sale of the Ipotesti farm to Carmistin pursuant to the Pre-Contract is in the best interests of

Debtor's estate and its creditors for several reasons:

a)      The current European financial crisis has caused many smaller, newer and more

modern hog farming operations to liquidate, and therefore there is a literal glut of hog farms on the

market in the region, which has depressed prices, making it a buyer's market.

b)      NPPOS's recent independent third party real estate appraisal by Neoconsult SRL,

opines that the value of the Ipotesti Farm, for building tax purposes, is €725,000.00, which is

substantially closer to Carmistin's offer than to the amount of money NPPII has invested and loaned

to NPPOS;

c)      The final Site Assessment and Environmental Due Diligence Report prepared by

F&R Worldwide, the environmental engineers engaged by NPPOS, indicates the potential

environmental clean up costs at the Ipotesti Farm could be in the approximate amount of €20,000.00

- €30,000.00, depending on remediation methodology.

d)      Sale of the Ipotesti Farm will eliminate the need for NPPII's Bankruptcy Estate to

continue to fund the administrative costs necessary to preserve its investment in NPPOS, which is a

depreciating asset in the current market;

e)      The professionals engaged by NPPOS at Deloitte have recommended and counseled

NPPOS that such a sale transaction at this time to Carmistin is in its best interests;

f)      After satisfaction of its financial obligations and costs to wind up and dissolve the

NPPOS asset, the net sale proceeds realized by NPPOS will flow upstream to NPPII as its sole

equity interest holder, thus benefiting NPPII's Bankruptcy Estate and creditors.

19.      Bankruptcy Code Section 363 governs Debtor's ability to sell property of the

estate outside of the ordinary course of business.  Although this section does not set forth a

standard for determining when it is appropriate to authorize such a sale, courts have uniformly held that such a sale should be approved when it is justified by a sound business purpose. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991); *accord Stephens Industries, Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991); *In re Continental Air Lines, Inc.*, 780 F.2d 1223 (5th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983). The burden of establishing a rational business justification lies with the debtor. *Lionel*, 722 F.2d at 1070-71. However, once the debtor makes such a showing, a presumption will attach that the decision was made on an informed basis, in good faith, and in the honest belief that the action was in the best interest of the company. *See, e.g., In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).

### The Proposed Transaction Satisfies All Applicable Legal Standards

20.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." *See also* Bankruptcy Rule 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction"). This section generally permits a debtor to sell property of the estate outside of the ordinary course of its business where the proposed sale is a sound exercise of the debtor's business judgment and when such sale is proposed in good faith. *See Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) ("[A] bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Channel One Comm., Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990).

21.     In the instant case, the proposed Sale constitutes a sound exercise of Debtor's business judgment and has been proposed in good faith.  A sale of the Ipotesti Farm by NPPOS will aid in minimizing the expenses of the Debtor's estate, resulting in greater distribution to creditors.

22.     The Debtor believes this Motion and the transaction contemplated by NPPOS is in the best interests of the bankruptcy estate and in the best interests of all other interested parties in this Chapter 11 case.

<u>**Sale Free and Clear of Liens**</u>

23.     Section 363(f) of the Bankruptcy Code authorizes a debtor to use, sell or lease property of the estate outside of the ordinary course of business, free and clear of any interest in such property.  This Motion proposes that NPPII authorize NPPOS to sell substantially all of its assets, free and clear of all interests, liens, claims and encumbrances.  Any such interests, liens, claims and encumbrances would attach to the proceeds from the sale of the Ipotesti Farm (the "Sale Proceeds") ultimately attributable to the property against or in which such interest, lien, claim or encumbrances is asserted.

24.     Under Section 363(f)(2) of the Bankruptcy Code, a sale free and clear of all interests, liens, claims and encumbrances is permissible if all parties asserting liens on or other interests in the property consent.  The Debtor is providing proper notice of this Motion to all interested parties and the Inter Creditor Committee ("ICC").  Provided that no creditors or interested parties object to this Motion and the proposed sale transaction, Section 363(f)(2) will be satisfied.  *See, e.g.*, *Veltman v. Whetzal*, 93 F.3d 517, 521 n.5 (8th Cir. 1996) (in a Chapter 7 case, stating that "some courts have found implied consent, however, when a party with an interest in the bankruptcy estate fails to object after receiving notice of the sale under subsection

363(f)(2)") (citing *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr.D.N.J.1994); *In re Elliot*, 94

B.R. 343, 345 (E.D. Pa. 1988)).

25.     Under Section 363(f)(4) of the Bankruptcy Code, a sale free and clear of all

interests, liens, claims and encumbrances is permissible if the interest of any entity is in *bona

fide* dispute.  Under Section 363(f)(5) of the Bankruptcy Code, a sale free and clear of all

interests, liens, claims and encumbrances is permissible if any party asserting an interest in the

assets could be compelled to accept money satisfaction of such interest in a legal or equitable

proceeding.  The Debtor submits that to the extent the ICC asserts security interests in the

Debtor's investment in NPPOS and does not consent under Section 363(f), a sale free and clear

of its interests will still be permissible because, as to the ICC, their interests, or the amount of

their interests, are in fact the subject of a *bona fide* dispute, and they could be compelled to

accept a money satisfaction of their interests in a legal equitable proceeding.

### A Proposed Sale Does Not Establish Any Sub Rosa Plan of Reorganization

26.     A sale of assets may not be approved where such sale, rather than merely

changing the composition of the debtor's assets, either restructures the right of creditors or

predetermines the rights of creditors under any future plan of reorganization. *See In re Braniff

Airways, Inc.*, 700 F.2d 935, 939-40 (5th Cir. 1983); *In re Continental Air Lines, Inc.*, 780 F.2d

1223, 1227-28 (5th Cir. 1986).

27.     In *Braniff*, the Fifth Circuit held that an agreement between the debtor and its

creditors established a *sub rosa* plan of reorganization because, among other things, the

agreement: (i) required that any future plan of reorganization allocate certain assets only to

employees, shareholders or unsecured creditors of the debtor; (ii) required the secured creditors

to vote a portion of their deficiency claim in favor of any future plan of reorganization approved

by a majority of the unsecured creditors' committee; and (iii) provided for the release of claims

by all parties against the debtors, its secured creditors and its officers and directors. *Braniff*, 700

F.2d at 939-40.

28.     Unlike *Braniff*, the sale transaction contemplated by this Motion will not

restructure the rights of Debtor's creditors or predetermine the rights of such creditors under any

future plan of reorganization.

29.     Furthermore, Debtor has articulated sound business justifications for seeking

authorization to liquidate its investment in NPPOS, rather than as part of a plan.   A Section 363

motion should be approved if it is based on good business reasoning. *In re Lionel Corp.*, 722

F.2d at 1070; *In re George Walsh Chevrolet, Inc.*, 118 B.R. 99, 101–102 (Bankr. E.D. Mo. 1990)

(Court considered some of the following factors:  whether all parties in interest received

reasonable notice; whether the purchase price is fair and reasonable; whether there is a sound

business reason for the sale; and whether the proposed sale unfairly benefits insiders or

proprietary purchasers, or unfairly favors a creditor or class).  All such factors have been met

here.

30.     The Purchase Price is a fair offer for the Ipostesti Farm at this time.  Given the

current economic climate, Debtor believes it would be imprudent to ignore such an attractive

offer now when the value of the Ipotesti Farm could be adversely affected or deteriorate in the

coming months prior to plan confirmation.  Basically, Debtor is taking the conservative approach

that a "bird in hand is worth two in the bush."

### Sale Price and Terms were Negotiated at Arm's Length and in Good Faith

31.     The Purchase Price and Sale Terms were negotiated and have been and are

undertaken by NPPOS and Carmistin at arm's length, without collusion and in good faith within

the meaning of Section 363(m) of the Bankruptcy Code, and Debtor accordingly requests that the Court determine that its decision to authorize NPPOS to sell the Ipotesti Farm was conducted in good faith within the meaning of Section 363(m) of the Bankruptcy Code and that Seller and Purchaser are entitled to the protections of Section 363(m) of the Bankruptcy Code. *See In re Apex Oil Co.,* 92 B.R. 847, 874 (Bankr. E.D. Mo. 1988).

32.     In Debtor's view, the proposed liquidation of its investment in NPPOS by authorizing the sale of the Ipotesti Farm represents substantial value to Debtor's estate inasmuch as it provides favorable terms for the disposition of the Ipotesti Farm at a price that represents fair and reasonable consideration having a certain value. *See id.* at 869. *See also Mellon Bank, N.A., v. Metro Communications, Inc*., 945 F.2d 635 (3d. Cir. 1991) (reasonably equivalent value under the Bankruptcy Code).

**Reduction or Elimination of 14-Day Stay Under Bankruptcy Rules 6004(h) and 6006(d)**

33.     Time is of the essence in approving and closing the Sale, and any unnecessary delay in closing the Sale could result in the collapse of the Sale.  Accordingly, this Court should waive the 14-day period staying any order to sell or assign property of the estate imposed by Bankruptcy Rules 6004(h) and 6006(d).

## CONCLUSION

Based upon the authorities and facts detailed above, Debtor submits that the Court should approve the Motion.  Such relief is warranted because Debtor has shown that liquidation of its investment in NPPOS by authorizing the sale of the Ipotesti Farm is in the best interests of Debtor, its estate and creditors, and because such decision was reached in the exercise of Debtor's sound business judgment, after careful deliberation of its consequences and possible alternatives.

Therefore, NPPII respectfully prays that this Honorable Court grant the Debtor's Motion herein, and enter an Order validating the Debtor's actions through and including the filing of this Motion with regard to corporate authority to execute the Pre-Contract, and authorizing the Debtor, in its capacity as sole equity interest holder in NPPOS, to further resolve and authorize NPPOS to sell substantially all of its assets, and for such other and further relief as may be just and equitable under the circumstances.

Date:  May 6, 2013                                    Respectfully submitted,

                                                      /s/ Jeffrey D. Goetz
                                                      Jeffrey D. Goetz, Esq., IS #9999366
                                                      Bradshaw Fowler Proctor & Fairgrave, P.C.
                                                      801 Grand Avenue, Suite 3700
                                                      Des Moines, IA 50309-8004
                                                      515/246-5817
                                                      515/246-5808 FAX
                                                      goetz.jeffrey@bradshawlaw.com

                                                      General Reorganization Counsel for
                                                      Natural Pork Production II, LLP,
                                                      Debtor and Debtor in Possession

CERTIFICATE OF SERVICE

        This document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing.

/s/        LuAnn Gilbert

*Cererea s-a cerut autentificarea prezentului înscris / The authentication of this document has been requested:*

| PROMISIUNE BILATERALĂ DE VÂNZARE - CUMPĂRARE | PROMISSORY SALE – PURCHASE AGREEMENT |
|---|---|
| PREZENTA PROMISIUNE BILATERALĂ DE VÂNZARE – CUMPĂRARE ("**Promisiunea**") este încheiată între: | THIS PROMISSORY SALE – PURCHASE AGREEEMENT (the "**Agreement**") has been concluded by and between: |
| 1.  **S.C. NATURAL PORC PRODUCTION OLT S.R.L.**, constituită și funcționând în baza legislației române, cu sediul în Sat Ipotești, Strada Principală, Poziția 001, Volumul 01, Tip 4, Tarla 58/1, Comuna Ipotești, Județul Olt, înregistrată la Oficiul Registrului Comerțului Olt sub nr. J28/117/2012, având cod unic de înregistrare (CUI) 18573000 și cont bancar nr. RO76RNCB0091040469090001 deschis la Banca Comercială Română – Sucursala Otopeni, reprezentată de către dna. Cristiana - Luminița Popa, în baza hotărârii asociatului unic din data de 16 aprilie 2013, apostilată sub nr. 13-198200/16 aprilie 2013, după cum a fost tradusă în limba română și certificată sub nr. 274 din data de 22 aprilie 2013 de către Biroul Notarului Public David Cătălina ("**Promitentul Vânzător**"), pe de-o parte | 1.  **S.C. NATURAL PORC PRODUCTION PORC S.R.L.**, incorporated and existing under the laws of Romania, with its registered office in Ipotesti Village, Principala Street, Position 001, Volume 01, Type 4, Plot 58/1, Ipotesti Commune, Olt Count, registered with the Olt Trade Registry Office under no. J28/117/2012, having sole registration code (SRC) 18573000 and bank account no. RO76RNCB0091040469090001 opened with Banca Comercială Română - Otopeni Branch, represented by Mrs. Cristiana - Luminita Popa according to the sole shareholder resolution dated 16 April 2013 apostilled under no. 13-198200/16 April 2013, as translated into Romanian language and certified under no. 274 dated 22 April 2013 by the Notary Public Office David Cătălina (the "**Promissory Seller**"), on the one hand, |
| și | and |
| 2.  **S.C. AGRIKILTI S.R.L.,**, constituită și funcționând în baza legislației române, cu sediul în Satul Mihăești, Comuna Mihăești nr. 133, Clădirea C21, Camera nr. 21, Județul Vâlcea, înregistrată la Oficiul Registrului Comerțului Vâlcea sub nr. J38/95/2012, având cod unic de înregistrare (CUI) 29802789 și cont bancar nr. RO60RZBR0000060014475399 deschis la Raiffeisen Bank – Agenția Băbeni, reprezentată de către dl. Alin Ancuța în baza procurii speciale autentificate sub nr. 1887 din 21 august 2012 de către Biroul Notarilor Publici Asociați Gutău Mariana și Stoica Cristina - Ioana ("**Promitentul Cumpărător**"), pe de altă parte. | 2.  **S.C. AGRIKILTI S.R.L.**, incorporated and existing under the laws of Romania, with its registered office in the Mihăești Village, Mihăești Commune No. 133, Building C21, Room no. 21, Vâlcea County, registered with the Vâlcea Trade Registry Office under no. J38/95/2012, having sole registration code (SRC) 29802789 and bank account no. RO60RZBR0000060014475399 opened with Raiffeisen Bank - Băbeni Agency, represented by Mr. Alin Ancuța, according to the special power of attorney authenticated under no. 1887 dated 21 August 2012 by the Associated Notary Public Office Gutău Mariana and Stoica Cristina - Ioana (the "**Promissory Buyer**"), |

*S-a solicitat autentificarea prezentului înscris / The authentication of this document has been requested:*



Promitentul Vânzător și Promitentul Cumpărător vor fi denumiți în continuare împreună „**Părțile**", iar fiecare „**Partea**".

on the other hand.

