# UNITED STATES BANKRUPTCY COURT

# SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In Re: | ) | Case No.:  12-02872-als11 |
| | ) | |
| **NATURAL PORK PRODUCTION II, LLP,** | ) | Chapter 11 |
| | ) | |
| | ) | Hon. Anita L. Shodeen |
| Debtor and Debtor in Possession. | ) | |
| | ) | **DEBTOR'S MOTION FOR ORDER** |
| PO Box 468 | ) | **AUTHORIZING SALE OF REAL** |
| Harlan, IA 51537 | ) | **ESTATE FREE AND CLEAR OF** |
| | ) | **LIENS, CLAIMS AND** |
| EIN: 03-0480873 | ) | **ENCUMBRANCES** |
| | ) | **(BRAYTON RESIDENCE)** |
| | ) | |
| _____ | ) | No Hearing Set |

COMES NOW NATURAL PORK PRODUCTION II, LLP ("NPPII"), the Debtor and Debtor in Possession herein, by and through its duly-employed General Reorganization Counsel, Jeffrey D. Goetz, Esq., of the law firm of Bradshaw, Fowler, Proctor & Fairgrave, P.C., and hereby respectfully files the instant Motion for Order Authorizing Sale of Real Estate Free and Clear of Liens, Claims and Encumbrances (Brayton Residence), and would show this Honorable Court as follows:

1.     On September 11, 2012 ("Petition Date") NPPII, a Limited Liability Partnership organized on July 12, 2002, and duly authorized to do business in the State of Iowa, filed its voluntary petition under Chapter 11 of the Bankruptcy Code, which case is now pending before this Court, and in which the Debtor is duly operating as a Debtor in Possession, pursuant to Bankruptcy Code Sections 1107 and 1108.  There is no motion or application pending for the appointment of a Trustee or Examiner.

2.     NPPII is the successor in interest to Natural Pork Production II, L.C. and is the parent, predecessor in interest, sole member and sole equity interest holder of that certain

wholly-owed subsidiary, Brayton, LLC, which is a debtor and debtor in possession in an affiliated case now pending before this Court at Case No. 12-03749-als11.

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for relief sought herein include Code §§ 105(a), 363, 365 and Rules 2002, 6004, 6006 and 9006 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules").

4.      NPPII holds title to a single family residence on approximately 1.6 acres in Audubon County, Iowa, and commonly referred to as 3257 Goldfinch Place, and legally described as Lot 1 of Parcel A of the Northeast Quarter of the Southeast Quarter of Section 22, Township 78 North, Range 36, West of the Fifth P.M., Audubon County, Iowa, as designated by survey recorded as Instrument #02-0913, in the Office of the Audubon County Recorder ("Brayton Residence").

5.      The Brayton Residence is contiguous with and substantially integrated with the operations at the Brayton Facility. Brayton, LLC holds title to improved real estate and buildings, with equipment and fixtures, specifically designed for a 5,600 sow Farrow-to-Wean pig production operation in Brayton, Iowa, and located at 3293 Goldfinch Place ("Brayton Facility").  Prior to Brayton, LLC's organization, and its acquisition of the Brayton Facility on September 4, 2008, the Brayton Facility was constructed and owned by NPPII.

6.      Filed contemporaneously with the instant motion, Brayton LLC has filed a motion to sell the Brayton Facility to Newell Pig II, LLP ("Newell") for $5,170,000.00, pursuant to a Lease, Notice of Exercise of Option and Asset Purchase Agreement. In connection with Brayton, LLC's proposed sale of the Brayton Facility to Newell, Newell wishes to purchase the Brayton

Residence from NPPII for $30,000 (the "Purchase Price").

7.      The Brayton Residence  is encumbered by a disputed mortgage, lien and security interest granted in January, 2012 to the Inter Creditor Committee ("ICC"), in its capacity as Collateral Agent for the Settlement and Intercreditor Agreement Parties ("SIA Parties").  The rights, if any, of the ICC in the disputed mortgage, lien and security interest is the subject of a pending adversary proceeding in the NPPII bankruptcy case, entitled "Natural Pork Production II, LLP v. IC Committee", Adversary Proceeding No. 13-30016.

8.      On or about December 31, 2008, NPPII entered into a month-to-month Dwelling Unit Rental Agreement of the Brayton Residence with Brian Peterson ("Peterson"). A copy of said Lease is attached hereto as Exhibit "A" and is incorporated by reference herein.

9.      The Debtor and Newell intend to enter into and execute a Residential Purchase Agreement ("RPA") to memorialize the terms and conditions of the proposed sale transaction of the Brayton Residence, a true and exact copy of which is attached hereto as Exhibit "B" and is incorporated by reference herein.

## Relief Requested

10.     The Debtor is seeking Court approval of a sale of the Brayton Residence to Newell for the Purchase Price, pursuant to the RPA, free and clear of all liens, claims, encumbrances and interests.  Debtor believes that a sale to Newell pursuant to the RPA is in the best interest of Debtor's estate and its creditors.

