# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re: | ) | Lead Case No. 12-02872-als11 |
| **NATURAL PORK PRODUCTION, II, LLP** | ) | |
| | ) | Chapter 11 |
| Debtor and Debtor in Possession. | ) | |
| | ) | Hon. Anita L. Shodeen |
| P.O. Box 468 | ) | |
| Harlan, IA  51537 | ) | |
| | ) | |
| EIN:  03-0480873 | ) | |
| **CRAWFORDSVILLE, LLC** | ) | Affiliated Case No. 12-03748 |
| | ) | |
| Debtor and Debtor in Possession | ) | |
| | ) | |
| EIN: 26-2579415 | ) | |
| **BRAYTON, LLC** | ) | Affiliated Case No. 12-03749 |
| | ) | |
| Debtor and Debtor in Possession | ) | |
| | ) | |
| EIN: 26-2579316 | ) | |
| **NORTH HARLAN, LLC** | ) | Affiliated Case No. 12-03750 |
| | ) | |
| Debtor and Debtor in Possession | ) | |
| | ) | |
| EIN: 26-2579496 | ) | |
| **SOUTH HARLAN, LLC** | ) | Affiliated Case No. 12-03751 |
| | ) | |
| Debtor and Debtor in Possession | ) | |
| | ) | |
| EIN: 26-2579560 | ) | |

## JOINT DISCLOSURE STATEMENT FOR LIQUIDATING PLAN OF
## REORGANIZATION DATED JANUARY 21, 2014

Jeffrey  D. Goetz, Esq., IS#9999366
Bradshaw, Fowler, Proctor & Fairgrave, PC
801 Grand Avenue, Suite 3700
Des Moines, IA  50309-8004
515/246-5817
515/246-5808 FAX
goetz.jeffrey@bradshawlaw.com
General Reorganization Counsel

TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................ 1
    A.  The Purpose of this Joint Disclosure Statement ............................................. 1
    B.  Defined Terms ................................................................................................. 5
II.  EXECUTIVE SUMMARY OF JOINT PLAN ...................................................... 6
III.  SUBSTANTIVE CONSOLIDATION ................................................................... 9
IV.  CONFIRMATION REQUIREMENTS: VOTE REQUIRED FOR APPROVAL OF THE
    PLAN .................................................................................................................... 10
    A.  Who may Vote or Object ................................................................................ 11
        1.  Who May Object to Confirmation of the Plan ....................................... 11
        2.  Who May Vote to Accept/Reject the Plan .............................................. 11
        3.  Who is Not Entitled to Vote .................................................................... 12
        4.  Who can Vote in More than One Class ................................................... 13
        5.  Votes Necessary to Confirm the Plan ..................................................... 13
        6.  Votes Necessary for a Class to Accept the Joint Plan ............................ 13
        7.  Treatment of Nonaccepting Classes: Absolute Priority Rule ................. 13
        8.  Request for Confirmation Despite Non-acceptance by Impaired Class(es) .......... 15
V.  DESCRIPTION OF THE JOINT PLAN ............................................................ 16
    A.  What Creditors and Interest Holders will Receive Under the Joint Plan .......... 16
    B.  Unclassified Claims ....................................................................................... 16
        1.  Administrative Expense Claims ............................................................... 17
        2.  Court Approval of Fees Required ............................................................ 18
        3.  Priority Tax Claims ................................................................................. 18
    C.  Classified Claims and Interests ..................................................................... 19
        1.  Class 1 - Priority Non-Tax Claims .......................................................... 19
        2.  Classes 2 – 5 – Allowed Secured Claims ................................................ 20
        3.  Class 6 - Contested Secured Claims of ICC/SIA Parties ........................ 20
        4.  Class 7 – Allowed Secured and Unsecured Claims for Executory Contracts and
            Unexpired Leases .................................................................................... 22
        5.  Class 8 – Allowed General Unsecured Claims ....................................... 22
        6.  Class 9 – Allowed Subordinated Unsecured Claims (No January 2012 Distribution. ..... 24
        7.  Class 10 – Allowed Subordinated Unsecured Claims (Received January 2012
            Distribution in an amount less than Sub Debt Note Claim) .................... 26
        8.  Class 11 – Allowed Subordinated Unsecured Claims (Received January 2012
            Distribution in amount greater than Sub Debt Note Claim on Petition Date) .......... 29
        9.  Class 12 – Contested Dissociated Equity Interests (Received January 2012 Distribution
            but held no Allowed Sub Debt Note Claim) (Total Disgorgement). ................. 32
        10.  Class 13 – Allowed Current Equity Interest Holders ............................ 34
        11.  Class 14 – Dissociated Equity Interests ................................................. 34
    D.  Reservation of Rights on Classification Disputes .......................................... 35
    E.  Effective Date of the Plan .............................................................................. 35
    F.  Executory Contracts and Unexpired Leases .................................................. 35
VI.  SUMMARY OF THE MEANS FOR EFFECTUATING THE PLAN ............................ 36
VII.  LEGAL PROCEEDINGS .................................................................................. 39
VIII.  BACKGROUND ON DEBTOR AND EVENTS LEADING TO FILING OF THE
    BANKRUPTCY CASES ..................................................................................... 41

IX.      ASSETS, LIABILITIES & FINANCIAL STATUS OF THE DEBTORS ......................... 42
X.       LIQUIDATION ANALYSIS ................................................................................................ 43
XI.      FEASIBILITY ...................................................................................................................... 45
XII.     MANAGEMENT AND COMPENSATIONAND POST-CONFIRMATION
         GOVERNANCE ................................................................................................................... 46
XIII.    UNITED STATES TRUSTEE SYSTEM FUND FEES ...................................................... 46
XIV.     TAX ANALYSIS................................................................................................................... 47
   A.    Tax Impact on the Debtors.................................................................................................. 48
   B.    Tax Impact on Creditors ..................................................................................................... 49
   C.    Tax Impact on Equity Interests ........................................................................................... 50
XV.      RISKS TO CREDITORS UNDER THE PLAN .................................................................. 50
XVI.     DEFAULT PROVISIONS..................................................................................................... 50
XVII.    EFFECT OF CONFIRMATION OF THE PLAN ............................................................... 51
   A.    Discharge ............................................................................................................................. 51
   B.    Revesting of Property in the Reorganized Debtors............................................................. 52
   C.    Modification and/or Amendment of the Joint Plan............................................................. 52
   D.    Revocation of an Order Confirming the Plan ..................................................................... 52
   E.    Post-Confirmation Status Report ........................................................................................ 53
   F.    Final Decree ........................................................................................................................ 53
   G.    Effect on Claims and Interests. ........................................................................................... 53
   H.    Termination of the Official Committee ............................................................................... 53
   I.    Bar Date For Administrative Expense Claims..................................................................... 54
   J.    Retained Bankruptcy Court Jurisdiction ............................................................................. 54
XVIII.   CONCLUSION AND RECOMMENDATION..................................................................... 57

I.    **INTRODUCTION**

NATURAL PORK PRODUCTION, II, LLP ("Natural Pork"), CRAWFORDSVILLE,

LLC ("Crawfordsville"), BRAYTON, LLC ("Brayton"), NORTH HARLAN, LLC ("North

Harlan"), and SOUTH HARLAN, LLC ("South Harlan")(hereinafter collectively referred to as

"NPPII" or "Debtors" or "Plan Proponents") are Debtors and Debtors in Possession in five (5)

separate Chapter 11 Bankruptcy Cases pending before this Court.  Natural Pork commenced its

case by filing a voluntary petition for relief on September 11, 2012. Crawfordsville, Brayton,

North Harlan and South Harlan are wholly-owned subsidiaries of Natural Pork, and they each

filed voluntary Chapter 11 petitions on December 7, 2012.  All five Bankruptcy Cases are not

jointly administered or substantively consolidated pursuant to Bankruptcy Rule 1015, but the

Debtors' Joint Plan proposes that the cases be substantively consolidated upon Confirmation.

Therefore, the Natural Pork case is being designated herein as the Lead Case.

Since the Petition Date, the Debtors have liquidated substantially all of their individual

and collective assets, with the exception of the Williamsburg and Windthorst assets.  Since the

Debtors will not continue business operations after confirmation, the Joint Plan is captioned as a

Liquidating Plan of Reorganization.

Chapter 11 allows Debtors, and under some circumstances, Creditors and other parties, to

propose a plan of reorganization. The Debtors are the Plan Proponents of the Joint Liquidating

Plan of Reorganization Dated January 7, 2014 ("Joint Plan").  A true and exact copy of the Joint

Plan is filed contemporaneously with this Joint Disclosure Statement.

A.    The Purpose of this Joint Disclosure Statement.

Pursuant to Bankruptcy Code § 1125, the Debtors have prepared and filed this Joint

Disclosure Statement along with the Joint Plan, for the Court's approval and submission to the

holders of Claims and Interests. However, before acceptance or rejection of a plan may be

1

solicited, the Court must find that this Joint Disclosure Statement contains "adequate

information."

"Adequate Information" is defined in Bankruptcy Code § 1125(a)(1) to mean information

of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and

history of the Debtors and the condition of the Debtors' books and records, that would enable a

hypothetical reasonable investor typical of the holders of Claims or Interests of the relevant Class

to make an informed judgment about the plan. In re Dakota Rail, Inc., 104 B.R. 138 (Bankr. MN

1989); In re Metrocraft Publishing Serv., Inc., 39 B.R. 567 (Bankr. N.D. Ga. 1984).

READ THIS JOINT DISCLOSURE STATEMENT CAREFULLY TO FIND OUT THE

FOLLOWING:

(1)     WHO CAN VOTE OR OBJECT;

(2)     WHAT THE TREATMENT OF YOUR CLAIM AND/OR INTEREST IS, (i.e., if

your Claim and/or Interest is disputed, and what your Claim and/or Interest will receive if the

Joint Plan is confirmed);

(3)     THE HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS DURING

THEIR BANKRUPTCY CASES;

(4)     WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR

NOT TO CONFIRM THE JOINT PLAN; AND

(5)     WHAT IS THE EFFECT OF CONFIRMATION?

This Joint Disclosure Statement cannot tell you everything about your rights. You should

consider consulting your own lawyer to obtain more specific advice on how the Joint Plan will

affect you and what is the best course of action for you.

Be sure to read the Joint Plan as well as the Joint Disclosure Statement. If there are any inconsistencies between the Joint Plan and Joint Disclosure Statement, the Joint Plan provisions will govern.

THE INFORMATION CONTAINED IN THIS JOINT DISCLOSURE STATEMENT HAS BEEN SUBMITTED BY THE DEBTORS, UNLESS SPECIFICALLY STATED TO BE FROM OTHER SOURCES.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THEM OR THEIR FINANCIAL AFFAIRS, OTHER THAN THOSE SET FORTH IN THIS JOINT DISCLOSURE STATEMENT.

YOU MAY NOT RELY UPON THIS JOINT DISCLOSURE STATEMENT FOR ANY PURPOSE OTHER THAN TO DECIDE HOW TO VOTE ON THE JOINT PLAN.  NOTHING CONTAINED IN THE JOINT PLAN OR THE JOINT DISCLOSURE STATEMENT SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY.

EXCEPT AS MAY BE SET FORTH IN THIS JOINT DISCLOSURE STATEMENT, THE BANKRUPTCY COURT HAS NOT APPROVED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR ASSETS.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS OR INDUCEMENTS TO SECURE ACCEPTANCE OR REJECTION OF THE JOINT PLAN OTHER THAN AS CONTAINED HEREIN AND APPROVED BY THE BANKRUPTCY COURT.

THE STATEMENTS CONTAINED IN THIS JOINT DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER DATE IS SPECIFIED HEREIN.  NEITHER DELIVERY OF THIS JOINT DISCLOSURE STATEMENT NOR ANY

3

EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THIS JOINT DISCLOSURE STATEMENT AND JOINT PLAN SHALL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH IN THE JOINT DISCLOSURE STATEMENT SINCE THE DATE THE JOINT DISCLOSURE STATEMENT WAS PREPARED.

ALTHOUGH THE DEBTORS BELIEVE THAT THE CONTENTS OF THIS JOINT DISCLOSURE STATEMENT ARE COMPLETE AND ACCURATE TO THE BEST OF THEIR KNOWLEDGE, INFORMATION AND BELIEF, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED THEREIN IS WITHOUT ANY INACCURACY.  ANY STATEMENTS REGARDING PROJECTED AMOUNTS OF CLAIMS AND DIVIDENDS ARE ESTIMATES OF THE DEBTORS BASED UPON CURRENTLY AVAILABLE INFORMATION AND ARE NOT A REPRESENTATION THAT SUCH AMOUNTS WILL ULTIMATELY PROVE CORRECT.

THE DEBTORS BELIEVE THAT THE TREATMENT OF CREDITORS AND INTEREST HOLDERS UNDER THE JOINT PLAN WILL RESULT IN A GREATER RECOVERY FOR CREDITORS THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER THE DIRECTION OF A TRUSTEE IN A CASE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.  ACCORDINGLY, THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTEREST OF CREDITORS AND INTEREST HOLDERS.  THE DEBTORS RECOMMEND THAT CREDITORS VOTE TO ACCEPT THE PLAN.

THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE JOINT PLAN DESCRIBED IN THIS JOINT DISCLOSURE STATEMENT.  IN OTHER WORDS, THE

TERMS OF THE JOINT PLAN ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF

THE BANKRUPTCY COURT LATER CONFIRMS THE JOINT PLAN, THEN THE JOINT

PLAN WILL BE BINDING ON ALL CREDITORS AND INTEREST HOLDERS IN THESE

CASES.

THE JOINT PLAN IS INTENDED TO RESOLVE, COMPROMISE AND SETTLE

ALL CLAIMS, DISPUTES, AND CAUSES OF ACTION BETWEEN AND AMONG ALL

PARTICIPANTS AND AS TO ALL MATTERS RELATING TO THESE PROCEEDINGS,

EXCEPT AS EXPRESSLY PROVIDED FOR IN THE JOINT PLAN.  THEREFORE,

APPROVAL OF THE JOINT PLAN SHALL AFFECT THE DISCHARGE AND RELEASE

OF THE DEBTORS AND SETTLE ALL CLAIMS OF CREDITORS AND INTEREST

HOLDERS, EXCEPT AS EXPRESSLY PROVIDED FOR IN THE JOINT PLAN.

IF THE BANKRUPTCY COURT CONFIRMS THE JOINT PLAN, CREDITORS'

CLAIMS, IF AND TO THE EXTENT ALLOWED, WILL BE PAID IN ACCORDANCE

WITH THE TERMS OF, AND AT SUCH TIME(S) SPECIFIED IN, THE JOINT PLAN.

B.      Defined Terms

For purposes of this Joint Disclosure Statement, all capitalized terms used herein, and not

otherwise defined, shall have the meanings set forth in the Joint Plan.  A term used, but not

defined, in the Joint Plan, but defined in the Bankruptcy Code or the Bankruptcy Rules, shall

have the meaning ascribed to it in the Bankruptcy Code or the Bankruptcy Rules, unless the

context clearly requires otherwise.  The rules of construction used in Bankruptcy Code Section

102 shall apply to construction of this Joint Disclosure Statement and the Joint Plan.  Headings

and captions are used in this Joint Disclosure Statement for the convenience of reference only,

and shall not constitute a part of this Joint Disclosure Statement for any other purpose.

II.    **EXECUTIVE SUMMARY OF JOINT PLAN**

The Debtors' Joint Plan is a "liquidating" plan, and not an "operating" plan.  That means the Debtors intend to pay Creditors and Interest holders from the liquidation of their assets, and not from revenue generated by future operations.

The Debtors' Joint Plan will also seek to have all five (5) Bankruptcy Cases substantively consolidated, so that all of the assets from all five (5) of the Bankruptcy Cases are pooled into one pot, and all of the Creditors and Interest holders from all five (5) of the Bankruptcy Cases share from that one pot.

Through the liquidation of assets during the pendency of the Bankruptcy Cases, the Debtors believe they will have sufficient Cash on hand to pay all Allowed Secured and Unsecured Creditors in full, with some receiving interest on their Claims, on the Effective Date of the Joint Plan.

The Debtors have disputed, will continue to dispute, and will seek a judicial determination of disallowance, of the alleged Secured Claims of the Inter-Creditor Committee ("ICC"), individually and collectively on behalf of the signatories to the Settlement and Intercreditor Agreement ("SIA Parties").

The SIA Parties who held Sub Debt Notes and received a payment from the January 2012 Distribution, will have the amounts they received re-characterized from partial return of their equity investment in Natural Pork to a repayment of their Sub Debt Notes, for tax purposes.

For those SIA Parties who received a payment from the January 2012 Distribution and the amount was less than the amount of their Sub Debt Note Claim on the Petition Date, they will get to keep their earlier January 2012 Distribution, and receive a further Distribution under the Joint Plan, so that their Sub Debt Note Claim will be paid in full, but without post-petition interest.  They will also be dismissed from all the Adversary Proceedings.

Those SIA Parties who were Sub Debt Note holders and received a payment from the January 2012 Distribution in an amount exceeding their respective Sub Debt Note Claim as of the Petition Date, will also get to keep their earlier payment and be dismissed from all the Adversary Proceedings, provided they consensually disgorge all amounts in excess of their Sub Debt Note Claim, on or before the Effective Date.

Those SIA Parties who did not hold Sub Debt Notes but received a payment from the January 2012 Distribution will be compelled to disgorge all amounts they received from the January 2012 Distribution.

Natural Pork will amend all of its previously filed 2011 and 2012 state and federal tax returns, and corresponding Schedule K-1's, to re-characterize the January 2012 Distribution as a repayment of debt rather than a partial return of equity.

The Debtors anticipate that after payment in full on the Allowed Claims of Creditors, there will be a dividend paid to Equity Interest holders, both Current Equity Interest holders and Dissociated Equity Interest holders.

Classes 1, 2, 3, 4, 5, 7, 8, 9, 10 and 11 are Unimpaired.  Classes 6, 12, 13 and 14 are Impaired.

The following chart provides a summary of the classification of Creditors and Interests under the Joint Plan and the anticipated aggregate amounts that will be allowed within each Class (on the Effective Date). This summary chart is purely an estimate based on the information presently available to the Debtors; the actual Distributions under the Joint Plan may vary from the projections.  For instance, the Debtors cannot predict with certainty how much the remaining assets will be sold for, the costs to pursue those who do not consensually disgorge the amounts

7

required and how much money, if any, will may recovered from pursuit of Claims and Causes of

Action.

| Class | Constituency | # of Claims/ Interests | Estimated Distribution | Treatment |
|---|---|---|---|---|
| Unclassified | §507(a)(2) – Administrative Expense Claims | 10 | $300,000.00 | Paid in full on the Effective Date[1] |
| Unclassified | §507(a)(8) – Priority Tax Claims | 3 | $5,280.33 | Paid in full on the Effective Date |
| Class 1 | §507(a)(1),(4),(5),(6) & (7) – Priority Non-Tax Claims | 0 | 0.00 | Paid in full on the Effective Date |
| Class 2 | Secured - AgStar Financial | 1 | 0.00 | Paid in full post-petition; no further dividend |
| Class 3 | Secured - First Farmers | 1 | 0.00 | Paid in full post-petition; no further dividend |
| Class 4 | Secured – GE | 1 | 0.00 | Paid in full post-petition; no further dividend |
| Class 5 | Secured - Met Life | 1 | 0.00 | Paid in full post-petition; no further dividend |
| Class 6 | Contested Secured Claims– ICC/SIA Parties | 123 | 0.00 | Claims will be disallowed; no dividend |
| Class 7 | Secured and Unsecured Executory Contract & Unexpired Lease Claims | 0 | 0.00 | Paid in full post-petition; no further dividend |
| Class 8 | General Unsecured Claims | 34 | $4,171,556.96 | Paid in full with interest on the Effective Date |
| Class 9 | Subordinated Unsecured Claims – No January 2012 Distribution | 42 | $7,852,291.57 | Paid in full with interest on the Effective Date |
| Class 10 | Subordinated Unsecured Claims – January 2012 Distribution less than Sub Debt Note Claim | 92 | $4,503,606.98 | Paid in full on the Effective Date, no interest |
| Class 11 | Subordinated Unsecured Claims – January 2012 Distribution more than Sub Debt Note Claim | 25 | 0.00 | Retain January 2012 Distribution provided overpayment of Sub Debt Note Claim is disgorged on or before Effective Date (approximately $3,063,008.01 aggregate disgorgement) |

---

[1] Payments throughout the summary should be deemed to be the later of the specified payment date or upon Final Order allowing such Claim or Interest.

| Class 12 | Dissociated Equity Interests – received a January 2012 Distribution but holds no Sub Debt Note Claim | 5 | 0.00 | All Interests in this Class will disgorge 100% of amount they received from the January 2012 Distribution, totaling approximately $295,338.44.  No dividend will be paid under the Joint Plan |
| Class 13 | Equity Interest Holders on Petition Date | 24 | $4,000,000.00 | Pro-rata dividend equal to $2/3^{rd}$ of the Equity Fund. Partial dividend paid on the Effective Date; potential subsequent dividends may be paid |
| Class 14 | Dissociated Equity Interest Holders on Petition Date | 128 | $2,000,000.00 | Pro-rata dividend equal to $1/3^{rd}$ of the Equity Fund. Partial dividend paid on the Effective Date; potential subsequent dividends may be paid No dividend will be paid under the Joint Plan |

III.    **SUBSTANTIVE CONSOLIDATION**

The Joint Plan will seek to have all five (5) Bankruptcy Cases substantively consolidated at Confirmation. The Debtors will need to show the Court that Natural Pork and its four wholly-owned subsidiaries are inseparably interrelated; the benefits of substantive consolidation outweigh the harm to Creditors and Interest holders, and no Creditors or Interest holders would suffer prejudice by having the Bankruptcy Cases substantively consolidated.

The doctrine of substantive consolidation is a recognized equitable remedy under the Bankruptcy Code.  In re: Cyberco Holdings, Inc., 431 B.R. 404, 410 (W.D. Mich. 2010). Although the remedy does not appear in the Code, bankruptcy courts cite Section 105(a) of the Code as authority for it.  Id. ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title").  The doctrine is a recognized

remedy in the Eighth Circuit for Chapter 11 bankruptcies.  *See* In re: Giller, 962 F.2d 796 (8th Cir. 1992).

