**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF IOWA**

| | | |
|---|---|---|
| In re: | ) | Lead Case No. 12-02872-als11 |
| **NATURAL PORK PRODUCTION, II, LLP** | ) | |
| | ) | Chapter 11 |
| Debtor and Debtor in Possession. | ) | |
| | ) | Hon. Anita L. Shodeen |
| P.O. Box 468 | ) | |
| Harlan, IA 51537 | ) | |
| | ) | |
| EIN: 03-0480873 | ) | |
| **CRAWFORDSVILLE, LLC** | ) | Affiliated Case No. 12-03748-als11 |
| | ) | |
| Debtor and Debtor in Possession | ) | |
| | ) | |
| EIN: 26-2579415 | ) | |
| **BRAYTON, LLC** | ) | Affiliated Case No. 12-03749-als11 |
| | ) | |
| Debtor and Debtor in Possession | ) | |
| | ) | |
| EIN: 26-2579316 | ) | |
| **NORTH HARLAN, LLC** | ) | Affiliated Case No. 12-03750-als11 |
| | ) | |
| Debtor and Debtor in Possession | ) | |
| | ) | |
| EIN: 26-2579476 | ) | |
| **SOUTH HARLAN, LLC** | ) | Affiliated Case No. 12-03751-als11 |
| | ) | |
| Debtor and Debtor in Possession | ) | |
| | ) | |
| EIN: 26-2579560 | ) | |

**JOINT RESPONSE OF THE PLAN PROPONENTS TO**
**THE IC COMMITTEE OBJECTION TO DISCLOSURE STATEMENT**

The Debtors and Debtors-in-Possession NATURAL PORK PRODUCTION, II, LLP

("Natural Pork"), CRAWFORDSVILLE, LLC ("Crawfordsville"), BRAYTON, LLC

("Brayton"), NORTH HARLAN, LLC ("North Harlan"), and SOUTH HARLAN, LLC ("South

Harlan") (hereinafter referred to as "NPPII" or "Debtors") and the Official Committee of

Unsecured Creditors of each of the Debtors (the "Committee," and with the Debtors, the "Plan

Proponents") hereby respond to the objection lodged by the IC Committee ("ICC") to approval of the Disclosure Statement filed in support of the Joint Liquidating Plan of Reorganization dated January 21, 2014 (the "Joint Plan").

1.    The ICC objects to approval of the Disclosure Statement filed in support of the Joint Plan on a number of grounds large and small.  The Plan Proponents have addressed certain objections with the filing of First Amended Joint Plan of Reorganization dated April 2, 2014 ("Amended Joint Plan"), and the accompanying amended Disclosure Statement in support of the Amended Joint Plan which was also filed April 2, 2014.  Other objections have no merit.

2.    The Amended Joint Plan and accompanying Disclosure Statement have been works in process for several weeks.  While the changes described herein address any material objections lodged by the ICC, they were not made in response to those objections but based on assessments made by the Plan Proponents that have led to refinements in plan structure, where appropriate, and informational corrections, where necessary.  All are discussed below.

<u>**Confirmation Objections**</u>

3.    The ICC's first objections are confirmation objections.  First, the ICC contends that the Joint Plan had a fatal flaw - the inability to secure an accepting impaired class of creditors – based on the prediction that the only impaired class of creditors identified in the initial Joint Plan (Class 6) will assuredly reject the Joint Plan.  The ICC also contends that the Joint Plan is not feasible on its face because it is allegedly premised on the Debtors' victory against all defendants in the Adversary Proceedings -- in particular, the proceeding that all parties in this case informally refer to as the Priority Litigation (Adv. Pro. 12-30098), which is currently scheduled for trial commencing April 28, 2014.

4.       The Plan Proponents have refined the Joint Plan's claim classification and reserve structure in a manner that resolves both objections.

*Accepting Impaired Class*

5.       As an initial matter, the Plan Proponents do not concede that they cannot secure Class 6 as an accepting impaired class.  The Plan Proponents submit that the overall settlement structure in the Amended Joint Plan provides significant incentives to members of the ICC's constituency to vote for the Amended Joint Plan.  It is certainly possible that a sufficient number of ICC members (all of which have Class 6 claims) will accept the Amended Joint Plan to make Class 6 an accepting impaired class.

6.       Furthermore, Class 9 in the Amended Joint Plan, which is a class of holders of unsecured subordinated debt that does not overlap with the ICC constituents, is an impaired class.  Class 9 (along with Class 8 – trade creditors) will be receiving post-petition interest on their claims at the rate of 3% based on the premise that the estates' are solvent under the capital structure proposed in the Amended Joint Plan.  As 3% is less than the contract rate under the applicable subordinated notes, which is typically 9% but can vary from 5 to 12%, Class 9 creditors are impaired, and thus entitled to vote.[1]

---

[1]       Under the Bankruptcy Code, any impairment to a creditor's contractual right of interest is "impairment" that creates a right to vote.  See 11 U.S.C. § 1124.  "Under § 1124, a class of claims or interests is impaired unless the plan 'leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." *Cutcliff v. Reuter (In re Reuter)*, 427 B.R. 727, 773 (Bankr. W.D. Mo. 2010).  The *Reuter* court further explains:  "Impairment is a term of art, extending beyond a worsening of a creditor's position to include virtually any alteration of the rights of interested parties beyond those specifically designated in § 1124 as not affecting impairment.   Any impairment, no matter how insignificant, renders the entire claim impaired under the plan. *Id.* at 773-74 *(internal citations omitted)*.