The Promissory Seller and the Promissory Buyer hereinafter referred to jointly as the "**Parties**" and individually as the "**Party**".

ÎNTRUCÂT:

WHEREAS:

(A)     Promitentul Vânzător deține o unitate de producție porcine nefuncțională, aflată în curs de modernizare, în Satul Ipotești, Comuna Ipotești, Județul Olt, compusă dintr-o parcelă de teren în suprafață de 134,288.55 mp și 53 de construcții C1 – C53 cu o suprafață totală de aproximativ 39.275,16 mp ("**Imobilul**") și în procesul de lichidare a activității sale din România este interesat să vândă Imobilul.

(A)     The Promissory Seller holds a swine production facility which is not operational, in the process of being modernized, in Ipotesti Village, Ipotesti Commune, Olt County, composed of a plot of land with a surface area of 134,288.55 sq.m. and 53 buildings C1-C53 with a total surface area of approximately 39,275.16 sq.m. (the "**Property**") and in the process of liquidating its activity in Romania, is interested to sell the Property.

(B)     Promitentul Cumpărător este o societate activă în domeniul producției de animale, mai exact al producției de porcine, care este interesat să preia Imobilul pentru a pune în funcțiune si opera o asemenea unitate de producție. În considerarea interesului său, Promitentul Cumpărător a trimis Promitentului Vânzător oferta nr. 14 din data de 5 aprilie 2013 atașată la prezenta Promisiune drept Anexa nr. 1.

(B)     The Promissory Buyer is a company active in the field of animal production and more specifically swine production business, which is interested to take over the Property, in order to commission and operate such a production facility. In consideration of its interest, the Promissory Buyer has sent to the Promissory Seller the offer no. 14 dated 5 April 2013, attached to this Agreement as Appendix no. 1;

Părțile au agreat după cum urmează:

The Parties have agreed as follows:

**1     Obiectul Promisiunii. Istoricul dreptului de proprietate asupra Imobilului**

**1.     Object of the Agreement. History of Ownership Right over the Property**

1.1. Promitentul Vânzător, prin reprezentant, se obligă să transmită prin vânzare Promitentului Cumpărător, iar Promitentul Cumpărător se obligă să dobândească de la Promitentul Vânzător dreptul de proprietate deplin și exclusiv și liber de orice sarcini asupra Imobilului situat în intravilanul Comunei Ipotești, Județul Olt, așa cum este aceasta identificat în Anexa nr. 2 la prezenta Promisiune, și să încheie contractul de vânzare - cumpărare, la prețul de

1.1 The Promissory Seller, by representative, undertakes to transfer by sale to the Promissory Buyer and the Promissory Buyer undertakes to acquire from the Promissory Seller the full and exclusive and free of any charges ownership right over the Property located within the build-up area of the Ipotesti Commune, Olt County, as it is identified in Appendix no. 2 to this

2

*S-a solicitat autentificarea prezentului înscris / The authentication of this document has been requested:*



cumpărare, în termenul şi conform condiţiilor prezentei Promisiuni („**Contractul**" şi respectiv „**Preţul de cumpărare**").

Agreement, and to conclude the sale – purchase agreement, for the purchase price, under the term and conditions established in this Agreement (the "**SPA**" and "**Purchase Price**" respectively).

1.2. Imobilul este identificat cu număr cadastral 13 şi este înscris în cartea funciară nr. **50048** a Comunei Ipoteşti, conform încheierii nr. 12517 din data de 6 iunie 2006 eliberată de către OCPI Olt – Biroul de Cadastru şi Publicitate Imobiliară Slatina şi are configuraţia şi delimitarea stabilite în planurile cadastrale anexate în Anexa nr. 4 la prezenta.

1.2  The Property is identified with cadastral number 13 and it is registered with the Land Book no. **50048** of Ipoteşti Commune, pursuant to the resolution no. 12517 dated 6 June 2006 issued by the Olt OCPI – the Slatina Office for Cadastre and Real Estate Publicity and has the configuration and the limits identified in the cadastral drawings attached hereto as Appendix no. 4.

1.3. Dreptul de proprietate asupra Imobilului, care include şi posesia deplină şi netulburată a acestuia, se va transmite Promitentului Cumpărător prin încheierea Contractului în formă autentică numai în cazul îndeplinirii condiţiilor menţionate în art. 3 din această Promisiune .

1.3  The ownership right over the Property, which includes the full and undisturbed possession over it, will be transferred to the Promissory Buyer by the conclusion of the SPA, in authentic form, only following the fulfillment of conditions listed in Art. 3 hereof.

1.4 Titlul de proprietate al Promitentului Vânzător şi istoricul dreptului de proprietate asupra Imobilului sunt detaliate în Anexa nr. 3 la prezenta.

1.4  The current title of the Promissory Seller and the history of ownership right over the Property are detailed in Appendix no. 3 hereof.

**2  Preţul de cumpărare şi modalitatea de plată**

**2.  Purchase Price and Payment Method**

2.1. Preţul de cumpărare pe care Promitentul Cumpărător îl va plăti Promitentului Vânzător în schimbul dobândirii dreptului de proprietate asupra Imobilului este de **500.000** (cinci sute de mii euro) **EURO + TVA**, după cum urmează.

2.1. The Purchase Price that the Promissory Buyer will pay to the Promissory Seller in exchange for the acquisition of the ownership right over the Property is equal to **EUR 500,000** (five hundred thousand euro) **+ VAT**, as follows.

- preţul de cumpărare pentru parcela de teren parte a Imobilului va fi de 95.000 EURO (reprezentând 19% din Preţul de cumpărare); iar

- the purchase price for the plot of land part of the Property shall be of EUR 95,000 (representing 19% of the Purchase Price); and

- preţul de cumpărare pentru construcţiile

- the purchase price for the constructions

3

*S-a solicitat autentificarea prezentului înscris / The authentication of this document has been requested:*

| | |
|---|---|
| C1 – C53 parte a Imobilului va fi de 405.000 EURO (reprezentând 81% din Prețul de cumpărare). | C1 – C53 part of the Property shall be of EUR 405,000 (representing 81% of the Purchase Price). |
| 2.2 Pretul de cumpărare se va achita la data încheierii Contractului, în lei, la cursul de schimb BNR din ziua plății. | 2.2 The Purchase Price will be paid on the conclusion date of the SPA, in RON, at the NBR exchange rate published on the payment date. |
| 2.3 În plus față de Prețul de cumpărare de mai sus, Promitentul Cumpărător se obligă să plătească următoarele: | 2.3 In addition to the Purchase Price above, the Promissory Buyer undertakes to pay for the following: |
| 2.2.1 onorariul S.C. F&R Worldwide S.R.L. rezultat din contractul nr. FRW-C13-023 din data de 21 martie 2013 încheiat cu Promitentul Vânzător, în sumă de 7.010 EURO + TVA, care va fi plătit în termen de 5 (cinci) zile calendaristice de la semnarea prezentei Promisiuni și transmiterea de către acesta a raportului său; | 2.2.1 the S.C. F&R Worldwide S.R.L.'s fee resulting from the agreement no. FRW-C13-023 dated 21 March 2013 concluded with the Promissory Seller, in the amount of EUR 7,010 + TVA, to be paid within five (5) calendar days from the execution of this Agreement and delivery by it of its report; and |
| 2.2.2 datoria înregistrată de Promitentul Vânzător către S.C. Electric Total S.R.L. în baza contractului nr. 561 din data de 10 octombrie 2006, în sumă de aproximativ 3.700 EURO, care va fi plătită în termen de 5 (cinci) zile calendaristice de la semnarea prezentei Promisiuni. | 2.2.2 the debt of the Promissory Seller towards S.C. Electric Total S.R.L. resulting from the agreement no. 561 dated 10 October 2006, in the amount of approximately EUR 3,700, to be paid within five (5) calendar days from the execution of this Agreement. |
| **3    Termenul contractual și Condiții** | **3.    Term and Conditions** |
| 3.1. Termenul pentru încheierea Contractului în formă autentică este de maximum **60 de zile calendaristice** de la data încheierii prezentei Promisiuni, ceea ce înseamnă ca scadența va interveni la data de **24 iunie 2013**, sub rezerva îndeplinirii condițiilor prevăzute în art. 3.3 de mai jos („**Data limită**"). | 3.1. The Parties agree that the term for the conclusion of the SPA in authentic form is maximum **60 calendar days** as of the date of conclusion of the present Agreement, which means that the due date shall be **24 June 2013**, provided that the conditions mentioned in art. 3.3 below are fulfilled (the "**Final Date**"). |
| La solicitarea întemeiată a Promitentului | Upon the justified request of the Promissory |



4

*S-a solicitat autentificarea prezentului înscris / The authentication of this document has been requested:*

Cumpărător, Părţile pot agrea prelungirea Datei limită, cu o perioadă de timp agreată de comun acord, nu mai mare de 30 (treizeci) de zile calendaristice.

3.2. Data limită este stabilită în beneficiul exclusiv al Promitentului Cumpărător, în scopul de a îndeplini procedurile legale şi obţinerea avizelor de principiu necesare în legătură cu exercitarea obiectului de activitate al acestuia, respectiv cel de creştere porcine. În cazul în care, din orice cauze externe de voinţa Părţilor, apar anumite situaţii care conduc în mod necesar la imposibilitatea încheierii Contractului înăuntrul Datei limită, termenul se va suspenda de drept până la încetarea cauzei respective. Comunicarea acestei situaţii este obligatorie între Părţi.

3.3. Având în vedere obiectul de activitate al Promitentului Cumpărător, încheierea Contractului va avea loc până la Data limită, sub condiţia obţinerii avizelor de principiu, necesare exercitării obiectului de activitate (i.e. creştere porcine), respectiv dar fără a se limita la: Avizul Direcţiei de Sănătate Publică, al Direcţia de Sănătate Veterinară, al Agenţiei pentru Protecţia Mediului.

3.4 Promitentul Cumpărător va transmite Promitentului Vânzător o notificare prin care va comunica dacă condiţiile prevăzute în art. 3.3 au fost îndeplinite si daca da, va indica data, ora şi locul pentru semnarea Contractului şi transferul dreptului de proprietate asupra Imobilului, semnare care va avea loc nu mai târziu de 5 (cinci) zile calendaristice de la transmiterea notificării şi în toate cazurile înainte sau cel mai târziu la Data limită.

3.5 La data semnării Contractului, Promitentul Vânzător va cesiona către Promitentul Cumpărător contractele încheiate cu S.C. Electric Total S.R.L. şi S.C. F&R Worldwide

Buyer, the Parties may agree the extension of the Final Date with a mutually agreed period of time, not longer than thirty (30) calendar days.

3.2. The Final Date is set to the exclusive benefit of the Promissory Buyer, for the purpose of fulfilling legal procedures and obtaining the approvals on principle necessary in connection with the performance of its object of activity, namely that of swine production. In the event that, for any reasons beyond the will of the Parties, certain circumstances appear that will necessarily lead to the impossibility to conclude the SPA within the agreed Final Date, the term will be duly suspended until the termination of said circumstances. The notification of this situation is mandatory between the Parties.

3.3. Given the Promissory Buyer's object of activity, the conclusion of the SPA will be made until the Due Date, subject to the obtaining of all the preliminary approvals, necessary for the performance of said object of activity (i.e.. swine production) namely, without limitation: the approval of the Public Health Department, the Veterinary Health Department, the Environment Protection Agency.