11.     Section 363 of the Bankruptcy Code governs the Debtor's ability to sell property of the estate outside of the ordinary course of business.  Although this Section does not set forth a standard for determining when it is appropriate to authorize such a sale, courts have uniformly held that such a sale should be approved when it is justified by a sound business purpose.  *See In*

re Lionel Corp., 722 F.2d 1063, 1070-71 (2d. Cir. 1983); *Chrysler Group LLC v. South Holland*

*Dodge, Inc.*, 862 F. Supp. 2d 661, 668 (E.D. Michigan 2012); *In re Dewey & LeBoeuf LLP*, No.

12–12321 (MG), 2012 WL 5386276, at *5 (Bankr. S.D. N.Y. Nov. 1, 2012); *In re Nicole Energy*

*Services, Inc.*, 385 B.R. 201, 230 (Bankr. S.D. Ohio 2008).  The burden of establishing a rational

business justification lies with the debtor.  *Nicole Energy*, 385 B.R. at 230 (citing *Lionel*, 722

F.2d at 1070-71).  However, once the debtor makes such a showing, a presumption will attach

that the decision was made on an informed basis, in good faith and in the honest belief that the

action was in the best interest of the company.  *See*, *e.g.*, *In re Brook Valley VII, Joint Venture*,

496 F.3d 892, 900 (8th Cir. 2007).

        12.    Applying Bankruptcy Code Section 363, courts accord Debtors substantial

deference in formulating procedures for selling assets.  *See*, *e.g.*, *In re Boston Generating, LLC*,

440 B.R. 302, 329-330 (S.D. N.Y. 2010) (noting that the requirements for Section 363 sales are

reviewed according to the deferential "business judgment" standard); *In re Adelphia*

*Communications Corp.*, No. 02–41729 (REG), 2003 WL 22316543, at *30 (Bankr. S.D.N.Y.

Mar. 4, 2003) (applying the "business judgment" standard presumption of validity and noting

that courts are "loath to interfere with corporate decisions absent showings of bad faith, self

interest, or gross negligence.")

        13.    Here, the RPA supporting the Purchase Price is supported by ample business

justification and is reasonable and appropriate under the circumstances of this case.

### The Proposed Transaction Satisfies All Applicable Legal Standards

        14.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor

"after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate."  *See also* Bankruptcy Rule 6004(f)(1) ("All sales not in the ordinary

course of business may be by private sale or by public auction").  This Section generally permits

a debtor to sell property of the estate outside of the ordinary course of its business where the

proposed sale is a sound exercise of the debtor's business judgment and when such sale is

proposed in good faith.  *See In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Nicole*

*Energy Services, Inc.*, 385 B.R. 201, 210 (S.D. Ohio 2008) ("Under the law of this [Sixth]

Circuit, the Court may approve a sale of all of a debtor's assets under § 363(b) 'when a sound

business purpose dictates such action.'") (quoting *Stephens Industries, Inc. v. McClung*, 789 F.2d

386, 390 (6th Cir. 1986)).

15.     In the instant case, the proposed sale pursuant to the RPA constitutes a sound

exercise of Debtor's business judgment and has been proposed in good faith.  A sale of the

Brayton Residence will aid in minimizing the expenses of Debtor's estate, resulting in greater

distribution to creditors.

16.     Debtor believes this Motion and the transaction contemplated thereby is in the

best interests of the bankruptcy estate and in the best interests of all other interested parties in

this Chapter 11 case.

17.     Debtor submits that the factors described above, which support an expeditious

sale of the Brayton Residence, are consistent with the traditional rationale for authorizing a sale

outside of a Chapter 11 plan.  *See also In re Boston Generating, LLC,* 440 B.R. 302, 321 (S.D.

N.Y. 2010); *Lionel*, 722 F.2d at 1070.

## Sale Free and Clear of Liens

18.     Section 363(f) of the Bankruptcy Code authorizes a debtor to use, sell or lease

property of the estate outside of the ordinary course of business, free and clear of any interest in

such property.  This Motion proposes the sale of the Brayton Residence free and clear of all

interests, liens, claims and encumbrances, including existing or asserted rights of first refusal, contractual restrictions on transferability or other similar protective rights.  Any such interests, liens, claims and encumbrances would attach to the proceeds from the sale of the Brayton Residence (the "Sale Proceeds") ultimately attributable to the property against or in which such interest, lien, claim or encumbrances is asserted.

19.     Under Section 363(f)(2) of the Bankruptcy Code, a sale free and clear of all interests, liens, claims and encumbrances is permissible if all parties asserting liens on or other interests in the property consent.  The Debtor is providing proper notice of this Motion to creditors who assert a security interest in the Brayton Residence, including but not limited to the Audubon County Treasurer, the ICC, and all parties to executory contracts and unexpired leases. Provided that no creditors or interested parties object to this Motion and the proposed sale transaction, Section 363(f)(2) will be satisfied.  *See, e.g.*, *In re Motors Liquidation Co.*, 430 B.R. 65, 72) (in a Chapter 11 case, noting that "secured lenders" approved a transaction under § 363(b) of the Bankruptcy Code and related transactions).