"Substantive consolidation is the pooling of two or more debtors' assets and liabilities so that of each of the debtor's liabilities is satisfied from the common pool of assets created by the consolidation.  In re: Gilbertson Restaurants, LLC, No. 04-00385, 2005 WL 783063 at *5 (Bankr. N.D. Iowa Apr. 4, 2005).  To substantively consolidate a bankruptcy case, the debtor(s) may file a motion to substantively consolidate with the court.  In re: Giller, 962 F.2d at 798. Alternatively, the debtor may substantively consolidate a bankruptcy pursuant to a Chapter 11 plan.  In re: Gilbertson Restaurants LLC, 2005 WL 783063 at *1; In re: Affiliated Foods, Inc., 249 B.R. 770, 775 n.3 (Bankr. W.D. Mo. 2000) ("[t]hough unusual, it is not inappropriate to propose substantive consolidation in a Chapter 11 plan").  When substantive consolidation is part of a plan, the court must approve the plan and ensure that it does not violate the law associated with substantive consolidation.  Gilbertson, 2005 WL 783063 at *7.

## IV.    CONFIRMATION REQUIREMENTS: VOTE REQUIRED FOR APPROVAL OF THE PLAN

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE JOINT PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims. The Plan Proponents CAN NOT and DO NOT represent that the discussion contained below is a complete summary of the law on this topic.

A.        Who may Vote or Object

        1.        Who May Object to Confirmation of the Plan

Any party in interest may object to the confirmation of the Joint Plan, but as explained below not everyone is entitled to vote to accept or reject the Joint Plan.

        2.        Who May Vote to Accept/Reject the Plan

A Creditor or Interest holder has a right to vote for or against the Joint Plan if that Creditor or Interest holder has a Claim and/or Interest which is both (1) allowed or allowed for voting purposes and (2) classified in an Impaired Class.

        a.        What is an Allowed Claim/Interest

As noted above, a Creditor or Interest holder must first have an Allowed Claim or Interest to have the right to vote. Generally, any Proof of Claim or Interest will be allowed, unless a party in interest brings a motion objecting to the Claim and/or Interest. When an objection to a Claim or Interest is filed, the Creditor or Interest holder holding the Claim or Interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the Claim or Interest for voting purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THESE CASES was January 8, 2013 for Natural Pork and April 23, 2013 for Crawfordsville, Brayton, North Harlan, and South Harlan. A Creditor or Interest holder may have an Allowed Claim or Interest even if a Proof of Claim or Interest was not timely filed. A Claim is deemed allowed if (1) it is scheduled on the Debtors' schedules and such Claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the Claim. An Interest is deemed allowed if it is scheduled and no party in interest has objected to the Interest.

b.      What is an Impaired Claim/Interest

As noted above, an Allowed Claim or Interest only has the right to vote if it is in a Class that is Impaired under the Joint Plan. A Class is Impaired if the Joint Plan alters the legal, equitable, or contractual rights of the members of that Class. For example, a Class comprised of General Unsecured Claims is Impaired if the Plan fails to pay the members of that Class 100% of what they are owed.

In this case the Debtors believe that Classes 6, 12, 13 and 14 are Impaired and that holders of Claims and Interests in Classes 6, 12, 13 and 14 are therefore entitled to vote to accept or reject the Joint Plan. The Debtors believe that Classes 1 through 5 and 7 through 11 are Unimpaired and holders of Claims in these Classes do not have the right to vote to accept or reject the Plan. Parties who dispute the Debtors' characterization of their Claim or Interest as being Impaired or Unimpaired may file an objection to the Joint Plan contending that the Debtors have incorrectly characterized the Class.

3.      Who is Not Entitled to Vote

The following four types of Claims are not entitled to vote:  (1) Claims that have been disallowed; (2) Claims in Unimpaired Classes; (3) Claims entitled to priority pursuant to Code § 507(a)(2), (a)(3) and (a)(8); and (4) Claims and/or Interests in Classes that do not receive or retain any value under the Joint Plan. Claims and/or Interests in Unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Joint Plan. Claims entitled to priority pursuant to Code § 507(a)(2), (a)(3), and (a)(8) are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Code. Claims and/or Interests in Classes that do not receive or retain any value under the Joint Plan do not vote because such Classes are deemed to have rejected the Plan. EVEN IF

12

YOUR CLAIM AND/OR INTEREST IS OF A TYPE DESCRIBED ABOVE, YOU MAY

STILL HAVE A RIGHT TO OBJECT TO CONFIRMATION OF THE PLAN.

4.    Who can Vote in More than One Class

A Creditor whose Claim has been allowed in part as a Secured Claim and in part as an

Unsecured Claim is entitled to accept or reject the Joint Plan in both capacities, by casting one

ballot for the secured part of the Claim and another ballot for the Unsecured Claim.

5.    Votes Necessary to Confirm the Plan

Since Impaired Classes exist, the Court cannot confirm the Joint Plan unless (1) at least

one Impaired Class has accepted the Joint Plan without counting the votes of any Insiders within

that Class, and (2) all Impaired Classes have voted to accept the Joint Plan, unless the Plan is

eligible to be confirmed by "cramdown" on non-accepting Classes, as discussed later in

paragraph 7 of this Section.

6.    Votes Necessary for a Class to Accept the Joint Plan

A Class of Claims is considered to have accepted the Joint Plan when more than one-half

(1/2) in number and at least two-thirds (2/3) in dollar amount of the Claims which actually voted,

voted in favor of the Joint Plan. A Class of Interests is considered to have accepted the Plan

when at least two-thirds (2/3) in amount of the Interest holders of such Class which actually

voted, voted to accept the Joint Plan.

7.    Treatment of Nonaccepting Classes: Absolute Priority Rule

As noted above, even if all Impaired Classes do not accept the Joint Plan, the Court may

confirm the Joint Plan as long as the nonaccepting Classes are treated in the manner required by

the Code. The process by which nonaccepting Classes are forced to be bound by the terms of a

plan is commonly referred to as "cramdown." The Code allows a plan to be "crammed down" on

13

nonaccepting Classes of Claims or Interests if it meets all consensual requirements, except the

voting requirements of Code § 1129(a)(8), and if the plan does not "discriminate unfairly" and is

"fair and equitable" toward each Impaired Class that has not voted to accept the plan, as referred

to in Code § 1129(b), and applicable case law.

a.    <u>Secured Claims</u>:

There are three ways to satisfy the fair and equitable standard with respect to a dissenting

Class of Secured Claims. The first way is to provide that Class members retain their security

interests (whether the collateral is kept or is transferred by the individual Debtors) to the extent

of their allowed Secured Claims, and to give each Secured Creditor in the Class deferred Cash

payments that aggregate to at least the amount of the allowed Secured Claim, and which have a

present value equal to the value of the collateral. This method of satisfying the fair and equitable

standard may be complicated by the application of the Code § 1111(b)(2). The meaning of

"Allowed Secured Claim" as used in this paragraph will depend on whether the Secured Class

makes a Code § 1111(b)(2) election to be treated as fully secured despite the fact that the

collateral may be worth less than the amount of the Claim.

The Code § 1111(b)(2) Election converts an Unsecured Deficiency Claim into a Claim

secured by the collateral of the electing Creditor. If a Creditor so elects, the Debtors must treat

the Creditor's entire Claim as a Secured Claim, and the Joint Plan must provide for the Creditor

to receive, (on account of its Claim) payments (either present or deferred), of a principal face

amount equal to the amount of the Claim and of a present value equal to the value of the

collateral.

A second alternative for complying with the fair and equitable standard with respect to a

Class of dissenting Secured Creditors, is for the Joint Plan to provide for the realization of the

14

"indubitable equivalent" of their Secured Claims.

The third alternative for satisfying the fair and equitable standard is for the Plan to provide for the sale of the collateral free and clear of liens, with the liens to attach to the sale proceeds.

b.    Unsecured Claims:

There are two ways of satisfying the fair and equitable standard with respect to a dissenting Class of Unsecured Claims. The first way is for the Joint Plan to provide for Distributions to the dissenting Class worth the full amount of their Allowed Claims. The Allowed Claims need not be paid in full on the Effective Date of the Plan. If the Plan provides for deferred payments, an appropriate discount factor must be used so that the present value of deferred payments equals the full amount of the Allowed Unsecured Claims of the dissenting Class.

The second way to satisfy the fair and equitable test with respect to a dissenting Class of Unsecured Creditors, is for the Joint Plan to provide that all Claims and/or Interests that are junior to the dissenting Class do not receive or retain any property on account of their Claims or Interests. Accordingly, if a dissenting Unsecured Creditor Class is to receive property worth only one-half of its Allowed Claims, the Joint Plan may still be fair and equitable if all junior Classes are to receive or retain nothing, and if no senior Class is to receive more than 100% of its Allowed Claims.

8.    Request for Confirmation Despite Non-acceptance by Impaired Class(es)

If any Impaired Class does not accept the Joint Plan, the Debtors will seek confirmation by the cramdown provisions of Section 1129(b), provided that all of the applicable requirements of Section 1129(a), other than Section 1129(a)(8), have been met.

15

## V.    DESCRIPTION OF THE JOINT PLAN

The following description of the Joint Plan is qualified in its entirety by the terms of the Joint Plan itself.

**THE STATEMENTS CONTAINED IN THIS JOINT DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE JOINT PLAN.  THE STATEMENTS CONTAINED HEREIN DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE JOINT PLAN, AND REFERENCE IS MADE TO THE PLAN FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS.**

**THE JOINT PLAN ITSELF WILL BE FILED CONTEMPORANEOUSLY WITH THIS JOINT DISCLOSURE STATEMENT, AND WILL CONTROL THE TREATMENT OF CREDITORS AND INTEREST HOLDERS UNDER THE JOINT PLAN UPON THE EFFECTIVE DATE, AND WILL BE BINDING UPON CREDITORS, INTEREST HOLDERS AND OTHER PARTIES**.

A.    What Creditors and Interest Holders will Receive Under the Joint Plan

As required by the Bankruptcy Code, the Joint Plan classifies Claims and Interests in various Classes according to their right to priority. The Joint Plan states whether each Class of Claims or Interests is Impaired or Unimpaired. The Joint Plan also provides the treatment Claims and Interests in each Class will receive.

B.    Unclassified Claims

Certain types of Claims are not placed into voting Classes; instead they are Unclassified. They are not considered Impaired and will not vote on the Joint Plan because they are

automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such,

the Plan Proponents have not placed the following Claims in a Class.

1.    <u>Administrative Expense Claims</u>

Administrative Expense Claims are Claims for costs and/or expenses of administering the

Debtors' Bankruptcy Cases which are allowed under Code § 507(a)(2). The Code requires that

all Administrative Expense Claims be paid on the Effective Date of the Joint Plan unless a

particular claimant agrees to a different and/or less favorable treatment.

The following chart lists all of the Debtors' § 507(a)(2) Administrative Expense Claims

and their treatment under the Plan

| Name | Amount Owed | Treatment |
|---|---|---|
| Allowed Code Sec. 503(b)(9) Claims | $0.00 | No Dividend – paid in full post-petition pursuant to Final Order of the Court |
| Bradshaw Law Firm, General Reorganization Counsel | $ 100,000.00 | Payment in full after approval of fees and costs by Final Order of the Court |
| Davis Brown Law Firm – Special Corporate Counsel | $10,000.00 | Payment in full after approval of fees and costs by Final Order of the Court |
| Davis Brown Law Firm – Special Litigation Counsel | $10,000.00 | Payment in full after approval of fees and costs by Final Order of the Court |
| Bose McKinney – Special Indiana Real Estate and Environmental Counsel | $10,000.00 | Payment in full after approval of fees and costs by Final Order of the Court |
| Frost, PLLC – General Reorganization Tax Accountants | $25,000.00 | Payment in full after approval of fees and costs by Final Order of the Court |
| Variant Capital – Debtor's Financial Advisor | $0.00 | No dividend – paid in full post-petition pursuant to Final Order of the Court |
| Sugar Felsenthal Law Firm – OUCC Counsel | $100,000.00 | Payment in full after approval of fees and costs by Final Order of the Court |
| Managing Partner Expense Reimbursement | $23,000.00 | Payment in full after approval of fees and costs by |

17

| | | Final Order of the Court |
|---|---|---|
| OUCC Members Expenses | $2,000.00 | Payment in full after approval of fees and costs by Final Order of the Court |
| Office of the U.S. Trustee Fees | $20,000.00 | Paid in full on or before the Effective Date |
| | TOTAL $300,00.00 | |

## 2.     Court Approval of Fees Required

The Court must rule on all fees listed in this chart, except U.S. Trustee Quarterly Fees, before the fees will be paid. For all fees except the U.S. Trustee's fees, the professional or party seeking reimbursement must file and serve a properly noticed fee application and the Court must rule on the application. Only the amount of fees allowed by the Court will be paid under this Joint Plan.

As indicated above, the Debtors will need to pay approximately $300,000.00 in Administrative Expense Claims on or about the Effective Date of the Joint Plan, unless the claimants have agreed to be paid later or the Court has not yet ruled on their Administrative Expense Claim. As indicated elsewhere in this Joint Disclosure Statement, the Debtors estimate that they may have as much as approximately $20,000,000 in Cash on hand on the Effective Date of the Joint Plan. The source of this Cash is from the post-petition liquidation and sale of substantially all of the Debtors' real and personal property, excluding the Williamsburg and Windthorst properties.

## 3.     Priority Tax Claims

Priority Tax Claims include certain unsecured income, employment and other taxes described in Code § 507(a)(8). The Code requires that each holder of such a § 507(a)(8) Priority Tax Claim receive the present value of such Claim in deferred Cash payments, over a period not

18

exceeding five (5) years from the Petition Date. The Debtors believe there are three (3) Priority

Tax Claims, two (2) for pre-petition property taxes on the Windthorst, Texas property, and one

(1) to the Nebraska Department of Revenue for the capital gains taxes incurred as a result of the

January 2012 Distribution. The Debtors do not dispute the property tax claims. The Debtors

dispute the Nebraska Department of Revenue Priority Tax Claim, on the basis that upon

amendment of all state and federal tax returns and corresponding Schedule K-1 to the Interest

holders, there will be no taxable event triggering capital gains taxes. Allowed Priority Tax

Claims will be paid in full on the Effective Date or such later date when any disputed or

disallowed Claims are allowed by Final Order of the Court.

      C.    <u>Classified Claims and Interests</u>

          1.    <u>Class 1 - Priority Non-Tax Claims</u>

Class 1 includes certain Priority Non-Tax Claims that are referred to in Code § 507(a)(1),

(4), (5), (6), and (7) that are required to be placed in Classes. These are generally for Domestic

Support Obligations, Wages, and Contributions to Employee Benefit Plans, Grain Production

and Purchase/Lease Deposits. These types of Claims are entitled to priority treatment as follows:

the Code requires that each holder of such a Claim receive Cash on the Effective Date equal to

the allowed amount of such Claim. However, Priority Non-Tax Claim holders may vote to accept

deferred Cash payments (of a value as of the Effective Date) equal to the allowed amount of such

Claim. These Claims are Unimpaired. The Debtors do not believe there are or will be any

Priority Non-Tax Claims on the Effective Date of the Joint Plan. To the extent there are any

Allowed Priority Non-Tax Claims due and owing on the Effective Date, they will be paid in full

on the Effective Date.

2.    Classes 2 – 5 – Allowed Secured Claims

The Claims in Classes 2 through 5 are Secured Claims, which are Claims secured by liens on property of the respective bankruptcy estates. The following chart lists all Classes containing Debtors' allowed secured pre-petition Claims and their treatment under the Plan.

| CLASS | DESCRIPTION | IMPAIRED | TREATMENT |
|---|---|---|---|
| 2 | Allowed Secured Claim of AgStar Financial (Crawfordsville & Natural Pork) | No | Claim paid in full post-petition after sale of collateral securing said claim. No further dividend will be paid through the Plan. |
| 3 | Allowed Secured Claim of First Farmers Bank & Trust of Peru Indiana (Crawfordsville & Natural Pork) | No | Claim paid in full post-petition after sale of collateral securing said claim. No further dividend will be paid through the Plan. |
| 4 | Allowed Secured Claim of GE Commercial Finance Business Corporation f/k/a General Electric Capital Business Asset Funding Corporation (Brayton) | No | Claim paid in full post-petition in the ordinary course of business, pursuant to Early Purchase Option. No further dividend will be paid through the Plan |
| 5 | Allowed Secured Claim of Metropolitan Life Insurance Company (North Harlan) | No | Claim paid in full post-petition after sale of collateral securing said claim. No further dividend will be paid through the Plan. |

3.    Class 6 - Contested Secured Claims of ICC/SIA Parties

The Claims in Class 6 are contested by the Debtors.  The constituency of Class 6 includes those individuals and entities who dissociated from the Natural Pork limited liability partnership prior to the Petition Date, were SIA Parties, and received a part of the January 2012 Distribution. The Class 6 claimants assert that their individual and collective claims arise from the value of their Dissociated Equity Interests on the date of their dissociation from the Natural Pork limited liability partnership, plus interest from the date of each respective Notice of Dissociation through the Petition Date, and spring from the SIA.  Each individual Class 6 claimants Claim is ostensibly evidenced by a promissory note issued to each claimant pursuant to the SIA and in

20

consideration for being an SIA Party.  The Class 6 claimants also assert that their Class 6 Claims

are individually and collectively secured by a junior security interest, lien and encumbrance upon

all of the assets of all five (5) bankruptcy estates. Each individual Class 6 claimant has filed a

proof of claim, and the ICC, ostensibly acting on behalf of all SIA Parties, has also filed an

omnibus proof of claim for all the SIA parties in all five (5) Bankruptcy Cases.

The Debtors have disputed all the individual Class 6 proofs of claim, and the ICC

omnibus proof of claim on behalf of all the SIA Parties, in the Adversary Proceedings, and by

filing objections to all the Class 6 proofs of claim.  Therefore, all Class 6 Claims are Contested

Claims.

The Debtors' dispute and objection of the Class 6 Claims are detailed in the Adversary

Proceedings and a condensed but non-exhaustive summary is below:

(a)      The SIA was executed without prior, proper or adequate notice to Natural Pork's

Current Equity Interests and without a vote of the Natural Pork Current Equity Interest holders.

(b)      The SIA contains material terms and conditions that violate the Natural Pork

Partnership Agreement, the Natural Pork Buy-Sell Agreement, and Iowa Code Chapter 486A,

because the SIA delegates control over management decisions of Natural Pork to persons or

entities that are not Current Equity Interest Holders.

(c)      The SIA contains material terms and conditions that violate the Natural Pork

Partnership Agreement, the Natural Pork Buy-Sell Agreement, and Iowa Code Chapter 486A, by

improperly reordering the priority of debt repayment between Sub Debt Note holders and

Dissociated Equity Interest holders.

(d)      The SIA was a creation borne of fraud, breach of fiduciary duty and improper self

dealing by Natural Pork's then managing partners.

(e)    The alleged junior security interests, liens and encumbrances on all of the property of all five (5) Debtors, granted to the SIA Parties, through the SIA, were all fraudulent conveyances and avoidable transfers under both the Bankruptcy Code, Iowa law and applicable case law.

(f)    To the extent the Claims of Class 6 claimants are allowed as Claims, such Claims are subject to equitable subordination pursuant to Bankruptcy Code Section 510, and should be treated as Interests rather than Claims.

Based on the above, all Class 6 Claims shall be disallowed and shall not receive any Distribution on account of their Class 6 Claims.  All the Dissociated Equity Interests shall be treated as Interests, and not Claims, in Class 14.

4.    <u>Class 7 – Allowed Secured and Unsecured Claims for Executory Contracts and Unexpired Leases</u>

Class 7 consists of all Allowed Secured and Unsecured Pre-Petition Executory Contract and Unexpired Lease Claims against all Five (5) bankruptcy estates. The Debtors are informed and believe that there are no Class 7 Claims. Class 7 is Unimpaired.

To the extent there are any Allowed Secured and/or Unsecured Pre-Petition Executory Contract and/or Unexpired Lease Claims against any of the Five (5) bankruptcy estates, and except to the extent that such a holder has agreed to different and/or less favorable treatment of such Claim, each holder of an Allowed Class 7 Claim shall be paid in full in Cash the allowed amount of such Claim on the Effective Date or the entry of a Final Order approving such Claim.

5.    <u>Class 8 – Allowed General Unsecured Claims</u>

Class 8 Claims are Unsecured Claims not entitled to priority under Code § 507(a).  Class 8 consists of Allowed General Unsecured Claims that the Debtors incurred pre-petition in the

ordinary course of their respective businesses.  The vast majority of the Class 8 Claims are described as "Trade Claims" and were incurred by Crawfordsville and Natural Pork in its Colfax operations. Class 8 also includes the Claims of Trupointe Cooperative and Purina Mills, LLC in connection with Natural Pork's earlier investment in the YNOT property, and Gary Weihs for development fees. There are 34 Claims in Class 8, and the total amount of Allowed Claims is $4,171,556.96.  Class 8 is Unimpaired.

Unless the holder of an Allowed Class 8 Claim has agreed to different and/or less favorable treatment of such Claim, each holder of an Allowed Class 8 Claim shall be paid in full in Cash the allowed amount of such Claim on the Effective Date or the entry of a Final Order approving such Claim, plus interest at Three Percent (3.0%) per annum, calculated from the Petition Date to the Effective Date. Below is a table of all Class 8 Claim holders and the proposed Distribution on each Claim without interest:

|    | Name | ClaimAmt | Consideration |
|----|------|----------|---------------|
| 1  | AMVC Employee Services | $240.81 | Trade Debt |
| 2  | AMVC Management Services | $216.00 | Trade Debt |
| 3  | AT&T | $299.66 | Trade Debt |
| 4  | B&K Smith Trucking, Inc. | $1,824.60 | Trade Debt |
| 5  | Berend Turf & Tractor | $1,735.15 | Trade Debt |
| 6  | Ceres Solutions | $0.00 | Trade Debt |
| 7  | Cottrell,  Zakk | $42.97 | Trade Debt |
| 8  | Darlington Municipal Utilities | $652.29 | Trade Debt |
| 9  | Davis Mike | $101.50 | Trade Debt |
| 10 | Duke Energy | $3,523.19 | Trade Debt |
| 11 | Farmers Mutual Coop Telephone | $6.06 | Trade Debt |
| 12 | First Bankcard | $4,154.00 | Trade Debt |
| 13 | Hog Slat, Inc. | $601.62 | Trade Debt |
| 14 | Hog Slat, Inc. | $645.68 | Trade Debt |
| 15 | Indiana State Dept. of Agriculture | $10.00 | Trade Debt |
| 16 | John Wilcox Excavating | $17,466.20 | Trade Debt |
| 17 | Land O Lakes | $8,291.11 | Trade Debt |
| 18 | McCord Electrical | $6,808.82 | Trade Debt |

23

| 19 | PIC | $29,171.10 | Trade Debt |
|----|-----|-----------|-----------|
| 20 | Pomp's Tire Service, Inc. | $311.18 | Trade Debt |
| 21 | Premier Feeds, LLC | $220.00 | Trade Debt |
| 22 | Purina Mills, LLC | $2,009,868.81 | YNOT Note |
| 23 | Quench USA (Aquaperfect) | $48.15 | Trade Debt |
| 24 | Sprint | $419.49 | Trade Debt |
| 25 | Swine Health Services, LLC | $90.61 | Trade Debt |
| 26 | Thrifty Wholesale Supply, Inc. | $127.64 | Trade Debt |
| 27 | Trupointe Cooperative, Inc. | $1,936,582.95 | YNOT Note |
| 28 | U Rent It Center, Inc. | $390.51 | Trade Debt |
| 29 | Verizon Wireless | $138.02 | Trade Debt |
| 30 | Waste Management of Central Indiana | $429.30 | Trade Debt |
| 31 | Waste Management of Central Indiana | $150.46 | Trade Debt |
| 32 | Weihs, Gary | $146,581.87 | Development fee |
| 33 | Whitewater Valley REMC | $132.81 | Trade Debt |
| 34 | Wright Hardware | $274.40 | Trade Debt |

Total   $4,171,556.96

6.     Class 9 – Allowed Subordinated Unsecured Claims (No January 2012 Distribution.

Class 9 Claims are Unsecured Claims not entitled to priority under Code § 507(a) and subordinated to the Claims in Class 8.  Class 9 consists of the Allowed Unsecured Claims of Subordinated Note Holders ("Sub Debt Notes") held by Natural Pork's Current and Dissociated Equity Interest holders on the Petition Date who did not receive any payment or dividend from the January 2012 Distribution. The Sub Debt Notes were issued to Current and Dissociated Equity Interest holders in connection with their subscription as Limited Liability Partners of Natural Pork and their equity investment in same.  There are 42 Class 9 Claim holders and the total amount of Allowed Claims is $7,852,291.57. Class 9 is Unimpaired.