7.     Assuming a prediction about class voting is a basis for approving, or not, a Disclosure Statement, the Plan Proponents look into the ICC's crystal ball and predict that the creditors in Class 9 will vote to accept the Amended Joint Plan.

### *Contested Interests Reserve*

8.     The Amended Joint Plan contains a mechanism – the Contested Interests Reserve – that protects the economic interests of ICC members that vote against – or opt out – of the Amended Joint Plan and, in effect, go "all in" on the outcome of the Priority Litigation and other pending adversary proceedings.

9.     The Plan Proponents have created Class 15 which will control the distribution rights of ICC members that vote against the Amended Joint Plan.  An opt-out party's right to distribution on account of its dissociated interest (defined as "Dissociated Equity Interest" under the Amended Joint Plan) will be assigned from Class 14 to Class 15, and a reserve in the amount of that party's Class 6 claim, if such claim was allowed in full, will be established through the Contested Interests Reserve.  This structure will preserve the economic interests of ICC members that select "litigation to judgment" as their option for determining their rights, as opposed to accepting their treatment under the Amended Joint Plan, pending the outcome of litigation.  If the ICC prevails in that litigation, such members will be paid their Class 6 claim amount from the Contested Interests Reserve.  If the Debtors prevail, however, the cash in the Contested Interests Reserve will be forfeited by the losing parties, and will be assigned to the Equity Interests Fund for redistribution to Classes 13 and 14.

10.     The ICC members presently assert that their Class 6 claims exceed $18 million. ICC Objection, p. 9, ¶ 17(a).[2]  There is currently sufficient cash in the Debtors' accounts to

---

[2]     It is worth noting there that under the ICC's view of the world, at least $18 million of the remaining available cash belongs to the ICC members.  If $18 million plus is paid to Class 6, then the Debtors would not be

satisfy such claims in full – approximately $20 million - and therefore sufficient cash to reserve for such claims even assuming every ICC member votes against the Amended Joint Plan.  The necessary size of the Contested Interests Reserve cannot be determined, however, until voting is completed.  The Plan Proponents (once again looking into the ICC's crystal ball) accept that some ICC members will opt out of the Amended Joint Plan, but also predict that the Contested Interests Reserve will require substantially less than $18 million once the votes have been tallied.

### Alleged Inaccuracies

11.      The ICC also complains about alleged inaccuracies in the Disclosure Statement.  The Plan Proponents welcome such comments to the extent they prove correct, or lead the Plan Proponents to clarify a section.

12.      The ICC complained about the addition of the statement of facts currently appended as Exhibit A to the Disclosure Statement, and to its characterization in the Disclosure Statement as "undisputed."  This was a valid comment, and it has been corrected.  The Disclosure Statement continues to include Exhibit A, but the Disclosure Statement now clarifies that Exhibit A presents the facts as presented by the Debtors in the Priority Litigation.  The Disclosure Statement also encourages interested parties to review the pleadings filed in the Priority Litigation if they want further information about the positions taken by the litigants in that action.

13.      The Disclosure Statement has been amended to note that the cross-motions for summary judgment filed by the Debtors, the ICC, and creditor Purina Mills, LLC, were all denied by this Court in January 2014.

---

able to pay even trade creditors (Class 8) in full.  It would be the ultimate irony (or is it tragedy) in this case if the partners that abandoned the Debtors' ship in 2008 precisely because the ship was beginning to flounder manage to leapfrog themselves ahead of the innocent businesses that continued to do business with the Debtors.

14.     The ICC asserts that the description of the outcome of the Iowa state court litigation captioned <u>Craton Capital, L.P. v. Natural Pork Production II, LP</u> is "materially misleading."  ICC Objection, p. 8, ¶ 17(a).  While that court did rule that partners that dissociated pre-impairment were entitled to receive debt instruments, the Plan Proponents believe that the Settlement and Intercreditor Agreement to which all ICC members (led by the state court plaintiff, Craton Capital, L.P.) signed on amounted to a consensual elimination of the distinction between pre- and post-impairment dissociation.  In effect, Craton Capital, L.P., and the few other pre-impairment dissociated parties went "all in" with the balance of the dissociated partners.  For the ICC to now contend that the Plan Proponents should acknowledge a distinction between pre- and post-impairment dissociated parties that the ICC itself <u>does not acknowledge</u> is the height of irony.

15.     The ICC ratchets up the volume by claiming that the description of the Iowa state court captioned <u>IC Committee v. Lawrence Handlos</u> is "patently false."  ICC Objection, p. 9, ¶ 17(b).  The only thing patently false here is the ICC's description of that litigation.  Among other things, the Iowa state court did <u>not</u> hold, as the ICC contends, that "the case against Mr. Handlos personally is not related to NPPII's bankruptcy proceeding."  The order in that court speaks for itself, and is attached hereto as <u>Exhibit A</u>.  In any event, every allegation made against Mr. Handlos in that litigation relates to his acting in the capacity as managing partner of lead debtor NPPII, and the allegations in the original petition, filed less than two weeks before these cases commenced, were almost immediately parroted by the ICC in its failed attempt in these cases to oust Mr. Handlos in favor of a chapter 11 trustee.  The Petition is attached as <u>Exhibit B</u>.  It is not a stretch to describe the action against Mr. Handlos as a litigation that involves the Debtors.