3.4 The Promissory Buyer shall send to the Promissory Seller a notice by which it shall communicate whether the conditions mentioned in art. 3.3 have been fulfilled and if so, it shall indicate the date, hour and place for the execution of the SPA and the transfer of the ownership right over the Property, signing which shall take place not later than five (5) calendar days from the transmission of the notification and in all cases before or at the Final Date, the latest.

3.5 Upon execution of the SPA, the Promissory Seller shall assign to the Promissory Buyer the agreements concluded with S.C. Electric Total S.R.L. and S.C. F&R Worldwide

*S-a solicitat autentificarea prezentului înscris / The authentication of this document has been requested:*

S.R.L., așa cum au fost menționate în art. 2.2.1 și 2.2.2 de mai sus.

S.R.L., as mentioned in art. 2.2.1 and 2.2.2 above.

**4    Sancțiuni de neexecutare**

**4.    Non-Performance Penalties**

4.1. În cazul în care, Promitentul Cumpărător, deși a depus diligentele necesare nu obține avizele de principiu necesare conform art. 3.3 până la Data limită, prezenta Promisiune se desființează de plin drept, Părțile fiind repuse în situația juridică anterioară încheierii acestuia, iar prestațiile executate conform art. 2.2.1, 2.2.2 și 5.2 d) vor fi supuse restituirii, în termen de maxim 5 (cinci) zile calendaristice de la primirea notificării prevăzute la art. 3.4.

4.1    In the event that the Promissory Buyer, although has undertaken the necessary diligences fails to obtain, the necessary preliminary approvals according to art. 3.3 until the Final Date, this Agreement will be terminated as of right, the Parties being restored to the legal situation previous to its conclusion, and the payments performed under art. 2.2.1, 2.2.2 and 5.2 d) shall be subject to reimbursement, within maximum five (5) calendar days from the receipt of the notice under art. 3.4.

4.2. În cazul în care Promitentul Cumpărător nu va depune toate diligențele necesare în vederea obținerii tuturor avizelor de principiu necesare conform art. 3.3 până la Data limită, acționând din culpa sa exclusivă, va plăti Promitentului Vânzător suma de 100.000 (o sută de mii) EURO cu titlu de daune interese, în termen de 10 (zece) zile calendaristice de la expirarea Datei limite.

4.2    In the event that the Promissory Buyer fails to make all diligences with a view to obtain all necessary preliminary approvals according to art. 3.3 until the Final Date due to its exclusive fault, it shall pay to the Promissory Seller the amount of EUR 100,000 (one hundred thousand euro as damages within ten (10) calendar days from the expiry of the Final Date.

4.3. În cazul în care Promitentul Vânzător va refuza încheierea Contractului în condițiile convenite prin prezenta Promisiune, va achita Promitentului Cumpărător suma de 100.000 (o suta de mii) EURO, în termen de 10 (zece) zile calendaristice de la expirarea Datei limite.

4.3    In the event the Promissory Seller refuses to conclude the SPA under the conditions provided herein, it will pay to the Promissory Buyer the amount of EUR 100,000 (one hundred thousand euro), within ten (10) calendar days from the expiry of the Final Date.

4.4. În plus față de dreptul de a primi suma prevăzută la art. 4.3, promitentul Cumpărător are si dreptul de a se adresa instanței judecătorești pentru a se pronunța o hotărâre care să înlocuiască Contractul, în situația în care Promitentul Vânzător refuză sau nu răspunde solicitării Promitentului Cumpărător pentru încheierea Contractului.

4.4    In addition to the right to receive the amount mentioned at art. 4.3, the Promissory Buyer has also the right to address the court of law, in order to award a decision replacing the SPA, in the event the Promissory Seller refuses or does not respond to the request of the Promissory Buyer to conclude the SPA.

4.5. Oricare obligații sau formalități prevăzute de orice acte normative în vigoare în sarcina

4.5    Any obligations or formalities provided by



*S-a solicitat autentificarea prezentului înscris / The authentication of this document has been requested:*

oricăreia dintre Părţi în vederea încheierii Contractului rămân pe deplin aplicabile în termenul prevăzut la art. 3.1 din Promisiune.

any legal provisions in force as being incumbent on any of the Parties with a view to the conclusion of the SPA remain fully applicable during the term mentioned in art. 3.1 of the Agreement.

**Declaraţii şi garanţii ale Părţilor**

5. **Representations and warranties of the Parties**

5. Promitentul Vânzător declară şi garantează la încheierea prezentei Promisiuni următoarele:

5.1. The Promissory Seller represents and warrants upon signing of this Agreement the following:

a) Este o societate comercială înfiinţată şi care funcţionează potrivit legilor romane aplicabile, deţine capacitatea legală precum şi orice aprobări sau autorizări necesare, inclusiv dar fără a se limita la cele societare, daca este cazul, pentru încheierea legală si valabilă a prezentei Promisiuni şi a Contractului;

a) it is a company duly incorporated and functioning under applicable Romanian laws; it has the legal power and any necessary approvals or authorisations including, without limitation, the corporate approvals and authorisations, if applicable, to duly and validly execute this Agreement and of the SPA.

În acest sens, Promitentul Vânzător se obligă să prezinte, la cererea Promitentului Cumpărător sau a notarului public instrumentator, orice document relevant şi justificat în vederea semnării Contractului.

For this purpose, the Promissory Seller undertakes to present, upon request of the Promissory Buyer or the instrumenting notary public, any relevant and justified document, with a view to executing the SPA.

b) Imobilul a fost dobândit în modul legal, aşa cum este descris în Anexa nr. 3 la prezenta Promisiune, iar Promitentul Vânzător se obligă să nu încheie alte acte juridice de natură a modifica dreptul de proprietate asupra Imobilului;

b) the Property was acquired in a lawful manner, as described in Appendix no. 3 of the present Agreement and the Promissory Seller undertakes not to conclude other legal documents likely to alter the ownership right over the Property;

c) Imobilul nu a fost scos din circuitul civil, nu a fost expropriat, confiscat sau rechiziţionat, ci a rămas continuu în stăpânirea Promitentului Vânzător în mod legal;

c) the Property was not withdrawn from the civil circuit, expropriated, confiscated or requisitioned, and it legally remained, without interruption, in the ownership of the Promissory Buyer;

d) nu au fost încheiate şi nu va încheia niciun fel de alte promisiuni sau convenţii de înstrăinare, alte constituiri de drepturi reale, ipoteci, privilegii sau sarcini asupra Imobilului; nu există litigii cu privire la dreptul de proprietate

d) no other promissory or sale contracts have been or will be concluded, no real rights, mortgages, privileges or encumbrances have been or will be established over the Property; there are no pending litigations regarding the

*S-a solicitat autentificarea prezentului înscris / The authentication of this document has been requested:*

| | |
|---|---|
| asupra Imobilului; | ownership right over the Property; |
| e) Imobilul nu face obiectul niciunui contract de arendă şi nu intră sub incidenţa dreptului de preempţiune reglementat de dispoziţiile art. 1730-1740 Cod Civil; | e) the Property is not subject to an agricultural lease and does not fall under the preemptive right regulated by the provisions of art. 1730-1740 of the Civil Code; |
| f) nu există şi nu vor exista niciun fel de obligaţii legale cu privire la Imobil, respectiv impozite sau alte taxe în sarcina Promitentului Cumpărător pentru perioada de timp anterioară semnării Contractului. | f) there are and there will be no legal obligations regarding the Property, namely taxes or other duties incumbent upon the Promissory Buyer for the period of time prior to the execution of the SPA; |
| g) Promitentul Vânzător se obligă să garanteze pe Promitentul Cumpărător împotriva oricărei cauze de evicţiune totală sau parţială asupra Imobilului, în conformitate cu art. 1695 Cod Civil. | g) the Promissory Seller undertakes to guarantee and hold harmless the Promissory Buyer against any total or partial eviction of the Property pursuant to art. 1695 of the Civil Code. |
| 5.2. Promitentul Cumpărător declară şi garantează la încheierea prezentei Promisiuni următoarele: | 5.2 The Promissory Buyer represents and warrants upon signing of this Agreement the following: |
| a) încheie prezenta Promisiune în desfăşurarea activităţii curente a societăţii comerciale, având toate aprobările sau împuternicirile legale/constitutive pentru încheierea sa. | a) it concludes this Agreement during the performance of the current activity of the company, holding all legal/corporate approvals for its conclusion,. |
| b) are capacitatea financiară şi economică pentru a-şi îndeplini obligaţiile rezultate din prezenta Promisiune; | b) has the financial and economical capability in order to fulfill its obligations arisen from this Agreement' |
| c) este la curent cu situaţia juridică şi de facto a Imobilului şi în considerarea acestor informaţii a transmis Promitentului Vânzător oferta nr. 14 din data de 5 aprilie 2013; | c) is aware of the legal and factual status of the Property and in consideration of this information has sent to the Promissory Seller the offer no. 14 dated 5 April 2013; |
| d) va efectua pe costul său orice acţiune de remediere la, sub, în, pe şi/sau în | d) shall perform, on its cost, any remedial action at, under, in, on and/or around the |



*S-a solicitat autentificarea prezentului înscris / The authentication of this document has been requested:*



jurul Imobilului care este dorită de către Promitentul Cumpărător sau impusă de către autoritatea competentă de protecția mediului sau prin legislația aplicabilă, indiferent dacă aceste acțiuni de remediere sunt cauzate de acte, fapte sau acțiuni anterioare sau ulterioare datei semnării Contractului, estimată la data prezentei Promisiuni la suma de 30.000 EURO.

Promitentul Cumpărător va putea iniția aceste acțiuni de remediere în vederea obținerii avizelor de principiu menționate în art. 3.3, oricând va considera necesar sau util după semnarea prezentei Promisiuni, după notificarea Promitentului Vânzător cu privire la costurile finale și procedura de lucru.

5.3. Oricare obligații sau formalități prevăzute de orice acte normative în vigoare în sarcina oricăreia dintre Părți în vederea încheierii Contractului rămân pe deplin aplicabile în termenul prevăzut la art.3.1 din Promisiune.

**6    Dreptul de folosință al Imobilului**

6.1. Promitentul Vânzător acordă cu titlu gratuit Promitentului Cumpărător, până la încheierea Contractului, un drept de folosință deplin și exclusiv asupra Imobilului pentru realizarea următoarelor activități:

-   acces în vederea efectuării oricăror evaluări sau măsurători necesare;

-   efectuarea oricăror acțiuni de remediere în condițiile art. 5.2 d) de mai sus.

-   orice altă activitate necesară în vederea autorizării activității Promitentului Cumpărător, respectiv creșterea de procine, prevăzută în condițiile prezentei Promisiuni.

Property that is imposed by the competent environment protection authority or by applicable legislation, regardless of whether such remedial actions are caused by act, facts or actions prior or further to the signing date of the SPA, estimated at the date of this Agreement at the amount of EURO 30,000.

The Promissory Buyer may initiate these remedial actions with a view to obtaining the approvals in principle mentioned at art. 3.3, at any time it shall deem necessary or useful after the execution of this Agreement, following the notification of the Promissory Seller with regard to.

5.3    Any obligations or formalities provided by any legal provisions in force as being incumbent on any of the Parties with a view to the conclusion of the SPA remain fully applicable during the term mentioned in art. 3.1 of the Agreement.

**6    Right of use of the Property**

6.1. The Promissory Seller grants the Promissory Buyer, until the conclusion of the SPA, a full, free of charge and exclusive right of use of the Property for the performance of the following activities.

-   access for the performance or any necessary evaluation or measurement;

-   performance of any remedial action under the terms of art. 5.2 d) above.

-   any other activity necessary for the purpose of authorizing the activity of the Promissory Buyer, namely swine production, as provided under the conditions of this Agreement.

*S-a solicitat autentificarea prezentului înscris / The authentication of this document has been requested:*

6.2. Promitentul Cumpărător, are, în privința dreptului de folosință acordat conform art. 6.1 de mai sus, drepturile și obligațiile unui locatar al bunului.

6.2. The Promissory Buyer has, in relation to the right of use granted under art. 6.1 above, the rights and obligations of a lessee of the asset.

6.3. În cazul în care la Data limită, Părțile nu au încheiat Contractul în condițiile prevăzute în prezenta Promisiune, dreptul de folosință al Promitentului Cumpărător încetează de plin drept, fără nicio altă formalitate prealabilă, termen de grație sau intervenție a vreunei instanțe de judecată la Data limită.

6.3. If the Parties have not executed the SPA until the Final Date, under the conditions mentioned in this Agreement, the right of use of the Promissory Buyer is terminated as of right, without any other prior formality, grace period or intervention of any court of law on the Final Date.

**7    Clauze finale**

**7    Final Clauses**

7.1. Părțile declară că au citit cuprinsul Promisiunii și aceasta corespunde în întregime voinței și condițiilor stabilite, drept pentru care semnează mai jos.