20.     Under Section 363(f)(4) of the Bankruptcy Code, a sale free and clear of all interests, liens, claims and encumbrances is permissible if the interest of any entity is in *bona fide* dispute.  Under Section 363(f)(5) of the Bankruptcy Code, a sale free and clear of all interests, liens, claims and encumbrances is permissible if any party asserting an interest in the assets could be compelled to accept money satisfaction of such interest in a legal or equitable proceeding.  The Debtor submits that to the extent the ICC asserts security interests in the Brayton Residence and does not consent under Section 363(f), a sale free and clear of its interests will still be permissible because, as to the ICC, its interests, or the amount of its interests, are in fact the subject of a *bona fide* dispute, and it could be compelled to accept a

money satisfaction of its interests in a legal equitable proceeding.

### A Proposed Sale Does Not Establish Any Sub Rosa Plan of Reorganization

21.    A sale of assets may not be approved where such sale, rather than merely
changing the composition of the debtor's assets, either restructures the rights of creditors or
predetermines the rights of creditors under any future plan of reorganization. *See In re Braniff
Airways, Inc.*, 700 F.2d 935, 939-40 (5th Cir. 1983); *In re Iridium Operating LLC*, 478 F.3d 452,
465-66 (2nd Cir. 2007); *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1227-28 (5th Cir. 1986).

22.    In *Braniff*, the Fifth Circuit held that an agreement between the debtor and its
creditors established a *sub rosa* plan of reorganization because, among other things, the
agreement: (i) required that any future plan of reorganization allocate certain assets only to
employees, shareholders or unsecured creditors of the debtor; (ii) required the secured creditors
to vote a portion of their deficiency claim in favor of any future plan of reorganization approved
by a majority of the unsecured creditors' committee; and (iii) provided for the release of claims
by all parties against the debtors, its secured creditors and its officers and directors.  *Braniff*, 700
F.2d at 939-40.

23.    Unlike *Braniff*, the sale transaction contemplated by this Motion will not
restructure the rights of the Debtor's creditors or predetermine the rights of such creditors under
any future plan of reorganization.

24.    Furthermore, the Debtor has articulated sound business justifications for selling
the Brayton Residence now, rather than as part of a plan.  A Bankruptcy Code § 363 sale motion
should be approved if it is based on good business reasoning. *In re Lionel Corp.*, 722 F.2d at
1070; *In re Equity Management Systems*, 149 B.R. 120 (Bankr. S.D. Iowa 1993) (Court
considered some of the following factors: whether all parties in interest received reasonable

notice; whether the purchase price is fair and reasonable; whether there is a sound business reason for the sale; and whether the proposed sale unfairly benefits insiders or proprietary purchasers, or unfairly favors a creditor or class).  All such factors have been met here.

25.     The Purchase Price is a fair offer for the Brayton Residence at this time.  Given the current economic climate, Debtor believes it would be imprudent to ignore such an attractive offer now when the value of the Brayton Residence could be adversely affected or deteriorate in the coming months prior to plan confirmation.  Basically, the Debtor is taking the conservative approach that a "bird in hand is worth two in the bush".

**Sale Price and Terms were Negotiated at Arm's Length and in Good Faith**

26.     The Purchase Price and sale terms were negotiated, have been, and are undertaken by Debtor and Newell at arm's length, without collusion and in good faith within the meaning of Bankruptcy Code § 363(m), and Debtor accordingly requests that the Court determine that the entire sale process has been conducted in good faith within the meaning of Bankruptcy Code § 363(m) and that Brayton and Newell are entitled to the protections of Bankruptcy Code § 363(m).  *See In re Brook Valley IV.*, 347 B.R. 662, 676 (B.A.P. 8th Cir. 2006).

27.     In the Debtor's view, the proposed sale of the Brayton Residence represents substantial value to Debtor's estate inasmuch as it provides favorable terms for the disposition of the Brayton Residence at a price that represents fair and reasonable consideration having a certain value.  *See id.* at 869.  *See also Mellon Bank, N.A., v. Metro Communications, Inc.*, 945 F.2d 635 (3d. Cir. 1991) (reasonably equivalent value under the Bankruptcy Code).

///

///

**Reduction or Elimination of 14-Day Stay Under Bankruptcy Rules 6004(h) and 6006(d)**

28.     Time is of the essence in approving and closing the sale and any unnecessary delay in closing the sale could result in the collapse of the sale.  Accordingly, this Court should waive the 14-day period staying any order to sell the property of the estate imposed by Bankruptcy Rules 6004(h) and 6006(d).

### CONCLUSION

Based upon the authorities and facts detailed above, Debtor submits that the Court should approve the Motion pursuant to the Residential Purchase Agreement.  Such relief is warranted because Debtor has shown that the sale of the Brayton Residence is in the best interests of the Debtor, its estate and creditors, and because the decision to sell the Brayton Residence was reached in the exercise of Debtor's sound business judgment, after careful deliberation of its consequences and possible alternatives.

WHEREFORE, the Debtor respectfully requests that the Court hear this Motion and (a) enter an Order authorizing the Debtor's sale of the Brayton Residence to Newell, free and clear of all liens, encumbrances, claims and interests; (b) find that the sale be effective immediately and that the stay provisions of Bankruptcy Rules 6004(h) and 6006(d) do not apply; and (c) provide such other relief as is just and proper under the circumstances.