Unless the holder of an Allowed Class 9 Claim has agreed to different and/or less favorable treatment of such Claim, each holder of an Allowed Class 9 Claim shall be paid in full in Cash the allowed amount of such Claim on the Effective Date or the entry of a Final Order

approving such Claim, plus interest at Three Percent (3.0%) per annum, calculated from the

Petition Date to the Effective Date. Below is a table of all Class 9 Claim holders and the

proposed Distribution on each Claim without interest:

|   | Last | First | Acct No | Claim Amount |
|---|------|-------|---------|--------------|
| 1 | Axelrod | Alan | 260169.0 | $464,830.58 |
| 2 | Axelrod | Arbie | 260129.0 | $326,871.51 |
| 3 | Bloomquist | Cynthia Gove | 260048.0 | $48,347.43 |
| 4 | Bolander | Frederick WW | 260087.0 | $438,750.61 |
| 5 | Bolander | Frederick/Rinske | 260068.0 | $440,809.16 |
| 6 | Burge | Wendell IRA (LT) | 260109.0 | $52.98 |
| 7 | Cass | Joseph & Amy | 260111.0 | $146,722.64 |
| 8 | Christofferson | Paul & Susan | 260024.0 | $24,168.84 |
| 9 | Croghan | Peter & Lois | 260095.0 | $18,313.75 |
| 10 | D & G Farms |  | 260002.0 | $69,426.22 |
| 11 | D & G Farms |  | 260175.0 | $69,504.54 |
| 12 | Dinsdale | Joy | 260063.0 | $94,761.10 |
| 13 | Finken | Bob | 260090.0 | $11,618.42 |
| 14 | Ford | Michael (RBC) | 260099.0 | $12,905.23 |
| 15 | Gray | Randy | 260133.0 | $2,207.32 |
| 16 | Handlos | Lawrence & Doris | 260092.0 | $4,140,372.43 |
| 17 | Handlos | Pat (RBC) | 260100.0 | $19,293.94 |
| 18 | Juckem | Jay & Denise | 260098.0 | $54,478.56 |
| 19 | Lane | Philip IRA (LT) | 260086.0 | $142,270.20 |
| 20 | Lane | Jessica | 260136.0 | $18,479.98 |
| 21 | Lapke | Gerald Rev Trust | 260127.0 | $204,294.69 |
| 22 | Lapke | JoAnn Rev Trust | 260126.0 | $204,294.69 |
| 23 | Lorack | Tim | 260016.0 | $69,065.36 |
| 24 | Lorack | Tim (RBC) | 260094.0 | $9,785.26 |
| 25 | Lorack | Todd | 260015.0 | $64,270.03 |
| 26 | Lorack | Todd (RBC) | 260049.0 | $21,660.84 |
| 27 | Neitzel | Charles | 260161.0 | $44,251.17 |
| 28 | Nyman | Mark & Shari | 260152.0 | $1,473.28 |
| 29 | Oestreicher | Jill | 260103.0 | $98,061.45 |
| 30 | Pond | Preston (Interagtive) | 260166.0 | $9,070.66 |
| 31 | R II B Family, LLC |  | 260067.0 | $46,679.59 |
| 32 | Schliesman | Thomas | 260128.0 | $102,427.62 |
| 33 | Schwartz | Gail | 260119.0 | $12,117.17 |

| 34 | Stewart | Diane | 260033.0 | $1,660.84 |
| 35 | Stewart | Diane | 260123.0 | $4,337.50 |
| 36 | Stewart | Paul | 260124.0 | $886.34 |
| 37 | Thorbeck | David | 260050.0 | $48,332.62 |
| 38 | Wigley | Michael | 260051.0 | $46,370.19 |
| 39 | Wittrup | Richard Trust | 260047.0 | $36,317.00 |
| 40 | Wood | Mark & Nancy | 260036.0 | $101,342.54 |
| 41 | Zaccone | Joe | 260006.0 | $17,634.14 |
| 42 | Zaccone | Martin & Mary Jane | 260102.0 | $163,773.15 |
| | | Total | | $7,852,291.57 |

7.      Class 10 – Allowed Subordinated Unsecured Claims (Received January 2012 Distribution in an amount less than Sub Debt Note Claim)

Class 10 consists of the Allowed Unsecured Claims of Sub Debt Note holders who did receive a payment from the January 2012 Distribution, but such payment was less than their Sub Debt Note Claim as of the Petition Date.  Although the January 2012 Distribution was initially characterized as a partial return of equity on account of dissociation from the Natural Pork limited liability partnership, the January 2012 Distribution under the Joint Plan will be re-characterized as a partial repayment of Sub Debt Note Claims.

There are 92 Allowed Claims in Class 10 who were collectively owed $10,342,226,78 on their Sub Debt Note Claims as of the Petition Date, collectively received $5,838,619.80 from the January 2012 Distribution, and will collectively receive $4,503,606.98 on account of their Class 10 Claim under the Joint Plan.  Class 10 is Unimpaired.

Unless the holder of an Allowed Class 10 Claim has agreed to different and/or less favorable treatment of such Claim, each holder of an Allowed Class 10 Claim shall be paid in full in Cash the allowed amount of such Claim on the Effective Date or the entry of a Final Order approving such Claim, without interest.

To the extent any or all of the Class 10 Claim Holders are plaintiffs, defendants, cross-claimants, counter-claimants, cross-defendants, or 3rd party defendants to any of the pending Adversary Proceedings, they shall be dismissed from said Adversary Proceedings upon entry of the Confirmation Order.

Below is a table of all Class 10 Claim holders and the proposed Distribution on each Claim:

|  | Last | First | Acct No. | Sub Debt Note Amount | January 2012 Distribution | Amount owed |
|---|---|---|---|---|---|---|
| 1 | Amrozowicz | Rich | 260031.0 | $301,869.61 | $173,802.83 | $128,066.78 |
| 2 | Anlicker | Michael (RBC) | 260121.0 | $9,076.76 | $4,092.31 | $4,984.45 |
| 3 | Betts | Robert (RBC) | 260172.0 | $43,767.58 | $17,354.95 | $26,412.63 |
| 4 | Blair | Kelly | 260163.0 | $58,545.37 | $22,348.37 | $36,197.00 |
| 5 | Blomme | Bob (RBC) | 260097.0 | $39,237.05 | $17,177.90 | $22,059.15 |
| 6 | Booth | Connie (RBC) | 260052.0 | $19,385.54 | $10,940.77 | $8,444.77 |
| 7 | Booth | Robert (RBC) | 260056.0 | $18,838.56 | $10,646.13 | $8,192.43 |
| 8 | Booth | Robert & Connie | 260030.0 | $90,521.83 | $51,696.07 | $38,825.76 |
| 9 | Bradley | John | 260041.0 | $87,360.73 | $41,062.46 | $46,298.27 |
| 10 | Burge | Gary Rev Trust | 260035.0 | $223,357.38 | $173,920.14 | $49,437.24 |
| 11 | Carpenter Family Trust | | 260154.0 | $35,358.93 | $15,997.61 | $19,361.32 |
| 12 | Clemens | Jon & Suzanne | 260125.0 | $6,185.22 | $2,802.18 | $3,383.04 |
| 13 | Deren | Christopher | 260040.0 | $94,816.82 | $34,861.69 | $59,955.13 |
| 14 | Deren | Patrick (RBC) | 260153.0 | $30,916.32 | $13,804.27 | $17,112.05 |
| 15 | Donlin | Sean | 260008.0 | $121,833.32 | $96,974.99 | $24,858.33 |
| 16 | Ewing | Richard | 260005.0 | $1,215,360.67 | $773,635.72 | $441,724.95 |
| 17 | First National Bank of Omaha (Gary & Diane Weihs) | | 260174.0 | $1,871,452.57 | $1,118,450.83 | $753,001.74 |
| 18 | Gardner | Cyrus & Christina | 260091.0 | $245,153.62 | $118,840.25 | $126,313.37 |
| 19 | Gearhart | Michael | 260101.0 | $47,204.41 | $22,013.34 | $25,191.07 |
| 20 | Gimbel | Ronald | 260151.0 | $46,283.27 | $20,523.87 | $25,759.40 |
| 21 | Gimbel | Steven | 260150.0 | $46,283.27 | $20,523.73 | $25,759.54 |
| 22 | Gordon | Deb | 260034.0 | $1,579.48 | $917.72 | $661.76 |
| 23 | Gordon | Todd | 260145.0 | $997.79 | $489.06 | $508.73 |
| 24 | Greer | Dennis | 260054.0 | $48,347.49 | $15,873.75 | $32,473.74 |
| 25 | Haupts | William (RBC) | 260064.0 | $23,331.19 | $8,130.33 | $15,200.86 |
| 26 | Hemminger | Dale | 260055.0 | $29,834.65 | $10,070.37 | $19,764.28 |

| 27 | Hofmeister | Douglas | 260089.0 | $34,644.53 | $17,195.47 | $17,449.06 |
| 28 | Hofmeister | Nancy (per) | 260157.0 | $43,816.55 | $15,991.51 | $27,825.04 |
| 29 | Howland | Amanda | 260104.0 | $3,072.31 | $1,963.83 | $1,108.48 |
| 30 | Howland | Amanda | 260135.0 | $4,252.83 | $1,474.66 | $2,778.17 |
| 31 | Koesters | Kara | 260114.0 | $17,997.64 | $8,120.26 | $9,877.38 |
| 32 | Koesters | Debbie Lee(RBC) | 260159.0 | $24,125.78 | $8,756.79 | $15,368.99 |
| 33 | Koesters | Luke F. (RBC) | 260158.0 | $20,784.44 | $7,547.29 | $13,237.15 |
| 34 | Lane | Eli, Philip & Richard Trust | 260156.0 | $14,595.12 | $5,390.06 | $9,205.06 |
| 35 | Lane | Jessica | 260118.0 | $46,292.25 | $20,015.15 | $26,277.10 |
| 36 | Lane | Harriet Trust | 260046.0 | $145,656.57 | $86,811.09 | $58,845.48 |
| 37 | Lane | Jonathan | 260110.0 | $15,979.42 | $293.45 | $15,685.97 |
| 38 | Lane | Jonathan | 260111.0 | $46,177.97 | $19,966.43 | $26,211.54 |
| 39 | Lane | Philip IRA (LT) | 260177.0 | $252,753.50 | $248,199.64 | $4,553.86 |
| 40 | Lane | Philip | 260022.0 | $156,164.29 | $62,970.32 | $93,193.97 |
| 41 | Lane | Philip (Mon Pur) | 260065.0 | $114,617.28 | $95,257.74 | $19,359.54 |
| 42 | Lane | Richard (IRA) | 260176.0 | $252,849.28 | $248,199.64 | $4,649.64 |
| 43 | Lane | Philip (Def Ben) | 260037.0 | $200,041.63 | $112,123.34 | $87,918.29 |
| 44 | Lane | Richard Trust | 260044.0 | $196,284.30 | $45,893.50 | $150,390.80 |
| 45 | Lane Asset Management | | 260023.0 | $474,712.84 | $409,084.40 | $65,628.44 |
| 46 | Larson | Dennis | 260038.0 | $231,850.99 | $75,374.79 | $156,476.20 |
| 47 | Leinen | Scott & Dena | 260139.0 | $44,703.22 | $20,680.30 | $24,022.92 |
| 48 | Ludwig | Thomas & Nancy | 260093.0 | $46,306.80 | $22,342.65 | $23,964.15 |
| 49 | Maday | Thomas & Jean | 260147.0 | $143,176.49 | $59,414.25 | $83,762.24 |
| 50 | Manatt | Chuck | 260029.0 | $181,962.07 | $105,162.78 | $76,799.29 |
| 51 | Markham | Philip | 260017.0 | $92,717.73 | $30,086.62 | $62,631.11 |
| 52 | McManaman | Betty | 260028.0 | $23,951.66 | $10,603.78 | $13,347.88 |
| 53 | Merkle | Brian & Peggy | 260058.0 | $22,257.59 | $6,659.23 | $15,598.36 |
| 54 | Moss | Robert | 260137.0 | $35,795.32 | $16,324.46 | $19,470.86 |
| 55 | Motsick | Lorrie (RBC) | 260134.0 | $5,714.22 | $2,415.58 | $3,298.64 |
| 56 | Motsick | Rick (RBC) | 260130.0 | $5,736.69 | $2,415.58 | $3,321.11 |
| 57 | Murtaugh | Tom & Jill | 260059.0 | $9,818.82 | $3,255.92 | $6,562.90 |
| 58 | Nichols | William (RBC) | 260155.0 | $38,876.33 | $16,959.41 | $21,916.92 |
| 59 | Nickel, Inc. | | 260171.0 | $87,290.97 | $32,792.07 | $54,498.90 |
| 60 | O'Connor | Brian & Jennifer | 260027.0 | $35,218.56 | $20,007.81 | $15,210.75 |
| 61 | Oestreicher | Jody | 260062.0 | $52,875.25 | $30,108.30 | $22,766.95 |
| 62 | Penney | Robert C. | 260173.0 | $84,920.28 | $34,392.81 | $50,527.47 |
| 63 | Petsche | Joe & Laura | 260105.0 | $16,343.57 | $7,763.64 | $8,579.93 |
| 64 | QRS Investment | | 260066.0 | $139,110.58 | $44,881.79 | $94,228.79 |

28

| 65 | Rees | Ryan | 260080.0 | $6,823.32 | $6,762.26 | $61.06 |
| 66 | Rees | Ryan | 260140.0 | $1,955.14 | $896.47 | $1,058.67 |
| 67 | Reinig | Elizabeth Jo Rev Trust | 260149.0 | $36,372.15 | $16,222.23 | $20,149.92 |
| 68 | Roberts | Brad (RBC) | 260069.0 | $102,975.49 | $34,285.94 | $68,689.55 |
| 69 | Ruppert | William/Eleanora | 260026.0 | $79,112.88 | $37,632.86 | $41,480.02 |
| 70 | Ruppert, Jr. | William | 260061.0 | $93,615.46 | $61,311.30 | $32,304.16 |
| 71 | Russell | Maurice/Mardene | 260060.0 | $102,470.45 | $43,648.36 | $58,822.09 |
| 72 | Salzinger | Steve | 260070.0 | $248,067.77 | $102,231.78 | $145,835.99 |
| 73 | Schaben | Gary & Jackie | 260164.0 | $22,610.57 | $8,784.26 | $13,826.31 |
| 74 | Schulte | Charles | 260009.0 | $38,155.86 | $31,914.08 | $6,241.78 |
| 75 | Schulte | Karen (LT) | 260143.0 | $42,256.13 | $28,975.46 | $13,280.67 |
| 76 | Schulte | Karen (per) | 260142.0 | $29,395.26 | $19,719.20 | $9,676.06 |
| 77 | Seivers | Kent & Judy | 260010.0 | $127,397.10 | $105,870.85 | $21,526.25 |
| 78 | Sorensen | Jerry (RBC) | 260057.0 | $67,957.63 | $25,646.24 | $42,311.39 |
| 79 | Stava | Ron & Grace | 260120.0 | $53,050.01 | $21,646.70 | $31,403.31 |
| 80 | Svendsen | Elliott & Ardis | 260113.0 | $12,157.58 | $5,443.07 | $6,714.51 |
| 81 | Svendsen | Doug (RBC) | 260107.0 | $24,231.21 | $11,155.31 | $13,075.90 |
| 82 | Teggatz | Curt | 260115.0 | $32,687.15 | $15,073.88 | $17,613.27 |
| 83 | Vincent | Thomas (RBC) | 260132.0 | $36,351.62 | $16,579.74 | $19,771.88 |
| 84 | Walsh | Patrick & Sheila | 260053.0 | $96,695.03 | $31,560.35 | $65,134.68 |
| 85 | Walsh | Patrick (RBC) | 260144.0 | $45,164.67 | $21,063.58 | $24,101.09 |
| 86 | Weihs | John | 260013.0 | $124,570.96 | $79,432.19 | $45,138.77 |
| 87 | Weihs | Karen Rev Trust | 260032.0 | $153,723.12 | $73,708.43 | $80,014.69 |
| 88 | Weihs | Karen(RBC)(IRA) | 260045.0 | $49,442.14 | $25,992.87 | $23,449.27 |
| 89 | Weihs | Karen (RBC) | 260165.0 | $167,493.86 | $75,414.87 | $92,078.99 |
| 90 | Wellmark, BCBS | | 260148.0 | $147,328.81 | $65,769.95 | $81,558.86 |
| 91 | Willis | Dean & Robin | 260162.0 | $165,891.58 | $59,916.92 | $105,974.66 |
| 92 | Woodruff | Michelle | 260042.0 | $113,928.73 | $58,112.69 | $55,816.04 |
| | | | Totals | 10,342,226.78 | $5,838,619.80 | $4,503,606.98 |

8.   Class 11 – Allowed Subordinated Unsecured Claims (Received January

2012 Distribution in amount greater than Sub Debt Note Claim on Petition Date)

Class 11 consists of Allowed Subordinated Unsecured Claims of Sub Debt Note Holders

who received a January 2012 Distribution, and such distribution was greater than or in excess of

their respective Allowed Sub Debt Note Claim as of the Petition Date.  Although the January

2012 Distribution was initially characterized as a partial return of equity on account of

dissociation from the Natural Pork limited liability partnership, the January 2012 Distribution

under the Joint Plan will be re-characterized as a partial repayment of Sub Debt Note Claims.

There are 25 Allowed Claims in Class 11 who were collectively owed $1,526,216.05 on

their Sub Debt Note Claims as of the Petition Date, collectively received $4,589,224.06 from the

January 2012 Distribution, and will collectively have to disgorge $3,063,008.01 on or before the

Effective Date on account of overpayment of their Class 11 Claim.  Class 11 is Unimpaired.

Subject to the paragraphs below, unless the holder of an Allowed Class 11 Claim has

agreed to different and/or less favorable treatment of such Claim, each holder of an Allowed

Class 11 Claim shall be entitled to retain their January 2012 Distribution, and will not receive

any further Distribution under the Joint Plan.

As a condition to retaining the dividend they received from the January 2012

Distribution, and having an Allowed Claim under Class 11, each Class 11 Claim holder must

consensually disgorge, and pay back to the Debtors, all amounts they individually received from

the January 2012 Distribution in excess of their Sub Debt Note Claim as of the Petition Date, on

or before the Effective Date.

To the extent that any Class 11 Claim holder fails or refuses to consensually disgorge and

pay back to the Debtors all of the amounts such Claim holder received in excess of their Sub

Debt Note Claim as of the Petition Date, their Class 11 Claim shall immediately be deemed a

Contested Claim and not an Allowed Claim.  The Debtors or Reorganized Debtor shall then have

the right to object to such Class 11 Claim through the Claims Objection protocol provided for

under the Joint Plan, or by one or more of the Adversary Proceedings.

In those cases where any Debtor or Reorganized Debtor shall need to pursue a Class 11

Claim holder for disgorgement, the costs and expenses to pursue such disgorgement, including

but not limited to reasonable attorney fees and costs incurred by the Debtors and/or the

Reorganized Debtor, shall be paid by such Class 11 Claim holder, who shall be taxed such costs

and expenses by surcharge against their Class 11 Claim.  In all cases, to the extent the Debtors or

Reorganized Debtor pursue such a Class 11 Claim holder after the Effective Date, the minimum

tax such Claim shall be surcharged for costs and expenses shall not be less than $10,000.00.

To the extent any or all of the Class 11 Claim holders consensually disgorge the amount

they are required to disgorge on or before the Effective Date, to the extent such Class 11 Claim

Holders are plaintiffs, defendants, cross-claimants, counter-claimants, cross-defendants, or 3rd

party defendants to any of the pending Adversary Proceedings, they shall be dismissed from said

Adversary Proceedings on the Effective Date.