16.     The Plan Proponents have also made corrections to the debt or payment figures attributed to certain parties in the Amended Joint Plan and Disclosure Statement, including the amounts that pertain to Michael Westphalen and Mark Zaccone.  ICC Objection, p. 11, ¶ 17(g).

17.     The Plan Proponents have also modified the description of the issuance of subordinated notes to the parties in Class 9 to address the ICC's concerns.  ICC Objection, p. 10, ¶ 17(d).

### Other Objections

18.     The ICC disputes the inclusion of claims by Purina Mills, LLC, Trupointe Cooperative, Inc., and a claim by Gary Weihs for development fees in Class 8, which includes trade debt.  ICC Objection, p. 9, ¶ 17(c).  The claims held by these parties relate to obligations incurred in the course of conducting business transactions with the Debtors, and are therefore can be distinguished from the debt placed in Class 9, which involves an investment in the Debtors. Both Class 8 and 9 will receive post-petition interest at 3%.  The impact of allowing such interest until the claims are paid should be obvious to readers, but in any event, cannot be accurately reported because the Plan Proponents do not know when such claims will be paid.

19.     After consultation with the Debtors' long-time operations administrator, the Plan Proponents have corrected the characterization of the January 2012 Distribution as a payment made on account of an equity interest.  ICC Objection, p. 10-11, ¶ 17(f).

### Conclusion

20.      The Plan Proponents believe that the amended Disclosure Statement filed in connection with the Amended Joint Plan contains more than the adequate information required by 11 U.S.C. § 1125, and should be approved.

Dated:  April 2, 2014

| | |
|---|---|
| **Natural Pork Production II, LLP., Crawfordsville, LLC, Brayton, LLC, North Harlan, LLC, South Harlan, LLC, Debtors and Debtors in Possession** | **Official Committee of Unsecured Creditors of Natural Pork Production II, LLP., Crawfordsville, LLC, Brayton, LLC, North Harlan, LLC, South Harlan, LLC** |
| /s/   Jeffrey D. Goetz | /s/  Aaron L. Hammer |
| Jeffrey D. Goetz, Esq., IS# 9999366<br>Bradshaw, Fowler, Proctor & Fairgrave, P.C.<br>801 Grand Avenue, Suite 3700<br>Des Moines, IA 50309-8004<br>515/246-5817<br>515/246-5808 FAX<br>goetz.jeffrey@bradshawlaw.com | Aaron L. Hammer, Esq.<br>Mark S. Melickian, Esq.<br>Sugar Felsenthal Grais & Hammer LLP<br>30 N. LaSalle Street, Ste. 3000<br>Chicago, IL  60602<br>312/704-9400<br>312/372-7951  FAX<br>ahammer@sugarfgh.com<br>mmelickian@sugarfgh.com |
| General Reorganization Counsel for Natural Pork Production II, LLP., and its wholly-owned subsidiaries: Crawfordsville, LLC, Brayton, LLC, North Harlan, LLC, South Harlan, LLC, Debtors and Plan Proponents | Counsel to the Official Committee of Unsecured Creditors |

CERTIFICATE OF SERVICE:  This document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing.
*/s/      Barbara Warner*

DEC 1 ? 2012

## IN THE IOWA DISTRICT COURT FOR SHELBY COUNTY

| | |
|---|---|
| IC COMMITTEE,<br><br>        Plaintiff,<br><br>v.<br><br>LAWRENCE HANDLOS,<br><br>        Defendant. | Case No. 04831 LACV019402<br><br>ORDER |

This matter came before the Court on Defendant's Motion to Dismiss on September 19, 2012. Rebecca A. Brommel appeared for the IC Committee ("Plaintiff"). Lawrence Handlos ("Defendant") appeared through his counsel of record, Jason M. Casini. Having received the materials submitted by the parties and heard the arguments of counsel, the Court finds the following:

## I.    Background Facts and Proceedings

On or about August 20, 2012, Plaintiff filed a Petition and Jury Demand in this case, alleging breach of a fiduciary duty.

The parties are also both involved litigation in Polk County. Case No. QCE071355. In the Polk County case, Defendant and his wife, Doris Handlos, sued the IC Committee as creditors of Natural Pork Production II, LLC ("NPPII"), claiming unjust enrichment and seeking a declaratory judgment.

The factual basis giving rise to the current claim is as follows: On November 30, 2011, NPPII entered in to a settlement and intercreditor agreement. Prior to entering this agreement, NPPII became insolvent and declared an "impairment circumstance." Due to NPPII's insolvency, the partnership interests of NPPII are worthless. This has resulted in increased risk

for NPPII's partners as NPPII liquidates its assets.  On April 3, 2012, Doris and Lawrence Handlos, who collectively own 76% of the outstanding, worthless NPPII partnership units, voted to remove then-current managing partners Ron Beach and Steve Schmitz.  The remaining then-current managing partner, Wendell Burge, resigned, leaving NPPII without any managing partners.  Doris and Lawrence Handlos then voted to install Lawrence Handlos as the sole managing partner of NPPII.  At the same meeting in which Lawrence Handlos was voted to become the sole managing partner, a resolution was adopted that amended the partnership agreement by giving the managing partners the power to "make decisions on behalf of the Partnership concerning litigation and/or potential litigation by the partnership or against the Partnership, including retention of legal counsel by the Partnership."  The actions Mr. Handlos took at the partner meeting and subsequently are the basis for the current suit in Shelby County.