7.1. The Parties represent that they have read the content of the Agreement and that it corresponds entirely to their will and the conditions agreed upon, therefore they sign below.

7.2. Orice comunicare sau notificare rezultată din prezenta Promisiune va fi adresată între Părți prin e-mail sau prin scrisoare recomandată cu confirmare de primire la următoarele date de contact:

7.2. Any communication or notification derived from or in relation to this Agreement will be sent between the Parties by e-mail or by registered letter with acknowledgement of receipt to the following contact data.

Pentru Promitentul Vânzător:

To the Promissory Seller:

**Jeffrey D. Goetz, Esq.**

**Jeffrey D. Goetz, Esq.**

Avocat

Attorney at Law

Bradshaw, Fowler, Proctor & Fairgrave, P.C.
801 Grand Avenue, Apartament 3700
Des Moines, IA  50309-8004
Linie directă: (515) 246-5817
Fax: (515) 246-5808

Bradshaw, Fowler, Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA  50309-8004
Direct Line:  (515) 246-5817
Fax:  (515) 246-5808

E-Mail: goetz.jeffrey@bradshawlaw.com.

E-Mail:  goetz.jeffrey@bradshawlaw.com

**Dna. Adina Gutiu**

**Mrs. Adina Gutiu**

E-mail: agutiu@deloittece.com

E-mail: agutiu@deloittece.com

Reff și Asociații SCA

Reff and Associates SCA

4-8 Nicolae Titulescu Road, East Entrance,



*S-a solicitat autentificarea prezentului înscris / The authentication of this document has been requested:*

| | |
|---|---|
| Șos. Nicolae Titulescu nr. 4-8, Intrarea de est, Etaj 2, Sector 1, București | 2nd Floor, District 1, Bucharest |
| **Pentru Promitentul Cumpărător:** | **To the Promissory Buyer:** |
| **Dl. Alin Ancuța** | **Mr. Alin Ancuța** |
| E-mail:ancuta.alin@gmail.com | E-mail: ancuța.alin@gmail.com |
| Satul Mihăești, Comuna Mihăești nr. 133, C21, Camera nr. 21, Județul Vâlcea. | Mihăești Village, Mihăești Commune, No. 133, Building C21, Room no. 21, Vâlcea County |

7.3. Orice litigiu dintre Părți ce ar decurge din încheierea sau executarea prezentei Promisiuni și care nu poate fi soluționată pe cale amiabilă, va fi soluționat de către instanțele judecătorești competente. Orice notificare intre Părți se va transmite la adresa menționată în partea introductivă a Promisiunii.

7.3. Any dispute between the Parties deriving from the conclusion or the performance of this Agreement and which cannot be settled amicably, will be settled by the competent courts of law. Any notification between the Parties will be sent to the address specified in the introductory part hereof.

7.4 Prezenta Promisiune a fost redactată și semnată în limbile română și engleză. În caz de neconcordanțe între versiunile în limba română și cea în limba engleză, versiunea în limba română va prevala.

7.4 This Agreement has been drawn-up and executed in Romanian and English languages. In case of discrepancies between the Romanian and the English versions, the Romanian version shall prevail.

7.5 Următoarele Anexe fac parte integrantă din prezentul Contract:

7.5 The following Appendixes form an integral part of this Agreement:

Anexa nr. 1 – Oferta Promitentului Cumparator nr. 14 din 5 aprilie 2013

Appendix no. 1 – The Offer of the Promissory Buyer no. 14 dated 5 April 2013

Anexa nr. 2 – Descrierea Imobilului

Appendix no. 2 – Description of the Property

Anexa nr. 3 – Istoricul dreptului de proprietate asupra Imobilului

Appendix no. 3 – History of the ownership title over the Property

Anexa no. 4 – Documentația cadastrală aferentă Imobilului.

Appendix no. 4 – Cadastral documentation of the Property.

Anexa nr. 5 – Evaluarea Imobilului (descriere pe scurt)

Appendix no. 5 – Property evaluation (executive summary)

Subsemnata, **Cristiana - Luminița Popa**, în calitate de reprezentant al Promitentului Vânzător declar, pe proprie răspundere,

The undersigned **Cristiana - Luminița Popa**, in my capacity as representative of the Promissory Seller, I declare, in lieu of oath, aware of the provisions of art. 292 Criminal

11

*S-a solicitat autentificarea prezentului înscris / The authentication of this document has been requested:*

cunoscând prevederile art. 292 Cod Penal referitoare la falsul in declaraţii, că nu am cunoştinţă de vreo cauză de incetare sau de revocare a mandatului in baza căruia am încheiat și semnat prezenta Promisiune.

Subsemnatul, **Alin Ancuţa**, în calitate de reprezentant al Promitentului Cumpărător, declar, pe proprie răspundere, cunoscând prevederile art. 292 Cod Penal referitoare la falsul in declaraţii, că nu am cunoştinţă de vreo cauză de incetare sau de revocare a mandatului in baza căruia am încheiat şi semnat prezenta Promisiune.

7.6  Părţile solicită notarea prezentei Promisiuni în Cartea funciară a Imobilului.

Redactată şi autentificată de notar public Adela Cetinturk, din cadrul BNP Fides, situat în Bucureşti, în 4 (four) exemplare originale, din care 2 (două) exemplare au fost înmânate Părţilor.

Code regarding false statements, that I am not aware of any termination or revocation cause of the mandate based on which I have concluded and executed this Agreement.

The undersigned **Alin Ancuţa**, in my capacity as representative of the Promissory Buyer, I declare, in lieu of oath, aware of the provisions of art. 292 Criminal Code regarding false statements, that I am not aware of any termination or revocation cause of the mandate based on which I have concluded and executed this Agreement.

7.6 The Parties request the registration of this Agreement in the Land Book of the Property.

Drawn up and authenticated by the Notary Public Adela Cetinturk, of the Notary Public Office Fides located in Bucharest, in four (4) original copies, of which two (2) were handed over to the Parties.



**S.C. NATURAL PORC PRODUCTION OLT
S.R.L.**

**S.C. NATURAL PORC PRODUCTION OLT
S.R.L.**



**S.C. AGRIKILTI S.R.L.**

**S.C. AGRIKILTI S.R.L.**

Urmează Încheierea de autentificare:

The authentication resolution shall follow:

12

*S-a solicitat autentificarea prezentului înscris / The authentication of this document has been requested:*

**Anexa nr. 1**

**Appendix no. 1**

**Oferta Promitentului Cumpărător nr. 14 din 5 aprilie 2013**

**The offer of the Promissory Buyer no. 14 dated 5 April 2013**



13







**S.C. AGRIKILKI S.R.L.**
*Com. Mihaiesti, nr.133, C 21, jud. Valcea*
*CUI 29802789; J 38 /95/2012*

*Nr. 14/05.04.2013*

Catre,
**S.C. NATURAL PORC PRODUCTION OLT S.R.L.**
**Bucuresti, str. Trotus, nr. 6, sector 1**
**CUI RO 18573000, J 40/6049/2006**

Subscrisa, S.C. AGRIKILTI S.R.L., cu sediul social in com. Mihaiesti, nr. 133, C 21, jud. Valcea, inregistrata la Oficiul Registrului Comertului Valcea sub nr. J 38/95/2012, CUI RO 29802789, reprezentata legal de dl. Isacila Georginel-Stefan va transmite prin prezenta oferta noastra ferma de cumpararea a activului: ferma porcine – situata in com. Ipotesti, sat Ipotesti, judetul Olt, inscrisa in CF nr. 11 a comunei Ipotesti la nr. cadastral 13 in urmatoarele conditii:

- Pret: 500.000 euro plus TVA – numai pentru imobilele la care este aplicabil;
- Avans 100.000 euro platibil la data semnarii antecontractului de vanzare-cumparare in forma autentica;
- Avansul va fi depus intr-un cont escrow, urmand ca diferenta de 400.000 euro sa fie achitata in termen de 60 de zile de la semnarea antecontractului de vanzare – cumparare sub conditia suspensiva a obtinerii acordurilor necesare functionarii, bineinteles si depunerea diligentelor necesare.
- Daca dupa cele 60 de zile nu vor fi obtinute acordurile necesare functionarii avansul va fi restituit.
- Daca vor fi obtinute acordurile necesare functionarii ne obligam sa semnam contractul in forma autentica si sa preluam ferma.

*Administrator: Isacila Georginel-Stefan*
*Prin Mandatar, in baza Procura autentificata sub nr.3989/21.04.2012*
*– Ancuta Alin Ancuta*





*S-a solicitat autentificarea prezentului înscris / The authentication of this document has been requested.*

| Anexa nr. 2 | Appendix no. 2 |
|---|---|
| **Descrierea Imobilului** | **The description of the Property** |
| I)  **Teren** în suprafaţă măsurată de **134.288 (o sută trei zeci şi patru de mii două sute opt zeci şi opt) mp**, configurat după cum urmează: | I)  **Land** with a measured surface area of **134,288 (one hundred thirty-four thousand two hundred and eighty-eight) sq m.**, configured as follows: |
| - Teren în suprafaţă măsurată de **117.597 mp**, având categoria de folosinţă curţi-construcţii; <br> - Teren în suprafaţă măsurată de **12.990 mp**, având categoria de folosinţă ape stătătoare; <br> - Teren în suprafaţă măsurată de **3.601 mp**, având categoria de folosinţă drum. | o  Land with a measured surface area of **117,597 sq.m**, with the category of use as buildable-land; <br><br> o  Land with a measured surface area of **12,990 sq.m.**, with the category of use as stagnant water; <br><br> o  Land with a measured surface area of **3,601 sq.m.**, with the category of use as road. |
| II)  **Construcţiile** edificate pe acest teren, după cum urmează: | II)  **The constructions** erected on this plot, as follows: |
| - Construcţia notată cu simbolul **C1**, având destinaţia de padoc, în suprafaţă construită de **2.164,50 mp**, identificată cu număr cadastral **13-C1**; <br> - Construcţia notată cu simbolul **C2**, având destinaţia de padoc, în suprafaţă construită de **2.164,50 mp**, identificată cu număr cadastral **13-C2**; <br> - Construcţia notată cu simbolul **C3**, având destinaţia de padoc, în suprafaţă construită de **2.164,50 mp**, identificată cu număr cadastral **13-C3**; <br> - Construcţia notată cu simbolul **C4**, având destinaţia de padoc, în suprafaţă construită de **2.164,50 mp**, identificată cu număr cadastral **13-C4**; <br> - Construcţia notată cu simbolul **C5**, având destinaţia de padoc, în suprafaţă construită de **2.164,50 mp**, identificată cu număr cadastral **13-C5**; <br> - Construcţia notată cu simbolul **C6**, | - Construction marked with the symbol **C1**, with the intended use as paddock, with a built surface area of **2,164.50 sq.m**, identified with cadastral no. **13-C1**; <br> - Construction marked with the symbol **C2**, with the intended use - paddock, with a built surface area of **2,164.50 sq.m.**, identified with cadastral no. **13-C2**; <br> - Construction marked with the symbol **C3**, with the intended use - paddock, with a built surface area of **2,164.50 sq.m.**, identified with cadastral no. **13-C3**; <br> - Construction marked with the symbol **C4**, with the intended use - paddock, with a built surface area of **2,164.50 sq.m.**, identified with cadastral no. **13-C4**; <br> - Construction marked with the symbol **C5**, with the intended use - paddock, with a built surface area of **2,164.50 sq.m.**, identified with cadastral no. **13-C5**; <br> - Construction marked with the symbol |