Date:  August 8, 2013

Respectfully submitted,

*/s/ Jeffrey D. Goetz*
Jeffrey D. Goetz, Esq., IS #9999366
Bradshaw Fowler Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA 50309-8004
515/246-5817
515/246-5808 FAX
goetz.jeffrey@bradshawlaw.com

General Reorganization Counsel
for Natural Pork Production II, LLP
Debtor and Debtor in Possession

CERTIFICATE OF SERVICE

This document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing. */s/        Barbara  Warner        *

## EXHIBIT "A"

(Dwelling Unit Rental Agreement)

# Dwelling Unit Rental Agreement

IT IS AGREED, by and between, Landlord, Natural Pork Production II, LLP, and Tenant, Joel Nelson and Brian Peterson :
That Landlord hereby lets to Tenant, and Tenant hereby leases from Landlord, the following described premises situated in Audubon County, Iowa, to-wit:

    **Address: 3257 Goldfinch Place, Brayton Iowa, 50042**
    **Legal Description:**

hereinafter referred to as the "dwelling unit," in consideration of the mutual promises of the parties herein, and upon the following terms, provisions and conditions:

1.    **TERM:**  The duration of this Rental Agreement shall be from the 1st day of January, 2009 to and including the 31st day of January, 2009, and will be month to month after this term.  Tenant must provide 30 days notice prior to vacating the premises.

2.    **RENT:**  Tenant agrees to pay to Landlord, as rental for said term, as follows
$350 per month, in advance, on the 1st day of each month thereafter during the term of this Rental Agreement, with interest on all delinquent rental at 12 % per annum.  All sums shall be paid to the Landlord at 508 Market Street, Audubon, IA or such other place as the Landlord may direct.

3.    **SECURITY DEPOSIT:**  At the time of execution of the Rental Agreement, Tenant shall pay to the Landlord in trust the sum of $350 (not to exceed two months' rent) to be held and disbursed as a rental deposit pursuant to the provisions of the Iowa Uniform Residential Landlord and Tenant Act.

4.    **USE-ABSENCES:**  Unless otherwise agreed in writing, Tenant shall occupy and use the above-described property as a dwelling unit.  Tenant shall notify Landlord of any anticipated extended absences from the premises not later than the first day of the extended absence.

5.    **UTILITIES:**  Utilities shall be furnished and paid for by the party indicated on the following:

| | | | |
|---|---|---|---|
| Electricity: **Tenant** | | Gas: **Tenant** | |
| Water: **Tenant** | | Other: | - |
| Trash Removal: **Tenant** | | Other: | - |

In the event that the Landlord pays for the cost of the utilities, usage will be monitored and any excess may be the responsibility of the Tenant.

6.    Tenant hereby acknowledges that Landlord, or the person authorized to enter into this Rental Agreement on Landlord's behalf, has heretofore fully explained to the Tenant the utility rates, charges, and service for which Tenant will be required to pay, other than those to be paid by Tenant directly to the utility company furnishing service.

7.    **MANAGER:**  (whose address is    ) is the person designated by Landlord to manage the premises (and to receive and receipt for all notices and demands upon the owner of the premises).

8.    **MAINTENANCE BY LANDLORD:**  Landlord shall:
(a) Comply with the requirements of applicable building and housing codes materially affecting health and safety.
(b) Make all repairs and do whatever is necessary to put and keep the dwelling unit in a fit and habitable condition.
(c) Keep all common areas of the premises in a clean and safe condition. But Landlord shall not be liable for any injury caused by any objects or materials which belong to, or which may have been placed by, a tenant in the common areas of the premises used by Tenant.
(d) Maintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating, air-conditioning, and other facilities and appliances, including elevators, supplied or required to be supplied by Landlord.
(e) Provide and maintain appropriate receptacles and conveniences, accessible to Tenant, for the central collection and removal of ashes, garbage, rubbish, and other waste incidental to the occupancy of the dwelling unit, and arrange for their removal.
(f) Supply running water and reasonable amounts of hot water at all times and reasonable heat, except where the building that includes the dwelling unit is not required by law to be equipped for that purpose, or the dwelling unit is so constructed that heat or hot water is generated by an installation within the exclusive control of Tenant and supplied by direct utility connection.
If the dwelling unit is a single family residence, it is understood and agreed that Tenant shall perform the Landlord's duties specified in Paragraphs (e) and (f) above, and shall also make whatever repairs, alterations, and remodeling, and perform whatever maintenance tasks, as may be specified on an addendum, which shall be attached hereto, and signed by the parties.

9.    **MAINTENANCE BY TENANT:**
Tenant shall:
(a) Comply with all obligations primarily imposed upon tenants by applicable provisions of building and housing codes materially affecting health and safety.
(b) Keep that part of the premises that Tenant occupies and uses as clean and safe as the condition of the premises permit.
(c) Dispose from the dwelling unit all ashes, rubbish, garbage, and other waste in a clean and safe manner.
(d) Keep all plumbing fixtures in the dwelling unit or used by Tenant as clean as their condition permits.
(e) Use in a reasonable manner all electrical, plumbing, sanitary, heating, ventilating, air-conditioning and other facilities and appliances, including elevators, in the premises.