Below is a table of all Class 11 Claim holders and the amount each Claim holder will be

required to disgorge:

|    | Last | First | Acct No. | Sub Debt Amount | 1/2012 Distribution | Disgorge |
|----|------|-------|----------|-----------------|---------------------|----------|
| 1  | Block | David | 260018.0 | $174,994.26 | $235,487.12 | -$60,492.86 |
| 2  | Burge | Wendell | 260072.0 | $25,555.05 | $79,207.19 | -$53,652.14 |
| 3  | Burgoyne Roberts Trust | | 260083.0 | $41,062.07 | $91,101.07 | -$50,039.00 |
| 4  | Craton Capital GP, LLC | | 260074.0 | $262,036.68 | $944,466.75 | -$682,430.07 |
| 5  | Gingerich | Maynard/Carol | 260014.0 | $26,416.26 | $29,494.23 | -$3,077.97 |
| 6  | Goedken | Wayne | 260073.0 | $16,029.58 | $17,513.90 | -$1,484.32 |
| 7  | Hoegh | Donna | 260075.0 | $11,030.59 | $40,842.35 | -$29,811.76 |
| 8  | Hoegh | Winston | 260076.0 | $6,618.36 | $24,505.69 | -$17,887.33 |
| 9  | Kruse Investment Co. | | 260077.0 | $33,091.76 | $798,352.26 | -$765,260.50 |
| 10 | Lane | Harriet | 260043.0 | $24,932.26 | $26,976.11 | -$2,043.85 |
| 11 | Noble | James | 260078.0 | $5,515.29 | $20,348.70 | -$14,833.41 |
| 12 | Pond | Preston | 260025.0 | $97.13 | $237,843.44 | -$237,746.31 |
| 13 | Pond | Preston (RBC) | 260106.0 | $38.01 | $27,788.77 | -$27,750.76 |
| 14 | Pond | Vicki (RBC) | 260131.0 | $33.87 | $1,806.84 | -$1,772.97 |

| 15 | Rees | Gary/Michelle | 260011.0 | $87,420.57 | $157,926.12 | -$70,505.55 |
|----|------|---------------|----------|------------|-------------|-------------|
| 16 | Rees | Tyler | 260081.0 | $3,309.19 | $12,353.31 | -$9,044.12 |
| 17 | Reinig | Ed | 260082.0 | $23,044.42 | $82,220.19 | -$59,175.77 |
| 18 | Schmitz | Steve | 260004.0 | $696,844.22 | $704,353.91 | -$7,509.69 |
| 19 | Schomers | Don | 260084.0 | $5,613.96 | $20,757.81 | -$15,143.85 |
| 20 | Staiert | Walter/Laurie | 260088.0 | $34,533.95 | $53,615.92 | -$19,081.97 |
| 21 | Weihs | David | 260141.0 | $430.55 | $4,811.33 | -$4,380.78 |
| 22 | Weihs | Ron | 260085.0 | $8,078.98 | $29,986.52 | -$21,907.54 |
| 23 | Westphalen | Michael (RBC) | 260116.0 | $356.69 | $308,092.44 | -$307,735.75 |
| 24 | Zaccone | Mark | 260012.0 | $25,431.11 | $319,686.04 | -$294,254.93 |
| 25 | Zaccone Investments | | 260007.0 | $13,701.24 | $319,686.04 | -$305,984.80 |
| | Totals | | | $1,526,216.05 | $4,589,224.06 | $3,063,008.01 |

9.    Class 12 – Contested Dissociated Equity Interests (Received January 2012

Distribution but held no Allowed Sub Debt Note Claim) (Total Disgorgement).

Class 12 consists of the Contested Dissociated Equity Interest holders who received a

dividend from the January 2012 Distribution, but at that time, (nor on the Petition Date), did not

hold any Allowed Sub Debt Note Claim.  Although the January 2012 Distribution was initially

characterized as a partial return of equity on account of dissociation from the Natural Pork

limited liability partnership, the January 2012 Distribution under this Joint Plan will be re-

characterized as repayment of debt when no debt amount was owed.

There are 5 Contested Dissociated Equity Interest holders in Class 12 who collectively

received $295,338.44 from the January 2012 Distribution, and will be required to collectively

disgorge $295,338.44.  The Class 12 Contested Dissociated Equity Interest holders will be

required to disgorge, and pay back to the Debtors, all amounts they individually received from

the January 2012 Distribution, on or before the Effective Date.  The Class 12 Contested

Dissociated Equity Interest holders who consensually disgorge the amounts due on or before the

Effective Date shall have their Dissociated Equity Interests treated in Class 14.

32

To the extent that any Class 14 Dissociated Equity Interest holder fails or refuses to consensually disgorge and pay back to the Debtors all of the amounts such Dissociated Equity Interest holder received from the January 2012 Distribution, their Class 14 Dissociated Equity Interests shall immediately be deemed a Contested Interest and not an Allowed Interest.  The Debtors or Reorganized Debtor shall then have the right to object to such Class 12 Interest through the Claims Objection protocol provided for under this Joint Plan, or by one or more of the Adversary Proceedings or by another adversary proceeding filed after the Effective Date.

In those cases where any Debtor or Reorganized Debtor shall pursue a Class 12 Interest holder for disgorgement, the costs and expenses to pursue such disgorgement, including but not limited to reasonable attorney fees and costs incurred by the Debtors and/or the Reorganized Debtor, shall be paid by such Class 12 Interest holder, who shall be taxed such costs and expenses by surcharge against their Class 14 Interest.  In all cases, to the extent the Debtors or Reorganized Debtor pursue such a Class 12 Interest holder after the Effective Date, the minimum tax such Interest shall be surcharged for costs and expenses shall not be less than $10,000.00.

To the extent any or all of the Class 12 Dissociated Equity Interest holders consensually disgorge the amount they are required to disgorge on or before the Effective Date, to the extent such Class 12 Dissociated Equity Interest holders are plaintiffs, defendants, cross-claimants, counter-claimants, cross-defendants, or 3rd party defendants to any of the pending Adversary Proceedings, they shall be dismissed from said Adversary Proceedings on the Effective Date.

Class 12 Dissociated Equity Interests shall not receive any distribution under the Joint Plan, on the basis that they did not hold any Allowed Sub Debt Note Claim on or before the Petition Date.  The Dissociated Equity Interests of a Class 12 Interest holder, if allowed, shall be treated in Class 14.

Below is a table of all Class 12 Claim holders and the amount each Claim holder will be required to disgorge:

**Class 12 Total  Disgorgement**

|   | Last | First | Acct. No. | Disgorge |
|---|------|-------|-----------|----------|
| 1 | Agriculture, Inc. |  | 260020.0 | -$130,817.67 |
| 2 | Beach/Jones | Ron/Mona | 260108.0 | -$90,377.99 |
| 3 | Goedken | Wayne (RBC) | 260019.0 | -$39,525.34 |
| 4 | VanBaale, LLC |  | 260138.0 | -$31,492.19 |
| 5 | Westphalen | Casey | 260122.0 | -$3,125.25 |

Total to be disgorged      $295,338.44

10.    <u>Class 13 – Allowed Current Equity Interest Holders</u>

Class 13 consists of the Allowed Current Equity Interests in Natural Pork as of the Petition Date. There are Twenty-Four (24) Allowed Current Equity Interests as of the Petition Date.  Class 13 shall also include the Interests held by Paul Stewart, Diane Stewart, Frederick & Rinske Bolander, Joy Dinsdale, Frederick WW Bolander, and R II B Family, LLC and Diane Weihs. Class 13 is Impaired.

Except to the extent that an Class 13 Interest holder agrees to different and/or less favorable treatment of their Equity Interest, such Class 13 Equity Interest holder shall receive a Pro-Rata dividend equal to Two-Thirds (2/3$^{rds}$) of the Equity Interests Fund.

11.    <u>Class 14 – Dissociated Equity Interests</u>

Class 14 consists of the Allowed Dissociated Equity Interests in Natural Pork as of the Petition Date. There are One Hundred and Twenty-Eight (128) Allowed Dissociated Equity Interests as of the Petition Date. Class 14 shall not include the Interests held by Paul Stewart, Diane Stewart, Frederick & Rinske Bolander, Joy Dinsdale, Frederick WW Bolander, and R II B Family, LLC and Diane Weihs which will be treated in Class 13.  Class 14 is Impaired.

Except to the extent that an Allowed Dissociated Equity Interest holder agrees to different and/or less favorable treatment of their Dissociated Equity Interest, such Dissociated Equity Interest holder shall receive a Pro-Rata dividend equal to One-Third (1/3rd) of the Equity Interests Fund.

D.    Reservation of Rights on Classification Disputes.

In the event any Creditor or Interest holder challenges their classification under the Joint Plan, the Debtors reserve the right to seek Court determination of the appropriate classification. Such determination shall not be a condition precedent to confirmation of the Joint Plan and may be effected through the Claims or Interest objection process.  Should the Creditor or Interest holder prevail in their classification challenge, such Creditor or Interest holder shall be treated under the Joint Plan as if such Creditor or Interest holder were classified as so determined. In addition, the classification of Claims or Interest in specific classes is not an admission of the ultimate validity, enforceability, perfection, or a liability of such Claims or Interests, and the Debtors expressly reserve all rights with respect to any objections to or other litigation on such Claims or Interests.

E.    Effective Date of the Plan

The Effective Date of the Joint Plan will be Ten (10) days after the Confirmation Order becomes a Final Order, unless a different date is stated in the Confirmation Order.

F.    Executory Contracts and Unexpired Leases

Most of the Debtors' executory contracts and/or unexpired leases have either been assumed and assigned, or rejected by Final Order of the Court during the pendency of the Bankruptcy Cases, in connection with sales of various properties.  Notwithstanding that the Joint

Plan is a liquidating plan of reorganization, there remains two (2) properties in the Natural Pork

bankruptcy estate yet to be sold, the Williamsburg, Indiana and Windthorst, Texas properties.

Since there are executory contracts and/or unexpired leases associated with these

properties, namely manure leases, the Debtors intend on assuming all unexpired leases or

executory contracts, so they can be assigned to any potential purchasers of the Williamsburg and

Windthorst properties.

On the Effective Date, all executory contracts and/or unexpired leases not specifically

assumed in connection with the Williamsburg and Windthorst properties, will be rejected, as of

the Effective Date. The Confirmation Order shall constitute an Order approving the rejection of

any such executory contract or unexpired leases. **If you are a party to an executory contract or

unexpired lease to be rejected and you object to the rejection of your contract or lease, you

must file and serve your objection to the Joint Plan within the deadline for objecting to the

confirmation of the Joint Plan**.

THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM

ARISING FROM THE REJECTION OF AN EXECUTORY CONTRACT OF UNEXPIRED

LEASE IS NO LATER THAN THIRTY (30) DAYS AFTER THE CONFIRMATION DATE.

Any Claim based on the rejection of an executory contract or unexpired lease will be barred if

the Proof of Claim is not timely filed, unless the Court later orders otherwise.

## VI.   SUMMARY OF THE MEANS FOR EFFECTUATING THE PLAN

Upon Confirmation, all the Bankruptcy Cases will be substantially consolidated, meaning

all the Creditors and Interest holders from all the Bankruptcy Cases will be treated as if there was

only one claims register and all of the assets from all of the bankruptcy estates will be used to

pay the Allowed Claims of Creditors and the Allowed Interests of Interest holders from all of the

bankruptcy estates.  Additionally, the Debtors in the Crawfordsville Case, the Brayton Case, the

36

North Harlan Case and the South Harlan Case will be dissolved, liquidated and their bankruptcy cases closed, and the Natural Pork Case shall be the sole surviving Reorganized Debtor.  Final Reports and Motions for Entry of Final Decrees in the Crawfordsville Case, the Brayton Case, the North Harlan Case and the South Harlan Case shall be filed by the Reorganized Debtor within thirty (30) days of the Effective Date.

On or before the Effective Date, the Reorganized Debtor shall make the Distributions provided for under the Joint Plan to Creditors with Allowed Unclassified Claims and Allowed Classified Claims in Classes 1 through 5, and 7 through 10, inclusive.  The Distributions shall be made by the Disbursing Agent from Cash on hand held by the Reorganized Debtor.  Any Unclassified Claims or Classified Claims that are not Allowed as of the Effective Date, but become Allowed Claims pursuant to a Final Order after the Effective Date, shall be promptly paid after the Effective Date and after they have become Allowed Claims by Final Order of the Court.

To the extent holders of Claims or Interests in Classes 11 and 12 fail and/or refuse to disgorge the amounts they are required to disgorge on or before the Effective Date pursuant to the Joint Plan, the Reorganized Debtor shall pursue such holders of Claims and/or Interests in Classes 11 and 12 by objection to Claim or Interest or by the Adversary Proceedings, until all amounts required to be disgorged are paid to the Reorganized Debtor, compromised and/or settled pursuant to a Final Order of the Court, or unless relieved of the obligation to disgorge by Final Order of the Court.

To the extent Natural Pork has not sold and/or liquidated all of its remaining assets, namely the Williamsburg and Windthorst properties, by the Effective Date, the Reorganized Debtor shall continue to pursue sales or other dispositions of its remaining assets.

To the extent Natural Pork has not completed the liquidation and formal dissolution of
Natural Porc Production Olt, SRL with the Romanian authorities prior to the Effective Date, the
Reorganized Debtor shall complete the process of such liquidation and formal dissolution.

The balance of Cash on deposit with the Reorganized Debtor after the payment of
Allowed Claims and after the Effective Date, and any funds collected by the Reorganized Debtor
after the Effective Date from holders of Claims and Interests in Classes 11 and 12, shall be
segregated and deposited into the Equity Interests Fund.  After resolution by the Court by Final
Order of all disputed and Contested Claims, and after segregating a reserve for Post-Effective
Date professional fees and expenses, and a reserve for Contested Interests, the Reorganized
Debtor shall make an initial Interim Distribution to Classes 13 and 14 on account of Allowed
Current Equity Interests and Allowed Dissociated Equity Interests.  The Reorganized Debtor
may make additional Interim Distributions as reasonable and necessary.  Upon resolution of all
disputed and Contested Interests by Final Order of the Court, and after making provision for
payment of final professional fees and expenses, the Reorganized Debtor shall make a Final
Distribution on account of all Allowed Interest in Classes 13 and 14.  Within thirty (30) days
after the Final Distribution, the Reorganized Debtor shall prepare and file a Final Report and
Motion for Entry of Final Decree.

Upon Confirmation, for state and federal tax purposes, the Dissociated Equity Interests
shall be deemed to have been Current Equity Interests, and the January 2012 Distribution
received by those certain SIA Parties shall be deemed to have been a partial repayment of debt,
and not a partial return of equity. Within thirty (30) days of the Effective Date, the Reorganized
Debtor shall file amended state and federal tax returns, including corresponding IRS Form K-1's,
for the fiscal years 2011 and 2012, with such amendments recognizing the Dissociated Equity

Interests as Current Equity Interests, and correcting and re-characterizing the January 2012

Distribution to those certain SIA Parties as partial repayment of debt as opposed to partial return

of equity.

## VII.    LEGAL PROCEEDINGS

Prior to the Petition Date, there were five (5) legal proceedings initiated by, against, or

involving the Debtor Natural Pork, and summarized in the table below:

| Caption of Suit & Case Number | Nature of Proceeding | Court and Location | Status or Disposition |
|---|---|---|---|
| Craton Capital, LP, et al. v. Natural Pork Production II, LLP, Case No. 10-0680 | Appeal from the Iowa District Court for Shelby County regarding dispute over partnership rights | Iowa District Court for Shelby County and Iowa Court of Appeals | Judgment for Defendant at District Court; Judgment for Petitioners/Appellants on appeal; case remanded to Iowa District Court for Shelby County; case ultimately dismissed by District Court |
| Lawrence Handlos, et al., v. Natural Pork Production II, LLP, Case No. LACV019321 | Petition at Law for Breach of Contract, Breach of Fiduciary Duty, Accounting, Constructive Trust and Restitution, Request for Temporary and Permanent Injunction and Request for Receiver | Iowa District Court for Shelby County | Case dismissed April, 2012 |
| Lawrence Handlos, et al., v. Intercreditor Committee, Case No. CE71355 | Petition for Declaratory Judgment and Equitable Relief | Iowa District Court for Polk County | Case Pending as of the Petition Date; dismissed post-petition. |
| Natural Pork Production II, LLP v. IC Committee, Case No. CL125019 | Petition for Declaratory Judgment | Iowa District Court for Polk County and U.S. Bankruptcy Court Southern District of Iowa | Case pending as of the Petition Date; Removed by IC Committee to Bankruptcy Court as Adversary Proceeding 12-30098 |

| Star Energy v. Natural Pork Production II, LLP; Case No LACV 019280 | Performance on contract | Iowa District Court Shelby County | Case pending as of the Petition Date. |
| IC Committee v. Lawrence Handlos; Case No LACV 019402 | Breach of fiduciary duty | Iowa District Court for Shelby County | Case pending as of the Petition Date |

After the Petition Date, the Debtor's Natural Pork and North Harlan initiated the

following Adversary Proceedings, including the Polk County District Court case removed by the

ICC to the Bankruptcy Court, as follows:

| | Adversary Proceeding | Filed date | Case Caption | Summary of Causes of Action |
|---|---|---|---|---|
| 1 | 12-30081 | 9/14/2012 | Natural Pork v. AgriCulture, Inc. | Fraudulent Transfers; Preferences, Recovery of Money & Property |
| 2 | 12-30098 | 12/5/2012 | Natural Pork v. IC Committee, et al. | Declaratory Judgment and Equitable Relief (Removed Action) |
| 3 | 13-30014 | 2/4/2012 | Natural Pork v. First National Bank of Omaha | Fraudulent Transfers; Preferences, Recovery of Money & Property |
| 4 | 13-30016 | 2/7/2012 | Natural Pork v. IC Committee | Fraudulent Transfers; Recovery of Money & Property |
| 5 | 13-30019 | 2/25/2013 | Natural Pork v. Beach, et al. | Fraudulent Transfers; Preferences, Recovery of Money & Property |
| 6 | 13-30021 | 3/6/2013 | Natural Pork v. Craton Capital, LP, et al. | Fraudulent Transfers; Preferences, Recovery of Money & Property |
| 7 | 13-30023 | 3/12/2013 | Natural Pork v. Amrozowicz, et al. | Fraudulent Transfers; Preferences, Recovery of Money & Property |
| 8 | 13-30031 | 4/8/2013 | North Harlan, LLC v. IC Committee | Fraudulent Transfers; Preferences, Recovery of Money & Property |

The Joint Plan reserves for the Debtors and the Reorganized Debtor the right to initiate

additional petitions and lawsuits, and pursue Claims and Causes of Action against any Creditor

or Interest holder, prior to or after Confirmation, including but not limited to the Adversary

Proceedings identified above, or any other adversary proceeding or state court petitions or

lawsuits to which the Debtors or Reorganized Debtor are entitled. The Debtors do not

contemplate or believe any litigation will affect the feasibility of the Joint Plan, and the Joint

Plan is not dependent on any potential recovery from any legal actions against others.

## VIII.    BACKGROUND ON DEBTOR AND EVENTS LEADING TO FILING OF THE BANKRUPTCY CASES

The history and background of the Debtors, and the litigation and events leading up to the

filing of the Bankruptcy Cases is long, detailed and complex. The Debtors do not believe a

comprehensive narrative of that history and background is necessary here, as the Debtors are

proposing a liquidating plan of reorganization, Natural Pork has effectively ceased all business

operations, and substantially all of the assets of the bankruptcy estates have been sold, liquidated

or otherwise disposed of for Cash post-petition, with the exception of the Williamsburg and

Windthorst properties, the Adversary Proceedings and Causes of Action.

In pursuit of the Adversary Proceedings, Natural Pork, through its counsel, conducted

extensive discovery, including the propounding of interrogatories, demands for production of

documents, and depositions of key individuals.  Additionally, in connection with the Adversary

Proceeding 12-30098, Natural Pork filed a Motion for Summary Judgment on the issues of

priority of debt and validity of the SIA. As part of, and in support of its Motion for Summary

Judgment, and based on the responses to interrogatories, documents produced and sworn

testimony at depositions, Natural Pork prepared an extensive pleading entitled "Statement of

Undisputed Material Facts" and filed on August 8, 2013 at Docket Item 134-2.

The Debtors believe the Natural Pork Statement of Undisputed Material Facts very

clearly and concisely summarizes the long, detailed and complex history and background of the

Debtors and the events and causes leading up to the filing of these Bankruptcy Cases.  The

Debtors have condensed and will rely on the Statement of Undisputed Material Facts, attached

hereto as Exhibit "A" and incorporated by reference herein, to provide adequate information to

readers of this Joint Disclosure Statement.  References to exhibits to substantiate the stated

undisputed material facts in the attached Exhibit "A", refer to exhibits filed in connection with

Natural Pork's Motion for Summary Judgment in Adversary Proceeding 12-30098.

For a complete and more detailed explanation and understanding of Natural Pork's

Motion for Summary Judgment, and the legal theories and basis in support thereof, you are

directed to review the docket and pleadings of record in the Adversary Proceeding 12-90038.  As

of the filing of this Joint Disclosure Statement, the Bankruptcy Court has not ruled upon or

issued any order or decision on Natural Pork's Motion for Summary Judgment.

## IX.    ASSETS, LIABILITIES & FINANCIAL STATUS OF THE DEBTORS

The Debtors believe and assert that because they are proposing a liquidating plan of

reorganization, it is not necessary to provide an extensive or detailed disclosure or discussion

regarding their assets, liabilities and financial status in this Joint Disclosure Statement.  This is

based in part on the fact that the Debtors have sold, liquidated or otherwise disposed of

substantially all their assets for Cash since the Petition Date, save for the Williamsburg,

Windthorst properties, the Adversary Proceedings and Causes of Action.

When the Bankruptcy Cases were filed, the Debtors filed extensive and comprehensive

schedules of its assets and debts, along with detailed statements of the Debtors financial affairs.

Pursuant to applicable provisions of the Bankruptcy Code and Bankruptcy Rules, some of those

schedules and statements have been updated and amended, mostly to correct names and

addresses of creditors.  The Debtors' petitions, schedules and statements, and the amendments

thereto, are public records and available for examination through the Court's CM/ECF and

PACER systems.  True and exact copies will also be provided at no cost by fax, email or hard copy by contacting the Debtors General Reorganization Counsel and requesting same.

After the Petition Date, the Debtors also prepared and filed initial financial statements and records for various pre-petition periods, and have also filed detailed and comprehensive monthly reports of operations.  The monthly reports of operations included balance sheets, profit and loss statements, cash receipts and disbursements, check registers and bank statements.  These too are public records and available for examination through the Court's CM/ECF and PACER systems.  True and exact copies will also be provided at no cost by fax, email or hard copy by contacting the Debtors General Reorganization Counsel and requesting same. YOU ARE ADVISED TO CONSULT WITH YOUR ACCOUNTANT OR FINANCIAL ADVISOR IF YOU HAVE ANY QUESTIONS PERTAINING TO THE FINANCIAL STATEMENTS OR MONTHLY REPORTS OF OPERATION.

## X.    LIQUIDATION ANALYSIS

Another confirmation requirement is the "Best Interest Test," which requires a liquidation analysis. Under the Best Interest Test, if a Creditor or Interest holder holds an Allowed Claim or Interest in an Impaired Class, and that Creditor or Interest holder does not vote to accept the Plan, then that Creditor or Interest holder must receive or retain under the Joint Plan property of a value not less than the amount that such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the Debtors' assets are usually sold by a Chapter 7 Trustee. Secured Creditors are paid first from the sales proceeds of properties on which the Secured Creditor has a lien. Administrative Expense Claims are paid next.  Unsecured Creditors are paid from any remaining sales proceeds, according to their rights to priority. Unsecured Creditors with the same

priority share in proportion to the amount of their Allowed Unsecured Claims. Finally, Interest

Holders receive the balance that remains after all Creditors are paid, if any.