These two cases are distinguishable in a number of ways.  In the Polk County case, Defendant and his wife, Doris, sued strictly in their capacity as creditors.  However, in the case at bar, Defendant is being sued strictly in his individual capacity.  In addition, the case at bar solely seeks monetary damages, whereas the Polk County case seeks both a declaratory judgment and equitable relief.

The claims involved in the two actions are distinct as well.  In the current action, Defendant is being sued for breaching his fiduciary duty by placing his own interest before that of NPPII.  The issues in the Polk County case are much broader and include the priority of debt; subordinate debt; payment obligations of dissociated partners through the settlement and intercreditor agreement; NPPII's obligations to purchase the partnership units of dissociated partners who sent notice of dissociation after the impairment circumstance was declared and any obligations of promissory notes/interest accumulation; and unjust enrichment interference with

2

the management of NPPII.

Both the Shelby County and Polk County causes of action consider the validity and effect of the settlement and intercreditor agreement entered between NPPII and various other settlement and intercreditor agreement participants. However, the case at bar limits that effect to how the assets from NPPII should be calculated and divided. The Polk County case focuses on the settlement agreement in terms of the status of the agreement, *i.e.*, whether it should be revoked, rescinded, modified, or reformed, and what terms would be considered material in it, specifically the rights and obligations of the actors involved and the priority of debt. In addition, the Polk County case considered whether the settlement agreement would be enforceable against NPPII. The Polk County action is still currently pending.

## II.    Standard for Motion To Dismiss

The decision to sustain or overrule a motion to dismiss must rest on legal grounds. *Hornby v. State*, 559 N.W.2d 23, 24 (Iowa 1997). The court views the plaintiff's petition in the light most favorable to the plaintiff. *Sanford v. Manternach*, 601 N.W.2d 360, 363 (Iowa 1999). Thus, facts alleged in the petition are regarded as true. *Hornby*, 559 N.W.2d at 24. The motion to dismiss will be granted "only if the plaintiff's claim could not be sustained under any state of facts provable under the petition." *Sanford*, 601 N.W.2d at 363.

## III.    Ruling of the Court

At issue is whether, given the similar parties and subject matter in dispute in both suits, the Plaintiff is permitted to have this case remain in Shelby County or whether the case should instead be dismissed to be pursued in a different forum. Defendant argues that the two cases are so related as to require dismissing the current case to instead be pursued with the pending litigation in Polk County.

3

Iowa Code § 602.6101 provides in part, "The district court has exclusive, general, and original jurisdiction of all actions, proceedings, and remedies, civil, criminal, probate, and juvenile, except in cases where exclusive or concurrent jurisdiction is conferred upon some other court, tribunal, or administrative body." Iowa Code § 602.6101 (2011). Further, in Iowa, two cases involving the same parties and the same subject matter may not be permitted to proceed at the same time in separate state courts. *Wray v. Wray*, 140 N.W. 414, 415 (Iowa 1913).

Here, however, the Court finds these two cases do not involve the same parties or the same subject matter. Not only do the named parties in the two actions differ, as one includes Doris Handlos, but also, the capacity in which the parties are involved also differs, as one case involves a creditor capacity and the other involves an individual capacity. The subject matter of the two cases is also notably distinct. In the case at bar, the Plaintiff claims Defendant violated his fiduciary duty to creditors, including Plaintiff and the other parties Plaintiff represents under the settlement and intercreditor agreement. In contrast, the Polk County case seeks a declaratory judgment regarding the settlement and intercreditor agreement and its enforceability. None of Defendant Handlos' fiduciary obligations are at issue in the Polk County case. The fact both cases have some connection to the settlement and intercreditor agreement is not sufficient to warrant dismissal. "The fact that the action depends upon the same right or title will not suffice to sustain a plea in abatement. It must involve the same cause of action." *Watson v. Richardson*, 110 Iowa 698, 80 N.W. 416, 417 (citations omitted).

It is established in Iowa that when venue is proper in multiple counties, the Plaintiff may choose the forum in which to file and the manner of making his/her claims there. *See Slattery v. Iowa Dist. Ct.*, 442 N.W.2d 82, 84-85 (Iowa 1989). Further, "In Iowa, there is a long-standing preference for trying cases in the county of a defendant's residence." *Richards v. Anderson*

4

*Erickson Dairy Co.*, 699 N.W. 2d 676, 678-80 (Iowa 2005) (citing *Tull v. Honda Research & Dev., Ltd.*, 469 N.W.2d 683, 686 (Iowa 1991) (tracing preference back to 1851)).

Plaintiff explained the reasoning behind its choice for filing the current cause of action in Shelby County:

> Notably, Shelby County was chosen as the forum for this action, because it would be the Court with personal jurisdiction over Handlos. The actions giving rise to these claims were taken in Handlos' capacity as sole managing partner of NPP, which has its principal place of business in Shelby County. See Petition, ¶¶ 2, 4. Handlos does not dispute that this Court has personal jurisdiction over him. See Handlos' Motion to Dismiss.