14

*S-a solicitat autentificarea prezentului înscris / The authentication of this document has been requested:*

| | |
|---|---|
| având destinaţia de padoc, în suprafaţă construită de **2.164,50 mp**, identificată cu număr cadastral **13-C6**; | **C6**, with the intended use - paddock, with a built surface area of **2,164.50 sq.m.**, identified with cadastral no. **13-C6**; |
| - Construcţia notată cu simbolul **C7**, având destinaţia de padoc, în suprafaţă construită de **2.164,50 mp**, identificată cu număr cadastral **13-C7**; | - Construction marked with the symbol **C7**, with the intended use - paddock, with a built surface area of **2,164.50 sq.m.**, identified with cadastral no. **13-C7**; |
| - Construcţia notată cu simbolul **C8**, având destinaţia de padoc, în suprafaţă construită de **2.164,50 mp**, identificată cu număr cadastral **13-C8**; | - Construction marked with the symbol **C8**, with the intended use - paddock, with a built surface area of **2,164.50 sq.m.**, identified with cadastral no. **13-C8**; |
| - Construcţia notată cu simbolul **C9**, având destinaţia de padoc, în suprafaţă construită de **2.164,50 mp**, identificată cu număr cadastral **13-C9**; | - Construction marked with the symbol **C9**, with the intended use - paddock, with a built surface area of **2,164.50 sq.m.**, identified with cadastral no. **13-C9**; |
| - Construcţia notată cu simbolul **C10**, având destinaţia de padoc, în suprafaţă construită de **2.164,50 mp**, identificată cu număr cadastral **13-C10**; | - Construction marked with the symbol **C10**, with the intended use - paddock, with a built surface area of **2,164.50 sq. m.**, identified with cadastral no. **13-C10**; |
| - Construcţia notată cu simbolul **C11**, având destinaţia de padoc, în suprafaţă construită de **2.164,50 mp**, identificată cu număr cadastral **13-C11**; | - Construction marked with the symbol **C11**, with the intended use - paddock, with a built surface area of **2,164.50 sq.m.**, identified with cadastral no. **13-C11**; |
| - Construcţia notată cu simbolul **C12**, având destinaţia de padoc, în suprafaţă construită de **2.164,50 mp**, identificată cu număr cadastral **13-C12**; | - Construction marked with the symbol **C12**, with the intended use - paddock, with a built surface area of **2,164.50 sq.m.**, identified with cadastral no. **13-C12**; |
| - Construcţia notată cu simbolul **C13**, având destinaţia de padoc, în suprafaţă construită de **2.164,50 mp**, identificată cu număr cadastral **13-C13**; | - Construction marked with the symbol **C13**, with the intended use - paddock, with a built surface area of **2,164.50 sq.m.**, identified with cadastral no. **13-C13**; |
| - Construcţia notată cu simbolul **C14**, având destinaţia de cabină basculă, în suprafaţă construită de **13,50 mp**, identificată cu număr cadastral **13-C14**; | - Construction marked with the symbol **C14**, with the intended use - weighbridge cabin, with a built surface area of **13.50 sq.m.**, identified with cadastral no. **13-C14**; |
| - Construcţia notată cu simbolul **C15**, având destinaţia de cântar basculă, în suprafaţă construită de **43,75 mp**, identificată cu număr cadastral **13-C15**; | - Construction marked with the symbol **C15**, with the intended use - lever scale, with a built surface area of **43.75 sq.m.**, identified with cadastral no. **13-C15**; |
| - Construcţia notată cu simbolul **C16**, având destinaţia de coteţ păsări, în suprafaţă construită de **22,50 mp**, | - Construction marked with the symbol **C16**, with the intended use - hen-coop, with a built surface area of |



*S-a solicitat autentificarea prezentului înscris / The authentication of this document has been requested*

ANEXĂ LA AUTENTIC
NR. 662/ 2013

| | |
|---|---|
| identificată cu număr cadastral **13-C16**; | **22.50 sq.m.**, identified with cadastral no. **13-C16**; |
| - Construcţia notată cu simbolul **C17**, având destinaţia de cantină, în suprafaţă construită de **101 mp**, identificată cu număr cadastral **13-C17**; | - Construction marked with the symbol **C17**, with the intended use - canteen, with a built surface area of **101 sq.m.**, identified with cadastral no. **13-C17**; |
| - Construcţia notată cu simbolul **C18**, având destinaţia de depozit combustibil, în suprafaţă construită de **19,25 mp**, identificată cu număr cadastral **13-C18**; | - Construction marked with the symbol **C18**, with the intended use - fuel storage, with a built surface area of **19.25 sq.m.**, identified with cadastral no. **13-C18**; |
| - Construcţia notată cu simbolul **C19**, având destinaţia de solar, în suprafaţă construită de **24 mp**, identificată cu număr cadastral **13-C19**; | - Construction marked with the symbol **C19**, with the intended use - solarium, with a built surface area of **24 sq.m.**, identified with cadastral no. **13-C19**; |
| - Construcţia notată cu simbolul **C20** având destinaţia de parc biciclete, în suprafaţă construită de **44 mp**, identificată cu număr cadastral **13-C20**; | - Construction marked with the symbol **C20** with the intended use - bicycle park, with a built surface area of **44 sq.m.**, identified with cadastral no. **13-C20**; |
| - Construcţia notată cu simbolul **C21**, având destinaţia de depozit veterinar, în suprafaţă construită de **93,75 mp**, identificată cu număr cadastral **13-C21**; | - Construction marked with the symbol **C21**, with the intended use - veterinary storage, with a built surface area of **93.75 sq.m.**, identified with cadastral no. **13-C21**; |
| - Construcţia notată cu simbolul **C22**, având destinaţia de centrală electrică, în suprafaţă construită de **172,50 mp**, identificată cu număr cadastral **13-C22**; | - Construction marked with the symbol **C22**, with the intended use - power plant, with a built surface area of **172.50 sq.m.**, identified with cadastral no. **13-C22**; |
| - Construcţia notată cu simbolul **C23**, având destinaţia de filtru, în suprafaţă construită de **360 mp**, identificată cu număr cadastral **13-C23**; | - Construction marked with the symbol **C23**, with the intended use - filter, with a built surface area of **360 sq.m.**, identified with cadastral no. **13-C23**; |
| - Construcţia notată cu simbolul **C24**, având destinaţia de padoc (ţarc), în suprafaţă construită de **196 mp**, identificată cu număr cadastral **13-C24**; | - Construction marked with the symbol **C24**, with the intended use - paddock (fold), with a built surface area of **196 sq. m.**, identified with cadastral no. **13-C24**; |
| - Construcţia notată cu simbolul **C25**, având destinaţia de rampă, în suprafaţă construită de **36,28 mp**, identificată cu număr cadastral **13-C25**; | - Construction marked with the symbol **C25**, with the intended use - baluster, with a built surface area of **36.28 sq.m.**, identified with cadastral no. **13-C25**; |
| - Construcţia notată cu simbolul **C26**, având destinaţia de heleşteu, în suprafaţă construită de **490,63 mp**, identificată cu număr cadastral **13-C26**; | - Construction marked with the symbol **C26**, with the intended use - pond, with a built surface area of **490.63 sq.m.**, identified with cadastral no. **13-C26**; |

16

*S-a solicitat autentificarea prezentului înscris / The authentication of this document has been requested:*

- Construcţia notată cu simbolul C27, având destinaţia de FMC, în suprafaţă construită de 142,01 mp, identificată cu număr cadastral 13-C27;
- Construcţia notată cu simbolul C28, având destinaţia de magazie cereale, în suprafaţă construită **de 1.447,88 mp**, identificată cu număr cadastral **13-C28**;
- Construcţia notată cu simbolul C29, având destinaţia de ateliere, în suprafaţă construită de 96,13 mp, identificată cu număr cadastral 13-C29;
- Construcţia notată cu simbolul C30, având destinaţia de moară DI, în suprafaţă construită de **287 mp**, identificată cu număr cadastral 13-C30;
- Construcţia notată cu simbolul **C31**, având destinaţia de magazie cereale, în suprafaţă construită de **1447,88 mp**, identificată cu număr cadastral 13-C31;
- Construcţia notată cu simbolul **C32**, având destinaţia de platformă betonată, în suprafaţă construită de **390 mp**, identificată cu număr cadastral 13-C32;
- Construcţia notată cu simbolul C33, având destinaţia de padoc, în suprafaţă construită de 483,63 mp, identificată cu număr cadastral 13-C33;
- Construcţia notată cu simbolul C34, având destinaţia de centrală termică, în suprafaţă construită de 197,97 **mp**, identificată cu număr cadastral **13-C34**;
- Construcţia notată cu simbolul **C35**, având destinaţia de adăpost animale, în suprafaţă construită de **13,14 mp**, identificată cu număr cadastral 13-C35;
- Construcţia notată cu simbolul C36, având destinaţia de birouri, în suprafaţă construită de **72 mp**, identificată cu număr cadastral 13-C36;
- Construcţia notată cu simbolul **C37**, având destinaţia de staţie biogaz, în

- Construction marked with the symbol **C27**, with the intended use - FMC, with a built surface area of **142.01 sq.m.**, identified with cadastral no. **13-C27**;
- Construction marked with the symbol **C28**, with the intended use - grain storage, with a built surface area of **1447.88 sq.m.**, identified with cadastral no. **13-C28**;
- Construction marked with the symbol **C29**, with the intended use - workshops, with a built surface area of **96.13 sq.m.**, identified with cadastral no. **13-C29**;
- Construction marked with the symbol **C30**, with the intended use – DI mill, with a built surface area of **287 sq.m.**, identified with cadastral no. **13-C30**;
- Construction marked with the symbol **C31**, with the intended use - grain storage, with a built surface area of **1447.88 sq.m.**, identified with cadastral no. **13-C31**;
- Construction marked with the symbol **C32**, with the intended use - concrete platform, with a built surface area of **390 sq.m.**, identified with cadastral no. **13-C32**;
- Construction marked with the symbol **C33**, with the intended use - paddock, with a built surface area of **483.63 sq.m.**, identified with cadastral no. **13-C33**;
- Construction marked with the symbol **C34**, with the intended use - thermic plant, with a built surface area of **197.97 sq.m.**, identified with cadastral no. **13-C34**;
- Construction marked with the symbol **C35**, with the intended use - animal shelter, with a built surface area of **13.14 sq.m.**, identified with cadastral no. **13-C35**;
- Construction marked with the symbol **C36**, with the intended use - offices, with a built surface area of **72 sq.m.**, identified with cadastral no. **13-C36**;
- Construction marked with the symbol **C37**, with the intended use - biogas



*S-a solicitat autentificarea prezentului înscris / The authentication of this document has been requested.* ...............

suprafață construită de **82,50 mp**, identificată cu număr cadastral **13-C37**;

- Construcția notată cu simbolul **C38**, având destinația de anexă stație biogaz, în suprafață construită de **29,25 mp**, identificată cu număr cadastral **13-C38**;

- Construcția notată cu simbolul **C39**, având destinația de remiză biogaz, în suprafață construită de **259,53 mp**, identificată cu număr cadastral **13-C39**;

- Construcția notată cu simbolul **C40**, având destinația de stație biogaz, în suprafață construită de **24 mp**, identificată cu număr cadastral **13-C40**;

- Construcția notată cu simbolul **C41**, având destinația de stație epurare, în suprafață construită de **2.331 mp**, identificată cu număr cadastral **13-C41**;

- Construcția notată cu simbolul **C42**, având destinația de stație epurare, în suprafață construită de **2.331 mp**, identificată cu număr cadastral **13-C42**;

- Construcția notată cu simbolul **C43**, având destinația de bazin gazificare, în suprafață construită de **94,50 mp**, identificată cu număr cadastral **13-C43**;

- Construcția notată cu simbolul **C44**, având destinația de sală motoare, în suprafață construită de **8,63 mp**, identificată cu număr cadastral **13-C44**;

- Construcția notată cu simbolul **C45**, având destinația de rezervor, în suprafață construită de **40,87 mp**, identificată cu număr cadastral **13-C45**;

- Construcția notată cu simbolul **C46**, având destinația de sală motoare, în suprafață construită de **15 mp**, identificată cu număr cadastral **13-C46**;

- Construcția notată cu simbolul **C47**, având destinația de bazin colectare, în suprafață construită de **33,95 mp**, identificată cu număr cadastral **13-**

station, with a built surface area of **82.50 sq.m.**, identified with cadastral no. **13-C37**;

- Construction marked with the symbol **C38**, with the intended use - biogas station annex, with a built surface area of **29.25 sq.m.**, identified with cadastral no. **13-C38**;

- Construction marked with the symbol **C39**, with the intended use - biogas shed, with a built surface area of **259.53 sq.m.**, identified with cadastral no. **13-C39**;

- Construction marked with the symbol **C40**, with the intended use - biogas station, with a built surface area of **24 sq.m.**, identified with cadastral no. **13-C40**;

- Construction marked with the symbol **C41**, with the intended use - waste water treatment plant, with a built surface area of **2,331 sq.m.**, identified with cadastral no. **13-C41**;

- Construction marked with the symbol **C42**, with the intended use - waste water treatment plant, with a built surface area of **2.331 sq.m.**, identified with cadastral no. **13-C42**;

- Construction marked with the symbol **C43**, with the intended use - gasification tank, with a built surface area of **94.50 sq.m.**, identified with cadastral no. **13-C43**;

- Construction marked with the symbol **C44**, with the intended use - engine room, with a built surface area of **8.63 sq.m.**, identified with cadastral no. **13-C44**;

- Construction marked with the symbol **C45**, with the intended use - tank, with a built surface area of **40.87 sq.m.**, identified with cadastral no. **13-C45**;

- Construction marked with the symbol **C46**, with the intended use - engine room, with a built surface area of **15 sq.m.**, identified with cadastral no. **13-C46**;

- Construction marked with the symbol **C47**, with the intended use - collecting tank, with a built surface area of **33.95 sq.m.**, identified with