(f) Not deliberately or negligently destroy, deface, damage, impair, or remove a part of the premises, or knowingly permit a person to do so.

(g) Conduct himself or herself in a manner that will not disturb a neighbor's peaceful enjoyment of the premises.

In addition, if the dwelling unit is other than a single family residence, Tenant shall perform those repairs, maintenance tasks, alterations, or remodeling as shall be specified in a separate writing signed by the parties and supported by adequate consideration; and Landlord shall not treat performance of such separate agreement as a condition to an obligation or a performance of this Rental Agreement.

10.    **RULES:**    All existing rules concerning the Tenant's use and occupancy of the premises have been furnished to the Tenant in writing.  Additionally, Landlord may, from time to time, and in the manner provided by law, adopt further or amended written rules concerning the Tenant's use and occupancy of the premises.

11.    **ACCESS:**    Landlord shall have the right, subject to Tenant's consent, which consent shall not be unreasonably withheld, to enter the dwelling unit in order to inspect the premises, make necessary or agreed repairs, decorations, alterations or improvements, supply necessary or agreed services, or exhibit the dwelling unit to prospective or actual purchasers, mortgagees, tenants, workers, or contractors; provided, however, that Landlord may enter the dwelling without Tenant's consent, in case of emergency and as otherwise provided in the Iowa Uniform Residential Landlord and Tenant Act.

12.    **ASSIGNMENT AND SUBLETTING:**    Tenant shall not assign this Rental Agreement, nor sublet the dwelling unit, or any portion thereof, without the written consent of Landlord.

13.    **FIXTURES AND IMPROVEMENTS:**    Tenant shall leave upon, and surrender to Landlord, with the premises at the termination of this Rental Agreement, all locks, brackets for curtains, and all other fixtures attached to doors, windows or woodwork, and all alterations, additions or improvements made by Tenant, without any payment therefor. Tenant shall make no structural alterations without Landlord's written consent.

14.    **FIRE OR CASUALTY DAMAGE:**    If the dwelling unit or premises are damaged or destroyed by fire or other casualty to the extent that enjoyment of the dwelling unit is substantially impaired, Tenant may (i) immediately vacate the premises and notify Landlord within fourteen (14) days of Tenant's intention to terminate this Rental Agreement, in which case this Rental Agreement shall terminate as of the date of vacating, or (ii) if continued occupancy is lawful, vacate only that part of the dwelling until rendered unusable by the fire or casualty, in which case, Tenant's liability for rent shall be reduced in proportion to the diminution in the fair rental value of the dwelling unit. If this Rental Agreement is terminated under the provisions of this paragraph, Landlord shall return to Tenant all prepaid rent and security recoverable under the Iowa Uniform Residential Landlord and Tenant Act. Accounting for rent in the event of termination or apportionment shall occur as of the date of the casualty.

15.    **NONPAYMENT OF RENT:**    In addition to Landlord's other remedies provided by law, and without prejudice thereto, if rent is unpaid when due, and Tenant fails to pay the rent within three (3) days after notice by Landlord of nonpayment and the Landlord's intention is to terminate this Rental Agreement if the rent is not paid within that period of time, then Landlord may terminate this Rental Agreement.

16.    **PRESENT AND CONTINUING HABITABILITY:**    Tenant has inspected the property and fixtures, and acknowledges that they are in a reasonable and acceptable condition of habitability for their intended use, and that the rent agreed upon is fair and reasonable in this community for premises in their condition. In the event that the condition changes so that, in Tenant's opinion, the habitability and rental value of the premises are affected, then Tenant shall promptly give reasonable notice to Landlord.

17.    **NOTICES:**    Any notice, for which provision is made in this Rental Agreement, shall be in writing, and may be given by either party to the other, in addition to any other manner provided by law, in any of the following ways: (i) by personal delivery, (ii) by service in the manner provided by law for the service of original notice, or (iii) by sending said Notice by certified or registered mail, return receipt requested, to the last known address. For purposes hereof, the place for the payment of rental as provided in Paragraph 2 above, shall be the place designated by Landlord for the receipt of any such notice; and, unless otherwise provided herein, Landlord shall receive and receipt for all notices and demands upon the owner of the premises.

18.    **CONSTRUCTION:**    Words and phrases herein shall be construed as in the single or plural number, and as masculine, feminine or neuter gender, according to the context.

19.    **ENTIRE AGREEMENT:**    This writing, including any addendum attached hereto, constitutes the entire agreement between the parties hereto with respect to the subject matters hereof; and no statement, representation or promise with reference to this Rental Agreement, or the premises leased, or any repairs, alterations or improvements, or any change in the term of this Rental Agreement, shall be binding upon either of the parties unless in writing and signed by both Landlord and Tenant.

20.    **ADDITIONAL PROVISIONS:**    AMVC Employee Services, LLC. Rules for Tennant and Occupancy of Dwelling.  AMVC Management Services Alarm System Book.

Dated: _Dec 31 2008_

_____
Landlord

_____
Tenant

# EXHIBIT "B"

(Residence Purchase Agreement)

# RESIDENCE PURCHASE AGREEMENT

THIS RESIDENCE PURCHASE AGREEMENT ("Agreement") is made and entered into as of this _____ day of July, 2013 ("Effective Date"), by and between Natural Pork Production II, LLP, an Iowa limited liability partnership ("Seller"), and Newell Pig II, LLP, an Iowa limited liability partnership ("Buyer").