For the Court to be able to confirm this Plan, the Court must find that all Creditors and

Interest holders who do not accept the Joint Plan will receive at least as much under the Joint

Plan as such holders would receive under a hypothetical Chapter 7 liquidation.   In the present

situation, both the Bankruptcy Cases and any hypothetical case are liquidation cases.  The

arguments the Debtors would make that the Debtors' Joint Plan meets the best interest test, is

premised primarily on one fact: Creditors will be paid sooner under the Joint Plan than they

would in a hypothetical Chapter 7 case, because there are additional steps, requirements, costs

and expenses before a Chapter 7 Trustee could make any Distribution to Creditors and Interest

holders. Based on this fact, the Plan Proponents maintain that this requirement is met for the

following reasons.

First, there is sufficient Cash on Hand from liquidation of substantially all of the Debtor's

tangible personal and real property, to pay Unsecured Creditors in full on the Effective Date of

the Joint Plan, with some classes receiving post-petition interest. Second, the Debtors are on-

track to liquidate the remaining Williamsburg and Windthorst properties in short order, for the

benefit of holders with Allowed Interests.  Finally, the Debtors are on a fast track to collect those

amounts that need to be disgorged from Creditors and Interest holders in Classes 11 and 12, for

the benefit of Interest holders.

The Debtors would argue that if the case were converted to a case under Chapter 7 now,

and a Chapter 7 Trustee was appointed, there would be a significant delay in payment of

Allowed Claims in full.  Additionally such delay would cost Creditors a significant penalty: the

44

Joint Plan proposes to pay Classes 8, 9 and 10, interest of 3.0% on Allowed Claims, but a

Chapter 7 Trustee could only pay the Federal Judgment Rate of Interest, currently 0.1%.

Finally, a Chapter 7 Trustee would not likely make any distribution until he or she has

fully administered the Bankruptcy Cases, which could take months or years.

Based on the above, the Debtors believe the proposed liquidating Joint Plan is more

likely to result in more money for Unsecured Creditors, and faster, compared to a similar

Chapter 7 liquidation at this time.

## XI.    **FEASIBILITY**

Another requirement for confirmation involves the feasibility of the Joint Plan.  This

means that confirmation of the Joint Plan is not likely to be followed by the liquidation, or the

need for further financial reorganization, of the Debtors or any successors to the Debtors under

the Joint Plan, unless such liquidation or reorganization is proposed in the Joint Plan.   In these

Bankruptcy Cases, the Joint Plan contemplates a complete liquidation of all the Debtors' assets.

There are at least two important aspects of a feasibility analysis. The first aspect

considers whether the Debtors will have enough Cash on Hand on the Effective Date of the Joint

Plan to pay all the Allowed Claims which are entitled to be paid on such date. The Plan

Proponents maintain that this aspect of feasibility will be satisfied.  Based on the actual amount

of Cash on hand, the Debtors believe there will be enough to pay all Allowed Unclassified and

Classified Claims which are entitled to be paid on the Effective Date.

The second aspect of feasibility considers whether the Proponents will have enough Cash

over the life of the Plan to make the required Plan payments.   Based on the fact that the Debtors

are proposing a liquidating plan, the Debtors assert that this element of the feasibility test is not

relevant.

## XII.    MANAGEMENT AND COMPENSATIONAND POST-CONFIRMATION GOVERNANCE

As previously disclosed, Lawrence Handlos is the Sole Managing Partner of Natural Pork, and effectively the Managing Partner of Crawfordsville, Brayton, North Harlan and South Harlan as they are wholly-owned subsidiaries of Natural Pork.  Lawrence Handlos is therefor an Insider of the Debtors, as that term is defined under the Bankruptcy Code.  Since April 2012, through the Petition Date until now, Lawrence Handlos has assumed sole responsibility for management and control of all of the Debtors in his capacity as Sole Managing Partner. Lawrence Handlos has not taken or received any compensation for his role as Sole Managing Partner, either pre-petition or post-petition.  However, he has been reimbursed a de minimus amount for out-of-pocket expenses.  Lawrence Handlos shall be entitled to file a Proof of Claim and/or Motion of Allowance of Administrative Expense Claim for services provided to the Debtors in his capacity as Sole Managing Partner.

Upon Confirmation, the post-confirmation management and governance of the Reorganized Debtor shall be by Lawrence Handlos as Managing Partner, and two (2) other persons designated by the Official Committee. Expenses incurred in conjunction with performance of management and governance obligations to the Reorganized Debtor are entitled to be reimbursed by the Reorganized Debtor, including reasonable outside counsel fees.

## XIII.    UNITED STATES TRUSTEE SYSTEM FUND FEES

A fee is required by the provisions of Title 28 United States Code § 1930(a)(6), to be paid quarterly to the United States Trustee by any Debtor in a Chapter 11 Case. The amount of the fee is based on a Debtor's disbursements for the preceding quarter. A Debtor's obligation to pay the fee continues after confirmation and until the Chapter 11 Case is fully administered and closed.

On the Effective Date of the Plan, the Debtors shall be current with all quarterly fees due as of that date. Any delinquent fees will be paid in full on the Effective Date of the Plan. Quarterly fees will be paid every calendar quarter thereafter, as a first priority under the Joint Plan until the case is closed.

## XIV.    TAX ANALYSIS

The Debtors will not seek a ruling from the Internal Revenue Service prior to the Effective Date with respect to any of the tax aspects of the Joint Plan.

ANY PERSON CONCERNED WITH THE TAX CONSEQUENCES OF THE JOINT PLAN IS STRONGLY URGED TO CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS TO DETERMINE HOW THE JOINT PLAN MAY AFFECT THEIR FEDERAL, STATE, LOCAL AND FOREIGN TAX LIABILITY.  The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues the Joint Plan may present to the Debtors.  The Plan Proponents CAN NOT and DO NOT represent that the tax consequences contained below are the only tax consequences of the Joint Plan, because the tax code embodies many complicated rules which make it difficult to completely and accurately state all of the tax implications of any action or transaction.

In December, 2011, Natural Pork recognized a significant amount of income on account of liquidation of its investment in Nebraska Pork, through Onyx Partners.  Based on the notices of dissociation given by Dissociated Equity beginning in March, 2008, and pursuant, at least in part, on the SIA, Natural Pork recognized the income from liquidation of the Nebraska Pork investment as a capital gain. Although the vast majority of the proceeds of that income (the January 2012 Distribution) went to the SIA Parties as repayment of debt on account of their equity interests, and the Current Equity did not receive any of those proceeds, the Current Equity

47

was "stuck" with paying the capital gains taxes on "phantom income" to themselves.  In essence, the SIA Parties got the money, and the innocent Current Equity Interest holders got stuck with the tax bill.

To undo this inequitable tax treatment, the Debtors propose to seek a specific finding at Confirmation that for tax purposes, the January 2012 Distribution to the SIA Parties was a partial repayment of their Allowed Sub Debt Note Claims, and not a partial repayment on account of any "dissociated" promissory notes evidencing their Interests in the Natural Pork Limited Liability Partnership, or Dissociated Equity Interests.

The Joint Plan provides for the Reorganized Debtor to prepare and file amended 2011 and 2012 federal and state tax returns within thirty (30) days of the Effective Date.  Those amended tax returns, with their corresponding K-1 tax forms, will re-characterize the January 2012 Distribution and likely result Natural Pork not recognizing a significant capital gains tax, with Current Equity likely to receive income tax refunds, and the SIA Parties potentially incurring some tax liability for the affected years.

A.    Tax Impact on the Debtors

Natural Pork is a Limited Liability Partnership and it's wholly-owned subsidiaries are Limited Liability Companies, all "pass-through" entities for income tax purposes.  Through the Joint Plan, the Debtors will be asking the Court to make a specific finding that for income tax reporting purposes, all holders of limited liability partnership interests of record in Natural Pork on March 1, 2008, will be deemed to hold equity interests in Natural Pork for tax years 2011 and 2012.

The following are some of the tax consequences that the Joint Plan will have on the Debtors' tax liability:

48

Since the Debtors are pass-through entities, the tax impact, if any of the liquidation of its

assets, will accrue to the corporate Debtors' Limited Liability Partners, and not on the corporate

Debtors.  Therefore, any gain that may be realized by the Debtors as a result of the liquidation of

their assets will be passed on to the Debtors' Limited Liability Partners, and thus, it is not

anticipated that the Debtors will suffer any impact as a result of this liquidation.

The Debtors are therefore otherwise unaware of any adverse tax consequences of the

Joint Plan as to the Debtors.  The Debtors and the Reorganized Debtor expect to minimize their

tax liability and, to the extent permitted by the Tax Code, will seek to expense from current

income the amounts paid under the Plan.  Notwithstanding the foregoing, the feasibility of the

Joint Plan does not depend on the deductibility of amounts paid.

B.      Tax Impact on Creditors

The Debtors are unaware of any adverse tax consequences of the Plan to Creditors.  It is

not necessary or practical to present a detailed explanation of the federal income tax aspects of

the Plan or the related bankruptcy tax matters involved in Bankruptcy Cases.  The tax

consequences resulting from the Joint Plan to each individual Creditor should not vary

significantly from the past tax consequences realized by each individual Creditor.  To the extent

that the tax consequences do vary for individual Creditors, each one is urged to seek advice from

their own counsel or tax advisor with respect to the federal income tax consequences resulting

from Confirmation of the Joint Plan.

The Disbursing Agent will withhold all amounts required by law to be withheld from

payments to holders of Allowed Claims.  In addition, such holders may be required to provide

certain tax information to the Disbursing Agent as a condition of receiving Distributions under

the Plan.  The Debtors will comply with all applicable reporting requirements of the Internal

Revenue Code of 1986, as amended.

      C.     <u>Tax Impact on Equity Interests</u>

      The proposed re-characterization of the Dissociated Equity Interests as Current Equity

Interests for tax purposes for the years 2011 and 2012 and re-characterization of the January

2012 Distribution as partial repayment of Allowed Sub Debt Note Claims are likely to have a

very significant impact on both Current Equity Interests and Dissociated Equity Interests.  Upon

the filing of amended tax returns for 2011 and 2012, all Interest holders will be required to file

amended tax returns.  For some, this will likely result in tax refunds, and others tax liability.

## XV.   <u>RISKS TO CREDITORS UNDER THE PLAN</u>

      Creditors will be paid under the Joint Plan from the Cash on Hand, which are the net

proceeds from liquidation of substantially all of the Debtors' property.  The proceeds from

liquidation of the remaining assets and collection of amounts to be disgorged from Classes 11

and 12 will go into the Equity Interest Fund.  The Debtors do not foresee any substantial risk that

it will not be able to liquidate its Williamsburg and Windthorst assets in a timely manner.  The

risk, if any, is that the Reorganized Debtor will not be completely successful in collecting 100%

of the amounts that will need to be disgorged from Classes 11 and 12, thus reducing the pool of

money in the Equity Interest Fund.

## XVI.  <u>DEFAULT PROVISIONS</u>

      The following shall be events of default under the Joint Plan:

      (a)     The failure to make a Distribution on account of an Allowed Claim or Allowed

Interest under the Joint Plan; <u>provided</u>, <u>however</u>, that no default shall be deemed to have

occurred if such missed payment is made within thirty (30) days of the date of the missed

payment.

(b)     Provided no agreement exists to extend or modify the terms of any agreement between the Reorganized Debtor and third party vendors or creditors, failure of the Reorganized Debtor to pay any post-confirmation expenses, including but not limited to, taxes, fees, expenses to whom the Reorganized Debtor becomes obligated after the Effective Date.

(c)     The Reorganized Debtor's failure to perform nonmonetary defaults under the Joint Plan; provided, however, that no nonmonetary default shall be deemed to have occurred if such default is cured within forty-five (45) days after written notice of such nonmonetary default has been provided the Reorganized Debtor and its General Reorganization Counsel.  All such notices hereunder shall be made <u>both</u> by facsimile and U.S. Mail, first class postage prepaid. Notice shall be deemed complete when transmission of the facsimile is completed.

As of the Confirmation Date, any defaults by the Debtors under any non-bankruptcy law or agreement, shall be deemed cured, and notice of default or sale recorded by any Creditor prior to the Confirmation Date shall be deemed null, void and have no further force or effect.

## XVII.  <u>EFFECT OF CONFIRMATION OF THE PLAN</u>

A.     <u>Discharge</u>

The Joint Plan provides that upon Confirmation, the Debtors will not be seeking a discharge of their debts.  Based on the test provided for in Bankruptcy Code Section 1141(d)(3), the Debtors will not be entitled to a discharge, because the Debtors' Joint Plan provides for the liquidation of all or substantially all of the property of the estate, the Debtors will not be engaging in business after consummation of the Joint Plan, and the Debtors would be denied a discharge under Bankruptcy Code Section 727(a), in that the Debtors are corporate entities.

B.      Revesting of Property in the Reorganized Debtors

Except as provided in the Joint Plan, Confirmation of the Joint Plan revests all of the

property of all the bankruptcy estates in the Reorganized Debtor.

C.      Modification and/or Amendment of the Joint Plan.

The Plan Proponents may modify the Joint Plan at any time before Confirmation.

However, the Court may require a new Joint Disclosure Statement and/or revoting on the Joint

Plan.

The Joint Plan may be modified by the Reorganized Debtor at any time after the

Confirmation Date, provided that such modification meets the requirements of the Bankruptcy

Code and is not inconsistent with the provisions of the Joint Plan.  The Joint Plan may be

modified or amended after Confirmation only if (1) the Joint Plan has not been substantially

consummated and (2) the Court authorizes the proposed modifications after notice and a hearing.

The Debtors and the Reorganized Debtor may, with the approval of the Court, and so

long as it does not materially or adversely effect the interests of Creditors or Interest holders,

remedy any defect or omission, or reconcile any inconsistencies in the Joint Plan, or in the

Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of

the Joint Plan.

D.      Revocation of an Order Confirming the Plan.

Pursuant to Bankruptcy Code Section 1144, on request of a party in interest at any time

before 180 days after the Confirmation Order becomes a Final Order, and after notice and a

hearing, the Court may revoke the Confirmation Order only if such order was procured by fraud.

E.    <u>Post-Confirmation Status Report</u>

Within ninety (90) days of the Confirmation Order, the Reorganized Debtor shall file a status report with the Court explaining what progress has been made toward consummation of the Joint Plan. The status report shall be served on the United States Trustee and those parties who have requested special notice. Further status reports shall be filed every ninety (90) days and served on the same entities, until entry of a Final Decree.

F.    <u>Final Decree</u>

Within thirty (30) days after Confirmation, the Reorganized Debtor shall file a final report and motion for entry of final decree in the Crawfordsville, Brayton, North Harlan and South Harlan cases.

Once the bankruptcy estate of Natural Pork has been fully administered (as referred to in Bankruptcy Rule 3022), and applicable case law, the Plan Proponents, or such other parties as the Court shall designate in the Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case.

G.    <u>Effect on Claims and Interests.</u>

A Creditor or Interest holder that has previously accepted or rejected this Plan shall be deemed to have accepted or rejected, as the case may be, this Joint Plan, as modified, unless, within the time fixed by the Court, such Creditor or Interest holder elects in writing to change his/her/its previous acceptance or rejection.

H.    <u>Termination of the Official Committee</u>

On the Effective Date, the Official Committee shall dissolve and the members of the Official Committee shall be released and discharged from all rights and duties arising from or related to the Bankruptcy Cases.  On the Effective Date, all Claims or Causes of Action, if any,

of the Debtors or Reorganized Debtor against any member of the Official Committee, and any

officer, director, employee, or agent of an Official Committee member shall be compromised,

settled, and released in consideration of the terms of this Joint Plan.

       I.       <u>Bar Date for Administrative Expense Claims</u>**.**

All Administrative Expense Claimants shall file motions for allowance of their

Administrative Expense Claims not later than thirty (30) days after the Confirmation Date or

such Administrative Expense Claims shall be disallowed and forever barred.

Any Creditor or party in interest having any Claim or Cause of Action against the

Debtors or against any Professional Persons relating to any actions or inactions in regard to the

Bankruptcy Cases, must pursue such Claim or Cause of Action by the commencement of an

adversary proceeding, within thirty (30) days after Confirmation or such Claim or Cause of

Action shall be forever barred and released.  Nothing in this Section shall be construed to affect

the Bar Date for filing pre-petition Claims against the Debtors.

The Office of the United States Trustee shall not be obligated to file any Proof of Claim

for either pre-confirmation or post-confirmation fees owed by the Debtors for and on account of

the U.S. Trustee Quarterly Fees.

       J.      <u>Retained Bankruptcy Court Jurisdiction</u>

The Court shall retain jurisdiction over the Bankruptcy Cases subsequent to the

Confirmation Date to the fullest extent permitted under Section 1334 of Title 28, United States

Code, including but not limited to, the following:

(a)      To determine any requests for subordination pursuant to the Joint Plan and

Bankruptcy Code Section 510, whether as part of an objection to Claim or otherwise;

(b)      To determine any motion for the sale of the Debtors' property or to compel

reconveyance of a lien against or interest in the Debtors' property upon the payment, in full, of a

Claim secured under the Joint Plan;

(c)      To determine any and all objections to the allowance of Claims, including the

objections to the classification of any Claim, and including, on an appropriate motion pursuant to

Bankruptcy Rule 3008, reconsidering Claims that have been allowed or disallowed prior to the

Confirmation Date;

(d)      To determine any and all applications of Professional Persons, and any other fees

and expenses authorized to be paid or reimbursed in accordance with the Bankruptcy Code or the

Joint Plan;

(e)      To determine any and all pending applications for the assumption or rejection of

executory contracts, or for the rejection or assumption and assignment, as the case may be, of

unexpired leases to which the Debtors are a party, or with respect to which they may be liable,

and to hear and determine, and if need be, to liquidate any and all Claims arising therefrom;

(f)      To hear and determine any and all actions initiated by the Debtors or the

Reorganized Debtors to collect, realize upon, reduce to judgment, or otherwise liquidate any

Causes of Action of the Debtors or the Reorganized Debtors;

(g)      To determine any and all applications, motions, adversary proceedings and

contested or litigated matters, whether pending before the Court on the Confirmation Date, or

filed or instituted after the Confirmation Date, including, without limitation, proceedings under

the Bankruptcy Code or other applicable law, seeking to avoid and recover any transfer of an

interest of the Debtors, and property or obligations incurred by the Debtors, or to exercise any

rights pursuant to Bankruptcy Code Sections 544-550;

(h)      To modify the Joint Plan or Joint Disclosure Statement, to remedy any defect or omission, or reconcile any inconsistency an the order of the Court, including the Confirmation Order, the Joint Plan or the Joint Disclosure Statement, in such manner as may be necessary to carry out the purposes and effects of the Joint Plan;

(i)      To determine disputes regarding title of the property claimed to be property of the Debtors whether as Debtors or Debtors in Possession;

(j)      To ensure that the Distributions to holders of Claims and Interests are accomplished in accordance with the provisions of the Joint Plan;

(k)      To liquidate or estimate any undetermined Claim or Interest;

(l)      To enter such orders as may be necessary to consummate and effectuate the operative provisions of the Joint Plan, including actions to enjoin enforcement of Claims or Interests inconsistent with the terms of the Joint Plan;

(m)      To hear any other matter not inconsistent with Chapter 11 of the Bankruptcy Code;

(n)      To enter a final decree closing the Bankruptcy Cases;

(o)      To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked or vacated; and

(p)      To determine such other matters as may arise in connection with the Joint Plan, the Joint Disclosure Statement or the Confirmation Order.

If the Court abstains from exercising or declines to exercise jurisdiction or is otherwise without jurisdiction over any matter arising out of the Bankruptcy Cases, this post-confirmation jurisdiction section shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## XVII.  CONCLUSION AND RECOMMENDATION

This Joint Disclosure Statement has been presented for the purpose of enabling Creditors and Interest holders to make an informed judgment to accept or reject the Plan.  *Creditors and Interest holders are urged to read the Plan in full and consult with their counsel if questions arise*.  Notwithstanding any inconsistencies between this Joint Disclosure Statement and the Joint Plan, the terms and conditions of the Joint Plan This Joint Disclosure Statement has been presented for the purpose of enabling Creditors shall control the treatment of Creditors and Interest holders and the amounts of any Distributions under the Joint Plan.

The Debtors believe that the text of this Joint Disclosure Statement, its Exhibits, and the Joint Plan itself, as incorporated herein, demonstrate that the Joint Plan will provide the greatest amount of funds for the payment of the legitimate Claims of Creditors and Interest holders.

The Debtors strongly urge all Creditors and Interest holders to vote to accept the Joint Plan.  You are urged to complete the enclosed ballot and return it immediately in accordance with the instructions above.

DATED:  January 21, 2014

Respectfully submitted,

NATURAL PORK PRODUCTION II, LLP

By: ___/s/ Lawrence Handlos_____
        Lawrence Handlos
        Its: Managing Member

57

Prepared by:
Jeffrey D. Goetz, Esq., IS# 9999366
Bradshaw, Fowler, Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA 50309-8004
515/246-5817
515/246-5808 FAX
goetz.jeffrey@bradshawlaw.com

General Reorganization Counsel for Natural Pork Production, II, LLP; Crawfordsville, LLC;
Brayton, LLC; North Harlan, LLC; South Harlan, LLC
Debtors, Debtors in Possession and Plan Proponents

Exhibit "A" to Joint Disclosure Statement for Joint Liquidating Plan of Reorganization dated January 21, 2014

## Table of Contents

Operating Documents ................................................................................................... 1
Capital Structure .......................................................................................................... 3
Subdebt Notes-Senior Liabilities ................................................................................ 3
Craton and Kruse Investment ...................................................................................... 4
Insolvency..................................................................................................................... 4
Pre-Impairment Dissociation Notices ......................................................................... 5
Instruction Regarding Fiduciary Duty - Self-Dealing ................................................. 5
2008 Priority Schedule ................................................................................................ 5
Resolutions Regarding Dissociated Partners Voting and Serving As Managing Partners ... 6
Post-Impairment Dissociation Notices ........................................................................ 7
2009 Priority Schedule ................................................................................................ 8
Craton-Kruse Lawsuit.................................................................................................. 9
Iowa Court of Appeals Ruling ..................................................................................... 9
Craton and Kruse Contentions .................................................................................... 9
The Managing Partners' Actions ................................................................................. 10
Negotiations Between the Managing Partners and Craton and Kruse........................... 12
Further Consideration of *Pari Passu* Requirement ....................................................... 14
Major Items Agreed Upon ........................................................................................... 15
August 2011 Managing Partners' Report to Subdebt and Partners ............................... 16
Comparison of "Winner/Losers" on 3-17-11 Priority Determination........................... 17
Removal of Subdebt List From SIA ............................................................................ 17
No Notice of SIA Provided to Partners With Subdebt ................................................. 18
Execution of SIA .......................................................................................................... 19
Enforcement Condition................................................................................................. 19
Transfer of Nebraska Pork Sale Proceeds ................................................................... 19
Significant SIA Terms .................................................................................................. 20
Invalidation Provisions ................................................................................................ 23
SIA Premise .................................................................................................................. 23
Not In Ordinary Course of Business............................................................................. 23
IC Committee Actions .................................................................................................. 24

## STATEMENT OF FACTS

1.     Plaintiff, Natural Pork Production II, LLP ("**NPPII**" or "**Partnership**"), is an Iowa Limited Liability Partnership.  (App. 196 - Depo. Ex. 70, p. 1).