Pl.'s Resistance to Def.'s Motion to Dismiss, 6-7, FN 3, September 27, 2012.

Iowa Code § 616.18 provides, "Actions arising out of injuries to a person or damage to property may be brought in the county in which the defendant, or one of the defendants, is a resident or in the county in which the injury or damage is sustained." Iowa Code § 616.18 (2011). Pursuant to Iowa Code § 616.18, Shelby County is a proper venue in which to bring this case, as both NPPII's principal place of business is in Shelby County and both the injury and damage were sustained in Shelby County.

Therefore, as venue is proper in Shelby County and this case is insufficiently related to the Polk County case in terms of both parties and subject matter, the case will not be dismissed to be pursued with other pending litigation in Polk County.

**IV.    Judgment**

IT IS THEREFORE THE ORDER OF THIS COURT that Defendant's Motion to Dismiss is hereby DENIED.

DATED:  December 11, 2012

/s/ KATHLEEN KILNOSKI, JUDGE
IOWA FOURTH JUDICIAL DISTRICT

CC: Ebinger } e-mail
Brommel }
Casini - mail
12-13-12
by WB

5

## IN THE IOWA DISTRICT COURT FOR SHELBY COUNTY

| | |
|---|---|
| IC COMMITTEE | |
| Plaintiff, | NO. _LACV019402_ |
| v. | |
| LAWRENCE HANDLOS, | **ORIGINAL NOTICE** |
| Defendant. | |

You are notified that there is now on file in the office of the clerk of the above court a petition in the above-entitled action, a copy of which petition is attached hereto. The petitioner's attorneys are Rebecca A. Brommel and Louis E. Ebinger of Brown, Winick, Graves, Gross, Baskerville, and Schoenebaum, P.L.C., whose address is 666 Grand Avenue, Suite 2000, Des Moines, Iowa 50309-2510. Their phone number is (515) 242-2400 and facsimile number (515) 242-2488.

You must serve a motion or answer within 20 days after service of this original notice upon you and, within a reasonable time thereafter, file your motion or answer with the Clerk of Court for Shelby County, at the courthouse in Harlan, Iowa. If you do not, judgment by default may be rendered against you for the relief demanded in the petition.

If you require the assistance of auxiliary aids or services to participate in court because of a disability, immediately call your district ADA coordinator at (712) 328-5883. (If you are hearing impaired, call Relay Iowa TTY at 1-800-735-2942).

*Vicki Korkow*

CLERK OF DISTRICT COURT
Shelby County Courthouse
612 Court Street
Harlan, IA 51537

**IMPORTANT**
**YOU ARE ADVISED TO SEEK LEGAL ADVICE AT ONCE TO PROTECT YOUR INTERESTS.**

IN THE IOWA DISTRICT COURT FOR SHELBY COUNTY

| | |
|---|---|
| IC COMMITTEE | |
| Plaintiff, | NO. _LACV019402_ |
| v. | **PETITION AND** |
| LAWRENCE HANDLOS, | **JURY DEMAND** |
| Defendant. | |

COMES NOW the IC Committee and hereby states the following Petition and Jury Demand against Defendant Lawrence Handlos:

## PARTIES AND JURISDICTION

1.      Plaintiff IC Committee is an unincorporated association established under a November 30, 2011 Settlement and Intercreditor Agreement between National Pork Production II, LLC ("NPP") and its dissociated members, the SIA Parties.

2.      Defendant Lawrence Handlos is an individual residing in Audubon County, Iowa. The events giving rise to this Petition relate to Defendant's activities as the sole managing partner of NPP, whose principal place of business is located in Shelby County, Iowa.

3.      The IC Committee has been given authority under section 9 of the Settlement and Intercreditor Agreement to make these claims on behalf of the SIA Parties, as that term is defined in such Agreement.

4.      This court has subject matter jurisdiction under Iowa Code § 602.6101 and venue is proper in the Iowa District Court for Shelby County pursuant to Iowa Code § 616.18.

## BACKGROUND FACTS

5.    On November 30, 2011, NPP, with and on the advice of counsel, entered into the Settlement and Intercreditor Agreement, a copy of which is attached as Exhibit A and by this reference incorporated herein, with Craton Capital, LP, Kruse Investment Company and each "SIA Participant" as that term is defined in such Agreement.

6.    Prior to entering the Settlement and Intercreditor Agreement, NPP determined that it was insolvent and had declared an "Impairment Circumstance." Although the Impairment Circumstance has been lifted, NPP continues to be insolvent and had been involved in the orderly liquidation of its assets since April 4, 2008 and at least through April 3, 2012 under the leadership of three duly and validly elected Managing Partners, Ron Beach, Wendell Burge and Steve Schmitz. Notably, at NPP's May 28, 2008 partnership meeting, Handlos voted in favor of the "Resolution Authorizing Amendments to Partnership Agreement to Eliminate Requirement that Managing Partners be Partners." This resolution provided the basis for the election of Messrs. Beach, Burge, and Schmitz as Managing Partners.