*S-a solicitat autentificarea prezentului înscris / The authentication of this document has been requested:*

| | |
|---|---|
| C47; | cadastral no. **13-C47**; |
| - Construcţia notată cu simbolul **C48**, având destinaţia de staţie hidrofor, în suprafaţă construită de **81 mp**, identificată cu număr cadastral **13-C48**; | - Construction marked with the symbol **C48**, with the intended use - house water supply plant, with a built surface area of **81 sq.m.**, identified with cadastral no. **13-C48**; |
| - Construcţia notată cu simbolul **C49**, având destinaţia de rezervor apă, în suprafaţă construită de **47,68 mp**, identificată cu număr cadastral **13-C49**; | - Construction marked with the symbol **C49**, with the intended use - water tank, with a built surface area of **47.68 sq.m.**, identified with cadastral no. **13-C49**; |
| - Construcţia notată cu simbolul **C50**, având destinaţia de puţ apă, în suprafaţă construită de **99,97 mp**, identificată cu număr cadastral **13-C50**; | - Construction marked with the symbol **C50**, with the intended use - well, with a built surface area of **99.97 sq.m.**, identified with cadastral no. **13-C50**; |
| - Construcţia notată cu simbolul **C51**, având destinaţia de puţ apă, în suprafaţă construită de **100,20 mp**, identificată cu număr cadastral **13-C51**; | - Construction marked with the symbol **C51**, with the intended use - well, with a built surface area of **100.20 sq.m.**, identified with cadastral no. **13-C51**; |
| - Construcţia notată cu simbolul **C52**, având destinaţia de puţ apă, în suprafaţă construită de **100,45 mp**, identificată cu număr cadastral **13-C52**; | - Construction marked with the symbol **C52**, with the intended use - well, with a built surface area of **100.45 sq.m.**, identified with cadastral no. **13-C52**; |
| - Construcţia notată cu simbolul **C53**, având destinaţia de puţ apă, în suprafaţă construită de **99,99 mp**, identificată cu număr cadastral **13-C53**. | - Construction marked with the symbol **C53**, with the intended use - well, with a built surface area of **99.99 sq.m.**, identified with cadastral no. **13-C53**. |



*S-a solicitat autentificarea prezentului înscris / The authentication of this document has been requested:*

ANEXĂ LA AUTENTIC
NR. 662 / 2012

| Anexa nr. 3 | Appendix no. 3 |
|---|---|
| **Istoricul dreptului de proprietate asupra Imobilului** | **History of ownership title over the Property** |
| Promitentul Vânzător a dobândit dreptul de proprietate asupra Imobilului prin cumpărare de la S.C SPAR S.R.L, în baza contractului de vânzare - cumpărare autentificat sub nr. 1037 din data de 5 iunie 2006 de către notarul public Ştefan Daniela, cu sediul biroului în Mun. Bucureşti. | The Promissory Seller acquired the ownership right over the Property by purchase from S.C. SPAR S.R.L, according to the sale - purchase agreement authenticated under no. 1037 dated 5 June 2006 by the Notary Public Daniela Stefan, with the office seat in Bucharest. |
| Anterior, S.C. SPAR S.R.L. a dobândit dreptul de proprietate asupra Imobilului prin cumpărare de la S.C. ALUTA S.A., în baza contractului de vânzare - cumpărare autentificat sub nr. 893 din data de 30 mai 2005 de către notarul public Veronica Constantinescu, cu sediul biroului în Mun. Slatina. | Previously, S.C. SPAR S.R.L. acquired the ownership right over the Property by purchase from S.C. ALUTA S.A., according to the sale-purchase agreement authenticated under no. 893 dated 30 May 2005 by the Notary Public Veronica Constantinescu, with the office seat in Slatina. |
| Iniţial, S.C. ALUTA S.A. a dobândit dreptul de proprietate asupra Imobilului în temeiul ordonanţei de adjudecare pronunţată la data de 23 septembrie 1995 în dosarul de faliment nr. 4262/1993 a Tribunalului Olt, conform sentinţei civile nr. 3977 din data de 23 mai 1996 pronunţată de către Judecătoria Slatina, rămasă definitivă, existând şi procesul verbal de punere în posesie nr. 199 din 20 februarie 2005 încheiat cu Primăria Comunei Ipoteşti, Comisia locală de aplicare a Legii nr. 18/1991. | Initially, S.C. ALUTA S.A. acquired the ownership right over the Property pursuant to the adjudication order awarded on 23 September 1995 in the bankruptcy case no. 4262/1993 of the Olt Tribunal, pursuant to the civil decision no. 3977 dated 23 May 1996 awarded by the Slatina First Instance Court, which became final; also existing the hand-over protocol no. 199 dated 20 February 2005 concluded with the Ipotesti Municipality, the Local Committee for the enforcement of the Law 18/1991. |

20





*S-a solicitat autentificarea prezentului înscris / The authentication of this document has been requested:*

**Anexa nr. 4**                          **Appendix no. 4**

**Documentaţia cadastrală aferentă Imobilului**      **The cadastral documentation of the Property**



21





ANEXĂ LA AUTENTIC
NR. 6621   2013

## MEMORIU TEHNIC

1. Denumirea lucrarii: PLAN DE AMPLASAMENT SI DELIMITARE AL CORPULUI DE PROPRIETATE scara 1 : 2000, nr.20 /2005 din registrul de evidenta propriu.

2. Beneficiarul lucrarii : SC ALUTA SA, cu sediu in mun. Slatina, str. Draganesti, nr 33, jud. Olt.

3. Executantul lucrarii : STERPU EMILIAN autorizatia seria OT, numarul 075 din 27. 06 2002.

4. Scopul lucrarii : Documentatia s-a intocmit in vederea inscrierii in Cartea Funciara.

5. Amplasamentul corpului de proprietate : Corpul de proprietate se afla in extravilanul comunei Ipotesti, jud. OLT.
Terenul are urmatoarele vecinatati :

|      |      |                            |
| NORD | - Asoc. Agric Coteana |
| EST  | - Teren al com Ipotesti |
| SUD  | - Teren al com Ipotesti |
| VEST | - Izlaz comunal Ipotest | ( dimensiuni distanta – anexa cu coordonate) |

Constructiile C1- C13 – Padocuri pentru porci. Sunt facute din pereti de beton armat pe fundatie de beton si acoperite cu placi de azbociment ; fiecare are o suprafata construita la sol de 2164.50 mp..

Constructia C14 – Cabina bascula ; este facuta din placi de beton pe fundatie de beton armat iar acoperisul din placi de azbociment ; are o sup. de 13.50 mp.

Constructia C15 – Cantar bascula ; are o sup. de 43.75 mp.

Constructia C16 – Coset pasari ; este facuta din dale de beton armat si fier beton ; fundatie de beton ; are o sup. de 22.50 mp.

Constructia C17 – Cantina ; este facuta din beton pe fundatie de beton ; are 3 camere ; acoperisul hidroizolant ; are o sup.construita la sol de 100.75 mp.

Constructia C18 – Depozit combustibil, partial ingropat ;  este facuta din beton cu acoperisul din placi de azbociment ; are o sup. construita la sol de 19.25 mp.

Constructia C19 – Solar ; este facuta din schelet metalic si are o sup. construita la sol de 24.00 mp.

Constructia C20 – Parc biciclete ; este betonata cu acoperisul din placi de azbociment ; are o sup. construita la sol de 44.00 mp.

Constructia C21 – Dispensar veterinar ; este facuta din beton pe fundatie de beton ; are 3 camere ; acoperisul hidroizolant; are o sup.construita la sol de 93.75 mp.

Constructia C22 – Centrala electrica ; este facuta din caramida pe fundatie de beton ; are 2 camere ; acoperisul hidroizolant; are o sup.construita la sol de 172.50 mp.

Constructia C23 – Filtru ; este facuta din beton pe fundatie de beton ; are 4 camere ; acoperisul hidroizolant; are o sup.construita la sol de 360.00 mp.

Constructia C24 – Padoc(tarc) ; este facuta din gard din dale de beton pe fundatie de beton ; fara acoperis ; are o sup.construita la sol de 196.00 mp.

Constructia C25 – Rampa; este facuta din beton si fier beton ; are o sup.construita la sol de 36.28 mp.

C26 – Helesteu ; are o sup. de 490.63 mp.(actualmente este desecat);

Constructia C27 – FNC ; este facuta din caramida si placi de azbociment pe fundatie de beton ; acoperisul din tabla ondulata; are o sup.construita la sol de 142.01 mp.

Constructia C28 – Magazie cereale ; este facuta din beton pe fundatie de beton ; acoperisul hidroizolant; are o sup.construita la sol de 641.75 mp.

Constructia C29 – Ateliere ; este facuta din caramida si plase din fier beton ; acoperisul hidroizolant; are o sup.construita la sol de 96.13 mp.

Constructia C30 –Moara DI ; este facuta din placi de beton ; acoperisul partial acoperit cu placi de azbociment; are o sup.construita la sol de 286.75 mp.

Constructia C31 – Magazie cereale ; este facuta din ziduri de beton  si din tabla pe fundatie de beton ; acoperisul din placi de azbociment; are o sup.construita la sol de 1447.88 mp.

C32 – Platforma betonata ; este facuta din beton; are o sup.construita la sol de 390.00 mp.

Constructia C33 – Padoc ; este facuta din ziduri din dale de beton si fier beton ; acoperisul din placi de azbociment; are o sup.construita la sol de 482.63 mp. (partial este demolat).

Constructia C34 – Centrala termica ; este facuta din caramida pe fundatie de beton ; acoperisul hidroizolant; are o sup.construita la sol de 197.97 mp.

Constructia C35 – Adapost animale ; este facuta din caramida pe fundatie de beton ; acoperisul din placi de azbociment; are o sup.construita la sol de 13.14 mp.

Constructia C36– Birouri ; este facuta din beton pe fundatie de beton ; are 3 camere ; acoperisul hidroizolant; are o sup.construita la sol de 72.00mp.

Constructia C37 – Statie biogaz ; este facuta din caramida pe fundatie de beton ; are 2 nivele ; acoperisul hidroizolant; are o sup.construita la sol de 82.50 mp.





COPIE LA AUTENTIC
NR. 682  2013

Constructia C38 — Anexa la statia de biogaz ; este facuta din beton pe fundatie de beton ; acoperisul hidroizolant;
are o sup.construita la sol de 29.25 mp.

Constructia C39 — Remiza statie de biogaz ; este facuta din beton pe fundatie de beton ; acoperisul hidroizolant;
o sup.construita la sol de 259.53 mp.

Constructia C40 — Anexa la statia de biogaz ; este facuta din beton pe fundatie de beton ; acoperisul hidroizolant;
are o sup.construita la sol de 24.00 mp.

Constructia C41 - C42 — Platforma epurare ; sunt facute din pereti de beton pe fundatie de beton ; fiecare are o
sup.construita la sol de 2331.00 mp.

Constructia C43 — Bazin gazeificare ; este facuta din beton pe fundatie de beton ; este partial ingropat ; are o
sup.construita la sol de 94.50 mp.

Constructia C44 — Sala motoare ; este subterana si facuta din beton ; are o sup.construita la sol de 8.61 mp.

Constructia C45 — Rezervor; este subterana si facuta din beton ; are o sup.construita la sol de 40.87 mp.

Constructia C46 — Sala motoare ; este subterana si facuta din beton ; are o sup.construita la sol de 15.00 mp

Constructia C47 — Bazin colectare; este subterana si facuta din beton ; are o sup.construita la sol de 33.94 mp.

Constructia C48 — Statie hidrofor; este facuta din beton pe fundatie de beton ; are o sup.construita la sol de 51.00 mp

Constructia C49 — Rezervor inmagazinare ; este subterana si facuta din beton ; acoperisul hidroizolant; are o
sup.construita la sol de 49.47 mp

Constructia C50 - C53 — Puturi apa; sunt subterane si facute din beton ; fiecare are o sup.construita la sol de 2 25
mp

6. Situatia juridica a corpului de proprietate : Corpul de proprietate pentru care s-a intocmit documentatia nu este
intabulat si este detinut in exclusivitate de catre SC ALUTA SA conform ORDONA       T ADJUDECARE din
23      1995 HOTARAREA JUDECATORIEI SLATINA SENTINTA CIVILA Nr. 39 / din 23.05 1996.

Suprafata terenului conform actelor    pr           cu 136 000 mp. teren

-sup incinta                        - 116 100.00mp
- sup bazin epurare                 - 12 980.00mp
-drum acces bazin stocare           -     750.00mp
-sup incinta rez apa si st. hidrofor -   1 200.00mp
-sup incinta puturi                 -     400.00mp
-drum acces la puturi               -   1540.00mp
-drum acces st. hidrofor            -    1330.00mp
-retea el. aeriana                  -     300.00mp
-cabluri subterane                  -     580.00mp
-retea subterana apa                -     760.00mp
-conducta subterana evacuare apa epurata  - 2 160.00mp

Suprafata din masuratori  este de 134 288.55 mp. teren extravilan astfel :
-sup incinta                        - 116 103.83 mp
-sup bazin epurare                  - 12 989.98 mp
-drum acces                         -   3 601.25 mp
-sup incinta rez apa si st. hidrofor -  1 192.88 mp
-sup incinta puturi                 -     400.61mp (99.97+100.20+11.45+99.99)

Diferenta de 3 711.45 mp o constituie suprafata aferenta utilitatilor subterane si aeriene care sunt
trecute in actul de proprietate

7. Operatiuni topo — cadastrale efectuate. Masuratorile au fost efectuate conform   normelor
tehnice in vigoare. Integrarea in sistemul national de referinta - pe baza de coordonate determinate grafic.
Reprezentarea grafica si calculul suprafetei s-a  executat cu programul AUTOCAD 2000, iar pentru masuratori a
fost folosit teodolitul DHALTA 020  cu precizia de 1 c. si panglica metalica de 50 m.