## R E C I T A L S :

A.    The term "Property" as used herein, means that certain real estate located at _____ and legally described on Exhibit "A" attached hereto, including (a) all easements, rights-of-way and other appurtenances to the Real Property and (b) all fixtures that integrally belong to, are specifically adapted to or are a part of the real estate, whether attached or detached;

B.    Seller presently is a debtor in possession in the case of In re: Natural Pork Production II, LLP, Case No.: 12-2872-als11, now pending before the United States Bankruptcy Court for the Southern District of Iowa (the "Bankruptcy Court");

C.    Seller and Purchaser anticipate that the Bankruptcy Court will enter an order authorizing and directing Seller to sell the Property to Buyer pursuant to the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the mutual promises contained herein, Seller and Buyer hereby agree as follows:

1.    Agreement to Sell and Purchase.    Seller covenants and agrees to sell the Property, and Buyer covenants and agrees to purchase the Property, upon the terms and conditions set forth herein.

2.    Purchase Price.    The purchase price of the Property shall be Thirty Thousand and 00/100 Dollars ($30,000.00) ("Purchase Price") and shall be paid to Seller at Closing (as hereafter defined) in immediately available funds.

3.    Closing.    Subject to Bankruptcy Court approval, Closing shall take place contemporaneously with the closing of that certain Asset Purchase Agreement (the "Brayton Facility Purchase Agreement") by and Between Buyer and Brayton, LLC, an Iowa limited liability company ("Brayton"), at a time and place mutually agreeable to Buyer and Seller ("Closing").

4.    Possession.    Possession of the Property will transfer to Buyer as of completion of Closing. Seller shall fully vacate the Property and transfer to Buyer all rights of access and possession of the Property as of the date of Closing.

5.    Title.    Seller shall, by special warranty deed, convey and transfer marketable fee simple title to the Property at Closing, free and clear of all liens, assessments, taxes which become delinquent in the year in which Closing occurs or prior thereto, easements, covenants, restrictions and reservations of record, but subject to any exceptions appearing on the Title Commitment (as defined herein) and not expressly objected to by Buyer in writing prior to Closing or that are expressly accepted by Buyer. Effective at Closing, Buyer shall assume the Dwelling Unit Rental Agreement by and between Seller, as landlord, and Joel Nelson and Brian Peterson, as tenants.

#2356177

DOCS/1199453.2

6.     <u>Title Insurance</u>.  Seller, at its expense, shall promptly obtain an abstract of title to the Property continued through the date of acceptance of this Agreement and deliver it to Buyer's attorney for examination.  It shall show marketable title in Seller in conformity with this Agreement, Iowa law, and title standards of the Iowa State Bar Association.  The abstract shall become the property of Buyer when the Purchase Price is paid in full.  Buyer may, at its expense, elect to obtain a commitment for title insurance (the "Title Commitment") issued in favor of Buyer in the amount of the Purchase Price, and agreeing to issue, upon fulfillment of the specific requirements, a policy of title insurance insuring the Buyer's interest in the Property. Buyer agrees to deliver to Seller within fifteen (15) days after Buyer's receipt of the Title Commitment written notice of any objections Buyer has to Seller's title to the Property.  In the event Buyer delivers written notice to Seller pursuant to this Paragraph, Seller, after receiving such notice, shall endeavor to cure the title defects to which Buyer objected in such notice within fifteen (15) days after Seller's receipt of such notice, and if not so cured within such time, then Buyer may rescind this Agreement.  Seller shall pay the costs of any additional abstracting and title work due to any act or omission of Seller.  The cost of an owner's title insurance policy shall be paid by Buyer.

7.     <u>Condition of the Property</u>.   The Property as of the date of this Agreement, including buildings, grounds, and all improvements, will be preserved by the Seller in its present condition until possession, ordinary wear and tear excepted.   Seller makes no warranties, expressed or implied, as to the condition of the Property.  Buyer acknowledges that it has made a satisfactory inspection of the Property and is purchasing the Property in its existing condition, AS IS, WHERE IS, WHAT IS, WITH ALL FAULTS.

8.     <u>Covenants of Seller</u>.  Prior to Closing, Seller agrees to:

a.     Cause to be in force public liability insurance with respect to damage or injury to persons or property occurring on the Property in at least such amounts, and with the same deductibles, as are maintained by Seller on the Effective Date.

b.     Maintain the Property in the same physical condition as it was on the Effective Date, reasonable wear and tear excepted, and to perform all normal maintenance from and after the Effective Date in the same fashion as prior to the Effective Date.

c.     Not sell, assign, or convey any right, title, or interest whatsoever in or to the Property, or create or permit to attach any new lien, security interest, easement, encumbrance, charge or condition affecting the Property (other than the Permitted Exceptions).