## Operating Documents

2.     NPPII was organized and operated pursuant to a Limited Liability Partnership Agreement dated July 10, 2002 ("**Partnership Agreement**").  The Partnership Agreement, among other things, regulated the affairs of the partnership, governed the conduct of its business, and established various rights and responsibilities between and among the partners.  (App. 1-36 - Depo. Ex. 1).

3.     In particular, the Partnership Agreement states:  "[t]he winding up of the affairs of the Partnership and the distribution of its assets shall be *conducted exclusively by the Managing Partners*…" (emphasis added).  (The Managing Partners are hereinafter referred to as "**Managing Partners**").  (App. 26 - Depo. Ex. 1, p. 26).

4.     NPPII's partners further agreed that certain aspects of management would be conducted by the Managing Partners.  (App. 7 - Depo. Ex. 1, p. 7).

5.     In particular, Managing Partners were *prohibited* from *delegating* their rights and powers to manage and control the partnership to *any other person* in Section 4.1 of the Partnership Agreement.  (App. 7 - Depo. Ex. 1, p. 7) (emphasis added).

6.     The Partnership Agreement referred to Subordinated Debt ("**Subdebt**") and contained a Subordinated Note ("**Subdebt Note**") dated 2002[1] which was prepared as part of the Partnership Agreement.  (App. 17 - Depo. Ex. 1, p. 17; App. 65-69 - Depo. Ex. 3).

7.     The Partnership Agreement also incorporates by reference a Buy-Sell Agreement which is dated July 10, 2002 ("**Buy-Sell Agreement**").  (App. 4, 35 - Depo. Ex. 1, pp. 4, 35).

8.     The Buy-Sell Agreement, among other things, established certain restrictions on and rights with respect to the sale, transfer or other disposition of partnership units in NPPII, and sets forth the specific procedures by which partnership units could be transferred and described procedures for transfers that would occur in the event a partner dissociated from the Partnership.  (App. 42-45, 47-52 - Depo. Ex. 2, pp. 6-9, 11-16).

9.     Those dissociation provisions were addressed in Section 5.5 of the Partnership Agreement and Section 3.4 of the Buy-Sell Agreement.  (App. 43-45 - Depo. Ex. 2, pp. 7-9).

10.    The Buy-Sell Agreement permitted a dissociated partner to demand that its equity interests be redeemed at an agreed upon purchase price subject to the terms and conditions set forth therein.  (App. 45 - Depo. Ex. 2, p. 9; App. 529 - Depo. Ex. 187).

11.    One of those conditions was that upon a partner's dissociation, the Partnership could choose not to pay the purchase price in full at the time of dissociation if doing so would create an "**Impairment Circumstance**."  (App. 51-52 - Depo. Ex. 2, pp. 15-16).

12.    An Impairment Circumstance could also be declared by the Managing Partners if making *any* payment to any dissociated partner would "materially impair or otherwise adversely affect the working capital, cash flow or other financial means, condition or operation of the Partnership."  (App. 52 - Depo. Ex. 2, p. 16).

13.    The determination of whether or not an Impairment Circumstance existed was based on the financial condition of the Partnership.  (App. 634 - Wade Schut Depo., p. 411; App. 615-616 - Steve Schmitz Depo., pp. 217-218).

14.    The Buy-Sell Agreement also provided that the Partnership is "only obligated to purchase such number of units as is determined by the Managing Partners given the Impairment Circumstance or Material Condition."  (App. 52 - Depo. Ex. 2, p. 16).

15.    If the Partnership elected not to pay a dissociated partner cash in full on a certain settlement date, the Partnership could issue a Promissory Note to that dissociated partner in the form included at Exhibit 6.3 of the Buy-Sell Agreement ("**Buy-Sell Note**").  (App. 49-50 - Depo. Ex. 2, pp. 13-14).

---

[1] The defined term "Subdebt Note" or "Subdebt" in this Statement of Facts refers solely and exclusively to subdebt derived from an equity position held by a partner.  It is acknowledged that the Company had other funds loaned to it as subdebt in which no equity investment was required and, consequently, the lender was never a partner.  "Pure Subdebt" will be used herein to describe the subdebt owed to five such subdebt persons (App. 235-236 - Depo. Ex. 88), e.g., Minster Farmers Cooperative.  (App. 530-531 - Depo. Ex. 188).

2

16.    The operative agreements and notes at issue were prepared contemporaneously. (App. 1-69 - Depo. Exs. 1, 2, 3).

## Capital Structure

17.    The original founding partners of NPPII included Gary Weihs ("**Weihs**") and Ron Beach ("**Beach**").  (App. 603 - Schmitz Depo., p. 20).

18.    The capital structure of the Partnership designed by Weihs was premised on the principle that each non-founding partner who invested in equity also had to loan a certain amount of funds to the Partnership as Subdebt.  (App. 602 - Schmitz Depo., p. 13).

19.    The original ratio of equity to Subdebt was one to one.  (App. 602 - Schmitz Depo., p. 13).  For example, if a person invested $100,000 in equity, then a corresponding Subdebt loan to the Partnership for $100,000 also had to be made.

20.    That ratio later changed to two-thirds in equity and one-third in subdebt.  (App. 602 - Schmitz Depo., p. 13).

21.    Founding partners, such as Beach, were not required to make a Subdebt loan to the Partnership to obtain equity.  (App. 112-115 - Depo. Ex. 35; App. 620 - Schut Depo., p. 234).

22.    NPPII offered units pursuant to private placement offerings in 2002, 2003, 2005 and 2006.  (App. 196-198, 259-356 - Depo. Exs. 70, 114; App. 622 - Schut Depo., p. 242).

23.    A Subdebt Note was associated with each of those offerings.  (App. 524 - Depo. Ex. 180).

## Subdebt Notes-Senior Liabilities

24.    Subdebt Notes declare that the notes, upon occurrence of a "**Delay Event**,"[2] are subordinated to "**Senior Liabilities**."  (App. 66 - Depo. Ex. 3, p. 2; App. 94 - Depo. Ex 27, p. 2).

25.    The term "Senior Liabilities," for purposes of Subdebt, means:
>    (i) any and all duties, liabilities and obligations of Borrower from time to time, whether of payment, performance or otherwise, to any third party whatsoever, including, without limitation, any and all duties, liabilities and obligations of Borrower to any and all Banks and trade creditors; and (ii) all liabilities and obligations of Borrower under all Operating Notes (as hereinafter defined),[3] and (iii) all liabilities and obligations of Borrower under all other Company Notes (as hereinafter defined) that are entitled to priority in payment over payment of this Note as determined by Borrower's records.

(App. 68 - Depo. Ex. 3, p. 4; App. 96-97 - Depo. Ex. 27, pp. 4-5; App. 524 - Depo. Ex. 180).

26.    The parties to the Subdebt Notes are the Lender (i.e. the investor in the Partnership who was required to enter into Subdebt Note) and the Borrower (i.e. the Partnership). (App. 65 - Depo. Ex. 3, p. 1; App. 93 - Depo. Ex. 27, p. 1).

27.    Subclauses (ii) and (iii) under the definition of a "Senior Liability" do not apply to dissociated equity interests.  (App. 623 - Schut Depo., pp. 246-247).

---

[2]  The dissolution or insolvency of the Company.  (App. 67 - Depo. Ex. 3, p. 3; App. 96 - Depo. Ex. 27, p. 4).

[3]  The 2006 Subdebt Note added the term "**Designated Notes**" which is addressed hereinafter.  (App. 93-98, 524 - Depo. Exs. 27, 180).

28.     Accordingly, to fit within the definition of a Senior Liability under subclause (i), a "third party" to the Note must be someone *other* than the Lender or the Borrower (Partnership).

29.     The Subdebt Notes do not mention a dissociated partner's equity interest or the Buy-Sell Note that could be issued after a partner provides notice of dissociation.  (App. 65-69, 93-98 - Depo. Exs. 3, 27; App. 624 - Schut Depo., p. 255).

30.     The Buy-Sell Note does not contain any language regarding priority of dissociated interests or Buy-Sell Notes over Subdebt.  (App. 65-69, 93-98 - Depo. Exs. 3, 27).

31.     The Partnership's former legal counsel, Wade Schut of Nyemaster Goode, P.C., (hereinafter "**company counsel**") could not identify any policy reason why dissociated partner equity interests would have priority over Subdebt Notes.  (App. 633 - Schut Depo., p. 341).

## Craton and Kruse Investment

32.     On or about July 6, 2006, Craton Capital, L.P. ("**Craton**") from New York, New York, and Kruse Investment Company, Inc. ("**Kruse**") from Goshen, California collectively invested over $3 million in the Partnership.

33.     Craton and Kruse had no corresponding Subdebt Notes due to a "different deal" with the Partnership in which they were able to enter into as "side letter" with the Partnership. (App. 428-431 - Depo. Ex. 149; App. 575 - Ron Beach Depo., p. 26; App. 644 - Raju Shah Depo., pp. 18-19).

34.     Raju Shah ("**Shah**") and Ejnar Knudsen ("**Knudsen**") were owners of Craton, and Knudsen was also an owner of Kruse.  (App. 642-643 - Shah Depo., pp. 13, 17).

## Insolvency

35.     In late 2007 and early 2008, NPPII experienced severe financial problems due, in part, to rising costs for raising hogs and prearranged fixed price sales contracts, which precluded the Partnership from "passing on" increased costs to buyers.  (App. 530-531 - Depo. Ex. 188; App. 607 - Schmitz Depo., p. 61).

36.     On January 30, 2008 the Managing Partners approved a resolution to "actively pursue the sale of all breeding herds and operating assets" and adopted a resolution to engage in a number of transactions which were defined as "**Restructuring Transactions**."  (App. 71-72 - Depo. Exs. 5, 6; App. 606 - Schmitz Depo., p. 55).

37.     Those Restructuring Transactions included forming subsidiaries, transferring substantially all assets, including selling the entire Partnership, and increasing the Partnership's governing board from five to seven seats so Knudsen and Phil Lane could serve on the board.[4] (App. 72 - Depo. Ex. 6).

38.     By February 2008, NPPII could no longer pay its debts as they became due in the ordinary course of business.  (App. 530-531 - Depo. Ex. 188).

39.     In fact, the Partnership was insolvent from, at least, April 4, 2008 through the date it filed this bankruptcy action.  (App. 396 - Depo. Ex. 119, p. 22; App. 442 - Depo. Ex. 163, p. 3; Depo. Ex. 188; App. 654-800 - 2007-2012 Financials; App. 578 - Beach Depo., pp. 84-85; App. 615 - Schmitz Depo., p. 217).

---

[4]  Knudsen and Richard Lane, a representative for the interest held by Phil Lane, ultimately became members of the IC Committee.  (App. 415-419 - Depo. Exs. 133, 134).

4

**Pre-Impairment Dissociation Notices**

40.    In late March 2008, NPPII received dissociation notices from several partners, including Craton and Kruse.  (App. 155, 157 - Depo. Ex. 48, pp. 1, 3).

41.    On or about April 4, 2008, NPPII declared an Impairment Circumstance pursuant to Article VII of the Buy-Sell Agreement based on the Partnership's financial condition.  (App. 75-76, 420-421 - Depo. Exs. 8A, 140).

42.    Partners who dissociated *before* NPPII's declaration of the Impairment Circumstance are referred to as "*pre-impairment dissociated partners*."

**Instruction Regarding Fiduciary Duty - Self-Dealing**

43.    On April 4, 2008, a Resolution was passed by the partners to pursue Restructuring Transactions which included the sale of assets.  (App. 73-74 - Depo. Ex. 7).

44.    The Managing Partners understood they had a responsibility at all times to all stakeholders—equity partners, dissociated partners, Subdebt holders and other creditors—and knew they needed to act in a manner that was fair to all stakeholders.  (App. 70 - Depo. Ex. 4; App. 605-606 - Schmitz Depo., pp. 44, 55; App. 576-577 - Beach Depo., pp. 73-74).

45.    Concerns were raised about whether the Managing Partners could dissociate. (App. 246-247 - Depo. Ex. 103).

46.    The Managing Partners were initially advised by company counsel in April 2008 that no Managing Partner should exercise his dissociation right and that it "would smell bad" if any Managing Partner did so and was eventually made whole.  (App. 525-526 - Depo. Ex. 183; app. 629 - Schut Depo., pp. 303-304).

47.    The Managing Partners were also advised, from a fiduciary duty perspective, "to stay cleanest, [the Managing Partners] should go down with the ship."  (App. 459 - Depo. Ex. 166, p. 7).  Company counsel wanted to avoid putting such advice in writing to avoid it being seen by unintended recipients.  (App. 630 - Schut Depo., p. 307).

48.    The Managing Partners were further advised that they should not prefer their own debts to the debts of unrelated persons when deciding which creditors to pay.  (App. 203-204 - Depo. Ex. 73).

49.    Managing Partners were also informed by company counsel that the fiduciary duty concept included self-dealing and that they need to be very careful in that regard.  (App. 440-443, 461-463 - Depo. Exs. 163, 169; App. 624 - Schut Depo., pp. 256-257).  In particular, company counsel advised that any attempt by dissociated interests to be on the same level as unsecured creditors could be voided in bankruptcy.  (App. 441 - Depo. Ex. 163, p. 2).

**2008 Priority Schedule**

50.    The Managing Partners decided that they needed to issue a Priority Schedule to all stakeholders regarding priority of their respective claims.  (App. 440-443 - Depo. Ex. 163; App. 619 - Schut Depo., pp. 68-69).

51.    The two founders, Weihs and Beach, both indicated their understanding of the capital structure of the Partnership was that Subdebt had priority over dissociated interests. (App. 437-439 - Depo. Ex. 159; App. 632-633 - Schut Depo., pp. 336, 338-339).

52.     In April of 2008, the Managing Partners wanted company counsel to provide a written analysis of the priority of Partnership obligations. No written analysis was provided to the Managing Partners. (App. 527-528 - Depo. Ex. 184).

53.     On April 14, 2008, NPPII, by and through its Managing Partners—Beach, Steve Schmitz ("**Schmitz**") and Wendell Burge ("**Burge**")—after consultation with legal counsel who drafted the Partnership Agreement, the Buy-Sell Agreement, the Subdebt Note and the Buy-Sell Note published a "**Priority Schedule**" to partners, Subdebt holders and dissociated partners. (App. 73-74 - Depo. Ex. 7; App. 604 - Schmitz Depo., p. 26; App. 595-596 - Wendell Burge Depo., pp. 23, 28).

54.     That published Priority Schedule identified the priority of debt as follows:
1. Secured Creditors
2. Senior Liabilities as defined in Promissory Notes
3. *Subordinated Debt*
4. *Dissociated Partner Units*
5. Partner Units (Equity)

(App. 75-76 - Depo. Ex. 8A) (emphasis added).

55.     Company counsel supported this Priority Schedule based on equitable principles. (App. 631 - Schut Depo., p. 313).

56.     In April of 2008 the Managing Partners, based on advice of company counsel, further represented to holders of Subdebt and partners that they would be kept fully informed on developments. (App. 75-76, 444-452 - Depo. Exs. 8A, 164).

**Resolutions Regarding Dissociated Partners Voting and Serving As Managing Partners**

57.     In April of 2008, the Managing Partners were considering a resolution to allow dissociated partners the right to vote and to serve as Managing Partners. (App. 154, 248-249, 453-460 - Depo. Exs. 44, 104, 166).

58.     The Managing Partners were advised by company counsel, however, that dissociation was complete upon written notice; that the right to vote on partnership matters and be involved in the management of the partnership was forfeited immediately upon dissociation; and that the only question remaining was how and when the dissociated partner was paid for their equity interests in the partnership. (App. 529 - Depo. Ex. 187).

59.     In spite of such advice, the Managing Partners' minutes from May 12, 2008 reflect "discussion held regarding voting rights of dissociated members. No vote was taken. Advisor [Phil] Lane will research further and report back." The Managing Partners "unanimously resolved that the Board recommend that the shareholders [sic] pass a resolution that the current Board members be allowed to continue serving on the board if they dissociate." (App. 248-249 - Depo. Ex. 104).

60.     Company counsel advised the Managing Partners to wait on submitting the voting issue to a partner vote because Iowa law indicated that dissociated partners could not exercise any voting rights. (App. 250 - Depo. Ex. 104A).

61.     At a meeting of NPPII partners on May 28, 2008, three of the Managing Partners, Beach, Schmitz and Burge, over objections by Weihs, presented a resolution passed by the partners that purported to amend the Partnership Agreement to permit dissociated partners to

continue to vote on partnership matters until the Settlement Date for the purchase of the units of the dissociated partner. (App. 251-254 - Depo. Ex. 105; App. 357-358 - Depo. Ex. 115; App. 360 - Depo. Ex. 116, p. 2).

62.     Section 6.3 of the Buy-Sell Agreement defined the "**Settlement Date**" as the date for and delivery of the dissociated units whether paid in cash in full or in installments at the election of the Partnership. (App. 49 - Depo. Ex. 2, p. 13).

63.     At the partner meeting on May 28, 2008, the Managing Partners also presented a resolution to permit persons who were not partners of NPPII—including dissociated partners—to serve as Managing Partners. (App. 360 - Depo. Ex. 116, p. 2). Dissociated partners were permitted to vote on that resolution. (Depo. Ex. 117, p. 12).

## Post-Impairment Dissociation Notices

64.     After the May 28, 2008 partner meeting, Beach, Schmitz and Burge, while continuing to serve as Managing Partners, sent dissociation notices and became dissociated partners. (App. 78, 205-208, 422-423 - Depo. Exs. 11, 74, 141).

65.     The Managing Partners' respective interests in the Partnership in both equity and Subdebt upon dissociation was:

| NAME | DISSOCIATION DATE | EQUITY VALUE | SUBDEBT |
|---|---|---|---|
| Ron Beach | 5/28/08 | $232,200.50 | $0 |
| Ron Beach/Mona Jones | 5/28/08 | $208,111.66 | $0 |
| Agriculture, Inc.[5] | 5/28/08 | $301,230.42 | $0 |
| Wendell Burge (IRA)[6] | 10/22/08 | $196,676.67 | $48.90 |
| Steve Schmitz | 5/29/08 | $1,622,197.78 | $655,733.77 |

(App. 112-115 - Depo. Ex. 35; App. 403-404 - Depo. Ex. 119, pp. 29-30).

66.     Those partners who dissociated after the declaration of the Impairment Circumstance were known as "*post-impairment dissociated partners*."

67.     By the end of 2008, over 80% of NPPII partners had dissociated. (App. 112-115 - Depo. Ex. 35).

68.     This so-called "tidal wave" of dissociation notices in 2008 put the Partnership in an even more precarious financial position. (App. 75-76, 432-436 - Depo. Exs. 8A, 158).

69.     Twenty-two partners with Subdebt never dissociated. (App. 112-115 - Depo. Ex. 35).

70.     Schmitz, a Managing Partner, later remarked that "the only difference between the dissociated members and the equity members is that the dissociated members chose to have their equity classified differently but if not for that and everyone was still in equity, equity holders could not expect to be getting interest on their equity." (App. 70 - Depo. Ex. 4).

---

[5]   Agriculture, Inc. is an entity owned by Mona Jones. Beach was classified as an employee of that entity which provided various consulting services to NPPII for which Beach was compensated while serving as a Managing Partner. (App. 574, 580-581 - Beach Depo., pp. 14, 109-110).

[6]   In addition to the IRA, Wendell Burge personally holds 1.85 units (0.34%) in the Partnership.

**2009 Priority Schedule**

71.     In March of 2009, Craton and Kruse questioned the 2008 Priority Schedule which showed Subdebt with priority over dissociated interests.  (App. 159-163 - Depo. Ex. 50).

72.     In April of 2009, the Partnership sent an agenda for an upcoming partner meeting that indicated the Managing Partners would re-address the priority between Subdebt and dissociated interests.  (App. 80-81 - Depo. Ex. 20).

73.     On April 29, 2009, when advised about self-dealing, company counsel told Beach that arguments could be made that Managing Partners should not have dissociated and instead "should have gone down with the ship."  (App. 462 - Depo. Ex. 169, p. 2).

74.     On May 18, 2009, NPPII, by and through Beach, Schmitz and Burge, and with advice of legal counsel, published another Priority Schedule to stakeholders which identified the priority of debt as follows:

|   |   |
|---|---|
| 1. | Senior Secured Liabilities |
| 2. | Trade Payables |
| 3. | Senior Unsecured |
| **4.** | ***Unsecured Subordinated*** |
| **5.** | ***Dissociated Obligation*** |

(App. 82-83 - Depo. Ex. 24) (emphasis added).

75.     This 2009 Priority Schedule affirmed the Managing Partners' prior determination that Subdebt had priority over dissociated interests.  (App. 75-76, 82-83 - Depo. Exs. 8A, 24).

76.     On May 20, 2009, the Managing Partners shared the priority schedule with all stakeholders and reported that Managing Partners were working toward a declaratory judgment which was progressing and hoped to have more information to share with all stakeholders in the coming months.  (App. 77 - Depo. Ex. 10).

77.     The Managing Partners reiterated their vow to keep Subdebt and partners fully informed on all matters.  (App. 77 - Depo. Ex. 10).

78.     On May 26, 2009, Managing Partners sought responses to the 2009 Priority Schedule.  (App. 164-165 - Depo. Ex. 51).

79.     On July 20, 2009, Craton and Kruse responded and expressed their disagreement with the May 2009 priority schedule.

80.     Craton and Kruse also suggested that a judicial determination should be made on the priority dispute and other stakeholders should be allowed to intervene.  (App. 164-165 - Depo. Ex. 51).

81.     In August of 2009, after further complaints from Craton and Kruse, the Managing Partners reached the same determination that Subdebt had priority over dissociated interests. (App. 92, 164-165 - Depo. Exs. 26, 51).

82.     On August 20, 2009, Beach emailed Shah and indicated the Managing Partners also supported a judicial determination of the priority issue and the Partnership had prepared a list of the names and addresses of holders of Subdebt.  (App. 85-86 - Depo. Ex. 25, pp. 2-3).

**Craton-Kruse Lawsuit**

83.    On September 25, 2009, Craton and Kruse filed a declaratory judgment action against NPPII in the Iowa District Court for Shelby County to, among other things, require NPPII to issue Buy-Sell Notes to them and have the district court determine priority between Subdebt Notes and dissociated interests.  (App. 168 - Depo. Ex. 52, p. 3).