7.    Both NPP and the SIA Parties (former partners of NPP who disassociated from NPP as provided in its partnership agreement and are today owed in excess of $15.3 million) gave and received consideration for entering into the Settlement and Intercreditor Agreement. This consideration included, but was not limited to, SIA Participants "giving up" the requirement that NPP make twenty percent (20%) cash down payments upon their Promissory Notes plus the accrued and unpaid interest on such Promissory Notes, the issuance of which resulted from the Iowa Court of Appeals decision in Craton Capital, et. al. v. Natural Pork Production II, LLP, 2011 WL 441390 (Iowa Ct. App. 2011), and a copy of which is attached hereto as Exhibit B.

2

The twenty percent (20%) cash down payments to Craton Capital, L.P. and Kruse Investment Company alone would have exceeded $855,000. The SIA Participants also agreed that NPP only had to make payments on the Promissory Notes under certain specified circumstances, essentially only as available "excess cash" allowed such payments to be made.    These concessions by NPP's dissociated partners prevented a race to the courthouse amongst them and allowed NPP to liquidate in an orderly fashion. In return, NPP granted a second position security interest in substantially all of its assets to the IC Committee (for the benefit of all SIA Parties) and granted to the IC Committee certain other rights all as set forth in the Settlement and Intercreditor Agreement.    Collectively, these terms allowed NPP to continue with the orderly liquidation of its assets for the benefit of its creditors.

8.    Section 5 of the Settlement and Intercreditor Agreement sets forth the payment obligations of NPP to the SIA Parties.   Under Section 5(c)(4)(ii), NPP is required to make a monthly payment to each SIA Party of the SIA Pro Rata Amount. The SIA Pro Rata Amount is determined pursuant to an "excess cash" formula set forth in that Section of the Agreement.

9.    It is undisputed that NPP is hopelessly insolvent.   Plaintiff will provide NPP's most recently available balance sheet for review by the Court in camera and under seal at the Court's request. Since April 4, 2008, NPP is and has been engaged in an orderly liquidation of its assets. Due to its insolvency, the partnership interests of NPP (including the partnership interests held by Defendant Lawrence Handlos and his wife, Doris Handlos, collectively, "the Handloses") have been, are, and will remain worthless. As a result, NPP's creditors are now the residual risk bearers of any transactions that occur while NPP liquidates. Due to this reality, the fiduciary duties of NPP's managers have shifted from NPP's partners to NPP's creditors,

3

including particularly the IC Committee, which represents the interests of the SIA Parties. See,

e.g., In re Tri-River Trading, LLC, 329 B.R. 252, 266 (B.A.P. 8th Cir. 2005); White v. Shaff,

2001 WL 855307 at *2 (Iowa Ct. App. 2001); In re Lemington Home for Aged, 659 F.3d 282

(3d Cir. 2011) ("fiduciary duties owed by directors and officers of a corporation . . . are owed not

only to the corporation and its shareholders, but also to the creditors of an insolvent entity").

10.    On April 3, 2012, Lawrence Handlos, who elected not to dissociate from NPP and

become a creditor of NPP like the vast majority of other NPP partners, convened through his law

firm, Whitfield & Eddy, PLC, a Special Meeting of the partners of NPP (the "Handlos Partner

Meeting"). The Handlos Partner Meeting was held at the law offices of Whitfield & Eddy and

the meeting was run by the Handloses' attorney, Jay Casini.

11.    At the Handlos Partner Meeting, among other actions, the Handloses, who hold

approximately 76% of the outstanding, worthless partnership units of NPP, voted to remove

then-current managing partners Ron Beach and Steve Schmitz. Messrs. Beach and Schmitz had

been appointed as managing partners of NPP at a duly noticed and properly held meeting of the

NPP partners on July 11, 2007 and had been the two managers primarily involved in all aspects

of the orderly liquidation of NPP. After the removal of Messrs. Beach and Schmitz by the

Handloses, the remaining then-current managing partner, Wendell Burge, resigned. Immediately

following these votes and actions, NPP was left without any managing partners. The Handloses

then voted to install Lawrence Handlos as the sole managing partner of NPP.

12.    Additionally, at the Handlos Partner Meeting, a resolution was adopted that

specifically amended the current partnership agreement of NPP and gave the Managing Partners

(now solely Mr. Handlos) the power to "make decisions on behalf of the Partnership concerning

4

litigation and/or potential litigation by the Partnership or against the Partnership, including retention of legal counsel by the Partnership." The adopted resolution is attached hereto as Exhibit C.

13.    Mr. Handlos, now the sole managing partner for NPP, is currently suing the IC Committee in his individual capacity as the holder of worthless partnership units in NPP and/or in his capacity as a holder of debt instruments of NPP that are junior to all other debts of NPP of any kind and nature. At the same time, NPP, at the direction of Mr. Handlos, wearing his other hat as the sole managing partner of NPP, is also suing the IC Committee. The IC Committee represents former NPP partners who properly dissociated from NPP under the NPP partnership agreement and are now the primary creditors of NPP as described in the Settlement and Intercreditor Agreement, also referred to as the SIA. The SIA settled pending litigation between NPP and the disassociated partners of NPP, and was negotiated by NPP through Messrs. Beach, Schmitz and Burge when NPP was represented by the Nyemaster, Goode, West, Hansell & O'Brien, P.C. law firm. Both of these lawsuits are currently pending in the Iowa District Court for Polk County.