Data                                        INTOCMIT
29.03 2005                                  STERPU EMILIAN

CERTIFICAT
DE
AUTORIZARE Nr.OT 078
C
STERPU
EMILIAN
JUDETUL OLT







B.N.P VERONICA−CONSTANTINESCU−    FAX NO. : 0249424040    Mar. 09 20

NR. 062 / 2013

Jud. OLT
Unitat. administ.-terit IPOTESTI
Cod SIRUTA 127563
Cod intravilan/extravilan 1

L-35-133-B-b-1-IV
L-35-133-B-b-1-IV
Nomenclatura: L-35-133-B-b-1-IV
Nr. sector cadastral
Nr cadastral al bunului imobil 13
Nr. carte funciara

Schita

A. DATE REFERITOARE LA TEREN - vezi anexa

B. DATE REFERITOARE LA CONSTRUCTII - vezi anexa

C. DATE REFERITOARE LA PROPRIETAR:

| Nume/Denumire proprietar | Domiciliul Sediul propr. | Cod numeric personal | Tipul actului de proprietate | Cod gr. propr. | Suprafata din act (mp) | | | Mod de dobandire | | Mentiuni |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Teren | Construct. | | Exclusiv | Indiviziune | |
| SC ALUTA SA | mun. SLATINA Str. Dragonesti, Nr. 33, Jud. OLT | 1634 0/5 | ORDONANTA DE ADJUDECARE din 23.09.1995 HOTARAREA TRIBUNALULUI OLT Nr. 1384 din 01 10 1996 HOTARAREA JUDECATOARIE SLATINA Nr. 3977 din 23. 05 1996 | P1 | 138 000 | | | Da | | |

Data 23. 03 2006

VERIFICAT

OFICIUL DE CADASTRU, GEODEZIE SI CARTOGRAFIE JUDETUL OLT
CERTIFICAT DE AUTORIZARE nr. 0185 C. STELICA/U EMILIAN





ANEXĂ LA AUTENTIC

NR. 862 .... 2013

## A. DATE REFERITOARE LA TEREN

| Nr. parcela | Categ. de folosinta | Cod gr. destin. | Supraf. din mas. (mp) | Clasa de calitate | Zona in cadrul loc. | Mentiuni |
|---|---|---|---|---|---|---|
| 1 | CC | TDA | 116 103.83 | | Extravilan | Sup incinta |
| 2 | HB | TDA | 12 989.98 | | | Bazin epurare |
| 3 | DR | TDA | 3 601 25 | | | Drum acces |
| 4 | CC | TDA | 1 192.88 | | | Incinta rez si st hidrofor |
| 5 | C | TDA | 99.97 | | | Putul 1 |
| | C | TDA | 100.20 | | | Putul 2 |
| | C | TDA | 100.45 | | | Putul 3 |
| | C | TDA | 99.99 | | | Putul 4 |
| Total | | | 134 288.55 | | | |







ANEXĂ LA AUTENTIC
NR. 662 2013

B. DATE REFERITOARE LA CONSTRUCȚII

| Nr. corp Clădire | Denumirea | Suprafața construita la sol(mp) | Cod grupa destinație | Mențiuni |
|---|---|---|---|---|
| C1 | Padoc | 2164.5 | CIE | 1/7/16,5 |
| C2 | Padoc | 2164.5 | CIE | —/,— |
| C3 | Padoc | 2164.5 | CIE | —,— |
| C4 | Padoc | 2164.5. | CIE | —,— |
| C5 | Padoc | 2164.5 | CIE | —/,— |
| C6 | Padoc | 2164.5 | CIE | —,— |
| C7 | Padoc | 2164.5 | CIE | —/,— |
| C8 | Padoc | 2164.5 | CIE | —/,— |
| C9 | Padoc | 2164.5 | CIE | —/— |
| C10 | Padoc | 2164.5 | CIE | —//— |
| C11 | Padoc | 2164.5 | CIE | —/,— |
| C12 | Padoc | 2164.5 | CIE | —//— |
| C13 | Padoc | 2164.5 | CIE | —,— |
| C14 | Cabina bascula | 13.50 | CA | 4,5/3,0 |
| C15 | Cantar bascula | 43.75 | CA | 11,5/3,5 |
| C16 | Cotet pasari | 22.50 | CIE | 5/4,5 |
| C17 | Cantina | 103.75 | CIE | 16,5/6,5 |
| C18 | Depozit combustibil | 19.25 | CA | 5,5/3,5 |
| C19 | Solar | 24.00 | CA | 6,0/4,0 |
| C20 | Parc biciclete | 44.00 | CA | 11/4 |
| C21 | Depozit veterinar | 93.75 | CIE | 15/6,25 |
| C22 | Centrala electrica | 172.50 | CIE | 11,5/15 |
| C23 | Filtru | 360.00 | CIE | 24/15 |
| C24 | Padoc (Tarc) | 196.00 | CA | 10,5/18,6 |
| C25 | Rampa | 36.28 | CA | 14,09/3 |
| C26 | Helesteu | 490.63 | A | 35,25/12,5 |
| C27 | FNC | 142.01 | CIE | 9,15/15 |
| C28 | Magazie cereale | 641.75 | CA | 42,5/15,5 |
| C29 | Ateliere | 96.13 | CA | 11,70/8,75 |
| C30 | Moara DI | 286.75 | CIE | 16,5/15,5 |
| C31 | Magazie cereale | 1447.88 | CA | 43,5/29,25 |
| C32 | Platforma betonata | 390.00 | CA | 39/10 |
| C33 | Padoc | 482.63 | CA | 49,5/9,75 |
| C34 | Centrala termica | 197.97 | CIE | 11,5/15 |
| C35 | Ad. animala | 13.14 | CA | 4,5/3 |
| C36 | Birouri | 72.00 | CAS | 9/8 |
| C37 | Statie biogaz | 82.50 | CIE | 11/7,5 |
| C38 | Anexa st. biogaz | 29.25 | CA | 6,5/4,5 |
| C39 | Remiza biogaz | 259.53 | CA | 21,63/12 |
| C40 | Anexa st. biogaz | 24.00 | CA | 6/3 |
| C41 | Statie epurare | 2331.00 | CIE | 63/37 |
| C42 | Statie epurare | 2331.00 | CIE | 63/37 |
| C43 | Bazin gazeificare | 94.50 | CIE | 27,5/3,5 |
| C44 | Sala motoare | 8.61 | CA | 3/3 |
| C45 | Rezervor | 40.87 | CA | 4,5/9,5 |
| C46 | Sala motoare | 15.00 | CA | 5/3 |
| C47 | Bazin colectare | 33.94 | CA | 1/5 3/3 |
| C48 | Statie hidrofor | 51.00 | CIE | 3/3 |
| C49 | Rezervor apa | 47.68 | CIE | 1×3,5 |
| C50 | Put apa | 99.97 | CA | 2,95/2,95 |
| C51 | Put apa | 100.20 | CA | —/— |
| C52 | Put apa | 100.43 | CA | —/— |
| C53 | Put apa | 98.90 | CA | —/— |

TOTAL







*S-a solicitat autentificarea prezentului înscris / The authentication of this document has been requested:*

**Anexa nr. 5**                                          **Appendix no. 5**

**Evaluarea Imobilului (descriere pe scurt)**            **Property evaluation (executive summary)**



22





ANEXĂ LA AUTENTIC
NR. 662 2013

S.C. Neoconsult S.R.L.

Raport de evaluare pentru S.C. Natural Porc Production Olt S.R.L.

## 5.1. Grila de calcul – abordarea prin cost

| Nr | Denumirea constructiei | Valoarea constructiei (lei) | Dat in folosinta (an) | Cost unitar (lei/mp) | Costul brut (lei) | Vechime (ani) | DVRT (ani) | Uzura viata lunga (%) | Uzura viata scurta (%) | Uzura fizica (%) | Uzura fizica (%) | Uzura fizica (lei) | Depreciere functionala (%) | Depreciere functionala (lei) | Valoarea dupa deprecierea fizica si functionala (lei) | Depreciere externa (%) | | Valoare justa (lei) | Valoare justa/mp (lei/mp) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | *1* | 3 | 4 | 5 | 6 | 7 | 8 | 10 | | 11 | | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 1 | C1 - padoc pt porci | 2,164.50 | 1970 | 740.92 | 1,603,725.00 | 43 | 50 | 86% | | 79% | 85.0% | 1,362,765 | 0% | 0.00 | 240,960 | 0% | | 240,960 | 111.32 |
| 2 | C2 - padoc pt porci | 2,164.50 | 1970 | 740.92 | 1,603,725.00 | 43 | 50 | 86% | | 79% | 85.0% | 1,362,765 | 0% | 0.00 | 240,960 | 0% | | 240,960 | 111.32 |
| 3 | C3 - padoc pt porci | 2,164.50 | 1970 | 740.92 | 1,603,725.00 | 43 | 50 | 86% | | 79% | 85.0% | 1,362,765 | 0% | 0.00 | 240,960 | 0% | | 240,960 | 111.32 |
| 4 | C4 - padoc pt porci | 2,164.50 | 1970 | 740.92 | 1,603,725.00 | 43 | 50 | 86% | | 79% | 85.0% | 1,362,765 | 0% | 0.00 | 240,960 | 0% | | 240,960 | 111.32 |
| 5 | C5 - padoc pt porci | 2,164.50 | 1970 | 740.92 | 1,603,725.00 | 43 | 50 | 86% | | 79% | 85.0% | 1,362,765 | 0% | 0.00 | 240,960 | 0% | | 240,960 | 111.32 |
| 6 | C6 - padoc pt porci | 2,164.50 | 1970 | 740.92 | 1,603,725.00 | 43 | 50 | 86% | | 79% | 85.0% | 1,362,765 | 0% | 0.00 | 240,960 | 0% | | 240,960 | 111.32 |
| 7 | C7 - padoc pt porci | 2,164.50 | 1970 | 740.92 | 1,603,725.00 | 43 | 50 | 86% | | 79% | 85.0% | 1,362,765 | 0% | 0.00 | 240,960 | 0% | | 240,960 | 111.32 |
| 8 | C8 - padoc pt porci | 2,164.50 | 1970 | 740.92 | 1,603,725.00 | 43 | 50 | 86% | | 79% | 85.0% | 1,362,765 | 0% | 0.00 | 240,960 | 0% | | 240,960 | 111.32 |
| 9 | C9 - padoc pt porci | 2,164.50 | 1970 | 740.92 | 1,603,725.00 | 43 | 50 | 86% | | 79% | 85.0% | 1,362,765 | 0% | 0.00 | 240,960 | 0% | | 240,960 | 111.32 |
| 10 | C10 - padoc pt porci | 2,164.50 | 1970 | 561.56 | 1,215,495.00 | 43 | 50 | 90% | | 100% | 91.5% | 1,112,178 | 0% | 0.00 | 103,317 | 0% | | 103,317 | 47.73 |
| 11 | C11 - padoc pt porci | 2,164.50 | 1970 | 561.56 | 1,215,495.00 | 43 | 50 | 90% | | 100% | 91.5% | 1,112,178 | 0% | 0.00 | 103,317 | 0% | | 103,317 | 47.73 |
| 12 | C12 - padoc pt porci | 2,164.50 | 1970 | 561.56 | 1,215,495.00 | 43 | 50 | 90% | | 100% | 91.5% | 1,112,178 | 0% | 0.00 | 103,317 | 0% | | 103,317 | 47.73 |
| 13 | C13 - padoc pt porci | 2,164.50 | 1970 | 561.56 | 1,215,495.00 | 43 | 50 | 90% | | 100% | 91.5% | 1,112,178 | 0% | 0.00 | 103,317 | 0% | | 103,317 | 47.73 |
| 14 | C14 - cabina bascula | 12.50 | 1970 | fara aport valoric pozitiv, sau aport inclus in valoarea justa a spatiilor deservite | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 15 | C15 - cantar bascula | 43.75 | 1970 | fara aport valoric pozitiv, sau aport inclus in valoarea justa a spatiilor deservite | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 16 | C16 - cos pasari | 22.50 | 1970 | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 17 | C17 - cantina | 100.75 | 1970 | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 18 | C18 - depozit combustibil | 19.25 | 1970 | fara aport valoric pozitiv, sau aport inclus in valoarea justa a spatiilor deservite | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 19 | C19 - masina | 24.00 | 1970 | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 20 | C20 - parc biciclete | 44.00 | 1970 | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 21 | C21 - dispensar veterinar | 93.75 | 1970 | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 22 | C22 - centrala electrica | 172.50 | 1970 | fara aport valoric pozitiv, sau aport inclus in valoarea justa a spatiilor deservite | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 23 | C23 - filtru | 12.50 | 1970 | fara aport valoric pozitiv, sau aport inclus in valoarea justa a spatiilor deservite | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 24 | C24 - padoc | 196.00 | 1970 | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 25 | C25 - rampa din beton | 36.28 | 1970 | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 26 | C26 - hesteu | 490.63 | 1970 | fara aport valoric pozitiv, sau aport inclus in valoarea justa a spatiilor deservite | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 27 | C27 - FNC | 142.01 | 1970 | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 28 | C28 - magazie cereale | 641.75 | 1970 | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 29 | C29 - arabere din caramida | 96.13 | 1970 | fara aport valoric pozitiv, sau aport inclus in valoarea justa a spatiilor deservite | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 30 | C30 - moara 2 | 204.75 | 1970 | fara aport valoric pozitiv, sau aport inclus in valoarea justa a spatiilor deservite | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 31 | C31 - magazie cereale | 1,447.88 | 1970 | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 32 | C32 - platforma betonata | 390.00 | 1970 | 197.35 | 76,688 | | | 95% | | 95% | | 73,043.55 | 0.00 | | 3,844 | 50% | 1,922 | | 1,922 | 4.93 |
| 33 | C33 - padoc | 482.63 | 1970 | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 34 | C34 - centrala termica | 17.97 | 1970 | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 35 | C35 - adapost animale | 13.14 | 1970 | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 36 | C36 - birou | 72.00 | 1970 | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 37 | C37 - statie bogaz | 82.50 | 1970 | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 38 | C38 - anexa la statie bogaz | 29.95 | 1970 | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 39 | C39 - centrala statie bogaz | 259.53 | 1970 | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | | | | | | | 0 | | | 0 | 0.00 |
| 40 | C40 - anexa la statie bogaz | 24.00 | 1970 | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | | | | | | | 0 | | | 0 | 0.00 |