9.     <u>Conditions Precedent</u>.   The obligations of Buyer to purchase the Property pursuant to this Agreement shall be subject to the following conditions precedent:

a.     All of the representations, warranties, and agreements of Seller set forth in this Agreement shall be true and correct in all material respects as of the Effective Date and as of Closing, and Seller shall not have on or prior to Closing, failed to meet, comply with or perform in any material respect any covenants or agreements on Seller's part as required by the terms of this Agreement.

b.     Seller shall have delivered all items required to be delivered by Seller hereunder.

c.    All conditions of the Brayton Facility Purchase Agreement shall be satisfied in Buyer's sole discretion, and contemporaneously with the Closing, Brayton shall have delivered all right, title, and interest to the assets and property described in the Brayton Facility Purchase Agreement.

If one or more of the conditions precedent shall not be satisfied prior to Closing, Buyer may, (a) waive the condition precedent or (b) terminate the Agreement, in any event by written notice to Seller. In the event Buyer terminates this Agreement pursuant to the terms of this Section, neither party shall have any continuing obligations hereunder.

10.    Real Estate Taxes.  Real estate taxes for the fiscal year of July 1, 2013 to June 30, 2014 shall be prorated by the parties based on the date of Closing.  If those taxes have not been determined by the date of Closing, the real estate taxes shall be determined by using the most recent valuation of the Property and the most current tax levy.  Seller shall also pay all prior installments of real estate taxes, and Buyer shall pay all subsequent installments of real estate taxes regardless of the tax assessment year or tax fiscal year to which they may apply.

11.    Closing Documents and Costs.  Seller shall pay any Iowa real estate transfer taxes relating to the transfer of the Property under this Agreement.  Buyer shall pay the cost for filing the deed at Closing.  Each party shall be responsible for its respective attorney fees. Seller shall deliver to Buyer an executed original of the special warranty deed.

12.    Other Prorations.  Rental payments (if any) will be prorated as of the date of Closing.  tility charges and other operating expenses, if any, will be prorated as of the date of Closing based on final readings and change over of billing responsibility, or such other equitable manner as may be agreed upon between Buyer and Seller if final readings cannot be taken as of the date of Closing.

13.    Risk of Loss.  Risk of loss on the Property prior to Closing shall remain with Seller.  Specifically:

a.    Casualty.  In the event that the Property should be damaged by any casualty prior to Closing, then Seller shall promptly provide Buyer with written notice of such casualty.  If the cost of repairing such damage, as estimated by an architect or contractor retained pursuant to the mutual agreement of the parties ("Cost of Repairs"), is (a) estimated to be less than Five Thousand Dollars ($5,000.00), Closing shall proceed as scheduled and any insurance proceeds, plus the cash amount of any associated deductible, shall be paid over to Buyer; or (b) estimated to be equal to or greater than Five Thousand Dollars ($5,000.00), then Buyer may in its sole discretion either (i) elect to terminate this Agreement, and neither party shall have any further obligation to the other, or (ii) proceed to Closing in which event any insurance proceeds, plus the cash amount of any associated deductible, shall be paid over to Buyer.  In the event that the casualty is uninsured, Buyer may terminate this Agreement unless Buyer receives a credit against the Purchase Price equal to the Cost of Repairs.  Any notice required to terminate this Agreement pursuant to this Section shall be delivered no later than thirty (30) days following Buyer's receipt of Seller's notice of such casualty.

b.    Eminent Domain.  If, before Closing, proceedings are commenced for the taking by exercise of the power of eminent domain of all or a material part of the Property which, as reasonably determined by Buyer, would render the Property unacceptable to Buyer or unsuitable for Buyer's intended use, Buyer shall have the right,

by giving written notice to Seller within ten (10) days after Seller gives notice of the commencement of such proceedings to Buyer, to terminate this Agreement, in which event this Agreement shall automatically terminate, and neither party shall have any continuing obligations hereunder. If, before Closing, proceedings are commenced for the taking by exercise of the power of eminent domain of less than a material part of the Property, or if Buyer has the right to terminate this Agreement pursuant to the preceding sentence but does not exercise such right, then this Agreement shall remain in full force and effect and, on Closing, that portion of the condemnation award (or, if not theretofore received, the right to receive such portion of the award) payable on account of the taking of all or a portion of the Property shall be assigned, or paid to, Buyer; provided that there shall be no reduction in the Purchase Price because of such condemnation. Seller shall give written notice to Buyer within three (3) business days after Seller's receiving notice of the commencement of any proceedings for the taking by exercise of the power of eminent domain of all or any part of the Property.

14.     <u>Real Estate Commission or Finder's Fee</u>.  The parties agree that no party hereto shall be liable for any real estate broker's commission, agent's commission, or finder's fee in connection with the transaction contemplated by this Agreement. Each party warrants to the other party that it shall indemnify and hold the other party harmless for any and all claims of any person whomsoever for brokers' or agents' commissions or finder fees making claim through it in connection with the transaction. The provisions of this Section shall survive Closing.

15.     <u>Default</u>.  Time is agreed to be of the essence. If Buyer fails to consummate its purchase of the Property in accordance with the terms hereof, then Seller may seek monetary damages from Buyer. If Seller defaults under this Agreement, Buyer may seek any remedy at law or in equity without notice or demand, including specific performance. No delay or omission of any party in exercising any remedies or power accruing upon any event of default shall impair any remedies or power or shall be construed to be a waiver of any event of default or any acquiescence therein.