84.    An October 2009 memo by company counsel addressed Iowa law on interpleader as an option on the priority dispute and further advised Managing Partners of the fiduciary duties they owed under Iowa law.  (App. 532-538 - Depo. Ex. 201).

85.    In November 2009, company counsel provided another memo to the Managing Partners which recommended that they "modify" their approach on the priority issue and proceed with a "bell weather" trial (a so-called test case) in the Craton and Kruse lawsuit which added representatives of the unsecured creditors as parties.  (App. 209-210 - Depo. Ex. 78, pp. 1-2).

86.    In December 2009, the Partnership provided the list of names and addresses of all unsecured creditors, including Subdebt holders, to Craton and Kruse for use in the declaratory judgment action on the priority issue.  (App. 539 - Depo. Ex. 202).

87.    In February of 2010, Beach and Schmitz requested counsel to further look at bringing a "test case" between holders of Subdebt and dissociated partners.  (App. 79, 424 - Depo. Exs. 17, 143).

88.    The Partnership prevailed on a motion for summary judgment when the district court ruled that the Partnership could not be required to purchase the units held by Craton and Kruse.  (App. 168 - Depo. Ex. 52, p. 3).  Craton and Kruse appealed.  (App. 166-170 - Depo. Ex. 52).

**Iowa Court of Appeals Ruling**

89.    On February 9, 2011, the Iowa Court of Appeals reversed the district court and ruled that Craton and Kruse, due to their status as pre-impairment dissociated partners, were entitled to issuance of a Buy-Sell Note.  (App. 166-170 - Depo. Ex. 52).

90.    One Manager commented that he was "irritated" Craton and Kruse took advantage of a "loop hole in the legal system" to try to 'put themselves ahead of everyone else which is just wrong."  (App. 99 - Depo. Ex. 28).

91.    Company counsel read the Iowa Court of Appeals decision as only requiring the Partnership to issue Buy-Sell Notes to Craton and Kruse and perhaps to other *pre*-impairment dissociated partners.  (App. 100-101 - Depo. Ex. 29).

92.    The Iowa Court of Appeals decision did not address priority between Subdebt and dissociated interests, did not require the Partnership to issue Buy-Sell Notes to *any post*-impairment dissociated partners and did not require the Partnership to make any payments to Craton and Kruse (or any other dissociated partner) if an Impairment Circumstance continued to exist.  (App. 166-170 - Depo. Ex. 52; App. 583 - Beach Depo., p. 201).

**Craton and Kruse Contentions**

93.    On February 15, 2011, Craton and Kruse's counsel indicated it wanted promissory notes issued to them and requested that the Partnership refrain from making any distribution to any creditors who were subordinate to their interest.  (App. 171 - Depo. Ex. 53).

9

94.     Craton and Kruse wanted notes issued to them by March 1st.  (App. 230 - Depo. Ex. 85).

95.     On February 23, 2011, Beach indicated in an email to company counsel that the reason Craton and Kruse "were pushing for March 1 is because of the $10 million NPPII will be getting shortly thereafter from the Nebraska Pork sale and they are afraid the company will pay subdebt."  (App. 230 - Depo. Ex. 85).

## The Managing Partners' Actions

96.     On February 23, 2011, the Managing Partners responded to a request from First National Bank of Omaha ("**FNBO**") (the successor in interest to Weihs' units) and indicated that if and when there is a court challenge on the priority issue, the Partnership would not take a position on the priority issue.  (App. 410-411 - Depo. Ex. 124).

97.     The next day, the Managing Partners' informed FNBO of the Priority Schedule from 2009 and stated that, despite a legal challenge from two dissociated partners, the Partnership's position was that even if an amount was owed to a dissociated equity owner, that dissociated interest did not "*leap frog*" any of the existing creditors of the Partnership.  (App. 102-103 - Depo. Ex. 30) (emphasis added).

98.     On March 6, 2011, Beach sent an email to company counsel stating that the Managing Partners had "worked on several scenarios and had many discussions.  With the convergence of two major events, we are focusing on how to write the 'final chapter' of NPPII.  Those two events are the pending ruling from the District Court on issuing notes to dissociated and the second is the sale of the Nebraska Pork asset ~ $15 million."  (App. 221-223 - Depo. Ex. 82).

99.     The Managing Partners knew the sale of Nebraska Pork was closing on March 9, 2011 and that NPPII was expected to receive around $15 million sometime in 2011.  (App. 117-118, 221-222, 230, 240, 241, 256 - Depo. Exs. 38, 82, 85, 92, 93,108; App. 615 - Schmitz Depo., pp. 214, 216).

100.    Craton and Kruse also knew that the Nebraska Pork payment was going to be received by NPPII in 2011.  (App. 194-195, 230, 240, 241 - Depo. Exs. 68, 85, 92, 93; App. 600 - Knudsen Depo., pp. 126-127).

101.    After discussions with Shah, on March 6, 2011, Beach sent an email to company counsel and indicated that "in a nutshell here's what we're anticipating:

1. Issue *notes to all dissociated*, with *accrued interest*, *from the day of dissociation* (*we are not interested in having two classes of dissociated*).

2. We would consider dissoc notes *equal in priority* to the one Senior Liability of $1.2M, plus interest, to Eli Lane estate.

3. Pay 20% down to all dissociated and Lane using some of proceeds from nebr pork sale.  (Or will *pay all Nebr money to secured creditors*).

4. The note to dissoc will have some *new terms* as part of a '*settlement*" with this group - (we can discuss).

10

5.    Proceed to sale the assets of the company and *apply the proceeds first to dissociated debt then any remainder to subdebt"*.

(App. 221-222 - Depo. Ex. 82) (emphasis added).

102.    A fundamental goal for Beach was that the Managing Partners treat all dissociated interests *pari passu* (in other words, *post*-impairment dissociated partners would be on the *same* level as *pre*-impairment dissociated partners).  (App. 221-222 - Depo. Ex. 82).

103.    Beach held no Subdebt, Burge had less than $50 of Subdebt, and Schmitz's dissociated interest was nearly double his Subdebt.  (App. 112-115 - Depo. Ex. 35; App. 403-404 - Depo. Ex. 119, pp. 29-30).

104.    The Managing Partners had determined that, if Subdebt Notes and pre-impairment obligations had priority over post-impairment dissociated interests, Beach and Burge stood to receive nothing from the Nebraska Pork sale and Schmitz stood to receive about half of the value of his dissociated interest.  (App. 112-115 - Depo. Ex. 35).

105.    On March 17, 2011, Beach emailed company counsel and stated:  "Considering the present circumstances, the lack of clear direction we are expecting from [Judge] Richardson and the uncertainty of when he will even address the [priority] issue, we believe it is time for the Board to make the next move.  Attached is what we want to accomplish.....can you help us figure out how to do it?"  (App. 541 - Depo. Ex. 206).

106.    The March 17th email had two attachments which were prepared by Beach, a Manager with no Subdebt.  The names on those attachments were: Settlement.docx and NPPII Priority Schedule_3-17-11.docx.  (App. 541 - Depo. Ex. 206).

107.    The first document prepared by Beach was titled "Settlement with All 'Operating' and 'Designated Creditors.'"  That outline, in part, reflected that pre-impairment dissociated partners would have priority above Subdebt and would have NPPII's subsidiaries pledge collateral to them *provided* that post-impairment dissociated interests (a class which included *all* Managing Partners) was treated *pari passu* with pre-impairment dissociated partners.  (App. 108-111, 464-468 - Depo. Exs. 34, 173; App. 584, 592 - Beach Depo., pp. 206, 305).

108.    The second attached document prepared by Beach, titled "NPPII Priority Schedule-Revised 3-17-11," listed dissociated interests as a "Senior Liability" based on the dissociated interests constituting a "Designated Note."  (App. 106-107 - Depo. Ex. 33).

109.    The term "Designated Notes" meant all promissory notes or other debt obligations issued by Company from time to time that are designated by Company in its sole and absolute discretion as constituting a "Senior Liability" for purposes of this Note and all other Company Notes.  (App. 801 - BEA 01249).

110.    "Designated Notes" was a term that was only used in the 2006 Subordinated Promissory Note and did not appear in the 2002, 2003 or 2005 Subdebt Notes.  (App. 524 - Depo. Ex. 180).

111.    Beach listed dissociated interests as "Designated Notes" because dissociated interests did not *"fit any other predefined category of Senior Liabilities."*  (App. 106-107 - Depo. Ex. 33) (emphasis added).

112.    Beach's outline did not list dissociated interests as satisfying the "third party" provision in subclause (i) of the Senior Liabilities definition contained in the Subdebt Notes. (App. 106-107 - Depo. Ex. 33).

113.    Beach's revised priority schedule did not address why the Partnership financials in 2009 and 2010 listed "Senior Liabilities" *separately* from dissociated interests, yet his 3-17-11

11

revised priority schedule listed *all* dissociated interests as Senior Liabilities.  (App. 106-107, 199-202 - Depo. Exs. 33, 71).

114.   The 3-17-11 Revised Priority Schedule is the first time any Managing Partner listed dissociated interests with a higher priority than Subdebt.

115.   Beach also stated to company counsel in the 3-17-11 Revised Priority Schedule: ". . . . Since Judge Richard [sic] is likely to not specifically address this it is up to the Managing Partners to look at the two notes and determine as they are written which one is subordinate." (App. 106-107 - Depo. Ex. 33).

116.   The Managing Partners did not inform the holders of Subdebt or the NPPII partners in 2011 that they were going re-examine priority for the third time.

117.   Company counsel believed in March 2011 that the Managing Partners were "reversing our order [of priority] we put out before" and Beach confirmed that when asked by company counsel.  (App. 540 - Depo. Ex. 205, p. 1).

118.   On March 23, 2011, company counsel expressed concern that this proposal to issue notes to all pre- and post-impairment dissociated partners "is at least arguably not consistent with what the appellate court said and not sure what the district court may say." (App. 475 - Depo. Ex. 174, p. 7).

119.   Company counsel's notes then indicated "but who would care?"  (App. 475 - Depo. Ex. 174, p. 7).

120.   Company counsel also considered the change reflected in the 3-17-11 Revised Priority Schedule and commented that "this is a different priority schedule than we sent to the partners before, where we said diss. notes were below Subdebt … this *change favors the partners* so can't see how we get any complaints or be forced to explain ourselves … and as between people who held both Raju says change not affect them $ wise in the end really so ones who will object are those who purchased and hold only subdebt or subdebt from acquisitions or other subdebt."  (App. 489 - Depo. Ex. 174, p. 21).

121.   That "change" *did not* favor partners who did not dissociate.  (App. 112-115 - Depo. Ex. 35).

## Negotiations Between the Managing Partners and Craton and Kruse

122.   On March 25, 2011, Beach sent an email to the other Managing Partners with an updated version of the base terms of the outline settlement and 3-17-11 Revised Priority Schedule after he had "spoken with Raju at some length and have incorporated his thoughts into the attached.  Wade Schut thinks this is doable, or very close to doable, and there is very reasonable business justification for doing it now." (App. 104 - Depo. Ex. 31).

123.   Beach sent company counsel an email that same day and indicated counsel needed to prepare "settlement notes, collateral documents and inter-creditor agreement." (App. 105 - Depo. Ex. 32).

124.   Beach also emailed Shah the same day and commented on company counsel's preference for the order of events in the settlement outline which had the proposed version of the Buy-Sell Note issued *before* settlement of the lawsuit because it took away the "problem" of needing to amend the Buy-Sell Agreement, which would have required notifying the partners of the SIA.  (App. 172-175 - Depo. Ex. 54).

125.   Section 14.4 to the Buy-Sell Agreement required that any amendment to its terms receive approval from the majority of outstanding partners.  (App. 58 - Depo. Ex. 2, p. 22).

12

126.    The purported rationale for the Managing Partners changing the 2008 and 2009 priority schedules to favor *all* dissociated partners was based on the Court of Appeals decision requiring issuance of Buy-Sell Notes to Craton and Kruse.  (App. 166-170 - Depo. Ex. 52; App. 579 - Beach Depo., p. 102).

127.    That rationale was challenged in a March 29, 2011 a letter from Craton and Kruse's counsel which indicated:  "Generally I know there was a concern that NPP intended to treat Craton and Kruse the same as others who dissociated *after* the impairment circumstance, which I believe is incorrect under the Buy-Sell Agreement and general priority principles."  (App. 178-179 - Depo. Ex. 56) (emphasis in original).

128.    One Manager admitted that he knew there was a difference between NPPII's obligations to pre-impairment and post-impairment dissociated partners based on the Iowa Court of Appeals decision.  (App. 609 - Schmitz Depo., p. 155).

129.    Nonetheless, Beach maintained that there was a "huge difference" on whether an "obligation" existed under a Buy-Sell Note as compared to a contract claim made by a dissociated partner under the Buy-Sell Agreement.  (App. 579 - Beach Depo., pp. 102-103).

130.    The Buy-Sell Agreement set forth all the material terms to determine the value of each dissociated partner's units, the interest rate for any such note and other payment terms.  (App. 49-50 - Depo. Ex. 2, pp. 13-14).

131.    Company counsel acknowledged during his deposition that any dissociated partner who sued the Partnership on a contract claim based on the Buy-Sell Agreement could be entitled to the same monetary relief as if a suit was brought on a Buy-Sell Note.  (App. 620621 - Schut Depo., pp. 237, 239-241).

132.    Beach acknowledged a claim for payment by a dissociated partner could be made under the Buy-Sell Agreement without issuance of a note.  (App. 579 - Beach Depo., pp. 103-105).

133.    In a March 30, 2011 email to Beach, Schmitz raised concerns about the Managing Partners being voted off the board by the current partners before having an opportunity to implement the settlement and revised priority schedule.  (App. 116 - Depo. Ex. 36).

134.    On April 5, 2011, the Managing Partners were informed by company counsel that a trial on the priority issue was set for December 16, 2011[7] and "the issue that remains for trial should be limited to the relative priority of unsecured creditors.  As we have previously discussed, this is not an issue for which NPP II has a direct interest.  For this reason, I do not plan to engage in discovery or otherwise prepare to try this issue unless you inform me that there is some change in NPPII's position."  (App. 233-234 - Depo. Ex. 87).

135.    The only parties to the declaratory judgment action were Craton, Kruse and NPPII.

136.    Neither NPPII nor Craton and Kruse sought to join representatives of Subdebt in the declaratory judgment action.

137.    The Managing Partners never disclosed to Subdebt holders or partners that they were abandoning the previously announced plan to have a judicial determination of the priority issue.

138.    On April 5, 2011, company counsel prepared a memo for the Managing Partners on equitable subordination. The memo addressed the actions that the Managing Partners were taking, including retained voting rights and "a possible conflict of interest" which could be

---

[7]   The Agreement at issue was not signed until November 30, 2011 – two weeks before the start of the trial on priority.  (App. 122-145 - Depo. Ex. 40).

13

deemed inequitable conduct and result in equitable subordination.  (App. 520-523 - Depo. Ex. 176).

139.    The same day, Beach  indicated to Shah that attorneys were working on the  an agreement and the attorneys were "providing the *talking points* for the legal argument on why we are changing the priority schedule even though the *recent ruling did not address priority of notes* and set it for trial in Dec." (App. 180-181 - Depo. Ex. 57) (emphasis added).

140.    The first draft of a Settlement and Intercreditor Agreement ("**SIA**") was completed by company counsel on April 8, 2011.  (App. 494-519 - Depo. Ex. 175).

141.    On April 8, 2011, the Managing Partners and counsel discussed an SIA provision which required that all excess working capital be paid to SIA Parties.  Company counsel pointed out that such a payment arrangement only worked, based on the terms of subordinated debt, as long as the Partnership was insolvent[8] because insolvency was the only potential relevant basis for subordination of Subdebt.  Company counsel advised the Managing Partners there was no "out" in the SIA if NPPII was no longer insolvent.  (App. 231-232 - Depo. Ex. 86).

142.    Later in April 2011, the Managing Partners expressed concern that if new Managing Partners were elected, excess working capital could be used to pay Subdebt and not used to pay SIA Parties.  (App. 542-545 - Depo. Ex. 207).

143.    A few days later, company counsel indicated to the Managing Partners that "We may want to consider *adding* a *sentence* that states that it is the intent of the parties that the *amounts owed* are all *Senior Liabilities* for purposes of Subdebt, *to add further to the position* that the subordinated provisions of the Subdebt include the agreement debt as Senior Liabilities." (App. 183 - Depo. Ex. 60).

144.    When asked why such a "bootstrapping" provision was need in the SIA, Shah said "because lawyers can twist any sentence into anything and make anything sound backwards, frontwards, upside down to serve their purposes."  (App. 646 - Shah Depo., pp. 155-156).

## Further Consideration of *Pari Passu*  Requirement

145.    In April 2011, the Managing Partners considered the impact of the *pari passu* requirement in Revised Priority Schedule on the top Subdebt holders:

   a.  12 dissociated partners had less than $10,000 to gain if Subdebt had priority;

   b.  3 dissociated partners had $10,000-$30,000 to gain if Subdebt had priority;

   c.  17 additional equity partners had less than $50,000 to gain if Subdebt had priority; and

   **d.  Only 1 dissociated partner, and 5 equity partners, had more than $50,000 to gain if Subdebt had priority.**

(App. 236 - Depo. Ex. 88, p. 2) (emphasis added).

146.    The Managing Partners knew that priority was not based on the number of persons or relative amounts involved. (App. 617 - Schmitz Depo., p. 234; App. 590 - Beach Depo., pp. 286-287).

---

[8]  Insolvency enabled NPPII to declare a Delay Event and suspend payments to Subdebt holders.

147.    On May 26, 2011, Craton and Kruse proposed "some significant changes" to the proposed agreement based on whether pre-impairment and post-impairment dissociated partners would be treated the same.  (App. 184 - Depo. Ex. 62).

148.    On May 26, 2011, Beach, contemplating a reply to Craton and Kruse, indicated that during "discussions with the other Managing Partners and legal counsel, *I pushed hard* and [got] our attorney *refocused and develop [sic] the strongest argument possible* for *why* the Managing Partners would step in at this time and *settle* with this group of creditors."  (App. 239 - Depo. Ex. 91, p. 2) (emphasis added).

149.    The "final outline" of settlement terms was circulated to Managing Partners and company counsel on June 5, 2011.  That outline set "forth the major points that were negotiated and we agreed."  Company counsel was then directed to update the draft SIA based on the outline.  (App. 425 - Depo. Ex. 146).

150.    On June 14, 2011, Shah again indicated Craton and Kruse could not agree with equal treatment for pre- and post-impairment dissociated partners "given the disparity between the two sets of partners with respect to how **initial** payments are split."  (App. 187-188 - Depo. Ex. 63, pp. 3-4) (emphasis in original).

151.    On June 24, 2011, Beach sent an email that he was "convinced that *fracturing the dissociated group* in the settlement proposal will make such an *approach impractical* in gaining support and *result in a court making the final decisions*."  (emphasis added).  "*Of course, with the settlement as outlined the entire dissociated group should be unified and will gain significant strength in assuring timeliest possible repayments. The Managers do not believe they are in a position to sign on to a settlement that segregates the pre and post; this point has been clear and consistent from the first conversation about a settlement.*"  (App. 146-147 - Depo. Ex. 41) (emphasis added).

152.    Beach then identified the "4Cs" of why pre- and post-impairment dissociated partners should band together as contemplated in the SIA:  (1) **control** over the Partnership; (2) **collateral** from the subsidiaries; (3) **committed direction** regardless of who the future Managing Partners might be; and (4) **collection** with diminished probability of additional legal expense and lengthy court proceedings.  (App. 146-147 - Depo. Ex. 41) (emphasis added).

153.    In July of 2011, Craton and Kruse determined that, even if all dissociated were treated *pari passu,* their "range of recovery" would be adequate, and therefore agreed to pursue the SIA on a *pari passu* basis as outlined in June.  (App. 189-190 - Depo. Exs. 64, 65; App. 645 - Shah Depo., p. 110).

154.    Once Craton and Kruse agreed to be *pari passu* with the post-impairment dissociated interests, those two groups sought terms to strengthen their self-interest over Subdebt and partners.  (App. 183 - Depo. Ex. 60; App. 646 - Shah Depo., pp. 155-156).

155.    No one specifically represented the interests of Subdebt holders when the Managing Partners were negotiating with Craton and Kruse.  (App. 638 - Schut Depo., p. 627).

## **Major Items Agreed Upon**

156.    By August of 2011, the Managing Partners had most of what they wanted and the "major" issues were "where [the Managing Partners] wanted them."  (App. 546 - Depo. Ex. 208).

157.    No significant changes were made to the draft SIA as compared to the final version executed thereafter.  (App. 190, 546 - Depo. Exs. 65, 208).

15

158.    By that time, the Managing Partners wanted support for the SIA and did not want to have a court make the priority decision.  (App. 191-192 - Depo. Ex. 66; App. 582, 587 - Beach Depo., pp. 195, 250-251).

159.    The Managing Partners acknowledged a problem existed because the court did not make any ruling except as to the issuance of the notes, but even though the court had not made any comment on priority between the creditors, the Managing Partners wanted to get the settlement finalized.  (App. 191-192 - Depo. Ex. 66; App. 608 - Schmitz Depo., p. 69).

## August 2011 Managing Partners' Report to Subdebt and Partners

160.    A draft of an "August 2011 Board of Managing Partners' Report" ("**August 2011 Report**") was reviewed by company counsel and he recommended changes to the August 2011 Report to state that the Iowa Court of Appeals decision required only that notes "just" be issued to Craton and Kruse.  (App. 117-118 - Depo. Ex. 38; App. 548 - Depo. Ex. 209, p. 2).

161.    The Managing Partners rejected that advice.  (App. 117-118 - Depo. Ex. 38).

162.    The final August 2011 Report, which was sent to all stakeholders, included several noteworthy items.  (App. 541 - Depo. Ex. 206).

163.    First, the August 2011 Report indicated that NPPII "does *continue* in the status of 'Delay Event' and 'Impairment Circumstance' due to its overall financial condition.  Loan agreements with the senior secured lender have terms that essentially give *them control* over whether NPPII can *pay anything* to Subdebt holders, dissociated partners and shareholders."  (App. 541 - Depo. Ex. 206) (emphasis added).

164.    Second, under the heading "Declaratory Judgment" the August 2011 Report indicated that: "NPPII was instructed to issue promissory notes to the Plaintiffs for their dissociated units.  Since that court decision NPPII and Plaintiffs, along with legal counsel, have been *exploring* a settlement agreement that would attempt to *resolve the issue company-wide*."  (App. 555-556 - Depo. Ex. 214) (emphasis added).

165.    At the time the August 2011 Report was issued to stakeholders, the Managing Partners had already made the decision to proceed with the SIA and had completed negotiations of its key terms.  (App. 546 - Depo. Ex. 208; App. 614 - Schmitz Depo., pp. 208-209, 234-235; App. 585-586 - Beach Depo., pp. 237, 239-240).