14.    The IC Committee has previously notified counsel for the Handloses of the serious implications of the removal of the former managing partners and the installation of Mr. Handlos as the managing partner, both with respect to Mr. Handlos and to the creditors of NPP, including Mr. Handlos as a holder of approximately $3.4 million of the subordinated debt of NPP, a class of debt junior to that of all other debt held by the creditors of NPP, including the secured noteholders that the IC Committee represents. The February 21, 2012 letter detailing such implications is attached hereto as Exhibit D. In response, Handloses' counsel indicated

5

that he would convey IC Committee's "positions as set forth in the letter" to NPP's partners at the Handlos Partner Meeting, though that did not in fact occur at such meeting. See February 24, 2012 letter from Jason M. Casini, attached hereto as Exhibit E.

15.    All of the actions taken at the Handlos Partner Meeting give Mr. Handlos, as the sole managing partner, the authority to prefer his own interests and that of his wife over the interests of NPP's creditors, including those NPP noteholders represented by the IC Committee. The conflicting interests of Handlos are both significant and many. The Handloses own approximately 76% of the worthless partnership units of NPP, which although worthless in economic value allowed the Handloses to remove the then-managing partners and install Mr. Handlos as the sole managing partner. The Handloses are also the largest holders of the subordinated debt of NPP. The Handloses also lease material properties – specifically swine farrowing and gilt farms in the state of Iowa - from NPP. These leases contain a purchase option in favor of the Handloses that allows the Handloses to purchase the farms from NPP at a price to be agreed upon by NPP and the Handloses, who now control the decisions on both sides of the transaction.

16.    The actual and potential conflicts of interest and the complete disregard of Mr. Handlos as to his fiduciary duties to the creditors of NPP, and in particular the noteholders represented by the IC Committee, are abundant and are already beginning to surface through Mr. Handlos' actions. For example, Mr. Handlos prevented NPP from making a required payment to the SIA Parties under the SIA that was due on or about April 23, 2012. Upon information and belief, the amount of such payment would have been approximately $500,000. This action was taken because Mr. Handlos (and now NPP as well, through counsel directed by Mr. Handlos and

6

Mr. Casini) have taken the position that the SIA is invalid, which is an issue to be decided as part of the pending cases in Polk County.

17.    In addition, at the Handlos Partner Meeting, Mr. Handlos indicated that he does not intend to proceed with a pending sale of certain major assets of NPP to pay off NPP's creditors, including the parties represented by IC Committee. These assets are known as the Crawfordsville and Colfax swine farrowing operations, and they are currently operated by NPP under Weaned Pig Purchase Agreements with parties unrelated to the Handloses. Upon information and belief, Mr. Handlos' reversal of NPP's prior plan to sell these assets may well cause the buyer to withdraw its offer and is also likely to impact the continuance of the Weaned Pig Purchase Agreements. It is uncertain if another buyer (other than Mr. Handlos, who is currently leasing certain NPP swine production assets himself, with an option to buy such assets) could be found. NPP's counsel has recently confirmed that NPP is not actively marketing the properties, in spite of deteriorating market conditions. See Exhibit F.

18.    In addition to failing to complete the sale of the Crawfordsville and Colfax swine farrowing operations, Mr. Handlos has also failed to move forward with two other sales of distressed assets owned by NPP. Prior to the Handlos Partner Meeting, NPP was in the process of putting together the final terms for the sale of a facility referred to as Williamsburg, which is located in Indiana. The Williamsburg facility is an abandoned site with lagoons that has been sitting empty for more than five (5) years. Upon information and belief, the Indiana Department of Environmental Management will require NPP to close up the Williamsburg facility if the sale is not completed. It is believed that the cost of closing such facility may be in excess of the purchase price that NPP could obtain from the willing buyer. NPP was also in negotiations to

7

sell a facility referred to as Romania, which like Williamsburg, is not in operation. It took NPP a number of years to locate willing buyers for these properties and now that Mr. Handlos has become the sole Managing Partner, all such discussions to finalize such sales have ended. See Exhibit F. Because of this, it is possible that NPP will lose out on the opportunity to sell such facilities and in turn, incur more expenses to the detriment of its creditors.

19. Mr. Handlos has taken other actions to exploit his conflicts of interest arising out of his lease arrangements with NPP. For example, as stated above, Mr. Handlos is leasing various swine production assets of NPP with the option to purchase the assets at the end of the lease term (which is believed to be May or June, 2013). These farms will, like similar farms, require expensive repairs and maintenance. Mr. Handlos, as sole managing partner, will have to decide if NPP should spend its own money to provide such repairs and maintenance to farms leased by Mr. Handlos, or if the tenant, Mr. Handlos, should be required to spend his own money for the required repairs and maintenance. To this end, Mr. Handlos has installed himself as the sole director of South Harlan, LLC. South Harlan, LLC, which is wholly owned by NPP, leases such property to Handlos. In this and many other matters, Mr. Handlos has inherent and irreconcilable conflicts of interest, and his actions demonstrate that he has already begun to prefer his own personal interests over the interests of NPP's creditors. See Written Consent of the Sole Member of South Harlan LLC, attached hereto as Exhibit G.