S.C. Neoconsult S.R.L.

Raport de evaluare pentru S.C. Natural Porc Production Olt S.R.L.

ANEXĂ LA AUTENTIC
NR. 662 2013

ROMANIA
CETINTURK ADELA - NOTAR PUBLIC
BUCUREȘTI

27

| Nr. | Denumire constructie | Suprafata construita mp | Valoare contabila (RON) lei | Dat in folosinta an | Cost unitar lei/mp | Cost brut lei | Vechime ani | DUVT ani | Uzura elemente cu viata lunga % | Uzura elemente cu viata scurta % | Uzura fizica % lei | Depreciere functionala % lei | Valoare dupa depreciere fizica si functionala lei | Depreciere externa % lei | Valoare justa lei | Valoare justa /mp lei/mp |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 = 2 x au | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 12 | 13 14 | 15 | 16 17 | 18 | 19 |
| 41 C41 | platforma epurare | 2,331.00 | | 1970 | | | | | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | 0 | 0.00 |
| 42 C42 | platforma epurare | 2,331.00 | | 1970 | | | | | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | 0 | 0.00 |
| 43 C43 | bazin gazeificare | 94.50 | | 1970 | | | | | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | 0 | 0.00 |
| 44 C44 | sala motoare | 8.61 | | 1970 | | | | | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | 0 | 0.00 |
| 45 C45 | rezervor subteran | 49.97 | | 1970 | | | | | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | 0 | 0.00 |
| 46 C46 | sala racoare subterana | 15.00 | | 1970 | | | | | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | 0 | 0.00 |
| 47 C47 | bazin colectare subteran | 33.94 | | 1970 | | | | | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | 0 | 0.00 |
| 48 C48 | statie hidrofor | 51.00 | | 1970 | | | | | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | 0 | 0.00 |
| 49 C49 | rezervor inmagazinare subteran | 49.97 | | 1970 | | | | | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | 0 | 0.00 |
| 50 C50 | put apa subteran | 2.25 | | 1970 | | | | | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | 0 | 0.00 |
| 51 C51 | put apa subteran | 2.25 | | 1970 | 123.58 | 7,415(60 mil) | | | 95% | 95% 7,043.78 | 0% | | 371 50% 185.36 | 185 | 82.22 |
| 52 C52 | put apa subteran | 2.25 | | 1970 | 123.58 | 7,415(60 mil) | | | 95% | 95% 7,043.78 | 0% | | 371 50% 185.36 | 185 | 82.22 |
| 53 C53 | put apa subteran | 2.25 | | 1970 | | | | | nu s-a regasit pe amplasament cu ocazia inspectiei | | | | | | 0 | 0.00 |
| | TOTAL CLADIRI SI CONSTRUCTII SPECIALE | 38,686.04 | 1,168,600.00 | | | | | | | | | | | | 3,594,200 | 66.49 |
| 54 | Teren    mp | 137,000.00 | 91,400.00 | | 4.40 lei/mp | | | | | | | | | | | |
| | TOTAL TEREN mp | 137,000.00 | 91,400.00 | | | | | | | | | | | | 607,200 | |
| | TOTAL | | 1,260,000.00 | | | | | | | | | | | | 3,191,400 | |









ROMÂNIA

## BIROUL NOTARIAL FIDES

Bucuresti, Calea Mosilor nr. 300, bl. 58, sc. 1, et. 1, ap. 3, sector 2
Tel: 021-619.22.76, 021-212.33.64 Fax: 031-805.74.04
secretariat@notariatfides.ro
Operator de date cu caracter personal

### ÎNCHEIERE DE AUTENTIFICARE Nr. 662
Anul 2013 Luna aprilie Ziua 24

Eu, **ADELA CETINTÜRK**, notar public, la cererea expresă a părţilor, m-am deplasat azi, data autentificării, la adresa din Bucureşti, Şos. Nicolae Titulescu nr. 4 – 8, American House, intrarea de Est, et. 2, sediul Reff şi Asociaţii SCA, unde am găsit pe:

-**POPA CRISTIANA – LUMINIŢA**, cetăţean român, domiciliată în sat Brebeni, (com. Brebeni) jud. Olt, identificată cu CI seria OT nr. 561280/ 31.05.2012 eliberată de SPCJEP Olt, CNP 2691208284414, în calitate de reprezentantă a SC NATURAL PORC PRODUCTION OLT SRL, în baza hotărârii asociatului unic din data de 16 aprilie 2013, apostilată sub nr. 13-198200/16 aprilie 2013, după cum a fost tradusă în limba română şi certificată sub nr. 274 din data de 22 aprilie 2013 de către Biroul Notarului Public David Cătălina,

-**ANCUŢA ALIN**, cetăţean român, domiciliat în Mun. Râmnicu Vâlcea, str. Ion L. Caragiale nr. 5, bl. A28/1, sc. B, ap. 11, jud. Vâlcea, identificat cu CI seria VX nr. 363373/17.09.2009 eliberată de SPCLEP Rm. Vîlcea, CNP 1830724384960, în calitate de mandatar al SC AGRIKILTI SRL, în baza procurii speciale autentificate sub nr. 1887 din 21 august 2012 de către Biroul Notarilor Publici Asociaţi Gutău Mariana şi Stoica Cristina – Ioana, care după citirea actului, au consimţit la autentificarea lui şi au semnat toate exemplarele, precum şi anexele acestuia.

Prezentul înscris a fost tradus de către traducător autorizat Ştefan Cătălin, identificat cu CI seria RT nr. 379930/08.04.2005 eliberată de Secţia 18, CNP 1680613450014, traducător autorizat de limbă engleză conform Autorizaţiei nr. 6712/14.06.2002 eliberată de Ministerul Justiţiei.

În temeiul art. 12, lit. b din Legea nr. 36/1995, republicată, **SE DECLARĂ AUTENTIC PREZENTUL ÎNSCRIS.**

S-a perceput onorariul de 500 lei, achitat cu BF nr. 0014/24.04.2013.

S-a perceput tariful de 60 lei, achitat cu BF nr. 0014/24.04.2013 pentru serviciul de carte funciară cu cod 2.4.2.

NOTAR PUBLIC

TRADUCĂTOR AUTORIZAT
DE MINISTERUL JUSTIŢIEI
AUT.Nr. 6712
ŞTEFAN CĂTĂLIN



April 16, 2013

# IOWA

## SECRETARY OF STATE



MRS. CRISTIANA-LUMINITA POPA
PRYSMIAN CABLURI SI SISTEME S.A., STRADA
DRAGANESTI,
NR. 28, SLATINA, JUD. OLT, COD 230119
ROMANIA,

### APOSTILLE
(Convention de La Haye du 5 octobre 1961)

1.  Country:  United States of America

2.  This public document has been signed by:  JOHN PIETILA

3.  Acting in the capacity of:  NOTARY PUBLIC

4.  Bearing the seal/stamp:  NOTARY PUBLIC IN AND FOR THE STATE OF
    IOWA

### CERTIFIED

5.  at:  DES MOINES, IOWA, UNITED STATES OF AMERICA

6.  date:  APRIL 16, 2013

7.  by:  the Secretary of State of the State of Iowa, United States of America

8.  No. 13-198200

9.  Seal                              10   Signature



_____

MATT SCHULTZ / SECRETARY OF STATE

198200

*The authentication of this document has been requested*

# RESOLUTION OF
# THE SOLE SHAREHOLDER
## OF
# S.C.  NATURAL PORC PRODUCTION OLT S.R.L.

**NATURAL PORK PRODUCTION II, LLP,** a limited liability partnership, with its headquarters in the U.S.A., Audubon, Iowa 50025, 1636 190th Street, duly represented by Lawrence Handlos, its sole Managing Partner,

In its capacity as sole shareholder (holding 100% of the share capital) of **S.C. NATURAL PORC PRODUCTION OLT S.R.L.,** a Romanian limited liability company, with its registered office in Ipoteşti Village, Ipoteşti Commune, Principală Street, Position 001, Volume 01, Type 4, Plot 58/1, Olt County, registered with the Olt Trade Registry Office under no. J28/117/2012, Sole Registration Code (*CUI*) 18573000, having a total share capital of RON 3,850,815 divided into 150 shares with a nominal value of RON 25,672.1 (the "**Company**"),

**WHEREAS:**

(A)     The Company is the sole and rightful owner over a real estate property located in Ipotesti Commune, Ipotesti Village, Olt County, consisting of (i) a plot of land with a surface area of 138,000 sq.m. according to ownership documents (134,288.55 sq.m. according to cadastral measurements) and (ii) buildings C1 - C53 with a total surface area of approximately 39,275.16 sq.m. composed of 13 main buildings and ancillary constructions, all located in plot 58/1, having cadastral no. 13 and registered with the Ipotesti Land Book no. 11 (the "**Property**");

(B)     The Company wishes to sell the Property, as part of the process of liquidating its business in Romania and is in the process of identifying potential buyers for the Property.

**HAVE RESOLVED AS FOLLOWS:**

1.      The Company is authorized to sell the Property to S.C. AGRIKILTI S.R.L., according to the terms and conditions mentioned in the offer no. 14 dated 5 April 2013, attached to this resolution.

2.      The Company empowers **Mrs. Cristiana - Luminita Popa**, a Romania citizen, born on 8 December 1969, identified with Identity Card Series OT No. 561280 issued by the SPCJEP Olt on 31 May 2012, so that, in the name and on behalf of the Company, to execute the sale documentation for the Property (including but not limited to sale-purchase pre-agreement, sale-purchase agreement, escrow agreement etc.) in the form required by the Romanian legislation for the respective documentation. To this extent, Mrs. Cristiana - Luminita Popa is empowered to obtain, attend to, deal with, sign, execute, undertake and perform all such formalities, documents, instruments, deeds, acts and things as they may consider necessary or desirable in order to execute the sale documentation between the Company and potential buyer, including but not limited to the execution of any and all agreements and the related

1

*The authentication of this document has been requested*

documents and decisions, as well as the granting of the powers of attorney necessary for the actual transfer of the ownership right over the Property and the opposability of the transfer towards third parties.

IN WITNESS WHEREOF, this Resolution has been executed today April 16, 2013, at Des Moines, Polk County, Iowa, in three (3) copies, in English language and shall be effective from today and until its completion.

**NATURAL PORK PRODUCTION II, LLP**

Lawrence Handlos, Managing Partner

STATE OF IOWA, COUNTY OF POLK

This record was acknowledged before me on the 16th day of April, 2013, by Lawrence Handlos, as Managing Partner of Natural Pork Production II, LLP, an Iowa limited liability partnership.

Notary Public, State of Iowa
My commission expires: 6/1/15

JOHN PIETILA
Commission Number 741030
My Commission Expires
6/1/15

2