16.     <u>Binding</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and assigns. This Agreement shall be construed in accordance with the laws of the State of Iowa.

17.     <u>Notice</u>.  Any notices required to be forwarded to a party hereto shall be deemed appropriately delivered, if delivered between 8:00 A.M. and 5:00 P.M. Central Daylight Time to the addresses shown below. Any party hereto may change its address for notification purposes by written notice to all other parties hereto and the manner and method set forth within this section. Delivery may be accomplished by (i) hand delivery; (ii) delivery by a nationally recognized overnight courier service providing proof of delivery; or (iii) by facsimile transmission if the sender receives fax confirmation of proper transmission <u>and</u> the notice is also delivered by one of the other delivery methods. Except as otherwise specified herein, all notices and other communications shall be deemed to have been duly given on (i) the date received if delivered by hand, (ii) the first (1st) business day after the date of deposit, if transmitted by reputable overnight courier service, or (iii) the date of transmission with confirmed answer back if transmitted by facsimile.

*To Buyer:*

Newell Pig II, LLP
Attn: Rusty Kosky

508 Market Street
Audubon, IA 50025
Tel: (712) 563-2080
Email: rusty@nutratec.net

With copy to:

Steve Schmitz
AMVC Re, LLC
508 Market Street
Audubon, IA 50025
Tel: (712) 563-2080
Email: sschmitz@amvcms.com

*With addtional copy to:*

Baird Holm LLP
Attn: Sylvester J. Orsi, Esq.
1700 Farnam Street
Suite 1500
Omaha, NE 68102-2068
Tel: (402) 344-0500
Email: sorsi@bairdholm.com

*To Seller:*

Natural Pork Production II, LLP
Attn: Lawrence Handlos, Managing Director
PO Box 468
Harlan, Iowa  51537

*With copy to:*

Davis, Brown, Koehn, Shors & Roberts, P.C.
Attn: John Pietila, Esq.
215 10th Street, Suite 1300
Des Moines, IA 50309
Email: johnpietila@davisbrownlaw.com

*With additional copy to:*

Bradshaw, Fowler, Proctor & Fairgrave, P.C.
Attn: Jeffrey Goetz, Esq.
801 Grand Avenue, Suite 3700
Des Moines, IA  50309
goetz.jeffrey@bradshawlaw.com

    18.   <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the parties.  This Agreement may not be changed or modified in any manner unless an instrument in writing is executed by the parties hereto.

19.    Interpretations.    Any uncertainty or ambiguity existing herein shall not be interpreted against a party because such party prepared any portion of this Agreement, but shall be interpreted according to the application of rules of interpretation of contracts generally.

20.    Further Assurances.    Closing on the purchase and sale contemplated by this Agreement shall be subject to the parties obtaining all required consents, approvals and waivers from and notifications to judicial, governmental or regulatory bodies necessary to permit the consummation of the transactions contemplated hereby, including prior notice, hearing and approval within the Bankruptcy Court.  Seller shall proceed promptly and diligently to bring the matter on for hearing for required Bankruptcy Court approval. Each party agrees to fully support, coordinate and cooperate to carry out the provisions of this Agreement.  Each party shall cooperate in good faith with the other party and shall execute, acknowledge, and deliver any and all documents or requests in order to satisfy the conditions set forth herein and carry out the intent and purposes of this Agreement.

21.    Relationship of Parties.    Nothing contained herein nor any acts of any party shall be deemed or construed by Seller or Buyer or by any third person to create the relationship of partnership or of joint venture or of any association between Seller and Buyer, other than contractual relationships stated in this Agreement.

22.    Authority.    By executing this Agreement, each party represents and warrants to the other that the terms and conditions of this Agreement and the transactions contemplated herein have received approval by its respective governing structure or boards, as required by law and applicable governing documents and no further authorization is required in order to consummate the transaction as described herein.

23.    Assignment.    This Agreement may not be assigned by Buyer or Seller without the written consent of the other party.   Any assignment shall not terminate the liability of the assignor to perform, unless a specific release in writing is given and signed by the other party to this Agreement.

24.    Execution in Counterparts.    This Agreement may be executed in two or more counterparts, each of which shall be an original but all of which shall constitute one and the same instrument.

25.    Non-Merger.   All representations, warranties, covenants and indemnities made herein are intended to survive Closing and remain in full force and effect and shall not be merged in the special warranty deed.  This Agreement shall not be canceled at Closing.

[Signature page follows]

IN WITNESS WHEREOF, this Agreement has been executed by Seller and Buyer as of the date and year first written above.

**SELLER:**

Natural Pork Production II, LLP,
an Iowa limited liability partnership

By: _____
Name: _____
Title: _____

**PURCHASER:**

NEWELL PIG II, LLP
an Iowa limited liability partnership

By: _____
Name: _____
Title: _____

**Exhibit A**

**Legal Description**

Lot 1 of Parcel A of the Northeast Quarter of the Southeast Quarter of Section 22, Township 78 North, Range 36, West of the Fifth P.M., Audubon County, Iowa, as designated by survey recorded as Instrument #02-0913, in the Office of the Audubon County Recorder