166.    Such key terms, which were not disclosed in the August 2011 Report, included: (1) the change to the priority schedules issued by the Company in 2008 and 2009 so that all dissociated interests were now deemed "Senior Liabilities" with priority over Subdebt; (2) the intent to lift the Impairment Circumstance only for SIA parties; (2) the intent to make a $10.5 million distribution only to SIA Parties from Nebraska Pork proceeds; (3) the intent to make NPPII's subsidiaries grant collateral interests in all of their assets for the benefit of SIA parties; and (4) that the SIA would, in effect, create the so-called Intercreditor Committee ("**IC Committee**") and give it full authority to wind up the affairs of NPPII without further notice to stakeholders and without need to seek partner approval.  (App. 117-118, 122-145 - Depo. Exs. 38, 40).

167.    The August 2011 Report told Subdebt holders and partners "there are quite a few issues that still need to be considered, so *we will give you another update when we have some definite information to present to you.*"  (App. 555-556 - Depo. Ex. 214) (emphasis added).

16

168.    No notice was ever sent by the Managing Partners to partners with Subdebt or Pure Subdebt regarding the SIA or its provisions, including the change in priority scheme for stakeholders.  (App. 610 Schmitz Depo., pp. 158-159; App. 585 - Beach Depo., p. 237).

169.    One Manager thought the Managing Partners "probably could have communicated better."  (App. 610 - Schmitz Depo., p. 158).

170.    With respect to holders of Subdebt, that Managing Partner was asked in a deposition:  "Do you know of any reason why they wouldn't have been notified?  A. **No**."  He further said "we worked on this [the SIA] for a long time and wanted to see it come to fruition." (App. 610, 614 - Schmitz Depo., pp. 159, 209) (emphasis added).

171.    On August 26, 2011, Beach indicated to Craton and Kruse that "an issue we discussed was *whether or not Subdebt holders are made aware* in some manner of the settlement taking place.  At some point they will know about it so is it better to deal with questions and/or challenges *before or after* money has been disbursed under settlement?"  (App. 192 - Depo. Ex. 66, p. 2).

172.    The August 2011 Report also identified that the Nebraska Pork deal closed on March 9, 2011 and the Company was waiting for payment.  (App. 117-118 - Depo. Ex. 38).

173.    The Managing Partners knew the Nebraska Pork funds would be available in 2011.  (App. 255 - Depo. Ex. 106; App. 615 - Schmitz Depo., pp. 214, 216).

## Comparison of "Winner/Losers" on 3-17-11 Priority Determination

174.    The Managing Partners expected that when presented with the SIA, dissociated partners would decide on whether to join it based upon their own financial best interest.  (App. 237 - Depo. Ex. 89).

175.    Toward that end, on September 30, 2011, the Managing Partners had an Excel spreadsheet prepared and compared the amount owed to dissociated interests and Subdebt. That information was compiled to determine how many people would be "winners" if dissociated interests had priority over Subdebt and vice versa.  That analysis revealed 110 "winners" if dissociated interests had priority.  Conversely, there would only be 62 "winners" if Subdebt had priority over dissociated interests.  (App. 112-115 - Depo. Ex. 35; App. 614 - Schmitz Depo., p. 206).

176.    The Managing Partners considered the magnitude of the "loss" to those 62 who would be financially harmed by changing the priority schedules adopted in 2008 and 2009.

177.    The Managing Partners also considered that out of the 125 dissociated partners, 22 had Subdebt that was greater than their equity position.  (App. 613 - Schmitz Depo., p. 204).

178.    The Managing Partners made this analysis in an attempt to limit the potential challengers to the SIA.  (App. 120 - Depo. Ex. 39, p. 2; App. 617 - Schmitz Depo., p. 234).

179.    The Managing Partners knew that priority was not based on the number of persons or relative amounts involved.  (App. 617 - Schmitz Depo., p. 234; App. 590 - Beach Depo., pp. 286-287).

## Removal of Subdebt List From SIA

190.    The original drafts of the SIA contained a schedule listing of all holders of Subdebt (including Alan Axelrod, Rick Bolander and Lawrence and Doris Handlos), but Beach and Shah did not want to include that list in the final SIA.  (App. 224-229 - Depo. Exs. 83, 84).

17

191.    As instructed by Beach and Shah, the list of all Subdebt holders was removed from the SIA by company counsel "*because it might make it easier for the holders of the subordinated debt to organize a potential challenge to the [SIA]*." (App. 228-229 - Depo. Ex. 84) (emphasis added).

## No Notice of SIA Provided to Partners With Subdebt

192.    On September 10, 2011, company counsel reminded the Managing Partners that "we still need to resolve whether all persons will be notified of the agreement, including those only holding Subdebt." (App. 120 - Depo. Ex. 39, p. 2).

193.    On October 12, 2011, Beach indicated concern that if there were new Managing Partners of NPPII, he did not want NPPII (or anyone else) to be able to do anything other than distribute Nebraska Pork proceeds as provided in the SIA and wanted company counsel to pursue "wrapping those funds up into this settlement and making sure they can't ever get away." (App. 572 - Depo. Ex. 228).

194.    Company counsel indicated that even though the Managing Partners would issue Buy-Sell Notes to dissociated partners who became SIA Parties *based on the SIA*, NPPII "would not otherwise be issuing them a Buy-Sell Note at this time, and perhaps not for quite some time." (App. 561 - Depo. Ex. 219).

195.    Even though the SIA was essentially in final form by October 25, 2011, notice was not sent until over a month later—and then only to dissociated partners.  (App. 150-153, 563 - Depo. Exs. 43, 222).

196.    In considering the type of notice to send regarding the SIA, on November 29, 2011, Beach chose not to provide dissociated partners with a list of the amount of their subdebt. (App. 426-427 - Depo. Ex. 147).

197.    Regarding this decision, Schmitz replied to Beach that: "I don't think we are telling those couple people with more sub-debt than dissociated that they won't get any of their sub-debt." Schmitz was in favor of including Subdebt holders on that disclosure.  (App. 426-427 - Depo. Ex. 147).

198.    A draft notice to dissociated partners regarding the SIA was prepared in late November 2011.  In that draft, the Managing Partners told dissociated partners their decision to change the schedule so that dissociated interests had priority over Subdebt was "in a way that a court *would have likely* have resolved that dispute." (App. 150-153 - Depo. Ex. 43) (emphasis added).

199.    At that time, company counsel advised that the notice should say that the Court "*might*" have resolved the dispute by finding that dissociated interests have priority over Subdebt. (App. 564-568 - Depo. Ex. 223) (emphasis added).

200.    That suggested change by company counsel was ignored. (App. 150-153 - Depo. Ex. 43).

201.    On November 30, 2011, the SIA notice was issued and was only sent to dissociated partners and not to partners with Subdebt, holders of Pure Subdebt, or other stakeholders including non-dissociated equity.  (App. 150-153 - Depo. Ex. 43).

## Execution of SIA

202.    On or about November 30, 2011, Craton and Kruse, on their own behalf, and Beach, on behalf of the Partnership, signed the SIA.  (App. 122-145, 245 - Depo. Exs. 40, 96).

203.    The SIA was executed without prior written notice to NPPII partners and without a vote of NPPII partners.  (App. 610 - Schmitz Depo., p. 158).

## Enforcement Condition

204.    The SIA contained an "Enforceability Condition" (**EC**") which required within 45 days of execution of the SIA that 70% of the dissociated partners, based on the amount of their respective Buy-Sell Notes (other than Craton or Kruse), must sign the SIA before it became "binding" on the Company and Craton and Kruse.  (App. 128 - Depo. Ex. 40, p. 7).

205.    The purpose of the EC was to have a degree of participation that could reduce the odds of challenge to the validity of the SIA.  (App. 120 - Depo. Ex. 39, p. 2; App. 617 - Schmitz Depo., p. 234).

206.    When presented with the SIA, a dissociated partner, who later became an IC Committee member, commented that the Managing Partners and Craton and Kruse "manufactured" priority by having dissociated interests deemed Senior Liabilities.  (App. 802 - DEW 2077).

207.    By December 23, 2011, the SIA was signed by over 120 dissociated partners. Those SIA Parties held in excess of 80% of the ownership of the NPPII prior to their dissociation.  (App. 412-414 - Depo. Exs. 130, 131; App. 803-833 - Am. Cmpt, Case 12-30081 DN 211).

208.    The Managing Partners determined that the EC was met on December 23, 2011. (App. 193 - Depo. Ex. 67).

209.    The Managing Partners then passed a resolution dated December 23, 2011 that lifted the Impairment Circumstance only with respect to SIA parties.  (App. 242, 569 - Depo. Exs. 94, 225).

210.    The Managing Partners made that determination in order to distribute the Nebraska Pork sale proceeds.  (App. 570-571 - Depo. Ex. 227).

211.    The Impairment Circumstance remained in effect for all other dissociated partners and the Delay Event remained in effect for all Subdebt holders even though an Impairment Circumstance and Delay Event were financially-based determinations based on the health of the Partnership as a whole, rather than the status of individual stakeholders.  (App. 65-69, 243-244 - Depo. Exs. 3, 95).

212.    The Delay Event was not lifted at that time because that would have required payments be made on Subdebt.  (App. 589 - Beach Depo., p. 273).

## Transfer of Nebraska Pork Sale Proceeds

213.    After the Impairment Circumstance was lifted, Buy-Sell Notes were issued to all SIA Parties.  (App. 124, 128 - Depo. Ex. 40, pp. 3, 7)

214.    Due to the Resolution permitting continued voting rights for dissociated partners pending receipt of payment for their equity interest, the Managing Partners understood, once Buy-Sell Notes were issued to SIA Parties, that none of the SIA Parties, including the Managing

19

Partners, could vote on Partnership matters.  (App. 359 - Depo. Ex. 116, p. 1; App. 588 -  Beach Depo., pp. 260-261).

215.   Beach knew if partners were notified that SIA Parties could no longer vote, the remaining partners could call a meeting, elect a new board before the Nebraska Pork proceeds were received and might use that money differently.  (App. 588 - Beach Depo., p. 261).

216.   The Managing Partners then awaited receipt of the Nebraska Pork sale proceeds. (App. 588 - Beach Depo., pp. 260-261).

217.   On January 27, 2012, NPPII received a wire transfer for distribution of $11,034,910.06 in connection with the sale of Nebraska Pork.  (App. 803-836 - Schedule A DN 1, Am. Cmpt, Case 12-30081 DN 211).

218.   On January 27, 2012, NPPII transferred funds, pursuant to the SIA, in the amount of $10,509,341.36 to the dissociated partners who had signed the SIA (hereinafter the "**Cash Transfers**").  (App. 598 - Jensen Depo., p. 113; App. 803-836 - Schedule A DN 1, Am. Cmpt, Case 12-30081 DN 211).

219.   The Managing Partners received the following amounts from such transfer:

| NAME | VALUE OF DISSOCIATION INTEREST | 1/27/12 CASH TRANSFER |
|------|--------------------------------|------------------------|
| Ron Beach | $185,760.40 | $100,839.65 |
| Ron Beach/ Mona Jones | $166,488.60 | $90,377.99 |
| Agriculture, Inc | $240,984.01 | $130,817.67 |
| Wendell Burge | $150,018.21 | $79,207.19 |
| Steve Schmitz | $1,297,757.82 | $704,353.91 |

(App. 393-394 - Depo. Ex. 119, pp. 19-20).


**Significant SIA Terms**

220.   The Managing Partners and Craton and Kruse designed the SIA to control NPPII's affairs after the Buy-Sell Notes were issued.  (App. 136 - Depo. Ex. 40, p. 15).

*a)  Lifting Impairment Circumstance Only for SIA Parties*

221.   For example, the power to manage and control the business and affairs of NPPII included the power to declare an Impairment Circumstance.  (App. 7 - Depo. Ex. 1, p. 7).

222.   However, the SIA provided in section 4:

> Lifting of Impairment Circumstance.  The determination of *when* to lift the Impairment Circumstance shall be made by the Managing Partners as contemplated by the Buy-Sell Agreement *except* that NPPII agrees the Impairment Circumstance shall be lifted within 15 days of … (i) the close of the fiscal month after the fiscal month that includes the IC Date as of which NPPII had working capital of $250,000 or more as of the last day of such fiscal month.

(App. 128 - Depo. Ex. 40, p. 7) (emphasis added).

20

223.    The SIA also provided in section 5(c)(4)(vi):

> NPPII shall not have the right or authority after the IC Date to declare another Impairment Circumstance or Material Condition under the Buy-Sell Agreement with respect to any payments of the Purchase Prices or any accrued interest thereon to the respective *SIA Parties* pursuant to this Agreement.

(App. 131 - Depo. Ex. 40, p. 10) (emphasis added).

224.    In essence, these SIA terms meant that the Managing Partners could never declare an Impairment Circumstance going forward as to any dissociated partner who signed the SIA. (App. 131 - Depo. Ex. 40, p. 10).

225.    In accordance with the SIA, the Impairment Circumstance was not lifted for dissociated partners who did not sign the SIA.  (App. 127-131 - Depo. Ex. 40, pp. 6-10; App. 242-244, 569 - Depo. Exs. 94, 95, 225; Ap. 634 - Schut Depo., p. 411).

226.    Lifting the Impairment Circumstance enabled all SIA Parties to receive the $10.5 million Nebraska Pork distribution.  (App. 51-52 - Depo. Ex. 2, pp. 15-16; App. 128, 131 - Depo. Ex. 40, pp. 7, 10).

227.    The SIA was designed to provide incentives to dissociated partners to sign the SIA because the Managing Partners would selectively lift the Impairment Circumstance, agree that the Impairment Circumstance could never be declared against a party to the SIA and allow SIA Parties to receive payments which would not be made to dissociated partners who did not sign the SIA. (App. 122-147, 242, 569 - Depo. Exs. 40, 42, 94, 225; App. 625 - Schut Depo., pp. 262-263).

### b)  *Pledge of Subsidiaries' Assets*

228.    The SIA required subsidiaries of NPPII to enter into certain mortgages, pledge agreements and security agreements which granted the IC Committee, as collateral agent for the SIA dissociated partners, secured interests in the assets of each subsidiary.  (App. 122-145 - Depo. Ex. 40, pp. 11-12, 20 & attachments C-E).

229.    The SIA, in effect, allowed the SIA Parties to own and control NPPII's subsidiaries and, if a subsidiary's assets were sold, the funds from such a transaction would "go directly to the SIA Parties" and "bypass" NPPII.  (App. 558-560 - Depo. Ex. 218).

230.    The pledge of subsidiaries' collateral in the SIA was used in an attempt to elevate the status of SIA Parties from unsecured creditors to Senior Lenders.  (App. 148-149 - Depo. Ex. 42).

231.    None of the subsidiaries owed any debt to any dissociated partners and the pledge of collateral did not benefit any subsidiary.  (App. 611-612 - Schmitz Depo., pp. 193-195; App. 593 - Beach Depo., p. 317).

232.    Under the SIA, the SIA Parties who were post-impairment dissociated partners were "Senior Lenders," while post-impairment dissociated partners who did not sign the SIA were "unsecured creditors."  (App. 148-149 - Depo. Ex. 42).

### c)  *Retroactive Interest Paid*

233.    The form of note attached to the Buy-Sell Agreement indicates interest is paid from the date "hereof"—that is, the date such note is issued.  (App. 63 - Depo. Ex. 2, p. 26).

234. The SIA required that the Partnership pay interest to post-impairment dissociated partners from the *date of their respective dissociation* as opposed to the *date of the issuance* of the Buy-Sell Note. (App. 128 - Depo. Ex. 40, p. 7).

235. Questions were raised by Craton and Kruse as to why interest would be paid retroactively to post-impairment dissociated partners, but they conceded that point due to the pay-out they would receive. (App. 176-177, 182 - Depo. Exs. 55, 59).

236. Company counsel advised the Managing Partners of the risk to the Partnership by paying post-impairment dissociated partners retroactive interest to the date of such person's dissociation. (App. 475 - Depo. Ex. 174, p. 4; App. 635, 639-640 - Schut Depo., pp. 460-461, 632-633).

237. Company counsel knew the amount of retroactive interest to the date of dissociation for post-impairment dissociated partners was "a healthy number" in the millions of dollars and such debt, isolated by itself, was not good for the Partnership. (App. 639-640 - Schut Depo., pp. 634-635).

238. The Managing Partners, all of whom were post-impairment dissociated partners, insisted retroactive interest had to be paid to them because all dissociated partners had to be treated equally. (App. 609 - Schmitz Depo., pp. 154-155).

239. The Managing Partners' decision to pay retroactive interest to post-impairment dissociated partners cost the Partnership in excess of *$4,150,000* and was paid from the $10.5 million distribution of Nebraska Pork proceeds. (App. 112-115 - Depo. Ex. 35; App. 635-636 - Schut Depo., pp. 460-461, 464-465; Excel Spreadsheet).[9]

240. The Managing Partners were paid $568,996 in retroactive interest. (App. 647 - 653 - Excel Spreadsheet).

### d) Delegation of Power to Settle With Other Creditors

241. Section 9 of the SIA created the IC Committee which had the right to: "*negotiate* and enter into settlement or other agreements with anyone or more of the holders of any of the *Subordinated Debt* or any of the *creditors* of NPPII, including agreeing to make payments to one or more such holders of Subordinated Debt or other creditors and in such amounts and upon such terms as are determined by the IC Committee." (App. 136 - Depo. Ex. 40, p. 15) (emphasis added).

242. The SIA, in effect, took away NPPII's power to settle claims by Subdebt holders or other creditors and transferred it to the IC Committee. (App. 7 - Depo. Ex. 1, p. 7; App. 136 - Depo. Ex. 40, p. 15; App. 542-545 - Depo. Ex. 207).

243. The only duty placed on the IC Committee under the SIA was to act for the SIA Parties in a manner that was not "reckless, fraudulent or involved willful misconduct." (App. 135-136 - Depo. Ex. 40, pp. 14-15).

### e) Limitations on Payments by Managing Partners

244. The SIA placed other obligations on the Partnership, including limitations on the payment authority of Managing Partners and the restriction that the Managing Partners could not take action without prior IC Committee approval. (App. 128-132, 136 - Depo. Ex. 40, pp. 7-11, 15).

---

[9]  The SIA Parties were to be paid compound interest for accrued but unpaid interest commencing December 31, 2011. (¶5(c)(3)). Neither the Partnership Agreement nor the Buy-Sell Agreement allowed for such interest payments and company counsel advised against payment of compound interest. (App. 640 - Schut Depo., p. 637).

245.    For example, the SIA required NPPII to pay all excess working capital (above a minimal threshold) to SIA Parties.  (App. 130 - Depo. Ex. 40, p. 9).  No provision in the Partnership Agreement or Buy-Sell Agreement obligated NPPII to do so.

246.    Upon default by NPPII under any payment obligation in the SIA, all assets of NPPII were to be sold and reduced to cash.  No provision in the Partnership Agreement or Buy-Sell Agreement obligated NPPII to sell all assets and reduce those assets to cash.

   f)   *No Contract or Statute Required Payment of Legal Fees*

247.    NPPII was not obligated to pay legal fees to Craton and Kruse under the Partnership Agreement and Buy-Sell Agreement even if such fees were incurred in connection with enforcement under those agreements.  (App. 1-64 - Depo. Exs. 1, 2).

248.    No Iowa statute required the Iowa state court to award Craton and Kruse their legal fees.

249.    However, the SIA provided for reimbursement of legal fees to Craton and Kruse. (App. 125 - Depo. Ex. 40, p. 4; App. 257-258 - Depo. Ex. 111).

**Invalidation Provisions**

250.    Efforts were taken to address concerns over whether the SIA was valid or enforceable. (App. 558-561 - Depo. Exs. 218, 219).

251.    For example, the mortgage did "not contain the representations and covenants that one often finds in a mortgage." (App. 557 - Depo. Ex. 217).

252.    Nor would NPPII "represent that it has the authority [to] deliver the Pledge Agreement or that it is valid and binding" due to concerns over whether the SIA could be invalidated. (App. 562 - Depo. Ex. 221).

253.    A representation regarding authority to deliver a pledge agreement and the validity and binding nature of such an agreement were fairly common in transactions of this size. (App. 637 - Schut Depo., pp. 541-542).

254.    The SIA contains several provisions which address what happens if the agreement is invalidated.  (App. 129, 132, 137 - Depo. Ex. 40, pp. 8, 11, 16).

**SIA Premise**

255.    In their depositions, two Managing Partners stated that the SIA was premised on dissociated equity having priority over Subdebt. (App. 613 - Schmitz Depo., p. 203; App. 591 - Beach Depo., p. 293).

256.    In his deposition, former counsel to the Company stated that if that premise was wrong, then the SIA should be deemed invalid. (App. 635 - Schut Depo., pp. 459-460).

**Not In Ordinary Course of Business**

257.    Section 4.12(e) of the Partnership Agreement required partner action for any act or matter for which a vote of the partners required by Iowa law.  (App. 10-11 - Depo. Ex. 1, pp.10-11).

258.    Iowa law requires partner approval for transactions which are not in the ordinary course of business.  See Iowa Code §486A.401(10).

23

259.    The Buy-Sell Agreement needed to be amended for any transaction that was not in the ordinary course of business.  (App. 636 - Schut Depo., p. 464).

260.    No such amendment was made when the Company issued Buy-Sell Notes to dissociated partners who signed the SIA.

261.    According to company counsel, the Buy-Sell Agreement was not amended because the changes were to the SIA.  (App. 636 - Schut Depo., p. 464).

262.    Although company counsel sought to "clarify" his testimony seven days later, in his initial deposition, company counsel stated that the SIA was not in the ordinary course of business of NPPII.  (App. 625-628 - Schut Depo., pp. 265-266, 278-279; App. 610 - Schmitz Depo., p. 161).

## IC Committee Actions

263.    Pursuant to the SIA, five members needed to be elected by the SIA Parties to be the members on the IC Committee.  (App. 414-416 - Depo. Exs. 131, 133).

264.    The Managing Partners supported the election of Craton and Kruse to the IC Committee and let others know that without the efforts of Craton and Kruse, there "would not have been a settlement and *subdebt would be priority.*"  (App. 554 - Depo. Ex. 213) (emphasis added).

265.    The IC Committee controlled the Partnership and proceeded with handling Partnership affairs as they saw fit.  (App. 414 - Depo. Ex. 131).

266.    On January 13, 2012, the IC Committee entered into a reservation of rights agreement with Diane Weihs regarding her units.  (App. 406-409 - Depo. Ex. 121).

267.    The IC Committee also addressed issues involving the Subdebt of Lawrence Handlos and another Subdebt claim.  (App. 414 - Depo. Ex. 131).

268.    All actions taken by the IC Committee were passed by unanimous vote.  (App. 415-419 - Depo. Exs. 133, 134).