20. Another such action is Mr. Handlos' role in making NPP proceed with the sale of a different NPP swine farrowing facility owned by an NPP subsidiary called North Harlan, LLC (the "North Harlan Farm"). The lessor of the North Harlan Farm is Southwest Pork, LLC, which is partially owned (directly or indirectly) and managed by AMVC, LLC or its principals.

8

AMVC, LLC, a swine management and veterinary consulting firm located in Audubon, Iowa, is

also under contract to NPP to provide day to day management of NPP's business affairs,

including all accounting records and financial reporting.   Upon information and belief, Mr.

Handlos and AMVC failed to follow the required appraisal procedures provided in the lease by

which the North Harlan Farm would be sold to Southwest Pork. After NPP and Southwest Pork

could not agree on a price for the North Harlan Farm, NPP had the first appraisal of the North

Harlan Farm completed by James VanDerWerff, a licensed appraiser with Farmers National

Company, in December 2012. The first appraisal assigned a value of $4.48 million to the North

Harlan Farm.   Southwest Pork then had an appraisal completed dated February 10, 2012 that

assigned a value of only $3.5 million to the North Harlan Farm. Per the option provisions in the

lease, since the first two appraisals were too far apart, the two appraisers who conducted the NPP

and Southwest Pork appraisals were to select a third appraiser. Attached as Exhibit H is a sworn

affidavit in which Mr. VanDerWerff states that he has not participated with any other licensed

appraiser as to the selection of a third licensed appraiser to conduct another appraisal of the

North Harlan Farm (referred to in his affidavit as the "Farrowing Farm"). Mr. VanDerWerff also

states in his affidavit that he has not been contacted or consulted by another licensed appraiser

regarding the North Harlan Farm or the basis of his appraisal of the North Harlan Farm.  See

Exhibit H. Within three weeks after the removal of Messrs. Beach and Schmitz, the resignation

of Mr. Burge, and the installation of Mr. Handlos as the sole managing partner of NPP, AMVC,

the company that runs the day to day operations of NPP for Mr. Handlos and also has financial

interests in Southwest Pork, selected (apparently with Mr. Handlos' consent) a third appraiser

without following the provisions of the NPP-Southwest Pork lease.  That appraiser, in a report

directed only to Southwest Pork and AMVC dated May 18, 2012, valued the North Harlan Farm

at $3.8 million, $300,000 higher than the Southwest Pork appraisal and $680,000 less than the

NPP appraisal. Attached as Exhibit I is an email dated June 27, 2012, from NPP's counsel to the

IC Committee's counsel indicating that the third appraiser was "designated by the other 2

appraisers". The IC Committee can only assume that this inaccurate statement was provided by

Mr. Handlos to NPP's counsel. See Letter to John Pietila dated August 9. 2012, attached hereto

as Exhibit J.

21.    Mr. Handlos has an option on another NPP farrowing farm and two gilt

development farms that includes the same appraisal process as that in the North Harlan Farm

lease. A more direct conflict of interest cannot be imagined. Not only would Mr. Handlos be

picking all the appraisers in the appraisal process set forth in the lease, he has also created a

potentially comparable sale in the North Harlan Farm that would drive down the value of the

farms upon which he has purchase options.

22.    Upon information and belief, Handlos has also failed to notify NPP's other

lenders of his actions, which resulted in a change of control of NPP. Such failure would, upon

information and belief, be a violation of NPP's agreements with such lenders, and impacts such

lenders' willingness to continue to work with NPP throughout its liquidation.

## COUNT I – BREACH OF FIDUCIARY DUTY

23.    Plaintiff hereby restates and realleges paragraphs 1 through 22 as if fully set forth

herein.

24.    Handlos, in his capacity as the sole managing partner of NPP, owes the IC

Committee, which represents the interests of NPP's creditors the SIA parties, a fiduciary duty.

10

25.    Handlos' actions to exploit NPP's assets for his personal gain are a breach of the fiduciary duty he owes to NPP and, in turn, its creditors, the SIA Parties, who are represented by the IC Committee.

26.    Furthermore, Handlos's many failures to act to proceed with the orderly liquidation of NPP is a breach of his fiduciary duty to NPP's creditors, which include the SIA Parties who are represented by the IC Committee.

27.    The SIA Parties have been damaged in that they have not received the payment that was due and owing as of April 23, 2012. Further, as discussed above, Mr. Handlos has caused NPP to stop negotiations with potential buyers of NPP property and with each day that passes, NPP's property values deteriorate to the detriment of NPP's creditors, including the SIA Parties.

**WHEREFORE,** Plaintiff IC Committee respectfully requests this Court enter an judgment against Lawrence Handlos and in favor of the IC Committee (and the SIA Parties that it represents) for breach of fiduciary duty. Plaintiff IC Committee further respectfully requests such other and further relief as the Court deems necessary under the circumstances.

## JURY DEMAND

Plaintiff hereby demands that the claims stated herein be tried to a jury.

11

Rebecca A. Brommel, AT0001235
Louis E. Ebinger, AT0009857

BROWN, WINICK, GRAVES, GROSS,
BASKERVILLE AND SCHOENEBAUM, P.L.C.
666 Grand Avenue, Suite 2000
Des Moines, IA 50309-2510
Telephone:  515-242-2400
Facsimile:  515-323-8552
E-mail:  brommel@brownwinick.com
E-mail:  ebinger@brownwinick.com

ATTORNEYS FOR PLAINTIFF

12